Jeffrey S. Ratliff
RANSOM, GILBERTSON,
MARTIN & RATLIFF, LLP
8401 NE Halsey Street Suite 208
Portland, OR 97220
T: 503-226-3664
F: 503-243-6716
rgmr1500@gmail.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

| | |
|---|---|
| ROBERT SOLIS, Individually and on behalf of all others similarly situated, | Case No: |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| v. | JURY TRIAL DEMANDED |
| LEXINFINTECH HOLDINGS LTD., JAY WENJIE XIAO, and CRAIG YAN ZENG, | |
| Defendants. | |

Plaintiff Robert Solis ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding LexinFintech Holdings Ltd. ("LexinFintech" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1 - CIVIL CLASS ACTION COMPLAINT

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded LexinFintech securities between April 30, 2019 and August 24, 2020, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased LexinFintech securities during the Class Period and was economically damaged thereby.

7.      Defendant LexinFintech through its subsidiaries, purports to operate as an online consumer finance platform for young professionals in the People's Republic of China. The Company operates Fenqile.com, a retail and online consumer finance platform that offers installment purchase loans, personal installment loans, and other loan products, as well as provides online direct sales with installment payment terms; and Le Card, a membership platform, which offers savings, benefits, and membership privileges to food and beverage, apparel, hospitality, and leisure sectors. LexinFintech is incorporated in the Cayman Islands with headquarters in Shenzen, PRC. LexinFintech's securities trade on NASDAQ under the ticker symbol "LX."

8.      Defendant Jay Wenjie Xiao ("Xiao") has served as the Company's Chief Executive Officer ("CEO") throughout the Class Period.

9.      Defendant Craig Yan Zeng ("Zeng") has served as the Company's Chief Financial Officer ("CFO") from April 2010 until June 1, 2020.

10.     Defendants Xiao and Zeng are collectively referred to herein as the "Individual Defendants."

11.     Each of the Individual Defendants:

        (a)     directly participated in the management of the Company;

        (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

        (c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

12.     LexinFintech is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to LexinFintech under *respondeat superior* and agency principles.

14.     Defendants LexinFintech and the Individual Defendants are collectively referred to herein as "Defendants."

**SUBSTANTIVE ALLEGATIONS**
**Materially False and Misleading**
**Statements Issued During the Class Period**

15.     On April 30, 2019, the Company filed its annual report on Form 20-F for the year ended December 31, 2018 with the SEC (the "2018 20-F"). The 2018 20-F was signed by Defendant Xiao. The 2018 20-F contained signed certifications by Defendants Xiao and Zeng pursuant to

the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of financial reporting, the

disclosure of any material changes to the Company's internal controls over financial reporting,

and the disclosure of all fraud.

16.     The 2018 20-F stated the following concerning the Company's off-balance sheet loans,

downplaying their riskiness:

>   (a)  *Loans funded by individual investors on Juzi Licai after April 24, 2018*
>
>   On April 24, 2018, we made some adjustments to our business model for new
>   loans funded by individual investors on *Juzi Licai* (the "Juzi New Model"). Under
>   the Juzi New Model, our roles include (1) matching the borrowing requests from
>   the borrowers with the individual investors on *Juzi Licai*, (2) processing monthly
>   repayment from the borrowers according to the terms of the Underlying Loan
>   Agreements through third-party custodian bank accounts, and (3) providing
>   ongoing management services to individual investors over the terms of respective
>   Investment Programs.
>
>   Under the Juzi New Model, we act as an intermediary between the borrower and
>   the individual investors. Pursuant to the Underlying Loan Agreement and the
>   Investment Programs, the individual investors are entitled to all the interests
>   generated from the underlying loans. Such interests are not generated until the
>   lending relationship has been established between the borrowers and the
>   individual investors, as the lenders, upon entering into the Underlying Loan
>   Agreements. The existing individual investors cannot exit from any outstanding
>   lending relationship unless the underlying loan is fully repaid by the borrower or
>   the outstanding loan principal with the remaining term is successfully re-matched
>   with other individual investors. We provide ongoing matching and re-matching
>   services to individual investors over the terms of respective Investment Programs
>   while it does not have any obligations to ensure such successful re-matching.
>
>   We conclude that under the terms of the Underlying Loan Agreements and the
>   Investment Programs under the Juzi New Model, we are not the legal lender or
>   borrower in the loan origination and repayment process. Accordingly, we do not
>   record financing receivables arising from these loans nor funding debts to the
>   individual investors.
>
>   ·           Risk safeguard scheme on *Juzi Licai*
>
>   Under the Juzi New Model, we have ceased offering the QAP for loans funded by
>   the individual investors on *Juzi Licai*. Instead, we entered into a cooperation
>   agreement with an independent third-party guarantee company (the "Guarantee
>   Company"), to set up a new investor protection program called the Risk

Safeguard Scheme ("RSS"). The purpose of the RSS is to provide make-up payments to the individual investors on *Juzi Licai* when the borrowers default. The RSS only applies to loans newly funded under the Juzi New Model, and requires the borrowers to contribute to the RSS to protect the individual investors. By default, all borrowers enroll in the RSS when the Underlying Loan Agreements are entered into.

