POMERANTZ LLP
Tamar A. Weinrib
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
taweinrib@pomlaw.com

*Attorney for Plaintiff*

- additional counsel on signature page -

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

| | |
|---|---|
| IN RE LEXINFINTECH HOLDINGS LTD. SECURITIES LITIGATION | Case No. 3:20-cv-1562-SI<br><br>AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Matthew P. Castner ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC")

filings, wire and press releases published by and regarding LexinFintech Holdings Ltd. ("Lexin" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired: (a) Lexin American depositary shares ("ADSs") pursuant and/or traceable to the Company's initial public offering conducted on or about December 21, 2017 (the "IPO" or "Offering"); or (b) Lexin securities between December 21, 2017 and August 24, 2020, both dates inclusive (the "Class Period").  Plaintiff pursues claims against the Defendants under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Lexin was founded in 2013 and is headquartered in Shenzhen, the People's Republic of China ("China").  The Company was formerly known as Staging Finance Holding Ltd. and changed its name to LexinFintech Holdings Ltd. in March 2017.

3.      Lexin, through its subsidiaries, operates as an online consumer finance platform for young professionals in China, offering various loans and financial services to consumers.

4.      On November 13, 2017, Lexin filed a registration statement on Form F-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on December 20, 2017 (the "Registration Statement").

5.      On December 21, 2017, pursuant to the Registration Statement, Lexin's ADSs began trading on the NASDAQ Global Market ("NASDAQ") under the symbol "LX." That same day, Lexin filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement (collectively, the "Offering Documents").

6.      Pursuant to the Offering Documents, Lexin issued 12,000,000 of its ADSs, representing 24,000,000 of its Class A ordinary shares, to the public at the Offering price of $9.00 per share for approximate proceeds of $100,440,000 to the Company, after applicable underwriting discounts and commission.

7.      The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation. Additionally, throughout the Class Period, Defendants made materially false and misleading statements

3

regarding the Company's business, operational and compliance policies. Specifically, the Offering Documents and Defendants made false and/or misleading statements and/or failed to disclose that: (i) Lexin overstated its growth metrics; (ii) Lexin engaged in undisclosed related party transactions; (iii) following the COVID-19 pandemic, Lexin maintained low delinquency rates by providing borrowers in default new funds to make payments; (iv) Lexin continued facilitating peer to peer loans, despite a regulatory crackdown on peer to peer lending; (v) Lexin engaged in usury and harassment to spur its lending and collection growth; and (iv) as a result, the Offering Documents and the Company's public statements were materially false and/or misleading and failed to state information required to be stated therein.

8.     On August 25, 2020, shortly after markets opened, Grizzly Research ("Grizzly") issued a research report on Lexin alleging, among other issues, that the Company reported "unfathomably low" delinquency rates by providing borrowers in default new funds to make payments, that Lexin engaged in undisclosed related party transactions, that Lexin facilitated peer to peer lending even after representing that it has ceased doing so, and that Lexin charged usurious rates to borrowers and harassed borrowers friends and family when pursuing collection.  The Grizzly report further alleged that a review of Lexin's web traffic called into question the Company's purported growth.

9.      On this news, Lexin's ADS price fell $0.47 per share, or 5.52%, to close at $8.04 per share on August 25, 2020.

10.     As of the time this Complaint was filed, the price of Lexin ADSs continues to trade below the Offering price, damaging investors.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Lexin's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements entered, and the subsequent damages took place in, this Judicial District.  Pursuant to Lexin's most recent annual report on Form 20-F, as of December 31, 2019, there were 359,417,329 of the Company's ordinary shares

issued and outstanding, consisting of 258,690,272 Class A ordinary shares. Lexin's ADSs, each representing two of the Company's Class A ordinary shares, trade on the NASDAQ. Accordingly, there are presumably hundreds, if not thousands, of investors in Lexin's ADSs located within the U.S., some of whom undoubtedly reside in the State of New Jersey.

15.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.    Plaintiff, as set forth in the Certification previously filed with this Court, acquired Lexin ADSs pursuant and/or traceable to the Offering Documents issued in connection with the Company's IPO, and/or purchased or otherwise acquired Lexin securities at artificially inflated prices during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.    Defendant Lexin is organized under the laws of the Cayman Islands, with principal executive offices located at 27/F CES Tower, No. 3099 Keyuan South Road, Nanshan District, Shenzhen 518057, China. Lexin ADSs trade in an efficient market on the NASDAQ under the symbol "LX."

18.     Defendant Jay Wenjie Xiao ("Xiao") has served as Lexin's Chief Executive Officer and a Director of the Company at all relevant times.  Xiao signed or authorized the signing of the Offering Documents filed with the SEC.  At all relevant times, per the Company's SEC filings, Defendant Xiao has owned more than 50% of Lexin's total voting power and thus "controls" the Company.

19.     Defendant Craig Yan Zeng ("Zeng") has served as Lexin's Chief Financial Officer at all relevant times.  Zeng signed or authorized the signing of the Offering Documents filed with the SEC.

20.     Defendants Xiao and Zeng are sometimes referred to herein collectively as the "Exchange Act Individual Defendants."

21.     The Exchange Act Individual Defendants possessed the power and authority to control the contents of Lexin's SEC filings, press releases, and other market communications.  The Exchange Act Individual Defendants were provided with copies of Lexin's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Lexin, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and

misleading.  The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

22.    Lexin and the Exchange Act Individual Defendants are sometimes referred to herein collectively as the "Exchange Act Defendants."

23.    Defendant Keyi Chen ("Chen") served as a Director of Lexin at the time of the IPO.  Chen signed or authorized the signing of the Offering Documents filed with the SEC.

24.    Defendant Yibo Shao ("Shao") served as a Director of Lexin at the time of the IPO.  Shao signed or authorized the signing of the Offering Documents filed with the SEC.

25.    Defendant Jared Yi Wu ("Wu") served as a Director of Lexin at the time of the IPO.  Wu signed or authorized the signing of the Offering Documents filed with the SEC.

26.    Defendants Xiao, Zeng, Chen, Shao, and Wu are sometimes referred to herein collectively as the "Securities Act Individual Defendants."

27.    As directors, executive officers and/or major shareholders of the Company, the Securities Act Individual Defendants participated in the solicitation and sale of Lexin ADSs in the IPO for their own benefit and the benefit of Lexin. The Securities Act Individual Defendants were key members of the IPO working

group and executives of Lexin who pitched investors to purchase the shares sold in the IPO, including in IPO road shows.

28.    The Exchange Act Defendants and the Securities Act Individual Defendants are sometimes collectively, in whole or in part, referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

29.    Lexin was founded in 2013 and is headquartered in Shenzhen, China. The Company was formerly known as Staging Finance Holding Ltd. and changed its name to LexinFintech Holdings Ltd. in March 2017. On November 13, 2017, Lexin filed a registration statement on Form F-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on December 20, 2017 (the "Registration Statement").   On December 21, 2017, pursuant to the Registration Statement, Lexin's ADSs began trading on the NASDAQ under the symbol "LX."  That same day, Lexin filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement ("Offering Documents").  Pursuant to the Offering Documents, Lexin issued 12,000,000 of its ADSs, representing 24,000,000 of its Class A ordinary shares, to the public at the Offering price of $9.00 per share for

approximate proceeds of $100,440,000 to the Company, after applicable underwriting discounts and commission.