Pursuant to the Underlying Loan Agreement, the borrower agrees to enroll in the RSS and pay the guarantee fee (the "Guarantee Fee") into the guarantee fund special account ("Risk Safeguard Fund") and the relevant guarantee service fees to the Guarantee Company. Accordingly, a certain amount of each monthly repayment from the borrowers, equal to a certain percentage of the outstanding principal balance of each loan, shall be transferred to the Risk Safeguard Fund. We have the discretion in determining the percentage, i.e. the amount of the Guarantee Fee, to be paid by the participating borrowers. The amount of make-up payments is limited to the available balance of the Risk Safeguard Fund. If the Risk Safeguard Fund become insufficient to pay back all individual investors with defaulted loans, these individual investors will be repaid on a pro rata basis, and their outstanding unpaid loans will be deferred to the next time the Risk Safeguard Fund are replenished, at which time a distribution will again be made to all individual investors with those defaulted loans. The participation of the Risk Safeguard Fund is not refundable, even if there is no default of loans. Therefore, we concluded that we are the primary obligor in providing the guarantee services and record our obligations associated with the RSS in accordance with Accounting Standards Codification ("ASC") 460, *Guarantees*. The balance of Risk Safeguard Fund is recorded as "Restricted Cash" on our consolidated balance sheets.

*(b)  Loans funded by certain other institutional funding partners such as third-party commercial banks or consumer finance companies*

For the loans funded by the proceeds from certain other institutional funding partners such as third-party commercial banks or consumer finance companies, each underlying loan and borrower has to be approved by the third-party commercial banks or consumer finance companies individually. Once the loan is approved by and originated by the third-party commercial bank or consumer finance company, the fund is provided by the third-party commercial bank or consumer finance company to the borrower and a lending relationship between the borrower and the third-party commercial bank or consumer finance company is established through a loan agreement. Effectively, we offer loan facilitation and matching services to the borrowers who have credit needs and the commercial banks or consumer finance companies who originate loans directly to borrowers referred by us. We continue to provide account maintenance, collection, and payment processing services to the borrowers over the term of the loan agreement. At the same time, we also provide a financial guarantee on the principal and the accrued interest repayment of the defaulted loans in case of

borrowers' defaults, and full interest repayment in the event that borrowers early repay their loans. Under this scenario, we determine that we are not the legal lender or borrower in the loan origination and repayment process. Accordingly, we do not record financing receivables arising from these loans nor funding debts to the third-party commercial banks or consumer finance companies. Separately, we account for the financial guarantee provided.

17.    The 2019 20-F reported the following concerning delinquency rates:

We define delinquency rate as outstanding principal balance of loans that were 1 to 29, 30 to 59, 60 to 89 and 90 to 179 calendar days past due as a percentage of the total outstanding principal balance of the loans on our platform as of a specific date. Loans that are delinquent for 180 days or more are charged off.

The following table provides our delinquency rates for all loans (including on- and off-balance sheet loans) as of December 31, 2016, 2017 and 2018:

|  | Delinquent for | | | |
|  | 1 - 29 days | 30 - 59 days | 60 - 89 days | 90 - 179 days |
|---|---|---|---|---|
| December 31, 2016 | 1.32% | 0.55% | 0.43% | 0.84% |
| December 31, 2017 | 1.55% | 0.56% | 0.45% | 1.14% |
| December 31, 2018 | 1.28% | 0.69% | 0.52% | 1.41% |

The following table provides our delinquency rates for installment purchase loans that were outstanding as of December 31, 2016, 2017 and 2018:

|  | Delinquent for | | | |
|  | 1 - 29 days | 30 - 59 days | 60 - 89 days | 90 - 179 days |
|---|---|---|---|---|
| December 31, 2016 | 0.79% | 0.37% | 0.34% | 0.85% |
| December 31, 2017 | 0.79% | 0.25% | 0.18% | 0.62% |
| December 31, 2018 | 0.51% | 0.28% | 0.21% | 0.68% |

The following table provides our delinquency rates for personal installment loans that were outstanding as of December 31, 2016, 2017 and 2018:

|  | Delinquent for | | | |
|  | 1 - 29 days | 30 - 59 days | 60 - 89 days | 90 - 179 days |
|---|---|---|---|---|
| December 31, 2016 | 1.46% | 0.59% | 0.45% | 0.84% |
| December 31, 2017 | 1.63% | 0.59% | 0.47% | 1.20% |
| December 31, 2018 | 1.32% | 0.71% | 0.53% | 1.45% |

18.    The 2018 20-F stated the following concerning the Company's registered users:

From our inception in August 2013 through the end of 2018, we originated loans to over 7.2 million users on a cumulative basis. In 2016, 2017 and 2018, we

originated loans to approximately 3.0 million, 4.1 million and 4.9 million active users through our platform, representing a compound annual growth rate, or CAGR, of 28%. Our online consumer finance platform features a high proportion of repeat users. Of all active users on our platform in 2016, 2017 and 2018, approximately 74%, 80% and 80%, respectively, were repeat users who had made at least one transaction on our platform before in the same year or in the previous year. As of December 31, 2018, we had over 10.5 million users with an approved credit line and over 37.3 million registered users.