30.    Lexin, through its subsidiaries, operates as an online consumer finance platform for young professionals in China.  Lexin targets young adults in China, more specifically, students studying at tertiary institutions, recent graduates or those who recently entered the workplace.  The Company operates Fenqile.com, a retail and online consumer finance platform that offers installment purchase loans, personal installment loans, and other loan products, as well as provides online direct sales with installment payment terms. In addition, the Company operates Le Card, a membership platform that offers savings, benefits, and membership privileges to food and beverage, apparel, hospitality, and leisure sectors.  The Company also matches customer loans with diversified funding sources, including individual investors on its Juzi Licai online investment platform, third-party commercial banks, consumer finance companies, institutional funding partners in its direct lending programs, investors of its asset-backed securities, and other licensed financial institutions.  According to the Company, it utilizes technologies including big data, cloud computing and artificial intelligence to enable the near-instantaneous matching of user funding requests with offers from funding partners, which include commercial banks, consumer finance companies, and other licensed financial institutions.

## Related Party Transactions

31.    In the Offering Documents, and in annual 20-F filings thereafter, Defendants have purported to disclose all of Lexin's related party transactions. Indeed, SEC Regulations and Generally Accepted Accounting Principles ("GAAP")[1] required the Company to disclose all material related party transactions during the Class Period.

32.    Under Accounting Standards Codification ("ASC") No. 850, a public company's "[f]inancial statements shall include disclosures of material related party transactions." ASC 850-10-50-1. "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." ASC 850-10-05-3. "Affiliate" includes any company that is under common control or management with the public company. ASC 850-10-20. Management is defined as "[p]ersons who are responsible for achieving the objectives of the enterprise and who have the authority to establish policies and make decisions by which those objectives are to be pursued. Management normally includes members of the board

---

[1] GAAP are the standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. SEC rules and regulations require that publicly traded companies include financial statements that comply with GAAP in their annual and quarterly filings with the SEC. See § 13 of the Exchange Act (15 U.S.C. § 78m); Rule 10-01(d) of Regulation S-X (17 C.F.R. § 210.10-01(d)). SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

of directors, the chief executive officer, chief operating officer, vice presidents in charge of principal business functions (such as sales, administration, or finance), and other persons who perform similar policymaking functions. Persons without formal titles also may be members of management." ASC 850-10-20.

33.    According to GAAP, disclosures of related party transactions must include: (a) the nature of the relationship involved; (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements; (c) the dollar amount of transactions for each of the periods for which income statements are presented; and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. ASC 850-10-50-1.

34.    SEC Regulations also mandated disclosure of related party transactions at all relevant times. SEC Regulation S-K ("Reg. S-K"), together with the General Rules and Regulations under the Securities Act and Exchange Act and the Forms under these Acts, states the requirements applicable to the content of the non-financial statement portions of annual reports on Form 10-K, quarterly reports on Form 10-Q, and proxy statements on Form 14A. *See* 17 C.F.R. § 229.10. Item 404 of Reg. S-K ("Item 404") requires the disclosure of detailed information

concerning related-party transactions in which the amount [2] involved exceeds $120,000, including the names of the "related person" or entity participating in the transaction, the related person's interest in the transaction, including related person's position, relationship or ownership in the other entity that is a party to the transaction, and the amount involved in the transaction. *See* 17 C.F.R. § 229.404(a). A "related person" under Item 404 is defined to include any director or executive officer of the company, any nominee for director, any immediate family member of a director or executive officer of the registrant, or of any nominee for director, or any person who is known to the registrant to be the beneficial owner of more than five percent of any class of the registrant's voting securities (*i.e.*, a 5% or greater shareholder), or the immediate family member of such beneficial owner. *See* Instruction 1 to 17 C.F.R. § 229.404(a); 17 C.F.R. § 229.403(a).

35.    Although Defendants purported to disclose all material related party transactions in the Offering Documents and in its annual 20-F filings thereafter, Plaintiffs' investigation and the Grizzly Report have uncovered facts demonstrating that the Company engaged in additional related party transactions that Defendants did not disclose as SEC regulations and GAAP require. Specifically, the facts show

---

[2] The term "amount," when used in regard to securities, means the principal amount if relating to evidences of indebtedness, the number of shares if relating to shares, and the number of units if relating to any other kind of security. *See* 17 C.F.R. § 270.8b-2(a).

that several Lexin executives operate companies with which Lexin transacted to inflate the Company's financials and engage in improper lending activities.

36.     At least five companies are owned by individuals that are "related" to Lexin. These include Beihai Caidan Electronic E-Commerce Co., Ltd. ("Beihai Caidan"), and it's four subsidiaries, Beihai Tuling Information Technology Co., Ltd., Beihai Jiguang Information Technology Co., Ltd., Beihai Juzi Network Technology Co., Ltd., and Tianjin Lexin Insurance Agency Co., Ltd. A review of the records of China's State Administration of Industry and Commerce ("SAIC") for each of these companies reveals that only one, Beihai Jiguang, has any meaningful financials. Almost half of Beihai Jiguang's revenue is from loan collection services.

37.     Three individuals own Beihai Caidan: Yang Tao (50% owner), Yuan Kai (25% owner), and Ma Ming (25% owner). Yang Tao is also the legal representative of Beihai Caidan. On Lexin's website, Yang Tao was listed as the Company's Vice President. Yuan Kai is the legal representative for numerous branch offices of Shenzhen Fenqile, one of Lexin's main subsidiaries. In other words, with a combined 75% ownership, Yang Tao and Yuan Kai had ultimate control over Beihai Caidan and its subsidiaries at the same time as they held positions of control at Lexin.

38.     Moreover, Plaintiff's investigation uncovered that Beihai Caidan and Shenzehn Fenqile jointly own 8% and 92% of Tianjin Lexin Insurance, respectively.

*See* https://aiqicha.baidu.com/company_detail_32672727738694. Additionally, Beihai Juzi Network Technology is a copyright owner for the website of Lexin Caifu, a Lexin subsidiary.

39.    Defendants did not reveal any of the foregoing in its Offering Documents or in subsequent filings with the SEC.

40.    In addition to the undisclosed related party relationships with Beihai Caidan and its subsidiaries, Plaintiff's investigation confirmed that Defendants failed to disclose a transaction between related parties involving more than a third of one of Lexin's businesses, Ji'an Fenqile Network Microedit Co. Ltd.

41.    Specifically, according to SAIC records and the Chinese government-run database, The National Enterprise Credit Information Publicity System, Ji'an Microcredit was established on December 2, 2016, and was 100% owned by one of Lexin's subsidiaries until May 8, 2019, when a company called Jiangxi Leyu Rong Technology Co., Ltd. ("Jiangxi Leyu"), *another Lexin subsidiary*, became a 34% shareholder. Another company called Ji'an Aojuxun Information Consulting Services Co., Ltd. ("Ji'an Aojuxun"), shares the same phone number (15079604902), email address (1913425305@qq.com) with Jiangxi Leyu and both companies are on the 7th floor of the same building. Ji'an Aojuxun is 80% owned by Xiao Wenjuan, *an immediate family member of Defendant Xiao*.