19.    As to internal controls, the 2018 20-F stated that "management has concluded that our internal control over financial reporting was effective as of December 31, 2018."

20.    On April 30, 2020, the Company filed its annual report on Form 20-F for the year ended December 31, 2019 with the SEC (the "2019 20-F"). The 2019 20-F was signed by Defendant Xiao. The 2019 20-F contained signed SOX certifications by Defendants Xiao and Zeng attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

21.    The 2019 20-F stated the following concerning the Company's off-balance sheet loans, downplaying their riskiness:

(a)  Loans funded by certain Institutional Funding Partners such as third-party commercial banks or consumer finance companies

For loans funded by the proceeds from certain Institutional Funding Partners such as third-party commercial banks or consumer finance companies, each underlying loan and Borrower has to be approved by the third-party commercial banks or consumer finance companies individually. Once the loan is approved by and originated by the third-party commercial bank or consumer finance company, the fund is provided by the third-party commercial bank or consumer finance company to the Borrower and a lending relationship between the Borrower and the third-party commercial bank or consumer finance company is established through a loan agreement. Effectively, the Group offers loan facilitation and matching services to the Borrowers who have credit needs and the commercial banks or consumer finance companies who originate loans directly to Borrowers referred by the Group. The Group continues to provide account maintenance and payment processing services to the Borrowers over the term of the loan agreement. Under this scenario, the Group determines that it is not the legal lender or borrower in the loan origination and repayment process. Accordingly,

the Group does not record financing receivables arising from these loans nor Funding Debts to the Institutional Funding Partners.

(b)  Loans funded by the Individual Investors on Juzi Licai under the New Model (as defined hereinafter)

In late April 2018, the Group made some adjustments to its business model for new loans funded by the Individual Investors on Juzi Licai (the "New Model", and the "Old Model" refers to the business model of Juzi Licai before such adjustments). Under the New Model, the Group's roles include: (1) matching the borrowing requests from the Borrowers with the Individual Investors on Juzi Licai, (2) processing monthly repayment from the Borrowers according to the terms of the Underlying Loan Agreements through third-party custodian bank accounts, and (3) providing ongoing management services to the Individual Investors over the terms of respective Investment Programs.

Under the New Model, the Group acts as an intermediary between the Borrower and the Individual Investors. Pursuant to the Underlying Loan Agreement and the Investment Programs, the Individual Investors are entitled to all the interests generated from the underlying loans. Such interests are not generated until the lending relationship has been established between the Borrowers and the Individual Investors, as the lenders, upon entering into the Underlying Loan Agreements. The existing Individual Investor cannot exit from any lending relationship of outstanding loan unless the underlying loan is fully repaid or the outstanding loan principal with the remaining term is successfully re-matched with other Individual Investors. The Group provides ongoing matching and re-matching services to the Individual Investors over the terms of respective Investment Programs while it does not have any obligations to ensure such successful re-matching.

The Group considers the terms of the Underlying Loan Agreements and the Investment Programs under the New Model and concludes that the Group is not the legal lender or borrower in the loan origination and repayment process. Accordingly, the Group does not record financing receivables arising from these loans nor Funding Debts to the Individual Investors.

The balances of funds payable to Individual Investors represent the investment funds received from the Individual Investors on Juzi Licai under the New Model but not yet matched with and transferred to the Borrowers due to the settlement time lag.

Risk safeguard scheme on Juzi Licai

Under the New Model, the Group entered into a cooperation agreement with an independent third-party guarantee company (the "Guarantee Company"), to set up a new investor protection program called the Risk Safeguard Scheme ("RSS").

The purpose of the RSS is to provide make-up payments to the Individual Investors on Juzi Licai when the Borrowers default. The RSS only applies to loans newly funded under the New Model, and requires the Borrowers to contribute to the RSS to protect the Individual Investors. By default, all Borrowers enroll in the RSS when the Underlying Loan Agreements are entered into.