**Lexin's Predatory Lending Practices and Questionable Growth Rate and**

42.     Unbeknownst to investors, predatory and usurious lending and collection practices have driven Lexin's revenue growth.  The legal usury rate in China is 36% per annum.  However, Fenqile charges interest rates over the legal limit according to numerous consumer complaints. *See* https://ts.21cn.com/.  For example, one borrower states:

> The borrowing amount reached RMB 30,000 plus between 2018 and 2020, and even if [I] borrowed RMB 35,000, and based on an annual interest rate of 24%, 1 year [I will have to pay] RMB 7,200, and it will be RMB 14,400 for two years. Adding the total annual interest payable of RMB 6,000 before 2018, the total interest [for me to pay] should only be about RMB 20,000. Now [Fenqile] is asking me to pay RMB 45,000, which means even if the principal of RMB 30,000 plus is paid off during these years, but the interest [on this principle] is RMB 45,000. This interest rate is much higher than the law-allowed red line, and it is usury of the usuries. During this period [I have] communicated with Fenqile's customer service and then they told me they would contact me, but they didn't. Now I am in delinquency, and if my credit is negatively affected, I will rely on the law to protect my rights…

*https://ts.21cn.com/tousu/show/id/2305472.*  Another borrower similarly described Lexin's usurious tactics:

> In the middle of 2016, one relative used my name to borrow RMB 30,000, and the actual borrowing [from Fenqile] is RMB 30,000. During this period my relative promised to pay it back, but he/she only paid in installments or minimum payback, and until now the total payback reached RMB 15,000. During this period, the debt collection parties phoned many of the contacts on my phone, and then I realized that the current balance payable increased to RMB 50,000. **I believe Fenqile belongs to usury, and it collects fees and uses the interest to grow interest under the name of installment fees.** Now I need to

negotiate with Fenqile to give me back the fees and reorganize the debt."

*https://ts.21cn.com/tousu/show/id/2306531.*

43.    Defendants' predatory tactics include harassing borrowers' contacts and family members as part of its collection strategy, causing injuries both economic and physical.  One borrower explained that:

> The outsourced loan collection company called many people in my contact list, even to my company. I have now been laid off due to this. **I tried to negotiate an installment but they didn't agree and continued to aggressively call everyone on my contact list**….

*https://ts.21cn.com/tousu/show/id/2339816.*  Another    borrower    described similar harassment:

> Fenqile sent me a lawyer letter on April 24th, I immediately added their WeChat account. I told them I repaid the money already. In addition, my credit report and Alipay account both do not have a record of loans outstanding. The other party asked me to log into Fenqile, but I couldn't. Due to work, I couldn't get off until 8 pm and couldn't reach out to customer service as well. **During this period, they contacted my family and told them about the loan issue.** My mother is almost 60 years old and has always been in poor health. Upon hearing the news, she was shocked and suffered health injuries. My father was injured as well. They also managed to call my father's new number. I don't know how they got that in the first place. I now demand Fenqile record an apology to my family and compensate my family accordingly.

*https://ts.21cn.com/tousu/show/id/2305293.*

44.    Moreover, Lexin has overstated its growth rate for registered users.  As of March 2020, Lexin reported that its registered user base had grown from approximately 20 million users at the time of the IPO to approximately 84 million.

Despite this claim of exponential growth, a review of the Baidu index for Fenqile for that same time frame (set forth in the picture below) shows that its web traffic remained flat, or even declined at points, which is entirely inconsistent with the amount of growth Defendants represented:



Source: Baidu Index

### Lexin's P2P Business

45.    Defendants shady business tactics did not end with their failure to fully report Lexin's related party transactions or misleading description of growth rates and strategies but extended to statements regarding its peer to peer lending business as well.  Peer to Peer ("P2P") lending enables individuals to obtain loans directly from other individuals, cutting out the financial institution as the middleman.  P2P lending websites, like Lexin's Juzi Licai platform, connect borrowers directly to investors.  Following the rapid and explosive growth of the P2P lending industry in China in a virtual regulatory vacuum, China began establishing a regulatory regime for P2P lending following a wave of scandals.

46.    Since July 2015, the Chinese government has been instituting regulations and enforcing more stringent oversight over P2P lending due to the high-risk nature of the business. The heavily intensified focus on regulating the P2P industry and a general governmental crackdown on high-risk financing has caused the close down of hundreds of P2P platforms since 2015. On December 7, 2018, the Shenzhen Internet Finance Association (a self-regulating body backed by the local government) issued a notice that put additional strict rules on the P2P sector. Specifically, the notice stated that P2P companies like Lexin should not increase the balance of loans outstanding, should not increase the number of individual investors on their platforms, and should decrease the number of individual investors. *Defendants acknowledged awareness of this notice in a press release issued on December 12, 2018*.

47.    Thereafter, Defendants represented that Lexin no longer facilitates new loans with funding from individual investors on its Juzi Licai platform.  For example, in Lexin's 20-F for 2019, Defendants stated that:

> Given the increasingly tightening trend of restrictions on online consumer financing, we have gradually shifted our business model away from individual funding and further diversified our funding sources in 2019 in line with regulatory guidance. *We have ceased facilitating new loans with funding from individual investors on Juzi Licai platform since November 2019.*

However, Lexin did not in fact stop facilitating P2P loans from individual investors.

Lexin continued to facilitate P2P loans, matching borrowers and individual lenders

on the Juzi Licai platform, raising a risk of regulatory scrutiny.  *See, e.g.*:



**Lexin Masked True Delinquency Rates During the COVID-19 Pandemic**

48.     For a Company like Lexin that lends to borrowers that do not qualify for loans from traditional banks and that pose a higher credit risk, delinquency rates are a significant metric to which investors pay particular heed. As the media heavily reported, the COVID-19 pandemic caused default rates at traditional banks to skyrocket as borrowers suffered severe economic downturns. For example, a March 29, 2020 article in *The Economic Times,* titled "A global consumer default wave is just getting started in China," reported that:

> **Consumer default rates at some banks have already increased to as high as 4% from about 1% before the outbreak**, according to Zhao Jian, head of Atlantis Financial Research, who cited a survey of lenders. An executive at one major Chinese bank said his firm is taking steps to **tighten credit card loans or even drop some clients after seeing a rapid increase in overdue payments**.

49.     Similarly, a March 22, 2020 article in the *Financial Times,* titled "China banks pump money into consumer loans," reported:

> Meanwhile, multiple local banks told the FT their **overdue personal loan ratio had surged by as much as 60 percent from January**, when the disease broke out….China Merchants Bank Co., paused on its credit-card business in March after a significant increase in past-due loans.
> \*\*\*
> The lending campaign, however, has raised concerns about credit risks because defaults have also taken off. Zhou Lifeng, chief risk officer at Hangzhou-based Sunyard Fintech, a consultancy that advises banks on risk management, said **his clients had seen an increase of between 20 percent and 50 percent in non-performing consumer loans since the disease emerged**.

50.    However, Lexin lends to borrowers that are characteristically subprime and higher risk borrowers that did not qualify for a traditional bank loan. Delinquency rates would therefore logically surpass those of a traditional bank. Indeed, from 2016 to 2019, Lexin's SEC filings reflect that the percentage of loans from higher risk levels D, E. F, N and others increased exponentially (Lexin rates its loans from "A" – "N and others," which the latter being the riskiest category and most likely to default. However, to mask its rising delinquency rates during the pandemic, Defendants engaged in practices such as artificially increasing the maturity of loans upon default through features called "installment on installment" and "minimum payment," which means the Company is not accurately booking delinquencies. Below is an example from one Lexin borrower:



Source: https://m.wdzj.com/intelligence/70422.html

**Management Compensation**

51.    Despite these machinations, from 2016 to 2019, Lexin's executive officer compensation (including Defendants Xiao, Zeng, and Wu) has grown from 4.6 RMB million to 28.1 RMB million.