Pursuant to the Underlying Loan Agreement, the Borrower agrees to enroll in the RSS and pay the guarantee fee (the "Guarantee Fee") into the guarantee fund special account ("Risk Safeguard Fund") and the relevant guarantee service fees to the Guarantee Company. Accordingly, a certain amount of each monthly repayment from the Borrowers, equal to a certain percentage of the outstanding principal balance of each loan, shall be transferred to the Risk Safeguard Fund. The Group has the discretion in determining the percentage, i.e. the amount of the Guarantee Fee, to be paid by the participating Borrowers. The amount of make-up payments is limited to the available balance of the Risk Safeguard Fund. If the Risk Safeguard Fund become insufficient to pay back all Individual Investors with defaulted loans, these Individual Investors will be repaid on a pro rata basis, and their outstanding unpaid loans will be deferred to the next time the Risk Safeguard Fund are replenished, at which time a distribution will again be made to all Individual Investors with those defaulted loans. The participation of the Risk Safeguard Fund is not refundable, even if there is no default of loans. Therefore, the Group concluded that it is the primary obligor in providing the guarantee services and records its obligations associated with the RSS in accordance with ASC 460, Guarantees as discussed in Note 2(l). The balance of Risk Safeguard Fund is recorded as "Restricted cash" on the Consolidated Balance Sheets.

22.     The 2019 20-F stated the following concerning the Company's peer-to-peer lending

practices:

Funds payable to Individual Investors decreased by 20.9% from RMB782 million as of December 31, 2018 to RMB619 million (US$88.9 million) as of December 31, 2019. *The decrease was due to the fact that we have gradually shifted our business model away from individual funding* and *ceased facilitating new loans with funding from individual investors on Juzi Licai since November 2019 in order to fully comply with the requirements of the PRC regulatory authorities.* See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—We may be forced to terminate our online lending information intermediary services if we fail to complete the record-filing for our online lending information intermediary services. We may also be required to gradually reduce the balance of loans on *Juzi Licai*."

(Emphasis added.)

23.     The 2019 20-F reported the following concerning delinquency rates:

We define delinquency rates as outstanding principal balance of on- and off-balance sheet loans that were 1 to 29, 30 to 59, 60 to 89, 90 to 179 calendar days past due as a percentage of the total outstanding principal balance of on- and off-balance sheet loans on our platform as of a specific date. Loans that are delinquent for 180 days or more are charged off and are not included in the delinquency rate calculation. We do not distinguish on the basis of the on- or off-balance sheet treatment in monitoring the credit risks of borrowers and the delinquency status of loans.

The following table provides our delinquency rates for all loans (including on- and off-balance sheet loans) as of December 31, 2017, 2018 and 2019:

|  | Delinquent for | | | |
| --- | --- | --- | --- | --- |
|  | 1 - 29 days | 30 - 59 days | 60 - 89 days | 90 - 179 days |
| December 31, 2017 | 1.55% | 0.56% | 0.45% | 1.14% |
| December 31, 2018 | 1.28% | 0.69% | 0.52% | 1.41% |
| December 31, 2019 | 1.75% | 1.12% | 0.77% | 1.56% |

The following table provides our delinquency rates for installment purchase loans that were outstanding as of December 31, 2017, 2018 and 2019:

|  | Delinquent for | | | |
| --- | --- | --- | --- | --- |
|  | 1 - 29 days | 30 - 59 days | 60 - 89 days | 90 - 179 days |
| December 31, 2017 | 0.79% | 0.25% | 0.18% | 0.62% |
| December 31, 2018 | 0.51% | 0.28% | 0.21% | 0.68% |
| December 31, 2019 | 1.03% | 0.69% | 0.47% | 1.02% |

The following table provides our delinquency rates for personal installment loans that were outstanding as of December 31, 2017, 2018 and 2019:

|  | Delinquent for | | | |
| --- | --- | --- | --- | --- |
|  | 1 - 29 days | 30 - 59 days | 60 - 89 days | 90 - 179 days |
| December 31, 2017 | 1.63% | 0.59% | 0.47% | 1.20% |
| December 31, 2018 | 1.32% | 0.71% | 0.53% | 1.45% |
| December 31, 2019 | 1.78% | 1.14% | 0.78% | 1.58% |

24.    The 2019 20-F stated the following concerning the Company's registered users:

From our inception in August 2013 through the end of 2019, we originated loans to over 13.3 million users on a cumulative basis. In 2017, 2018 and 2019, we originated loans to approximately 4.1 million, 4.9 million and 9.9 million active users through our platform, representing a compound annual growth rate, or CAGR, of 55.4%. Our online consumer finance platform features a high proportion of repeat users. Of all active users on our platform in 2017, 2018 and 2019, approximately 80%, 80% and 81%, respectively, were repeat users who had

made at least one transaction on our platform before in the same year or in the previous year. As of December 31, 2019, we had over 19.4 million users with an approved credit line and over 73.3 million registered users.

25.     As to internal controls, the 2019 20-F stated that "management has concluded that our internal control over financial reporting was effective as of December 31, 2019."