**Materially False and Misleading Statements Issued in the Offering Documents**

52.    The Offering Documents touted Lexin's "competitive strengths [that] are essential to [its] success and differentiate [it] from [its] competitors," including the Company's status as "a leading and fast-growing online consumer finance

platform that is well positioned to capture the long-term growth potential of educated young adults in China," its "advanced and customized credit risk management," its "superior customer experience supported by an efficient and robust technology platform," its "targeted and cost-effective customer acquisition strategy," its "diversified and scalable funding," and its "self-reinforcing and demographically targeted ecosystem, creating powerful network effects."

53.    Additionally, the Offering Documents touted Lexin's growth strategies, representing, in relevant part, that the Company's "target customer cohort, educated young adults aged between 18 and 36 in China, features young people with high income potential, high educational background, high consumption needs, a strong desire to build their credit profile, and an appreciation for efficient customer experience;" that Lexin has "scalable and stable funding to meet [its] customers' needs and grow [its] platform;" that Lexin "adopt[ed] a targeted and cost-effective customer acquisition strategy by leveraging [its] e-commerce channel, word-of-mouth referrals, as well as cooperation with reputable commercial banks;" that Lexin's "educated young adult customers are often geographically concentrated and socially connected, which enables [Lexin] to achieve effective customer acquisition through customer referrals;" and that Lexin "cooperate[s] with commercial banks, for example, by promoting co-branded credit cards issued by the bank to reach potential customers."

24

54.    Attesting to Lexin's successful implementation and execution of its growth strategy, the Offering Documents touted the Company's user growth metrics, stating, in relevant part, that Lexin "had approximately 3.0 million active customers in 2016 and 3.3 million active customers in the nine months ended September 30, 2017, representing a 103% increase and a 34% increase from 2015 and the nine months ended September 30, 2016, respectively;" that, "[a]s of September 30, 2017, [Lexin] had over 6.5 million customers with an approved credit line and over 20 million registered users;" that, "[a]s of September 30, 2017, [Lexin's] target customer group represented over 90% of [its] customer base"; and that, "[i]n 2016 and the nine months ended September 30, 2017, approximately 36% and 45%, respectively, of [Lexin's] new customers registered on [its] platform using a referral code obtained from an existing customer."

55.    The Offering Documents represented that, "[c]urrently, none of our loans has annual interest rate exceeding 36%," which constitutes usury in China.

56.    The Offering Documents also discussed Lexin's related party transactions, disclosing, in relevant part, that Lexin "operate[s] [its] relevant business through [its] variable interest entities and their subsidiaries based on a series of contractual arrangements"; that, "[o]n December 16, 2015, [Lexin] provided a loan in the amount of US$2.5 million to [Defendant] Xiao for the purpose of allowing Mr. Xiao to make potential investments on behalf of [Lexin]"; that, "[o]n

May 24, 2016, [Lexin], through [Defendant] Xiao, entered into an agreement with Finnov Private Limited, or Finnov, to subscribe and purchase 11,363,637 series A preferred shares of Finnov," in addition to a subsequent transaction related to Finnov; that "[c]ertain individual directors and officers and/or [their] immediate family members participate in [Lexin's] investment programs offered to individual investors on *Juzi Licai;*" that, "[i]n 2015, [Lexin] entered into a strategic cooperation agreement with JD.com and a series of related agreements pursuant to which [Lexin] source[s] [its] products sold on [its] e-commerce channel and receive[s] fulfillment and storage service from JD.com;" and that "[c]ertain of [Lexin's] existing shareholders, including K2 Partners entities, JD.com Asia Pacific Investment Limited and affiliates and certain other existing shareholders, have subscribed for, and have been allocated by the underwriters, 2,960,000 ADSs in th[e] [O]ffering at the [IPO] price."

57.    The statements referenced in ¶¶ 52-56, *supra*, were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation. Specifically, the Offering Documents made false and/or misleading statements and/or failed to disclose that: (i) Lexin misrepresented its growth strategy and the causes of its

competitive edge, which included usurious lending and harassment of borrowers'
friends and family for collection purposes, thus raising a risk of regulatory scrutiny
and/or reputational damage- including negative publicity and customer complaints;
(ii) Lexin engaged in undisclosed related party transactions, contravening GAAP,
and also raising a risk of audit or challenge by the PRC tax authorities; and (iii) as a
result, the Offering Documents were materially false and/or misleading and failed to
state information required to be stated therein.

### <u>Materially False and Misleading Statements Issued During the Class Period</u>

58.    The Class Period begins on December 21, 2017, when Lexin's
securities began publicly trading on the NASDAQ pursuant to the materially false
or misleading statements or omissions in the Offering Documents.

59.    On March 20, 2018, Lexin filed a Form 6-K, signed by Defendant
Zeng, which attached a press release announcing the Company's fourth quarter and
full year results for 2017.  Therein, the Company represented that its total number
of registered users increased 99.2% from 12 million as of December 31, 2016 to 23.9
million as of December 31, 2017.  More specifically, the Company claimed that
users with credit line reached 7.6 million as of December 31, 2017, up by 68.9%
from 4.5 million the year before.  In the press release, Defendant Xiao states:

> [i]n the past years, our continued investment in financial technology
> has allowed us to establish strong competitive advantages, as
> demonstrated in our growing customer base. We established our AI and

blockchain laboratories as part of our commitment to developing financial technology.

Defendant Zeng further stated:

> In the past year, we've continued to provide our customers with more competitive terms. For the fourth quarter of 2017, our effective APR was 22.8%, compared to an APR of 25.3% for the first three quarters of 2017, and our average tenor was over 9 months. We will continue to provide highly competitive APRs and credit products to our customers while ensuring compliance with all applicable laws and regulations.

Defendant Liu stated:

> Our credit performance continues to be strong," said Mr. Ryan Huanian Liu, Lexin's chief risk officer. "Our M6+ charge-off rates4 continue to be approximately 2.0%. In an environment of increasing change and complexity, we have maintained a steady charge-off rate, demonstrating the creditworthiness of our customers, and the capabilities and reliability of our advanced credit risk assessment technology. At of the end of 2017, our 90+ delinquency rate was 1.14%, lower than the third quarter's 1.22%.

60.    The press release further stated that amounts due from related parties totaled 11,742,000 RMB and that amounts due to related parties totaled 137,782,000 RMB.

61.    On an earnings call the same day, Defendant Xiao represented that Lexin's "growth in users continues to be a key part of our rapid growth." Defendant Zeng attributed Lexin's "strong performance" to the Company's "commitment to providing superior customer service to our customers in China and to continue to grow with our customers" and an increase in "the number of active customers."

62.    The foregoing statements on March 20, 2018 were false and/or misleading statements and/or failed to disclose that: (i) Lexin failed to disclose that usurious lending and harassment of borrowers' friends and family for collection purposes, contributed to its growth, and raised a risk of regulatory scrutiny and/or reputational damage- including negative publicity and customer complaints; (ii) it misrepresented its growth metrics; and (iii) the reported related party numbers do not account for Lexin's undisclosed related party transactions involving Beihai Caidan and its subsidiaries.