26.     The statements contained in ¶¶15-25 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) LexinFintech reported artificially low delinquency rates by giving borrowers in default new funds to make payments; (2) the Company's business model exposes shareholders to enormous losses by prioritizing Chinese lenders for off-balance sheet loans;  (3) the Company exaggerated its user base; (4) the Company was facilitating direct peer to peer lending contrary to Chinese law; (5) the Company engaged in undisclosed related party transactions; (6) the Company lacked adequate internal controls; and (7) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

27.     On August 25, 2020, Grizzly Research published a report describing, among other things, how the Company: (i) reports artificially low delinquency rates by giving borrowers in default new funds to make payments; (ii) has a business model that exposes shareholders to enormous losses; (iii) was still conducting direct peer to peer lending despite claiming otherwise, (iv) lacked internal controls; and (v) conducted undisclosed related party transactions.

28.   The report alleged that the Company had accumulated a giant off-balance sheet loan book that was guaranteed by shareholders, stating, in pertinent part:

> Since 2018, LX has been shifting to off-balance sheet loans by facilitating loans between its customers and institutional funding partners. This is the main driver of the company's revenue growth in the past two years.
>
> *      *      *
>
> We believe the increase in the off-balance sheet loans outstanding makes it hard for investors to gauge what kind of risks are associated with these loans. Although the risk prole of the on-balance-sheet loans might not be the same for the off-balance sheet loans, we believe it is a good proxy for investors to get a general idea of how the risk profile has shifted in the last two years.

| | 2016 | 2017 | 2,018 | 2,019 | | 2016 | 2017 | 2,018 | 2,019 |
|---|---|---|---|---|---|---|---|---|---|
| Risk level: | | | | | | | | | |
| A | 2,575,784 | 3,078,483 | 1,544,637 | 996,524 | | 33.4% | 25.6% | 22.7% | 20.8% |
| B | 1,296,013 | 2,235,552 | 1,502,681 | 1,023,490 | | 16.8% | 18.6% | 22.1% | 21.4% |
| C | 2,455,076 | 2,890,202 | 1,447,785 | 661,688 | | 31.8% | 24.1% | 21.3% | 13.8% |
| D | 892,322 | 2,714,510 | 1,359,982 | 856,633 | | 11.6% | 22.6% | 20.0% | 17.9% |
| E | 206,164 | 807,290 | 308,528 | 625,700 | | 2.7% | 6.7% | 4.5% | 13.1% |
| F | 67,973 | 170,335 | 318,276 | 399,073 | | 0.9% | 1.4% | 4.7% | 8.3% |
| N and others | 218,540 | 116,078 | 325,817 | 221,925 | | 2.8% | 1.0% | 4.8% | 4.6% |
| Total | 7,711,872 | 12,012,450 | 6,807,706 | 4,785,033 | | 100.0% | 100.0% | 100.0% | 100.0% |

note: per company's filing, the key factors we consider in determining the credit risk level of each customer include: 1) Geographic location, for example, whether the customer is located in a first-tier, second-tier or third-tier city, and the level of economic development of the relevant city; 2) Education background, i.e., the customer's academic degree and past or current education institutions; 3) Level of income; 4) Outstanding loans from other external sources, such as credit card issuers and other consumer finance platforms; and 5) External credit references. Risk Level A has the highest credit rank.

> Above is the table that summarizes the company's net record investment of the financing receivables, by credit quality indicator, from 2016 to 2019.
>
> It is evident that the percentage of loans from risk levels D and below increased dramatically from 2016 to 2019. To put into perspective, the total percentage of loans from risk levels D, E, F and N and others increased from 18.0% in 2016 to 44.0% in 2019.
>
> Typically, it would make sense for the company to put relatively better loans in terms of risk on its own balance sheet and put the loans that are riskier off its balance sheet. Thus, it is reasonable to assume the risk profile of the loans that are off-balance sheet is as least as bad as what is shown on its balance sheet.
>
> *      *      *
>
> We believe LX's business model is widely misunderstood. Investors seem to be largely unaware that, even if the majority of the company's loans outstanding are off-balance sheet, it still needs to provide protection for a lot of these loans.
>
> • For the off-balance sheet loans funded by the individual investors on Juzi Licai, **LX provides a risk safeguard scheme** to the individual investors

and records the obligations associated with the RSS in accordance with ASC 460, Guarantees.

• For the off-balance sheet loans funded by certain Institutional Funding Partners, **LX provides deposits and replenishes such deposits** from time to time to the institutional funding partners by directly compensating them for principal and interest payment in the event of the borrowers' defaults, which are accounted for as guarantee liabilities under ASC 460, Guarantees, provided that the scope exception under ASC 815-10-15-58 is met.

We believe that LX's structure has exposed shareholders to giant off-balance sheet liabilities while protecting Chinese institutional investors. While in good times big leverage might work in your favor, it also exposes you to greater risk when the going gets rough. We believe the time has come for LX's scheme to unfold and it is only a question of time until the company must restructure or wipe out shareholders. Our belief is based on four key insights:

1. Recent guidelines issued by SPC and NDRC put significant downward pressure on the future usury hurdle. Under the newly proposed interest rate, LX's business will see a significant decrease in profits, if not a complete wipeout of business.