63.    On April 26, 2018, Lexin filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2017 (the "2017 20-F"). With respect to Lexin's customer base, the 2017 20-F represented, in relevant part, that, "[f]rom [Lexin's] inception in August 2013 through the end of 2017, [Lexin] originated loans to over 5.5 million customers on a cumulative basis; that, "[i]n 2015, 2016 and 2017, [Lexin] originated loans to approximately 1.5 million, 3.0 million and 4.1 million active customers through [its] platform, representing a compound annual growth rate, or CAGR, of 66%;" that Lexin's "online consumer finance platform features a high proportion of repeat customers;" that, "[o]f all active customers on [Lexin's] platform in 2015, 2016 and 2017, approximately 63%, 74% and 80%, respectively, were repeat customers who had made at least one transaction on [Lexin's] platform before in the

same year or in the previous year;" and that, "[a]s of December 31, 2017, [Lexin]
had over 7.6 million customers with an approved credit line and over 20 million
registered users."

64.    In this same respect, the 2017 20-F further touted, in relevant part, that,
"[a]s of December 31, 2017, [Lexin's] target customer group represented over 90%
of [its] customer base"; that Lexin has "successfully accumulated a large customer
base and achieved deep market penetration among educated young adults in China";
that, "[h]istorically, [Lexin] attracted educated young adults customers through
various channels, mainly [Lexin's] e-commerce channel and operational team"; and
that, "[w]ith the growth of [Lexin's] business, [the Company's] customer acquisition
efforts have become primarily driven by [Lexin's] e-commerce channel, word-of-
mouth referrals, and cooperation with reputable commercial banks, other e-
commerce channel and network service platform."

65.    With respect to Lexin's disclosure of related party transactions, the
2017 20-F contained substantively the same statements as referenced in ¶ 56, *supra*,
while disclosing additional information related to shareholder agreements and
registration rights.

66.    Appended as exhibits to the 2017 20-F were signed certifications
pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Exchange Act
Individual Defendants certified that "[t]he [2017 20-F] fully complies with the

requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and "[t]he information contained in the [2017 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

67.    The foregoing statements on April 26, 2018 were false and/or misleading statements and/or failed to disclose that: (i) Lexin failed to disclose that usurious lending and harassment of borrowers' friends and family for collection purposes, contributed to its growth, and raised a risk of regulatory scrutiny and/or reputational damage- including negative publicity and customer complaints; (ii) it misrepresented its growth metrics; and (iii) the reported related party numbers do not account for Lexin's undisclosed related party transactions involving Beihai Caidan and its subsidiaries.

68.    On May 21, 2018, Lexin filed a Form 6-K, signed by Defendant Zeng, which attached a press release announcing the Company's first quarter results for 2018.  Therein, Defendant Xiao stated, ""Our consistent regulatory compliance and our investment in financial technology have enabled us to strengthen our competitive advantages and fuel our growth," said Mr. Jay Wenjie Xiao, Lexin's chairman and chief executive officer. "Nearly a third of Lexin's operating expenses went into financial technology research and development in the past year, which resulted in higher operating efficiency and greater profitability as we scale up our business."  In the press release, Defendants also represented that, "Total number of registered users

reached 26.4 million as of March 31, 2018, representing an increase of 94.8% from 13.6 million as of March 31, 2017; and users with credit line reached 8.2 million as of March 31, 2018, up by 64.0% from 5.0 million as of March 31, 2017."

69.    The press release further stated that amounts due from related parties totaled 1,992,000 RMB and that amounts due to related parties totaled 62,680,000 RMB.

70.    On an earnings call the same day, Defendant Xiao attributed the Company's growth to "past investment in our financial technology."  Defendant Zeng further attributed growth to "superior customer service."  Defendant Liu stated, "we have seen the strength of our strategy in growing with our customers."

71.    The foregoing statements on May 21, 2018 were false and/or misleading statements and/or failed to disclose that: (i) Lexin failed to disclose that usurious lending and harassment of borrowers' friends and family for collection purposes, contributed to its growth, and raised a risk of regulatory scrutiny and/or reputational damage- including negative publicity and customer complaints; (ii) it misrepresented its growth metrics; and (iii) the reported related party numbers do not account for Lexin's undisclosed related party transactions involving Beihai Caidan and its subsidiaries.

72.    On August 27, 2018, Lexin filed a Form 6-K, signed by Defendant Zeng, which attached a press release dated August 23, 2017 announcing the

Company's second quarter results for 2018.  Therein, the Company represented that, "[t]otal number of registered users reached 29.2 million as of June 30, 2018, representing an increase of 82.9% from 16.0 million as of June 30, 2017; and users with credit line reached 8.9 million as of June 30, 2018, up by 58.8% from 5.6 million as of June 30, 2017."  The Company also represented that amounts due from related parties totaled 125,000 RMB and amounts due to related parties totaled 24,893,000 RMB.

73.    The foregoing statements were false and/or misleading statements and/or failed to disclose that: (i) Lexin failed to disclose that usurious lending and harassment of borrowers' friends and family for collection purposes, contributed to its growth, and raised a risk of regulatory scrutiny and/or reputational damage-including negative publicity and customer complaints; (ii) it misrepresented its growth metrics; and (iii) the reported related party numbers do not account for Lexin's undisclosed related party transactions involving Beihai Caidan and its subsidiaries.

74.    On November 14, 2018, Lexin filed a Form 6-K, signed by Defendant Zeng, which attached a press release announcing the Company's third quarter results for 2018.  Therein, the Company represented that, "[t]otal number of registered users reached 32.6 million as of September 30, 2018, representing an increase of 61.0% from 20.2 million as of September 30, 2017; and users with credit line reached 9.6

million as of September 30, 2018, up by 46.4% from 6.5 million as of September 30, 2017." The Company also represented that amounts due to related parties totaled 23,322,000 RMB.

75.     The foregoing statements were false and/or misleading statements and/or failed to disclose that: (i) Lexin failed to disclose that usurious lending and harassment of borrowers' friends and family for collection purposes, contributed to its growth, and raised a risk of regulatory scrutiny and/or reputational damage-including negative publicity and customer complaints; (ii) it misrepresented its growth metrics; and (iii) the reported related party numbers do not account for Lexin's undisclosed related party transactions involving Beihai Caidan and its subsidiaries.

76.     On March 15, 2019, Lexin filed a Form 6-K, signed by Defendant Zeng, which attached a press release dated March 14, 2019 announcing the Company's fourth quarter and full year results for 2018. Therein, the Company represented that, "[t]otal number of registered users reached 37.3 million as of December 31, 2018, representing an increase of 55.8% from 23.9 million as of December 31, 2017; and users with credit line reached 10.5 million as of December 31, 2018, up by 38.8% from 7.6 million as of December 31, 2017." The Company also represented that amounts due to related parties totaled 14,569,000 RMB.

34

77.    The foregoing statements were false and/or misleading statements and/or failed to disclose that: (i) Lexin failed to disclose that usurious lending and harassment of borrowers' friends and family for collection purposes, contributed to its growth, and raised a risk of regulatory scrutiny and/or reputational damage-including negative publicity and customer complaints; (ii) it misrepresented its growth metrics; and (iii) the reported related party numbers do not account for Lexin's undisclosed related party transactions involving Beihai Caidan and its subsidiaries.

78.    On the related March 14, 2019 earnings call, Defendant Xiao claimed that the Company had stopped P2P lending, stating, "since the end of last year, in accordance with the regulators' wishes, we stopped the growth of the balances on our P2P."

79.    The foregoing statements were false and/or misleading statements and/or failed to disclose that Lexin in fact continued facilitating P2P loans, despite a regulatory crackdown on peer to peer lending.