2. LX is essentially targeting low credit quality consumers in China. Even under current interest hurdle rates, LX's consumer lending platform seems to be predatory. There are countless complaints about usurious interest rates (36% apr is usury hurdle in China) and predatory collection practices. These consumers are likely unable to obtain credit from traditional financing methods.

3. The Corona Virus has forced many Chinese borrowers into delinquency. We believe the recent delinquency rates LX reports seem way too low and are utterly untrustworthy. This effect should disproportionally affect low-quality borrowers who are willing to pay the excessive interest rates LX charges.

**4. We observed that LX seems to extend and restructure loans to give the appearance of performance and current-ness of old loans where the borrower is actually delinquent or in default.**

Additionally, we have evidence that makes us strongly doubt the integrity of the financial statements in general and the legality of certain business practices in particular:

- LX seems to be still facilitating direct peer to peer lending, which is generally outlawed as illegal in China.

- Several employees of LX operate companies in the similar business as LX. We suspect these undisclosed related parties are used to inflate financials and conduct borderline illegal activities such as direct peer-to-peer lending and aggressive debt collections.

- Big restatements of past financials cast doubt on the integrity of financial statements.

> - Insiders are selling shares, and pocketing unordinary high
> compensations.

29.    The report provided evidence that the Company was selling direct peer to peer lending

products despite claiming otherwise:

> Despite what the company claimed, we discovered that LX is blatantly lying to
> the government and investors, and are continuing to offer P2P products on its Juzi
> Licai app (LX's P2P Mobile App). We are also quite amazed at how auditors
> neglected a red flag that was so easy to identify. All they had to do was to
> download the application and look at the product offerings. As of the date of this
> report, LX's Juzi Licai is still offering 8 products with interests ranging from 5%
> to over 10%. The products are sold daily at 10am every day. A variety of products
> are offered everyday at 10:00 Beijing Time.

> [image omitted]

> Each product has a detailed breakdown of the related transaction personnel
> involved, including whose loan was matched with whose money. For example, in
> this case, on July 8th, a person Surnamed Rong borrowed RMB 90,000 and
> received loans from over 2818 lenders.

> [image omitted]

> *Even as of today, we still see cases where peer loans are matched with peer
> lenders on the Juzi Licai platform, in the typical P2P finance fashion. It is
> mind-boggling that LX continues to sell P2P products under the current
> stringent regulatory environment. We believe this could cause a big backlash
> once the regulator determines to take action on this activity.*

> It seems LX is in clear violation of the current regulation from the city of
> Shenzhen, Guangdong Province. According to a media report, on December 7,
> 2018, the Shenzhen Internet Finance Association (a self-regulating body backed
> by the local government) issued a notice that put additional strict rules on the P2P
> sector.

> (Emphasis added.)

30.    The report also alleged that employees were holding equity interests in companies that

were undisclosed by Lexinfintech as subsidiaries:



During the research, we identified at least five companies that are owned by individuals who we believe are related to LX.

We obtained SAIC filing on the above companies and discovered that only Beihai Jiguang had meaningful financials. The company generated 52m RMB in revenue in 2018, of which close to 20M RMB were from loan collection services provided most likely to LX. (Note that there were no costs associated with the additional 20M revenue.) It's as if the company gave this money to Beihai Jiguang for free.

The parent company Beihai Caidan lists www.mycaidan.com as their official website. The website is no longer functional as of the date of this report. However, wayback archive suggests that the website previously hosted MMM Finance (MMM互助金融平台). In 2016, Chinese Central Bank warned investors to not participate in MMM Finance. Due to the website's previous involvement in MMM Finance, we do not believe this related party to be a credible company. We suspect this is one of the reasons why the company was not disclosed as a related party.

[image omitted.]

16 - CIVIL CLASS ACTION COMPLAINT

Three individuals own Beihai Caidan E-Commerce Co., Ltd ("Beihai Caidan"), which has another 4 subsidiaries. Those individuals are YANG Tao (50%), YUAN Kai (25%), and Ma Ming (25%). YANG Tao is also the legal representative of Beihai Caidan.

On LX's official website, YANG Tao was listed as the company's Vice President.

[image omitted.]

With the employee being legal representative and combined 75% equity interest of Beihai Caidan (along with its 4 subsidiaries) owned by its employees, we believe it is reasonable to say that LX has the ultimate control over Beihai Caidan. According to the introduction on Beihai Caidan's business per SAIC filings, it includes:

> *Commerce information consulting services, e-commerce information consulting services, electronic and network electronic product development, technological consulting, technological services, technological promotion and transfer. Enterprise information consulting service, etc.*

These business descriptions share similarities to LX's consumer financing lending business and we highly suspect there are undisclosed related party transactions between these two parties.