80.    On May 17, 2019, Lexin filed a Form 6-K, signed by Defendant Zeng, which attached a press release announcing the Company's first quarter results for 2019.  Therein, the Company represented that, "[t]otal number of registered users reached 42.2 million as of March 31, 2019, representing an increase of 59.6% from 26.4 million as of March 31, 2018; and users with credit line reached 11.6 million

as of March 31, 2019, up by 41.6% from 8.2 million as of March 31, 2018." The Company also represented that amounts due from related parties totaled 2,230,000 RMB and amounts due to related parties totaled 8,829,000 RMB.

81.    On an earnings call the same day, Defendant Xiao attributed the Company's growth to its "three core strengths of consumption scenarios, financial technology, and diversified funding…"  Regarding the Company's P2P business, Defendant Xiao further represented that, "But, safe to say that whatever needs to be done, we've done it already, and we're very well-prepared to do whatever else the government will require us to be done. On this, we've definitely been a clear leader in being more compliant and being forward thinking and being aware of what the government will want."

82.    The foregoing statements on May 17, 2019 were false and/or misleading statements and/or failed to disclose that: (i) Lexin failed to disclose that usurious lending and harassment of borrowers' friends and family for collection purposes, contributed to its growth, and raised a risk of regulatory scrutiny and/or reputational damage- including negative publicity and customer complaints; (ii) it misrepresented its growth metrics; (iii) the reported related party numbers do not account for Lexin's undisclosed related party transactions involving Beihai Caidan and its subsidiaries; and (iv) Lexin in fact continued facilitating P2P loans, despite a regulatory crackdown on peer to peer lending.

83.    On April 30, 2019, Lexin filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2018 (the "2018 20-F").  With respect to Lexin's customer base, the 2018 20-F represented, in relevant part, that, "[f]rom [Lexin's] inception in August 2013 through the end of 2018, [Lexin] originated loans to over 7.2 million users on a cumulative basis"; that, "[i]n . . . 2018, [Lexin] originated loans to approximately . . . 4.9 million active users through [its] platform, representing a compound annual growth rate, or CAGR, of 28%"; that, "[o]f all active users on [Lexin's] platform in . . . 2018, approximately . . . 80% . . . were repeat users who had made at least one transaction on [Lexin's] platform before in the same year or in the previous year"; and that, "[a]s of December 31, 2018, [Lexin] had over 10.5 million users with an approved credit line and over 37.3 million registered users."

84.    The 2018 20-F also contained substantively the same statements as referenced in ¶ 64, *supra*, touting the variety and effectiveness of Lexin's user acquisition and retention strategies.

85.    With respect to Lexin's disclosure of related party transactions, the 2018 20-F contained substantively the same statements as referenced in ¶ 56, *supra*, while disclosing additional information related to shareholder agreements and registration rights.

86.    Appended as exhibits to the 2018 20-F were substantively the same SOX certifications as referenced in ¶ 66, *supra*, signed by the Exchange Act Individual Defendants.

87.    The foregoing statements in the 2018 20-F were false and/or misleading statements and/or failed to disclose that: (i) Lexin failed to disclose that usurious lending and harassment of borrowers' friends and family for collection purposes, contributed to its growth, and raised a risk of regulatory scrutiny and/or reputational damage- including negative publicity and customer complaints; (ii) it misrepresented its growth metrics; and (iii) the reported related party numbers do not account for Lexin's undisclosed related party transactions involving Beihai Caidan and its subsidiaries as well as the related party transaction involving Ji'an Fenqile Microedit Co., Ltd.

88.    On November 18, 2019, Lexin filed a Form 6-K, signed by Defendant Zeng, which attached a press release announcing the Company's third quarter results for 2019.  Therein, the Company represented that, "[t]otal number of registered users reached 62.6 million as of September 30, 2019, representing an increase of 92.2% from 32.6 million as of September 30, 2018; and users with credit line reached 16.7 million as of September 30, 2019, up by 74.7% from 9.6 million as of September 30, 2018."  Defendant Xiao further represented that, "[t]hanks to our new consumption-focused strategy which helps unlock the consumption potential of hundreds of

thousands of educated young Chinese consumers, we were able to capitalize on the unique opportunities in the market and register both strong customer and business growth in the quarter."  The Company also represented that amounts due from related parties totaled 2,786,000 RMB and amounts due to related parties totaled 26,866,000 RMB.

89.     The foregoing statements were false and/or misleading statements and/or failed to disclose that: (i) Lexin failed to disclose that usurious lending and harassment of borrowers' friends and family for collection purposes, contributed to its growth, and raised a risk of regulatory scrutiny and/or reputational damage-including negative publicity and customer complaints; (ii) it misrepresented its growth metrics; and (iii) the reported related party numbers do not account for Lexin's undisclosed related party transactions involving Beihai Caidan and its subsidiaries as well as the related party transaction involving Ji'an Fenqile Microedit Co., Ltd.

90.     On March 24, 2020, Lexin filed a Form 6-K, signed by Defendant Zeng, which attached a press release announcing the Company's fourth quarter and full year results for 2019.  Therein, the Company represented that, "[t]otal number of registered users reached 73.3 million as of December 31, 2019, representing an increase of 96.5 % from 37.3 million as of December 31, 2018; and users with credit line reached 19.4 million as of December 31, 2019, up by 84.0% from 10.5 million

as of December 31, 2018."   The Company also represented that amounts due to related parties totaled 40,804,000 RMB.

91.    The foregoing statements were false and/or misleading statements and/or failed to disclose that: (i) Lexin failed to disclose that usurious lending and harassment of borrowers' friends and family for collection purposes, contributed to its growth, and raised a risk of regulatory scrutiny and/or reputational damage-including negative publicity and customer complaints; (ii) it misrepresented its growth metrics; and (iii) the reported related party numbers do not account for Lexin's undisclosed related party transactions involving Beihai Caidan and its subsidiaries as well as the related party transaction involving Ji'an Fenqile Microedit Co., Ltd.

92.    On April 30, 2020, Lexin filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 20-F").  With respect to Lexin's customer base, the 2019 20-F represented, in relevant part, that, "[f]rom [Lexin's] inception in August 2013 through the end of 2019, [Lexin] originated loans to over 13.3 million users on a cumulative basis"; that, "[i]n . . . 2019, [Lexin] originated loans to approximately . . . 9.9 million active users through [its] platform, representing a compound annual growth rate, or CAGR, of 55.4%"; that, "[o]f all active users on [Lexin's] platform in . . . 2019, approximately . . . 81% . . . were repeat users who

had made at least one transaction on [Lexin's] platform before in the same year or in the previous year"; and that, "[a]s of December 31, 2019, [Lexin] had over 19.4 million users with an approved credit line and over 73.3 million registered users."

93.    Regarding Lexin's P2P business, Defendants represented that, "We have ceased facilitating new loans with funding from individual investors on *Juzi Licai* platform since November 2019."

94.    The 2019 20-F also contained substantively the same statements as referenced in ¶¶ 56, 64, and 65, *supra*, with respect to Lexin's related party transactions, and touting the variety and effectiveness of Lexin's user acquisition and retention strategies.

95.    Appended as exhibits to the 2019 20-F were substantively the same SOX certifications as referenced in ¶ 66, *supra*, signed by the Exchange Act Individual Defendants.

96.    The foregoing statements in the 2019 20-F were false and/or misleading statements and/or failed to disclose that: (i) Lexin failed to disclose that usurious lending and harassment of borrowers' friends and family for collection purposes, contributed to its growth, and raised a risk of regulatory scrutiny and/or reputational damage- including negative publicity and customer complaints; (ii) it misrepresented its growth metrics; (iii) the reported related party numbers do not account for Lexin's undisclosed related party transactions involving Beihai Caidan

and its subsidiaries, and the related party transaction involving Ji'an Fenqile Microedit Co., Ltd.; and (iv) Lexin in fact continued facilitating P2P loans, despite a regulatory crackdown on peer to peer lending.