31.     The report also alleges that the Company entered into an undisclosed related party transaction with the Chairman's relative:

> According to the SAIC information, Ji'an Microcredit was established on December 2, 2016, and it was 100% owned by one of LX's subsidiaries until May 8, 2019, when a company called Jiangxi Leyu Technology Co., Ltd. (江西乐誉融科技有 限公司, "Jiangxi Leyu") became a 34% shareholder. There is limited information on Jiangxi Leyu, but we also found that there is another company called吉安奥聚讯信息咨询服务有限公司     (Ji'an     Aojuxun     Information Consulting Services Co., Ltd. "Ji'an Aojuxun"), which shares the same phone number (15079604902), email address (1913425305@qq.com), and both of the companies are on the 7th floor of the same building.

> Ji'an Aojuxun is 80% owned by an individual named XIAO Wenjuan, whose name is very similar to LX's Chairman and CEO, XIAO Wenjie. We strongly suspect this individual to be in fact the chairman's sister, and act as a proxy on his behalf. If true, this constitutes a clear violation of SEC disclosure guideline.

> We suspect the reason why XIAO Wenjuan (related to XIAO Wenjie) wants to control Ji'an Microcredit is that the microcredit lending business has a much lower regulatory risk. In November 2019, the National Fintech Risk Regulators

issued a notice that guides P2P companies to transforms to become microcredit lending companies. That means microcredit lending business, in regulator's views, is a lower risk sector than the P2P sector, and it appears to us that XIAO Wenjuan's move in May 2019 is to take advantage of this regulatory trend in advance.

We question why the management failed to disclose this transaction at the time. Was it due to favorable prices? Was it due to the family connection? We suspect both!

32.    The report further alleged that the Company was deflating its default and delinquency

ratios:

We believe LX has artificially deflated its default and delinquency ratio to give the appearance of a more healthy financial position.

We believe the LX has been artificially increasing the maturity of the loans upon default through a feature called "再分期", installment on installment and "最低还款服务", minimum payment. To put this into perspective, this is equivalent to when your minimum credit card payment comes due this month, the company gives another extension to your minimum payment and treat it as a new credit loan.

According to LX users, LX has recently been extending the maturity of their loans on the second day after they become delinquent. We believe the company has been secretly doing so for a long time.

One user applied for this extension on the third day of becoming delinquent. His loan balance suddenly spread out over 12 months.

[image omitted.]

This feature has been implemented by LX since 2016. **However, it was only used on loans that weren't delinquent. Now, most likely due to effects of COVID-19, the company has deployed this tactic on delinquent loans to generate a seemingly healthy loan portfolio**. The users don't have to pay back the amount immediately and the company no longer has to book delinquencies.
\*        \*        \*

However, there are some symptoms we can expect from this scheme.

**Overall High APR**

Note that in China, the legal upper limit of interest rate is separated into two tranches, 24% and 36%. For borrowers who have not repaid interest, the lender must not ask for an APR higher than 24%. The amount exceeding 24% will not be

18 - CIVIL CLASS ACTION COMPLAINT

protected by law. For borrowers who have already paid interest, borrowers can request the amount of interest exceeding APR of 36% to be returned.

LX's APR has been consistently over 24% in 2018Q4 and will likely continue to rise due lower asset credit qualities and the installment on installment scheme. This has been above the legal interest rate. Borrowers can refuse to pay such amounts. In other words, the increase of APR cannot go on.

Furthermore, the recent regulation in China will likely further limit the company's ability to charge excessive APR.

**Deteriorating Credit Performance**

Another symptom we can expect is the deterioration of credit performance measured by many factors, including vintage rate, charge-off rate, delinquency rate, and default rates. While some are more reliable than others, in the case of LX, we see deterioration in all metrics.

*Vintage Rate*
Vintage rate is defined as the amount of net delinquent loans during a period (vintage) to the total amount of loans originated during that same period. The metric is more reliable than the delinquency rate since delinquency rates can easily be manipulated by growth.

Below is the chart of LX's vintage rate up to Q2 2020. As we can see, the lines that are to the upper-left tend to be shorter than those to the lower left. The length of the line corresponds to the period of origination. Shorter lines indicate that less time has passed, thus corresponds to more recent periods, and longer lines correspond to more distant periods. *We see that newer vintages are having higher delinquency rates, indicating lower credit quality*.

[image omitted]

We see a taller vintage curve due to lower quality loans being packaged together into newer loans. As discussed below, a tall vintage curve indicates a recent deterioration of asset quality. *We believe as LX repackages delinquent loans and selling them to investors, they are postponing the inevitable delinquency into later periods.* This can already be seen in the changes in the vintage curve. We believe this trend will continue and that LX's loans will become even riskier.

(Emphasis added.)