97.     On June 4, 2020, Lexin filed a Form 6-K, signed by Defendant Zeng, which attached a press release announcing the Company's first quarter results for 2020.  Therein, the Company represented that, "[t]otal number of registered users reached 84.2 million as of March 31, 2020, representing an increase of 99.7% from 42.2 million as of March 31, 2019; and users with credit line reached 20.7 million as of March 31, 2020, up by 78.9% from 11.6 million as of March 31, 2019." Regarding delinquency rates on its loans, Defendants represented that the, "90 day+ delinquency ratio was 2.57% as of March 31, 2020." [3] The Company also represented that amounts due from related parties totaled 941,000 RMB and amounts due to related parties totaled 46,808,000 RMB.

98.     On an earnings call the same day, Defendant Xiao stated, "First quarter 90-day delinquencies reached 2.57%. As we enter the second quarter, asset quality trends continue to improve. Our first quarter seven-day delinquency rate was 3.7%,

---

[3] The press release explained that, "90 day+ delinquency ratio refers to outstanding principal balance of on- and off-balance sheet loans that were 90 to 179 calendar days past due as a percentage of the total outstanding principal balance of on- and off-balance sheet loans on our platform as of a specific date. On-balance sheet loans that were over 179 calendar days past due and charged off are not included in the delinquency rate calculation. Off-balance sheet loans that were over 179 calendar days past due are assumed charged off and not included in the delinquency rate calculation. The Company does not distinguish on the basis of the on- or off-balance sheet treatment in monitoring the credit risks of borrowers and the delinquency status of loans."

recovering with the domestic Chinese economy. As of today, our seven-day delinquency rate has declined to 2.77%, recovering to pre-pandemic levels."

99.    The foregoing statements on June 4, 2019 were false and/or misleading statements and/or failed to disclose that: (i) Lexin failed to disclose that usurious lending and harassment of borrowers' friends and family for collection purposes, contributed to its growth, and raised a risk of regulatory scrutiny and/or reputational damage- including negative publicity and customer complaints; (ii) it misrepresented its growth metrics; (iii) the reported related party numbers do not account for Lexin's undisclosed related party transactions involving Beihai Caidan and its subsidiaries as well as the related party transaction involving Ji'an Fenqile Microedit Co., Ltd.; (iv) Lexin in fact continued facilitating P2P loans, despite a regulatory crackdown on peer to peer lending; and (v) though admitting to an increase in delinquencies, the Company masked the extent of that increase during the COVID-19 pandemic by utilizing tactics such as "installment on installment and "minimum payment."

100.    On August 18, 2020, Lexin filed a Form 6-K, signed by Defendant Zeng, which attached a press release announcing the Company's second quarter results for 2020.    Therein, the Company represented that, "[t]otal number of registered users reached 95.3 million as of June 30, 2020, representing an increase of 90.0% from 50.2 million as of June 30, 2019; and users with credit line reached

22.7 million as of June 30, 2020, up by 68.4% from 13.5 million as of June 30, 2019." Regarding delinquency rates on its loans, Defendants represented that the, "90 day+ delinquency ratio was 2.99% as of June 30, 2020." Defendant Xiao attributed "strong growth" for the quarter to Lexin's, "New Consumption Platform Strategy and a continuing recovery of China's consumer market," rather than to the Company's machinations to mask delinquency rates, its usurious rates, or harassment tactics. The Company also represented that amounts due from related parties totaled 941,000 RMB and amounts due to related parties totaled 53,729,000 RMB.

101.    On an earnings call the same day, Defendant Xiao represented that, "As of today, our day-7 delinquency has declined to 2.32%, which is even lower than our numbers from the third quarter of last year." Defendant Liu further stated that Lexin's "90 days delinquency ratio remains low at 2.99%, and we continue to see stable credit performance, and our lifetime charge-off ration is approximately 4.5%." Regarding P2P lending on the *Juzi Licai* platform, Defendant Zeng claimed that, "no funding for new loan originations came from our Juzi Licai platform."

102.    The foregoing statements on August 18, 2019 were false and/or misleading statements and/or failed to disclose that: (i) Lexin failed to disclose that usurious lending and harassment of borrowers' friends and family for collection purposes, contributed to its growth, and raised a risk of regulatory scrutiny and/or

reputational damage- including negative publicity and customer complaints; (ii) it misrepresented its growth metrics; (iii) the reported related party numbers do not account for Lexin's undisclosed related party transactions involving Beihai Caidan and its subsidiaries as well as the related party transaction involving Ji'an Fenqile Microedit Co., Ltd.; (iv) Lexin in fact continued facilitating P2P loans, despite a regulatory crackdown on peer to peer lending; and (v) though admitting to an increase in delinquencies, the Company masked the extent of that increase during the COVID-19 pandemic by utilizing tactics such as "installment on installment and "minimum payment."

103.    That the market paid heed to Defendants' misrepresentations is exemplified by analyst positive reactions despite Lexin's earnings miss.  For example, on August 18, 2020, Nomura issued a buy rating on Lexin citing *inter alia* an "improved 30-day+ delinquency rate in 2Q20."

104.    On August 19, 2020, DBS Group issued a "Flash Note" indicating a buy rating on Lexin, citing *inter alia* the "improving trend" for delinquency rates in 2Q20.  Ignorant of Lexin's usurious lending, DBS also assumed that Lexin would be "less impacted" by regulations capping APR (interest rates) at 24%.

### The Truth Emerges

105.    On August 25, 2020, shortly after markets opened, Grizzly issued a research report on Lexin alleging, among other issues, that the Company reported

"unfathomably low" delinquency rates by providing borrowers in default new funds to make payments, that Lexin engaged in undisclosed related party transactions, and that a review of Lexin's web traffic called into question the Company's purported growth.

106.    Specifically, with respect to Lexin's low delinquency rates, the Grizzly report stated, in relevant part, that Grizzly "believe[s] [Lexin] has artificially deflated its default and delinquency ratio to give the appearance of a more healthy financial position"; that Grizzly "believe[s] . . . [Lexin] has been artificially increasing the maturity of the loans upon default through a feature called . . . installment on installment and . . . minimum payment"; that "this is equivalent to when your minimum credit card payment comes due . . . the company gives another extension to your minimum payment and treat[s] it as a new credit loan"; that, "[a]ccording to [Lexin] users, [Lexin] has recently been extending the maturity of their loans on the second day after they become delinquent"; and that "[t]his feature has been implemented by [Lexin] since 2016," but "was only used on loans that weren't delinquent," whereas, "[n]ow, most likely due to effects of COVID-19, the company has deployed this tactic on delinquent loans to generate a seemingly healthy loan portfolio," whereby "[t]he users don't have to pay back the amount immediately and the company no longer has to book delinquencies."  The Grizzly report concluded that "the black box is so elaborately set up that even institutional

investors and insurance companies are not fully aware," and that, "[a]s long as the company can solicit more funding from investors the Ponzi scheme keeps rolling."