33.    The report contained an analysis of the Company's web traffic, which cast significant

doubt on its purported growth:

Below is the Baidu index for LX's key consumer lending product Fenqile (分期乐) from the beginning of 2017 to May 21, 2020. One can easily see that in the past couple of years the index has rather at. This does not make sense given that the LX's registered users increased from 20.2M at IPO Source: Baidu Index to 84.2M as of March 2020, or approximately 300% in total.

We dare to ask: How does a company manage to grow by 3x when the website traffic on its main platform appears to be at or even declining?





Source: Baidu Index

34.    On this news, shares of LexinFintech stock fell $0.47 per share or 5.52% to close at $8.04 per share on August 25, 2020.

35.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

36.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired LexinFintech securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of LexinFintech, members of the Individual Defendants' immediate families and their

20 - CIVIL CLASS ACTION COMPLAINT

legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, LexinFintech securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

38.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

39.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business LexinFintech;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused LexinFintech to issue false and misleading SEC filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and SEC filing

- whether the prices of LexinFintech securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

41.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

42.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- LexinFintech shares met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient and automated market;

- As a public issuer, LexinFintech filed periodic public reports with the SEC and NASDAQ;

- LexinFintech regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination

of press releases via major newswire services and through other wide-ranging

public disclosures, such as communications with the financial press and other

similar reporting services; and

- LexinFintech was followed by a number of securities analysts employed by

  major brokerage firms who wrote reports that were widely distributed and

  publicly available.

43.    Based on the foregoing, the market for LexinFintech securities promptly digested current information regarding LexinFintech from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

44.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of

reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v.*

*United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class

Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

45.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

47.    During the Class Period, Defendants, individually and in concert, directly or indirectly,

disseminated or approved the false statements specified above, which they knew or deliberately

disregarded were misleading in that they contained misrepresentations and failed to disclose

material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading.

48.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of LexinFintech securities during the Class Period.

49.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of LexinFintech were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of LexinFintech, their control over, and/or receipt and/or modification of LexinFintech's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning LexinFintech, participated in the fraudulent scheme alleged herein.

50.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other LexinFintech personnel to members of the investing public, including Plaintiff and the Class.

51.     As a result of the foregoing, the market price of LexinFintech securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of LexinFintech securities during the Class Period in purchasing LexinFintech securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

52.     Had Plaintiff and the other members of the Class been aware that the market price of LexinFintech securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased LexinFintech securities at the artificially inflated prices that they did, or at all.

53.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

54.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of LexinFintech securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

55.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

56.     During the Class Period, the Individual Defendants participated in the operation and management of LexinFintech, and conducted and participated, directly and indirectly, in the

conduct of LexinFintech's business affairs. Because of their senior positions, they knew the adverse non-public information about LexinFintech's misstatement of revenue and profit and false financial statements.

57.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to LexinFintech's financial condition and results of operations, and to correct promptly any public statements issued by LexinFintech which had become materially false or misleading.

58.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which LexinFintech disseminated in the marketplace during the Class Period concerning LexinFintech's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause LexinFintech to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of LexinFintech within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of LexinFintech securities.

59.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by LexinFintech.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 9, 2020

By: _____

Jeffrey S. Ratliff
**RANSOM, GILBERTSON, MARTIN & RATLIFF, LLP**
8401 NE Halsey Street Suite 208
Portland, OR 97220
T: 503-226-3664

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
       lrosen@rosenlegal.com
*Counsel for Plaintiff*

**THE SCHALL LAW FIRM**
Brian Schall, Esq.
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Fax: (877) 590-0482
Email: brian@schallfirm.com
*Additional Counsel for Plaintiff*

27 - CIVIL CLASS ACTION COMPLAINT

DocuSign Envelope ID: F6424E5E-88FC-41E9-B5FE-8A6628AF0E1E

# CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the firm to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against LexinFintech Holdings Ltd. (NASDAQ: LX), and their current and former officers, and others in connection with the purchase and sale of securities issued by LexinFintech Holdings Ltd.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      I have reviewed a complaint against LexinFintech Holdings Ltd. and certain of their officers and directors and I authorize the filing of a comparable complaint on my behalf.

2.      I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the purchases and sales I have made in LexinFintech Holdings Ltd. securities during the Class Period set forth in the complaint. I have made no transactions during the class period in the securities that are the subject of this lawsuit except those set forth below.

         See Schedule A

5.      I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except for the following company(ies):

6.      I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this day ____9/9/2020_____ .

Signature: _____

Name: Robert Solis

**SCHEDULE A**

**ROBERT SOLIS**

CLASS PERIOD TRANSACTIONS

| PURCHASES | | | SALES | | |
|---|---|---|---|---|---|
| **DATE** | **SHARES** | **PRICE** | **DATE** | **SHARES** | **PRICE** |
| 6/10/2020 | 10 | $9.30 | | | |
| 5/26/2020 | 5 | $8.22 | | | |
| 5/20/2020 | 10 | $9.9861 | | | |
| 4/27/2020 | 45 | $8.2767 | | | |