107.   With respect to Lexin's undisclosed related party transactions, the Grizzly report stated, in relevant part, that Grizzly "identified at least five companies that are owned by individuals who [Grizzly] believe[s] are related to [Lexin]"; that Lexin "obtained SAIC filing [*sic*] on th[ose] companies and discovered that only Beihai Jiguang had meaningful financials," including "52m RMB in revenue in 2018, of which close to 20M RMB were from loan collection services provided most likely to [Lexin]"; that "there were no costs associated with the additional 20M revenue," so "[i]t's as if the company gave this money to Beihai Jiguang for free"; that "[t]hree individuals own Beihai Caidan E-Commerce Co., Ltd ('Beihai Caidan'), which has another 4 subsidiaries"; that "[t]hose individuals are YANG Tao (50%), YUAN Kai (25%), and Ma Ming (25%)"; that "YANG Tao is also the legal representative of Beihai Caidan"; that "[o]n [Lexin]'s official website, YANG Tao was listed as the company's Vice President"; that "Yuan is the legal representative for numerous branch offices of Shenzhen Fenqile, which is one of [Lexin]'s main subsidiaries"; and that, given "the employee being legal representative [*sic*] and combined 75% equity interest of Beihai Caidan (along with its 4 subsidiaries) owned by its employees, [Grizzly] believe[s] it is reasonable to say that [Lexin] has the ultimate control over Beihai Caidan."

108.   Finally, with respect to Lexin's website traffic calling into question the Company's purported growth, the Grizzly report stated, in relevant part, that, based on the "Baidu index for [Lexin]'s key consumer lending product Fenqile . . . from the beginning of 2017 to May 21, 2020," and a chart provided by Grizzly sourced from the Baidu index, "[o]ne can easily see that in the past couple of years the index has [been] rather flat"; that "[t]his does not make sense given that . . . [Lexin]'s registered users increased from 20.2M at IPO to 84.2M as of March 2020, or approximately 300% in total"; and that all the foregoing caused Grizzly to question "[h]ow does a company manage to grow by 3x when the website traffic on its main platform appears to be at or even declining?"

109.   Following the release of the Grizzly report, Lexin's ADS price fell $0.47 per share, or 5.52%, to close at $8.04 per share on August 25, 2020.

110.   As of the time this Complaint was filed, the price of Lexin ADSs continues to trade below the Offering price, damaging investors.

111.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Lexin's securities, Plaintiff and other Class members have suffered significant losses and damages.

## ITEM 303

112.   SEC regulations require that a company's quarterly and annual financial statements comply with item 303 of Regulation S-K (17 C.F.R. § 229.303,

"Item 303"). Item 303 requires the disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

113.    To determine if a known trend or uncertainty must be included in a company's filings, the SEC has stated that companies should determine 1 – whether a trend, demand, commitment, event, or uncertainty is presently known to management and 2 – whether it is reasonably likely to have a material effect on the registrant's financial condition or results of operations.

114.    The SEC has stated that the disclosure requirements of Item 303 apply to foreign issuers such as Lexin. For example, Item 5 of Form 20-F requires foreign issuers such as Lexin to disclose "any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition."

115.    Defendants therefore had an independent duty to disclose the risk and uncertainty that by continuing to facilitate P2P loans on Lexin's Juzi Licai platform, by charging usurious rates and by harassing borrowers' friends and family, the

Company violated Chinese regulations and triggered a risk of regulatory scrutiny that could materially impact the Company.

116.    Defendants also had an independent duty to disclose the trend of rising delinquency rates that Lexin actively masked during the COVID pandemic by implementing strategies to artificially increase the maturity of loans upon default, including "installment on installment" and "minimum payment."

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

117.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired: (a) Lexin ADSs in the IPO or purchased Lexin ADSs thereafter in the stock market pursuant and/or traceable to the Company's Offering Documents issued in connection with the IPO; or (b) Lexin securities during the Class Period; and were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

118.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Lexin securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff

at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Lexin or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

119.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

120.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

121.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public in the Offering Documents for the IPO, or during the Class Period, misrepresented material facts about the business, operations and management of Lexin;

- whether the Securities Act Individual Defendants negligently prepared the Offering Documents for the IPO and, as a result, the Offering Documents contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation;

- whether the Exchange Act Individual Defendants caused Lexin to issue false and misleading financial statements during the Class Period;

- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Lexin securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

122.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

123.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Lexin securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Lexin securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

124.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

125.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 11 of the Securities Act Against All Defendants)

126.   Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

127.   This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendants.

128.   The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

129.   Lexin is the registrant for the IPO.   Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

130.   As issuer of the shares, Lexin is strictly liable to Plaintiff and the Class for the misstatements and omissions in the Offering Documents.

131.   None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

132.   By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

133.   Plaintiff acquired Lexin shares pursuant and/or traceable to the Offering Documents for the IPO.

134.   Plaintiff and the Class have sustained damages.  The value of Lexin ADSs has declined substantially subsequent to and because of Defendants' violations.

## COUNT II

### (Violations of Section 15 of the Securities Act Against the Securities Act Individual Defendants)

135.   Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

136.   This Count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

137.   The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Lexin within the meaning of Section 15 of the Securities Act.  The Securities Act Individual Defendants had the power and

influence and exercised the same to cause Lexin to engage in the acts described herein.

138.   The Securities Act Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

139.   By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## COUNT III

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants)

140.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

141.   This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

142.   During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Lexin securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Lexin securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

143.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Lexin securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Lexin's finances and business prospects.

144.    By virtue of their positions at Lexin, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material

omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants.   Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth.  In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

145.  Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control.  As the senior managers and/or directors of Lexin, the Exchange Act Individual Defendants had knowledge of the details of Lexin's internal affairs.

146.  The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Lexin.  As officers and/or directors of a publicly-held company, the Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to

Lexin's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Lexin securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Lexin's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Lexin securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

147.   During the Class Period, Lexin securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Lexin securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Lexin securities was substantially lower than the prices paid by Plaintiff and the other

members of the Class.  The market price of Lexin securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

148.   By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

149.   As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT IV

### (Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants)

150.   Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

151.   During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of Lexin, and conducted and participated, directly and indirectly, in the conduct of Lexin's business affairs. Because of their senior positions, they knew the adverse non-public information about Lexin's misstatement of income and expenses and false financial statements.

152.   As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to Lexin's financial condition and results of operations, and to correct promptly any public statements issued by Lexin which had become materially false or misleading.

153.   Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Lexin disseminated in the marketplace during the Class Period concerning Lexin's results of operations. Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause Lexin to engage in the wrongful acts complained of herein. The Exchange Act Individual Defendants therefore, were "controlling persons" of Lexin within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Lexin securities.

154.   Each of the Exchange Act Individual Defendants, therefore, acted as a controlling person of Lexin. By reason of their senior management positions and/or being directors of Lexin, each of the Exchange Act Individual Defendants had the power to direct the actions of, and exercised the same to cause, Lexin to engage in the unlawful acts and conduct complained of herein. Each of the Exchange Act

Individual Defendants exercised control over the general operations of Lexin and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

155.  By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Lexin.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  January 19, 2021

Respectfully submitted,

POMERANTZ LLP

*/s/ Tamar A. Weinrib*
Jeremy A. Lieberman
(admitted *pro hac vice*)
Tamar A. Weinrib
(admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
taweinrib@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
(*pro hac vice* application forthcoming)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

RANSOM, GILBERTSON, MARTIN
& RATLIFF, LLP
Jeffrey S. Ratliff
8401 NE Halsey Street Suite 208
Portland, Oregon 97220
Telephone: (503) 226-3664
Facsimile: (503) 243-6716
Rgmr1500@gmail.com

*Attorneys for Plaintiff*