**Milo Petranovich**, OSB, #813376
petranovichm@lanepowell.com
**Peter D. Hawkes**, OSB #071986
hawkesp@lanepowell.com
**LANE POWELL PC**
601 SW Second Avenue, Suite 2100
Portland, Oregon 97204-3158
Tel: 503.778.2100

**Peter B. Morrison** (*pro hac vice*)
peter.morrison@skadden.com
**Virginia F. Milstead** (*pro hac vice*)
virginia.milstead@skadden.com
**Kasonni M. Scales** (*pro hac vice*)
kasonni.scales@skadden.com
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: 213.687.5000
Facsimile: 213.687.5600

Attorneys for Defendant LexinFintech Holdings Ltd.

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| IN RE LEXINFINTECH HOLDINGS LTD. SECURITIES LITIGATION | Case No.: 3:20-cv-01562-SI<br><br>Defendant LexinFintech Holdings Ltd.'s **DECLARATION OF KASONNI M. SCALES IN SUPPORT OF REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE**<br><br>**REQUEST FOR ORAL ARGUMENT** |

PAGE 1 -    DECLARATION OF KASONNI M. SCALES

## DECLARATION OF KASONNI M. SCALES

1.      I am an attorney licensed to practice law before the before the courts of the State of California, and have been admitted *pro hac vice* to this Court. I am an associate at Skadden, Arps, Slate, Meagher & Flom LLP, counsel of record for Defendant LexinFintech Holdings Ltd. ("Lexin" or the "Company") in the above captioned-matter.  I make this declaration in support of Lexin's Request for Incorporation by Reference and Judicial Notice.  This declaration is based on my own personal knowledge and if called upon to do so, I could and would testify competently thereto.

2.      Attached as **Exhibit 1**  is a true and correct copy of the short-seller report published by Grizzly Research on August 25, 2020. This document is publicly available and its contents are referenced in the Amended Class Action Complaint ("AC") in paragraphs 8, 35, 105, 106, 107, and 108.

3.      Attached as **Exhibit 2** is a true and correct copy of historical stock price data for Lexin's American Depositary Shares ("ADS"), from August 25, 2020 through March 19, 2021. The stock price data was retrieved from Yahoo! Finance.

4.      Attached as **Exhibit 3** is a true and correct copy of excerpts of the 2019 Form 20-F Annual Report filed by Lexin with the SEC on April 30, 2020. The document is publicly available and is referenced in the AC in paragraphs 31, 35, 47, 50, 92, 93, 94, 95, and 96. Lexin is submitting only excerpts of the Form 20-F for the convenience of the Court because the un-excerpted version of that document is quite long. Lexin will gladly submit a full copy of the document if the Court so desires.

5.      Attached as **Exhibit 4** is a true and correct copy of excerpts of the 2018 Form 20-F Annual Report filed by Lexin with the SEC on April 30, 2019. The document is publicly

PAGE 2 -      DECLARATION OF KASONNI M. SCALES

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

available and is referenced in the AC in paragraphs 31, 35, 50, 83, 84, 85, 86, and 87. Lexin is submitting only excerpts of the Form 20-F for the convenience of the Court because the un-excerpted version of that document is quite long. Lexin will gladly submit a full copy of the document if the Court so desires.

6.    Attached as **Exhibit 5** is a true and correct copy of excerpts of the 2017 Form 20-F Annual Report filed by Lexin with the SEC on April 26, 2018. The document is publicly available and is referenced in the AC in paragraphs 31, 35, 50, 63, 64, 65, 66, and 67. Lexin is submitting only excerpts of the Form 20-F for the convenience of the Court because the un-excerpted version of that document is quite long. Lexin will gladly submit a full copy of the document if the Court so desires.

7.    Attached as **Exhibit 6**  is a true and correct copy of excerpts of the Form F-1 Registration Statement filed by Lexin with the SEC on November 13, 2017. The document is publicly available and is referenced in the AC in paragraphs 4, 5, 6, 7, 16, 18, 19, 23, 24, 25, 29, 31, 35, 39, 52, 53, 54, 55, 56, 55, 56, 57, 58, 117, 121, 128, 129, 130, 131, and 133. Lexin is submitting only excerpts of the Form F-1 for the convenience of the Court because the un-excerpted version of that document is quite long. Lexin will gladly submit a full copy of the document if the Court so desires.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 22nd day of March 2021, in Los Angeles, California.

_____
*/s/ Kasonni M. Scales*
Kasonni M. Scales

719517.0001/8396574.1

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# We Believe LexinFintech Holdings Ltd. (NASDAQ: LX) is a Leverage Time Bomb About to Explode

• LX operates a high-interest rate online consumer lending platform in China. We believe LX's business model is deeply flawed and set to collapse. Our target price is ZERO.

• The structure utilized by LX exposes its shareholders to enormous losses by guaranteeing payment of loans while putting Chinese lenders first. This strikes us as a quintessential "Heads I win, tails you lose" situation for current shareholders.

• LX reports unfathomably low delinquency rates that we simply do not trust. We believe LX is reporting artificially low delinquency rates by essentially giving borrowers who are already in default new funds to make payments. This has led to a rapidly deteriorating credit quality.

• LX has historically charged Chinese consumers enormous interest rates, often above the legal 36% usury rate. New regulation in China will significantly limit how much LX can charge to 15.4%, therefore putting the entire business model at risk.

• LX seems to be still actively engaged in direct peer-to-peer lending, which the company supposedly already halted per regulatory pressure. Other companies that have broken p2p restrictions have mostly been shut down and executives were even jailed. We think LX could face similar regulatory pressure.

• The Corona Virus pandemic added insult to injury and the consequent shut down of the economy has put a massive number of consumers and consumer loans in default or delinquency.

• Several employees run businesses that are not disclosed by LX as related parties. We identified these businesses as service providers or in the same field as LX. The opportunity to maneuver costs and siphon off money unbeknownst to investors and auditors is troublesome to us.

• We also suspect that LX sold one business unbeknownst to investors to the Chairman's relative.

• Giant misstatements in the past and weakness in financial reporting we uncover in this report paint the picture of a company whose financials can simply not be trusted.

• Our review of basic web traffic analysis leads us to question if the purported volume by LX is even real in the first place.

• Despite LX management touting its Tencent background, major shareholders including JD.com are selling off, showing a lack of confidence in LX's future.

• Our valuation prices in the severe risks hidden from investors. Upon adjustments, we believe the company should have seen an equity decrease of RMB 1.85B. Ultimately, we believe the company is not viable under new Chinese regulations.



LX Stock Performance — *As of August 24th 2020*

| LX Trade Data | *As of August 24th 2020* |
|---|---|
| Stock Price: | $8.51 |
| 52 Week Low: | $6.98 |
| 52 Week High: | $16.93 |
| Market Capitalization: | $1.54B |
| 3 Month Avg. Volume: | 2.08M |
| Weighted Avg. Shares Outstanding: | 179.7M |



LX vs FXI Stock Performance — *As of August 24th 2020*

| Share price performance (%) | 3 months | 6 month | 12 months |
|---|---|---|---|
| Absolute | 32% | -36% | -6% |
| Relative to S&P500 | 16% | -38% | -15% |
| Relative to FXI | 19% | -35% | -10% |

## Website

https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND. FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION. © 2020 GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.



# Legal Disclaimer

IMPORTANT LEGAL DISCLAIMER

PLEASE REVIEW CAREFULLY IN CONJUNCTION WITH OUR RESEARCH REPORT AND SUPPORTING MATERIALS, INCLUDING THE FULL LEGAL DISCLAIMER ON THE LAST PAGE OF THIS REPORT.

This report and all statements contained herein are the opinions of Grizzly Research, and are not statements of fact.

Reports are based on generally available information, field research, inferences and deductions through Grizzly Research's due diligence and analytical process. Our opinions are held in good faith, and we have based them upon publicly available facts and evidence collected and analyzed including our understanding of representations made by the management of the companies we analyze, all of which we set out in our research reports to support our opinions, all of which we set out herein. HOWEVER, THEY REMAIN OUR OPINIONS AND BELIEFS ONLY.

We conducted research and analysis based on public information in a manner than any person could have done if they had been interested in doing so. You can publicly access any piece of evidence cited in this report or that we relied on to write this report.

Grizzly Research makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use.

We are entitled to our opinions and to the right to express such opinions in a public forum. We believe that the publication of our opinions and the underlying facts about the public companies we research is in the public interest, and that publication is justified due to the fact that public investors and the market are connected in a common interest in the true value and share price of the public companies we research. All expressions of opinion are subject to change without notice, Grizzly Research does not undertake a duty to update or supplement this report or any of the information contained herein.

This is not an offer to sell or a solicitation of an offer to buy any security, nor shall any security be offered or sold to any person, in any jurisdiction in which such offer would be unlawful under the securities laws of such jurisdiction. Recipients of the research report are professional investors who are expected to make their own judgment as to any reliance that they place on the research report. You represent that you have sufficient investment sophistication to critically assess the information, analysis and opinion on this website.

AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND. FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION.

To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. Note that LX LexinFintech Holdings Inc. and insiders, agents, and legal representatives of LexinFintech Holdings and other entities mentioned herein may be in possession of material non-public information that may be relevant to the matters discussed herein. Do not presume that any person or company mentioned herein has reviewed our report prior to its publication.

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Background

Shenzhen Fenqile Network Technology Co., Ltd. ("Shenzhen Fenqile"), was established in China in August 2013 and began to operate Fenqile, an online consumer finance platform, in October 2013. On Fenqile consumers can borrow money. In October 2013, Beijing Lejiaxin Network Technology Co., Ltd. ("Beijing Lejiaxin"), was incorporated as an investment holding company in China and established its wholly-owned subsidiary Shenzhen Qianhai Juzi Information Technology Co., Ltd. ("Qianhai Juzi") in June 2014, which operates the company's online investment platform Juzi Licai. Juzi Licai is targeted at attracting institutional investors that want to invest in consumer loans.

The company's online consumer finance platform, Fenqile, offers customers personal installment loans, installment purchase loans, and other loan products. The platform also offers a wide range of products on its e-commerce channel and allows customers to utilize their credit lines to finance their purchases. It matches customer loans with three main funding sources:

- Individual Investors on its Juzi Licai platform
- Institutional Funding Partners through Juzi Licai platform and direct lending program
- Investors of asset-backed securities

At first glance, investors might be impressed by the company's growth in its loan origination (from 22.2 Billion RMB in 2016 to 126.0 Billion RMB in 2019) and its top and bottom-line growth (revenues grew from 4.3 Billion RMB in 2016 to 10.6 Billion RMB in 2019, with earnings per ADS of loss of 4.03 RMB in 2016 to profit of 12.29 RMB (~US$1.76) in 2019. However, upon a closer look, it becomes apparent why we believe LX is a ticking time bomb about to explode.



*Source:  Company prospectus*

## Website
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION.  © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

Exhibit 1
Page 3

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Civil Lending/Borrowing Interest Hurdle Rate Reform Means the End of LX's Business Model

On July 22, 2020, China's Supreme People's Court (SPC) and National Development and Reform Commission (NDRC) jointly issued a guideline on legal protection for the economy. Article 13 talks about the civil lending-borrowing interest rate and the government's intention to dramatically decrease the current up-limit interest rate that can be charged by the lenders.

> "统筹兼顾利率市场化改革与维护正常金融秩序的关系，对于借贷合同中一方主张的利息、复利、罚息、违约金和其他费用总和超出司法保护上限的，不予支持。……抓紧修改完善关于审理民间借贷案件适用法律问题的司法解释，大幅度降低民间借贷利率的司法保护上限，坚决否定高利转贷行为、违法放贷行为的效力，维护金融市场秩序，服务实体经济发展。"
>
> "Coordinate the relationship between interest rate market reform and normal financial order protection, do not support the counterparty in a lending-borrowing contract whose aggregate interest rate including interest payment, compounding interest, penalty, default fees, and other fees that exceeds the law-protected up-limit interest rate……Amend the justice explanation of lawsuits involving lending-borrowing civil cases, to dramatically decrease the legal protection of the up-limit of civil lending-borrowing interest rate, decisively denying the high-interest rate loan transfer activity and illegal lending activity, to protect the financial market's order and service the real economy's development."

**The Supreme People's Court set 24% as the legally protected up-limit of the interest rate in the civil lending-borrowing cases,** meaning if the agreed interest rate is lower than 24%, the court should support the lender when the lender requests borrower to pay interest under the contract. It was also reported that the up-limit protected interest rate could be 4 times of the one year LPR (Loan Prime Rate).

> "有知情人士向21世纪经济报道记者表示，今年春节前后最高法就在酝酿修改民间借贷的司法解释，相对于之前的24%、36%划分两道"红线"的做法，主流的意见是设定一个民间借贷利率保护上限，这个上限有专家建议参考之前一年期利率的4倍，现在可以参考央行LPR报价的四倍。"
>
> "Certain personnel familiar with this matter told the reporter from 21st Century Business Herald that around this year's Spring Festival the Supreme People's Court has already been under consideration of amending the justice explanation of civil lending-borrowing, in contrast to the previous 24% and 36% two red lines for the interest rate, the mainstream opinion is to set an up-limit protected civil lending-borrowing interest rate, and some expert suggest this up-limit rate should be 4 times of the previous one-year base interest rate, now people can refer the 4 times of Central Bank's LPR pricing. "

**Website**

https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND. FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION. © 2020 GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

Exhibit 1
Page 4

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Civil Lending/Borrowing Interest Hurdle Rate Reform Means the End of LX's Business Model (Cont'd)

On August 2020, China's Supreme People's Court (SPC) issued a press release confirming the implementation of the 4x LPR upper limit. According to July 2020 data, this would indicate an uppler limit of 15.4%. As of Q2 2020, LX averages 26.5%. SPC further stipulates that fees charged in forms other than interest need also be less than 4x LPR. In essence, the summation of all fees charged related to a loan will need to conform to the 4x LPR limit. This means LX will not be able to work around this issue by recategorizing interest payments as other forms of fees.

经院审判委员会讨论后决定：以中国人民银行授权全国银行间同业拆借中心每月 20 日发布的一年期贷款市场报价利率（LPR）的 4 倍为标准确定民间借贷利率的司法保护上限，取代原《规定》中"以 24%和 36%为基准的两线三区"的规定，大幅度降低民间借贷利率的司法保护上限，促进民间借贷利率逐步与我国经济社会发展的实际水平相适应。以 2020 年 7

> The upper limit of judicial protection for private lending rates is determined based on the standard of 4 times the one-year Loan Prime Rate (LPR) issued by the National Interbank Funding Center authorized by the National Interbank Funding Center of the People's Bank of China on the 20th of each month, replacing the original regulations of 24% and 36% two rates and three-zone regulations greatly reduce the upper limit of judicial protection for private lending rates, and promote private lending rates to gradually adapt to the actual level of China's economic and social development.

他费用之和也不得高于民间借贷利率的司法保护上限。即出借人与借款人既约定了逾期利率，又约定了违约金或者其他费用，出借人可以选择主张逾期利息、违约金或者其他费用，也可以一并主张，但总计超过合同成立时一年期贷款市场报价利率四倍的部分，人民法院不予支持。

> That is, the lender and the borrower have agreed not only on the overdue interest rate, but also liquidated damages or other costs. The lender can choose to claim overdue interest, liquidated damages or other costs, or both. However, the people's court will not support the portion that exceeds the 4 times LPR limit.

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION. © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Civil Lending/Borrowing Interest Hurdle Rate Reform Means the End of LX's Business Model (Cont'd)

## What Does This Mean For LX?

LX currently averages an APR of 26.5%, which is already higher than the previously supported rate. However, new regulations would further decrease the upper limit to 15.4%.

**If LX were to apply this 15.4% as its APR, we do not believe LX is viable anymore. According to our model, LX would have negative net income and negative book value of equity.**

Therefore, we believe this jointly issued Guideline is an existential risk for consumer lending/P2P platforms such as LX. LX's business model would simply cease to make sense once the upper-limit interest rate change is implemented. **We therefore give LX a target price of ZERO.**

| in RMB Mil | 2019 Q4 | 2020 Normalized |
|---|---|---|
| Total Outstanding Principal | 60,600 | |
| Original APR | 27% | |
| New Suggested APR | 15% | |
| Credit Spread | -12% | |
| Reduction in Operating Revenue | -1,757 | -7,030 |
| Current Operating Revenue | 3,148 | 12,592 |
| New Operating Revenue | 1,391 | 5,562 |
| Total Operating Costs | 1,670 | 6,680 |
| **Gross Profit** | **-279** | **-1,118** |
| Total Operating expenses | 741 | 2,964 |
| **Net Income Original** | **518** | **2,072** |
| **Net Income Adjusted** | **-1,020** | **-4,082** |

*Source: Grizzly Analysis, Company filings*



*Link to press release of the Hurdle Rate Reform: https://tv.chinacourt.org/50474.html*

**Website**

https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION. © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Civil Lending/Borrowing Interest Hurdle Rate Reform Means the End of LX's Business Model (Cont'd)

## But Sell-Side Said This Could Be Good?

On August 20th, the day when the official decrease of usury rate to 15.4% was announced, headlines and sell-side commentary were quick to conclude that the announcement would actually have positive implications for Chinese Fintech companies and licensed lenders such as LX. We believe these statements to be categorically false and hugely misleading.

First of all, we did not find any indications that fintech platforms are exempt from this regulation. We also believe LX does not fall under the licensed lender category, as those are typically reserved for banks.

> *"...no impact on major fintech platforms or licensed consumer credit providers, in our view. "*
>
> --- Jacky Zuo, China Renaissance Securities

Secondly, the goal of the new rule is to lower credit cost for the whole society. Contrary to what Sell-side claims, it is widely acknowledged that following the reduction of unlicensed lenders' interest rates will have a profound effect on the whole credit industry. We have seen this back in 2015 and again today in 2020. An article on Xinhua Net helps explain the full-on effect of the decision.

> *Although the "Regulations" make it clear that the scope of private lending does not include "financial institutions whose loan business is a business", industry insiders said that taking into account actual operating conditions, this "Regulations" may still have a large impact on financial institutions.*
>
> *"The general consensus is that licensed financial institutions cannot charge surpass usury rates. Therefore, we see that nominal lending rates for bank credit cards, consumer finance companies, etc. are also set just below the upper limit of judicial protection of private lending rates."*
>
> *---Chen Wen, director of the Digital Economy Research Center of the School of Finance of the University of Finance and Economics*

Thirdly, we compared word by word the 2015 and 2020 rules, and note that the exact same words were used to describe the scope of the effect. The 2015 interest rate changes which set the upper limit to be 36% had a wide effect on all financial institutions. We also see LX complying to the 2015 rules. There is no reason why the 2015 iteration would apply to LX where the 2020 version would not.

In any case, we don't see a scenario where Chinese regulators ignore and allow LX to continue charging predatory lending rates.



法程【2015】18号

**2015 Iteration**

第一条　本规定所称的民间借贷，是指自然人、法人、其他组织之间及其相互之间进行资金融通的行为。

经金融监管部门批准设立的从事贷款业务的金融机构及其分支机构，因发放贷款等相关金融业务引发的纠纷，不适用本规定。

法程【2020】 号

**2020 Iteration**

**第一条** 本规定所称的民间借贷，是指自然人、法人和非法人组织之间进行资金融通的行为。

经金融监管部门批准设立的从事贷款业务的金融机构及其分支机构，因发放贷款等相关金融业务引发的纠纷，不适用本规定。

*Translation:*
*These Provisions are not applicable to financial institutions and their branches established with the approval of the financial regulatory authorities to engage in loan business and disputes arising from the issuance of loans and other related financial businesses*

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION.  © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

Exhibit 1
Page 7

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Civil Lending/Borrowing Interest Hurdle Rate Reform Means the End of LX's Business Model (Cont'd)

## Stock Price and Earnings Q&A Signals Negative Effects



*The stock price performance on the heels of earnings report was dumbfounding to say the least. With revenue beat and only slight earnings miss, the stock was down almost 15% in the following two days. We suspect people familiar with the hurdle rate reform already began selling-off on rumors of decision being reached. Had the decision been truly beneficial to LX, the opposite likely would have happened.*

Contrary to consensus, we believe the decision to reform the hurdle rates was actually reached on August 18th, 2 days before the official announcement. In fact, it is not unreasonable to assume the decision was already reached before LX earnings report.

> Translation of Interest Rate Press Conference:
>
> *Hello everyone, thank you all for attending today's press conference.* **In accordance with the decision adopted by the Supreme People's Court Judicial Committee on August 18, 2020 at the 1809 meeting of the Supreme People's Court, the decision to amend the regulations on several issues concerning the application of law in the trial of private lending cases was officially released today (August 20, 2020).** *The revised Supreme People's Court on Several Issues Concerning the Application of Law in the Trial of Private Loan Cases*

During the earnings call, the management was asked about the "rumors of the interest rate reform". Below are responses from LX.

> **Tony Hung, LexinFintech Holdings Ltd. - Investor Contact [24]**
>
> [Interpreted]
>
> So Eddie, we've also seen the reports, obviously, and I think it's fair to say that, ultimately, there is no conclusion, if you will, from any of the government authorities. And then after the article was out, there was certainly a lot of media responses and other things that came out discussing the particular news. And I think a lot of it basically indicated that, well, ultimately, this doesn't really match the situation or the needs in China right now.
>
> Now the goal ultimately is to lower the APR to strengthen the economy that we can certainly understand, and it does make sense by itself. But what it will do and how they will do it in a way that makes sense, obviously, we don't know and no one knows yet.
>
> Now we did do our own analysis on our underlying business as well, which we can share. We can say that businesses where we're making loans over 24% APR, we don't really have that. We're basically focused on an IRR definition of things. And we're much focused on the 24% IRR. Where we can be over in the most recent quarter, we were at around 26%. Well, when we calculated, if we adhere to some of the calculations stringently, then we might have a 10% reduction in our service fees or revenues. And anybody who is over that, we would cut off, unfortunately, as a customer. But in turn, this is going to reduce our overall risk. So in turn, there may be some benefits to it as well.

**Website**

https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION.  © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Civil Lending/Borrowing Interest Hurdle Rate Reform Means the End of LX's Business Model (Cont'd)

## Stock Price and Earnings Q&A Signals Negative Effects

We assume the following two scenarios.

### Scenario 1: LX Management Knew the Outcome of the Decision

Assuming management knew the outcome of the decision, their response to the analyst would seem dodgy at best, and pessimistic about its effect on LX's current services. If the ruling were in favor of LX, we believe management would have been much more confident and offered a much stronger response.

### Scenario 2: LX Management Unaware of the Outcome of the Decision

Assuming management did not know the outcome of the decision, their response would still indicate that they will suffer as opposed to thrive under the new regulations. Even they acknowledge that they will likely see at least 10% reduction in service fees or revenues. Although we believe the ultimate effect is much more devastating, we side with management in that this is all-together bad news for them.

Therefore, we strongly disagree with the prevailing sell-side commentary and believe that the Hurdle Rate Reform will be a hurdle LX cannot pass.

**Website**

https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION.  © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

Exhibit 1
Page 9

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# LX Accumulated a Giant Off-Balance Sheet Loan Book that Looks Highly Toxic to Us

Since 2018, LX has been shifting to off-balance sheet loans by facilitating loans between its customers and institutional funding partners. This is the main driver of the company's revenue growth in the past two years.

| (in RMB'000, except for number of users) | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| **Outstanding principal balance (in millions)** | **9,899** | **19,272** | **32,397** | **60,567** |
| Outstanding principal balance by accounting treatment: | | | | |
| **Outstanding principal balance of on-balance sheet loans (in millions)** | **7,712** | **12,012** | **6,808** | **4,785** |
| **Outstanding principal balance of off-balance sheet loans (in millions)** | **2,187** | **7,260** | **25,589** | **55,782** |
| Outstanding principal balance by type of loan product: | | | | |
| **Outstanding principal balance of installment purchase loans (in millions)** | **2,106** | **1,677** | **1,570** | **2,365** |
| **Outstanding principal balance of personal installment loans (in millions)** | **7,793** | **17,595** | **30,827** | **58,202** |

This is due to overall regulatory pressure on peer to peer (p2p) lending. Since 2015, the Chinese government has been adjusting regulations and enforcing more stringent oversight over p2p lending due to the high-risk nature of the business. By the end of 2018 and early 2019, a document called "Opinions on the correct Classified Disposal and Risk Prevention of Online Lending Institutions关于做好网贷机构分类处置和风险防范工作的意见", more commonly known as document 175, outlined the general trend of companies exiting the entire p2p industry. We believe LX made the recent structural changes to comply with regulatory changes.

While we applaud the company for taking measures to seem more compliant with relevant regulations, two issues deem scrutiny:

1. Off-balance sheet loans demonstrate high risk profile
2. Despite what the name suggests, equity investors are ultimately liable for the performance of these loans

We believe the increase in the off-balance sheet loans outstanding makes it hard for investors to gauge what kind of risks are associated with these loans. Although the risk profile of the on-balance-sheet loans might not be the same for the off-balance sheet loans, we believe it is a good proxy for investors to get a general idea of how the risk profile has shifted in the last two years.

| | 2016 | 2017 | 2,018 | 2,019 | | 2016 | 2017 | 2,018 | 2,019 |
|---|---|---|---|---|---|---|---|---|---|
| Risk level: | | | | | | | | | |
| A | 2,575,784 | 3,078,483 | 1,544,637 | 996,524 | | 33.4% | 25.6% | 22.7% | 20.8% |
| B | 1,296,013 | 2,235,552 | 1,502,681 | 1,023,490 | | 16.8% | 18.6% | 22.1% | 21.4% |
| C | 2,455,076 | 2,890,202 | 1,447,785 | 661,688 | | 31.8% | 24.1% | 21.3% | 13.8% |
| D | 892,322 | 2,714,510 | 1,359,982 | 856,633 | | 11.6% | 22.6% | 20.0% | 17.9% |
| E | 206,164 | 807,290 | 308,528 | 625,700 | | 2.7% | 6.7% | 4.5% | 13.1% |
| F | 67,973 | 170,335 | 318,276 | 399,073 | | 0.9% | 1.4% | 4.7% | 8.3% |
| N and others | 218,540 | 116,078 | 325,817 | 221,925 | | 2.8% | 1.0% | 4.8% | 4.6% |
| **Total** | **7,711,872** | **12,012,450** | **6,807,706** | **4,785,033** | | 100.0% | 100.0% | 100.0% | 100.0% |

*note: per company's filing, the key factors we consider in determining the credit risk level of each customer include: 1) Geographic location, for example, whether the customer is located in a first-tier, second-tier or third-tier city, and the level of economic development of the relevant city; 2) Education background, i.e., the customer's academic degree and past or current education institutions; 3) Level of income; 4) Outstanding loans from other external sources, such as credit card issuers and other consumer finance platforms; and 5) External credit references. Risk Level A has the highest credit rank.*

Above is the table that summarizes the company's net record investment of the financing receivables, by credit quality indicator, from 2016 to 2019.

It is evident that the percentage of loans from risk levels D and below increased dramatically from 2016 to 2019. To put into perspective, the total percentage of loans from risk levels D, E, F and N and others

increased from 18.0% in 2016 to 44.0% in 2019.

Typically, it would make sense for the company to put relatively better loans in terms of risk on its own balance sheet and put the loans that are riskier off its balance sheet. Thus, it is reasonable to assume the risk profile of the loans that are off-balance sheet is as least as bad as what is shown on its balance sheet.

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND. FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION. © 2020 GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

August 25th 2020



GRIZZLY
R E P O R T S

Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# LX Accumulated a Giant Off-Balance Sheet Loan Book that Looks Highly Toxic to Us (Cont'd)

## Worse Yet, LX Shareholders Are Guaranteeing the Performance of These Toxic Loans.

We believe LX's business model is widely misunderstood. Investors seem to be largely unaware that, even if the majority of the company's loans outstanding are off-balance sheet, it still needs to provide protection for a lot of these loans.

- For the off-balance sheet loans funded by the individual investors on Juzi Licai, **LX provides a risk safeguard scheme** to the individual investors and records the obligations associated with the RSS in accordance with ASC 460, Guarantees.
- For the off-balance sheet loans funded by certain Institutional Funding Partners, **LX provides deposits and replenishes such deposits** from time to time to the institutional funding partners by directly compensating them for principal and interest payment in the event of the borrowers' defaults, which are accounted for as guarantee liabilities under ASC 460, Guarantees, provided that the scope exception under ASC 815-10-15-58 is met.

*Accounting Standards Codification (ASC) 460, Guarantees, requires that the fair value of guarantees be recognized as a liability, and establishes the notion that a guarantee actually consists of two distinct components. These two obligations have quite different accounting implications: noncontingent obligation; and contingent obligation. The first of these components is a noncontingent obligation, namely, the obligation to stand ready to perform over the term of the guarantee in the event that the specified triggering events or conditions occur. This stand-ready obligation is unconditional and thus is not considered a contingent obligation. The second component, which is a contingent obligation, is the obligation to make future payments if those triggering events or conditions occur.*

*For a financial guarantee contract to meet the scope exception of ASC 815-10-15-58, the contract must:*
*1.   Provide for payments to be made solely to reimburse the guaranteed party for failure of the debtor to satisfy its required payment obligations*
*2.   Provide payment only if the debtor's obligation is past due*
*3.   Provide payment only if the guaranteed party is exposed to the risk of nonpayment at inception of the guarantee arrangement and throughout its life*

### *Off-Balance Sheet Loans Funded by Individual Investors*

Off-balance sheet loans on the Juzi Licai platform went through a structural change in late April 2018. The previous model was referred to as the Old Model. The New Model positions LX as the intermediary between Borrower and Individual Investors. In terms of protection for loans:

Under the New Model, the Group entered into a cooperation agreement with an independent third-party guarantee company (the "Guarantee Company"), to set up a new investor protection program called the Risk Safeguard Scheme ("RSS"). The purpose of the RSS is to provide make-up payments to the Individual Investors on Juzi Licai when the Borrowers default. **The RSS only applies to loans newly funded under the New Model** and requires the Borrowers to contribute to the RSS to protect the Individual Investors. By default, all Borrowers enroll in the RSS when the Underlying Loan Agreements are entered into.

However, the Juzi Licai's old model is not covered by such RSS. Rather they are protected by the quality assurance program that ceased operation in April 2018.

As of fiscal year end of 2019, there are still over RMB 821.4M are still outstanding from the old model. This is disturbing in two aspects:

1.   Since the old model halted on April 24th, 2018, why is there such a large balance by the end of 2019?

2.   Who offers protection for the default of such loans? They should be largely overdue right? According to company disclosure, loans delinquent for over 90 days are 1.56%, amounting to around 945M. We have reason to believe RMB 821.4M belongs to the old model that is unprotected.  **This is a huge red flag**

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION.  © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# LX Accumulated a Giant Off-Balance Sheet Loan Book that Looks Highly Toxic to Us (Cont'd)

## Worse Yet, LX Shareholders Are Guaranteeing the Performance of These Toxic Loans.

*Off-Balance Sheet Loans Funded by Institutional Funding Partners*

LX sources the majority of its funds through institutional funding partners. Wall Street and investors have applauded the company for this structural funding change and have allocated a higher valuation to the company. However, we believe the general perception of the potential riskiness of the loans is largely misguided. We believe these loans are even riskier than individual investor loans. Per 2019 20F, the company discusses that they have guarantees for institutional funding partners:

> Starting from 2019, the Group started to cooperate with third-party insurance companies and guarantee companies that directly provide guarantee services to certain Institutional Funding Partners, and no longer replenished the deposits made to these Institutional Funding Partners. According to relevant financial guarantee arrangements, third-party insurance companies and guarantee companies will provide the principal and interest payment to these Institutional Funding Partners, in case of Borrowers' defaults. However, the Group is required to provide deposits and replenish such deposits from time to time to the bank accounts of these insurance companies and guarantee companies, in the event that such insurance companies and guarantee companies perform their guarantee obligations upon the Borrowers' defaults. ***Effectively, the Group provides back-to-back guarantee to the insurance companies and guarantee companies and takes on all of the credit risk of the Borrowers.***

**Effectively, the Group provides back-to-back guarantee to the insurance companies and guarantee companies and takes on all of the credit risk of the Borrowers.**

Sophisticated verbiage aside, their RSS program is a limited liability account that only pays out investors the maximum amount in the RSS program, whereas guarantees for institutional investors take on all credit risks of borrowers. Essentially, under mass default, all company assets and shareholder equity are fair game as repayment measures. As of December 2019, the company has close to $8 billion in outstanding principal from off-balance sheet loans. However, the company only holds $179 million in deposits to insurance companies and guarantee companies, which is merely 2.2% of the total outstanding balance. This is even insufficient to cover the ~3% default rate disclosed by the company, not to mention the undisclosed, or hidden portion of the defaults.

In essence, LX is under-reserving for a liability that they are 100% responsible for.

To give you an idea how fragile LX's balance sheet is, consider the restatement that occurred in Q1 2020. The FASB issued amended guidance related to impairment of financial instruments as part of ASU No. 2016-13, Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments, which became effective January 1, 2020. The implementation of this new accounting guidance wiped out 0.3B RMB, or 5% of LX's shareholder equity on its balance sheet. Shareholder equity is a common metric to value subprime lenders, and we are surprised the significant development has gone seemingly unnoticed.

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION.  © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

Exhibit 1
Page 12

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# LX Accumulated a Giant Off-Balance Sheet Loan Book that Looks Highly Toxic to Us  (Cont'd)

## Timeliness: Why we believe the Scheme is about to Fall Apart

We believe that LX's structure has exposed shareholders to giant off-balance sheet liabilities while protecting Chinese institutional investors. While in good times big leverage might work in your favor, it also exposes you to greater risk when the going gets rough. We believe the time has come for LX's scheme to unfold and it is only a question of time until the company must restructure or wipe out shareholders. Our belief is based on four key insights:

1.  Recent guidelines issued by SPC and NDRC put significant downward pressure on the future usury hurdle. Under the newly proposed interest rate, LX's business will see a significant decrease in profits, if not a complete wipeout of business.

2.  LX is essentially targeting low credit quality consumers in China. Even under current interest hurdle rates, LX's consumer lending platform seems to be predatory. There are countless complaints about usurious interest rates (36% apr is usury hurdle in China) and predatory collection practices. These consumers are likely unable to obtain credit from traditional financing methods.

3.  The Corona Virus has forced many Chinese borrowers into delinquency. We believe the recent delinquency rates LX reports seem way too low and are utterly untrustworthy. This effect should disproportionally affect low-quality borrowers who are willing to pay the excessive interest rates LX charges.

**4.  We observed that LX seems to extend and restructure loans to give the appearance of performance and current-ness of old loans where the borrower is actually delinquent or in default.**

Additionally, we have evidence that makes us strongly doubt the integrity of the financial statements in general and the legality of certain business practices in particular:

-    LX seems to be still facilitating direct peer to peer lending, which is generally outlawed as illegal in China.

-    Several employees of LX operate companies in the similar business as LX. We suspect these undisclosed related parties are used to inflate financials and conduct borderline illegal activities such as direct peer-to-peer lending and aggressive debt collections.

-    Big restatements of past financials cast doubt on the integrity of financial statements.

-    Insiders are selling shares, and pocketing unordinary high compensations.

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION.  © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

Exhibit 1
Page 13

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# LX Continues to Sell P2P Products Despite Publicly Stating Otherwise

*"Given the increasingly tightening trend of restrictions on online consumer financing, we have gradually shifted our business model away from individual funding and further diversified our funding sources in 2019 in line with regulatory guidance.* **We have ceased facilitating new loans with funding from individual investors on Juzi Licai platform since November 2019.** *"* --- LX 20F

Despite what the company claimed, we discovered that LX is blatantly lying to the government and investors, and are continuing to offer P2P products on its Juzi Licai app (LX's P2P Mobile App). We are also quite amazed at how auditors neglected a red flag that was so easy to identify. All they had to do was to download the application and look at the product offerings. As of the date of this report, LX's Juzi Licai is still offering 8 products with interests ranging from 5% to over 10%. The products are sold daily at 10am every day.

Each product has a detailed breakdown of the related transaction personnel involved, including whose loan was matched with whose money.

For example, in this case, on July 8th, a person Surnamed Rong borrowed RMB 90,000 and received loans from over 2818 lenders.



Even as of today, we still see cases where peer loans are matched with peer lenders on the Juzi Licai platform, in the typical P2P finance fashion.

It is mind-boggling that LX continues to sell P2P products under the current stringent regulatory environment. We believe this could cause a big backlash once the regulator determines to take action on this activity.

A variety of products are offered everyday at 10:00 Beijing Time.

## Website

https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND. FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION. © 2020 GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# LX Continues to Sell P2P Products Despite Publicly Stating Otherwise (Cont'd)

It seems LX is in clear violation of the current regulation from the city of Shenzhen, Guangdong Province. According to a media report, on December 7, 2018, the Shenzhen Internet Finance Association (a self-regulating body backed by the local government) issued a notice that put additional strict rules on the P2P sector.



It was reported that as of January 2020 already 203 P2P platforms have phased out of this peer-to-peer lending business. It seems the trend is continuing. As recently as April and May, two big-scale P2P platforms have announced a gradual phase-out of the P2P business. These two companies located in the city of Shenzhen, where LX's P2P platform Juzi Licai is also headquartered.

> **In the past few years, countless P2P platforms have been busted which resulted in management arrest/civil lawsuits/regulatory shut-down. LX is danger of facing the same fate.**

> •    In Feb 2019, the Chinese government confirmed it had frozen $1.5billion in assets from unscrupulous P2P lenders and around 100 executives are under investigation. Thousands of platforms have gone bust or just disappeared over the past two years.
> •    In April 2020, a P2P platform called Suishouji (随手记) issued a notice stating that it will gradually conduct business closure and get out of the P2P business. It is reported that the balance of outstanding loans on its platform was RMB 2.6 Billion as of March 31, 2020, with 80,793 individual lenders.
> •    In May 2020, a P2P platform called Xiaoniu Zaixian (小牛在线), one of the biggest P2P platforms in Guangdong Province, announced the gradual phase-out of the P2P business. According to its website, the balance of outstanding loans on its platform was RMB 10.4 Billion with 115,790 individual investors.

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION.  © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Fenqile Lending Platform Seems Highly Predatory

We looked into Fenqile and found that it targets very low credit consumers and often charges interest rates over the legal usury rate in China, which is 36% p.a. Additionally, the company seems to bully lenders on the platform with harassing phone calls, and sudden increases in principal. These practices are more reminiscent of loan sharks than a credible lending operation.

There are many complaints online that allege Fenqile's APR is over 36%. For example, on one of the main consumer complaining site, https://ts.21cn.com/ (聚投诉), numerous complaints are alleging Fenqile has been charging higher than 36% on the loans the company lends out.

*Example 1: https://ts.21cn.com/tousu/show/id/2305472*

> "……而欠款额度到达三万多的时候是2018年到2020年期间，就算这两年借满三万五，一年利息按24%算，一年7200，两年也才14400，加上2018年以前的年利息算6000，总的也才两万左右利息啊，现在还要我还出四万五，也就是这几年的本金还清了，借款三万多，这两年的利息就是四万五，其利息高出法律红线，是高利贷中的高利贷，期间多次跟分期乐客服沟通，都说后期联系我，但是一直没联系，现在也逾期了，如果本人征信受到影响，必将拿起法律逾期保护自身权益……"
>
> "The borrowing amount reached RMB 30,000 plus between 2018 and 2020, and even if [I] borrowed RMB 35,000, and based on an annual interest rate of 24%, 1 year [I will have to pay] RMB 7,200, and it will be RMB 14,400 for two years. Adding the total annual interest payable of RMB 6,000 before 2018, the total interest [for me to pay] should only be about RMB 20,000. Now [Fenqile] is asking me to pay RMB 45,000, which means even if the principal of RMB 30,000 plus is paid off during these years, but the interest [on this principle] is RMB 45,000. **This interest rate is much higher than the law-allowed red line, and it is usury of the usuries.** During this period [I have] communicated with Fenqile's customer service and then they told me they would contact me, but they didn't. Now I am in delinquency, and if my credit is negatively affected, I will rely on the law to protect my rights…"

In this case, the person complained that he/she is receiving over 60% annualized interest rate on his/her principal.

*Example 2: https://ts.21cn.com/tousu/show/id/2306531*

> "……16年中旬亲戚用我的名义借款30000元，实际到账30000元，期间亲戚承诺还款，但一直分期或者最低还款，现还款金额达到15000元，期间催收电话进行通讯爆破，本人才得知真相，直至今日需还账单涨到50000元，我认为分期乐属于高利贷，以分期手续费名义进行乱收费，利滚利，现本人需要和分期乐协商退还手续费，重新规划债务……"
>
> "In the middle of 2016, one relative used my name to borrow RMB 30,000, and the actual borrowing [from Fenqile] is RMB 30,000. During this period my relative promised to pay it back, but he/she only paid in installments or minimum payback, and until now the total payback reached RMB 15,000. During this period, the debt collection parties phoned many of the contacts on my phone, and then I realized that the current balance payable increased to RMB 50,000. **I believe Fenqile belongs to usury, and it collects fees and uses the interest to grow interest under the name of installment fees.** Now I need to negotiate with Fenqile to give me back the fees and reorganize the debt."

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND. FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION. © 2020 GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

16

Exhibit 1
Page 16

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Fenqile Lending Platform Seems Highly Predatory (Cont'd)

Additionally, we also saw countless complaints regarding the collection policy. These malpractices are borderline reckless, harassments, and illegal. Many of these malpractices include contacting the borrower's friends and family to pressure repayment. Note that in China it is illegal to disclose personal loan information to third party without consent of the debtor.

*Example 3: https://ts.21cn.com/tousu/show/id/2339816*

> "……外包催收直接打爆通讯录，打到公司，导致我现在被公司准备辞退，协商分期付款，不同意，一直不停的爆通讯录。……"
>
> "The outsourced loan collection company called many people in my contact list, even to my company. I have now been laid off due to this. **I tried to negotiate an installment but they didn't agree and continued to aggressively call everyone on my contact list**.…"

*Example 4: https://ts.21cn.com/tousu/show/id/2305293*

> "分期乐平台再4月24日给我发送一封律师函件，当时我加了联系人微信。告知对方款项已经还清，并且我征信报告和支付宝上面也没有记录。对方让我登陆分期乐账户，但是我登陆不了。由于上班原因要晚上8点才下班。客服电话我也联系不了。在这期间联系家人告知有欠款事情，老母亲已经马上60岁了，身体一直不好，听其消息整个人由于雷劈，身体受到严重伤害。其父亲也一同受到伤害，并且打的是我父亲新的手机号码，不知道对方在何地用何种方法窃取到的。现要求分期乐致电家人道歉并提供录音，对家人造成的影响做出赔偿"
>
> "Fenqile sent me a lawyer letter on April 24th, I immediately added their WeChat account. I told them I repaid the money already. In addition, my credit report and Alipay account both do not have a record of loans outstanding. The other party asked me to log into Fenqile, but I couldn't. Due to work, I couldn't get off until 8 pm and couldn't reach out to customer service as well. **During this period, they contacted my family and told them about the loan issue.** My mother is almost 60 years old and has always been in poor health. Upon hearing the news, she was shocked and suffered health injuries. My father was injured as well. They also managed to call my father's new number. I don't know how they got that in the first place. I now demand Fenqile record an apology to my family and compensate my family accordingly. "

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION. © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Related Party Issues - Undisclosed Entities are not a good look

## Employees of LX Has Been Holding Equity Interest in Companies that Are Undisclosed by LX as Subsidiaries



*Source: Qichacha*

During the research, we identified at least five companies that are owned by individuals who we believe are related to LX.

We obtained SAIC filing on the above companies and discovered that only Beihai Jiguang had meaningful financials. The company generated 52m RMB in revenue in 2018, of which close to 20M RMB were from loan collection services provided most likely to LX. (Note that there were no costs associated with the additional 20M revenue.) It's as if the company gave this money to Beihai Jiguang for free.

The parent company Beihai Caidan lists www.my-caidan.com as their official website. The website is no longer functional as of the date of this report. However, wayback archive suggests that the website previously hosted MMM Finance (MMM互助金融平台). In 2016, Chinese Central Bank warned investors to not participate in MMM Finance. Due to the website's previous involvement in MMM Finance, we do not believe this related party to be a credible company. We suspect this is one of the reasons why the company was not disclosed as a related party.



*Source: https://web.archive.org/web/20160308210732/http://www.mycaidan.com/*

### Website

https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION. © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Related Party Issues – Undisclosed Entities Cast Doubt on Integrity of Financial Statements

Three individuals own Beihai Caidan E-Commerce Co., Ltd ("Beihai Caidan"), which has another 4 subsidiaries. Those individuals are YANG Tao (50%), YUAN Kai (25%), and Ma Ming (25%). YANG Tao is also the legal representative of Beihai Caidan.

On LX's official website, YANG Tao was listed as the company's Vice President.



*Source: LX Website*

Yuan is the legal representative for numerous branch offices of Shenzhen Fenqile, which is one of LX's main subsidiaries.



*Source: Qichacha*

With the employee being legal representative and combined 75% equity interest of Beihai Caidan (along with its 4 subsidiaries) owned by its employees, we believe it is reasonable to say that LX has the ultimate control over Beihai Caidan. According to the introduction on Beihai Caidan's business per SAIC filings, it includes:

> *Commerce information consulting services, e-commerce information consulting services, electronic and network electronic product development, technological consulting, technological services, technological promotion and transfer. Enterprise information consulting service, etc.*

These busines descriptions share similarities to LX's consumer financing lending business and we highly suspect there are undisclosed related party transactions between these two parties.

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND. FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION. © 2020 GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Related Party Issues - Family Matters

## We Suspect LX Sold a Business Unbeknownst to Investors to the Chairman's Relative

According to the SAIC information, Ji'an Microcredit was established on December 2, 2016, and it was 100% owned by one of LX's subsidiaries until May 8, 2019, when a company called Jiangxi Leyu Technology Co., Ltd. (江西乐誉融科技有限公司, "Jiangxi Leyu") became a 34% shareholder. There is limited information on Jiangxi Leyu, but we also found that there is another company called吉安奥聚讯信息咨询服务有限公司 (Ji'an Aojuxun Information Consulting Services Co., Ltd. "Ji'an Aojuxun"), which shares the same phone number (15079604902), email address (1913425305@qq.com), and both of the companies are on the 7th floor of the same building.

Ji'an Aojuxun is 80% owned by an individual named XIAO Wenjuan, whose name is very similar to LX's Chairman and CEO, XIAO Wenjie. We strongly suspect this individual to be in fact the chairman's sister, and act as a proxy on his behalf.

If true, this constitutes a clear violation of SEC disclosure guideline.

We suspect the reason why XIAO Wenjuan (related to XIAO Wenjie) wants to control Ji'an Microcredit is that the microcredit lending business has a much lower regulatory risk. In November 2019, the National Fintech Risk Regulators issued a notice that guides P2P companies to transforms to become microcredit lending companies. That means microcredit lending business, in regulator's views, is a lower risk sector than the P2P sector, and it appears to us that XIAO Wenjuan's move in May 2019 is to take advantage of this regulatory trend in advance.

We question why the management failed to disclose this transaction at the time. Was it due to favorable prices? Was it due to the family connection? We suspect both!

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION. © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Terrible Macro Trends: The Chinese Low Credit Consumer has had a Tough Period During The Quarantine

The overall banking sector in China has taken a heavy blow due to COVID, and the vast economic effects continue to show.

Multiple media outlets have touched upon the massive headwind to the credit industry in China during the coronavirus.

> "**Consumer default rates at some banks have already increased to as high as 4% from about 1% before the outbreak**, according to Zhao Jian, head of Atlantis Financial Research, who cited a survey of lenders. An executive at one major Chinese bank said his firm is taking steps to **tighten credit card loans or even drop some clients after seeing a rapid increase in overdue payments**."
> ---The Economic Times

> "Meanwhile, multiple local banks told the FT their **overdue personal loan ratio had surged by as much as 60 percent from January**, when the disease broke out….China Merchants Bank Co., paused on its credit-card business in March after a significant increase in past-due loans." ---Financial Times

> "The lending campaign, however, has raised concerns about credit risks because defaults have also taken off. Zhou Lifeng, chief risk officer at Hangzhou-based Sunyard Fintech, a consultancy that advises banks on risk management, said **his clients had seen an increase of between 20 percent and 50 percent in non-performing consumer loans since the disease emerged**." ---Financial Times

The situation unfortunately prolonged even when Covid in China was steadily put under control. The borrowers are still fundamentally in a bad place.

> "As of June 2020, Chinese bank's delinquent loan rate is 2.1%, even higher than during the first quarter. **Regulators are even more worried that the current numbers do not fully reflect the underlying risks** due to a number of policies put out such as extending loans, borrowing new ones to repay old etc." ---Sina Finance

Similarly, in the online financing sector, which is typically considered to be targeting subprime borrowers who could not secure financing from lower interest rate channels such as banks and other traditional financial institution, the situation has been consistently dire.
Qudian Inc., (NYSE: QD) has seen its delinquency ratio jump to 20% in February from 13% at the end of last year.

Notice that borrowers and users under LX are typically considered sub-prime and high-risk borrowers by any traditional bank standards. Most probably turned to LX services after failing to acquire the desired loan from a bank. If the situation banks present is this dire, we worry the risks LX is facing is even a lot worse.

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION. © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# We Believe the Company is Masquerading Deteriorating Credit Quality

We believe LX has artificially deflated its default and delinquency ratio to give the appearance of a more healthy financial position.

We believe the LX has been artificially increasing the maturity of the loans upon default through a feature called "再分期", installment on installment and "最低还款服务", minimum payment. To put this into perspective, this is equivalent to when your minimum credit card payment comes due this month, the company gives another extension to your minimum payment and treat it as a new credit loan. According to LX users, LX has recently been extending the maturity of their loans on the second day after they become delinquent. We believe the company has been secretly doing so for a long time.

One user applied for this extension on the third day of becoming delinquent. His loan balance suddenly spread out over 12 months.

> *We spoke to numerous sell-side analysts who also casted doubt on how LX was able to maintain such low default and delinquency data. They suspected loan extensions but weren't able to obtain evidence. We now provide proof that delinquent loans were in fact extended/renewed.*



*Source: https://m.wdzj.com/intelligence/70422.html*

This feature has been implemented by LX since 2016. However, it was only used on loans that weren't delinquent. **Now, most likely due to effects of COVID-19, the company has deployed this tactic on delinquent loans to generate a seemingly healthy loan portfolio.** The users don't have to pay back the amount immediately and the company no longer has to book delinquencies.

In reality, we believe what is happening under the black box that no investors, no lenders can see is the following.

Suppose $1M of loans issued in Jan 2019 becomes due 12 months later on Jan 2020 and only very few borrowers are able to make payment. Instead of directly charging the entire balance of 1M+ delinquent loans, LX "vets" its borrowers and chooses to either offer them "installment on installment" or "minimum payment". Those who do not receive such services are accounted for as delinquent borrowers, but the company wants to keep this number to a minimum. However, those who receive such options, their delinquent loans are essentially packaged into another product that is sold to lenders (investors). The proceeds are then used by the borrowers to pay back delinquent loans, thus reducing delinquency rates. We believe the black box is so elaborately set up that even institutional investors and insurance companies are not fully aware. As long as the company can solicit more funding from investors the Ponzi scheme keeps rolling.

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION. © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

22

Exhibit 1
Page 22

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# We Believe the Company is Masquerading Deteriorating Credit Quality (Cont'd)

However, there are some symptoms we can expect from this scheme.

## Overall High APR



*Source: Company filings*

*We can expect an overall increase in APR due to higher interest expenses charged on supposedly delinquent loans*

Note that in China, the legal upper limit of interest rate is separated into two tranches, 24% and 36%. For borrowers who have not repaid interest, the lender must not ask for an APR higher than 24%. The amount exceeding 24% will not be protected by law. For borrowers who have already paid interest, borrowers can request the amount of interest exceeding APR of 36% to be returned.

LX's APR has been consistently over 24% in 2018Q4 and will likely continue to rise due lower asset credit qualities and the installment on installment scheme. This has been above the legal interest rate. Borrowers can refuse to pay such amounts. In other words, the increase of APR cannot go on.

Furthermore, the recent regulation in China will likely further limit the company's ability to charge excessive APR.

## Deteriorating Credit Performance

Another symptom we can expect is the deterioration of credit performance measured by many factors, including vintage rate, charge-off rate, delinquency rate, and default rates. While some are more reliable than others, in the case of LX, we see deterioration in all metrics.

### Vintage Rate

Vintage rate is defined as the amount of net delinquent loans during a period (vintage) to the total amount of loans originated during that same period. The metric is more reliable than the delinquency rate since delinquency rates can easily be manipulated by growth.

Below is the chart of LX's vintage rate up to Q2 2020. As we can see, the lines that are to the upper-left tend to be shorter than those to the lower left. The length of the line corresponds to the period of origination. Shorter lines indicate that less time has passed, thus corresponds to more recent periods, and longer lines correspond to more distant periods. We see that newer vintages are having higher delinquency rates, indicating lower credit quality.



*Source: Company filings*

*Vintage Rate Curve of LX from 2015Q1 to 2020Q2.*

We see a taller vintage curve due to lower quality loans being packaged together into newer loans. As discussed below, a tall vintage curve indicates a recent deterioration of asset quality. We believe as LX repackages delinquent loans and selling them to investors, they are postponing the inevitable delinquency into later periods. This can already be seen in the changes in the vintage curve. We believe this trend will continue and that LX's loans will become even riskier.



*Source: Grizzly Analysis, Company filings*

*The lines will start to pile into the first quadrant indicated by the red rectangle. This is an indication of deteriorating credit quality*

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION. © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# We Believe the Company is Masquerading Deteriorating Credit Quality (Cont'd)

In comparison, LX's competitor QFIN demonstrates higher stability in their products' creditworthiness.



*Source: QFIN Company filings*

QFIN's vintage curve appears to be much flatter.

We see that apart from the latest quarter Q2 2020, charge-off rates have been consistently around 3%. However, as we've previously shown, this datapoint is not to be relied upon.



*Source: Company filings*

LX's charge-off rates appear to be consistently around 3%, however we believe this is just an illusion.

## Vintage Charge-off Rate

Vintage Charge-off rate, more commonly known as default rate is the amount of loan that was charged-off (due to default) during a specific period (vintage) to the total loan amount originated during the same period.

## Delinquency Rate

Delinquency rates can be fairly misleading. It is defined by the delinquent amount over the total outstanding loan balance of a given period. It can be easily manipulated to portray a better risk profile by simply issuing more loans.

| RMB in Bil | 18Q1 | 18Q2 | 18Q3 | 18Q4 | 19Q1 | 19Q2 | 19Q3 | 19Q4 | 20Q1 | 20Q2 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total outstanding principal balance** | 21.3 | 24.7 | 25.8 | 32.4 | 35 | 40.6 | 51.5 | 60.6 | 58.5 | 61.9 |
| *growth y/y* | | | | | 64% | 64% | 100% | 87% | 67% | 52% |
| **30 Days + Delinquency Ratio** | 3.00% | 2.60% | 2.80% | 2.60% | 2.90% | 3.00% | 2.70% | 3.45% | 6.02% | 5.55% |
| *growth y/y* | | | | | -3% | 15% | -4% | 33% | 108% | 85% |
| **30 Days + Delinquency Amount** | 0.64 | 0.64 | 0.72 | 0.84 | 1.02 | 1.22 | 1.39 | 2.09 | 3.52 | 3.44 |
| *growth y/y* | | | | | 59% | 90% | 92% | 148% | 247% | 182% |
| **90 Days + Deliquency Ratio** | 1.44% | 1.39% | 1.39% | 1.41% | 1.42% | 1.49% | 1.40% | 1.56% | 2.57% | 2.99% |
| *growth y/y* | | | | | -1% | 7% | 1% | 11% | 81% | 101% |
| **90 Days + Delinquency Amount** | 0.31 | 0.34 | 0.36 | 0.46 | 0.50 | 0.60 | 0.72 | 0.95 | 1.50 | 1.85 |
| *growth y/y* | | | | | 62% | 76% | 101% | 107% | 203% | 206% |

As we can see, each decrease in delinquency rate was accompanied by much higher growth in outstanding principal relative to delinquent amount. By expanding the denominator at a faster speed, LX can artificially keep their delinquency rate lower and portray healthy loan performance.

When we consider the total effect of charge-offs (default) and the highly uncollectable M3+ Delinquent loans, we see that as of Q1 2020, total potential downfall can be between 6.1% to 7.1%. This is equivalent to around 4.4B RMB, or roughly $630M.

According to the latest 20-F, LX has an allowance for credit loss for financial receivables of RMB 374 million, way short of covering the potential risks.

**Website**

https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND. FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION. © 2020 GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Web Traffic Analysis Casts Doubt on Purported Volume

Below is the Baidu index for LX's key consumer lending product Fenqile (分期乐) from the beginning of 2017 to May 21, 2020. One can easily see that in the past couple of years the index has rather flat. This does not make sense given that the LX's registered users increased from 20.2M at IPO

to 84.2M as of March 2020, or approximately 300% in total.

We dare to ask: How does a company manage to grow by 3x when the website traffic on its main platform appears to be flat or even declining?



*Source: Baidu Index*

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION.  © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Valuation

We believe there are severe risks that have not been correctly modeled into the current valuation, including the hidden portion of delinquency and default risks and the existential risk incurred by the recent policies regarding civil-lending hurdle interest rates. We further consider hidden liabilities brought by the old P2P model and the real effect of back-to-back guarantees.

According to our model the income statement is affected by one-time charges of RMB 372M due to delinquency and default risk adjustments, and an annual decrease of RMB 4.082B in 2020 due to hurdle interest rate changes. As a result, shareholder equity is decreased to RMB 1.85B in 2020Q1, and to negative value by the third quarter of 2020. We believe the company is essentially insolvent.

## Effect of Hidden Portion of Delinquency and Default Risks



Denominated in RMB

| Delinquency Data | | | |
|---|---|---|---|
| | 2019 Q1 | 2020 Q1 | YoY Multiple |
| QFIN [1] | 0.94% | 2.17% | 2.31 |
| FINV [1] | 3.80% | 7.25% | 1.91 |
| YRD [2] | 4.50% | 8.90% | 1.98 |
| QD [3] | 7% | 20% | 2.86 |
| | | **Average** | **2.26** |

| LX | 2019 Q1 Reported | 2020 Q1 Reported | 2020 Q1 Implied |
|---|---|---|---|
| | 1.42% | 2.57% | 3.21% |
| | | **Delta%** | 25.03% |
| | | **Effect on Operating Costs M** | **95.00** |

| Default Data | | |
|---|---|---|
| | YoY Multiple | QoQ Multiple |
| QFIN [4] | 1.80 | 1.37 |
| YRD [5] | Nil | 1.68 |
| Average | | 1.53 |

| LX | 2019 Q1 Reported | 2019 Q4 Reported | 2020 Q1 Reported |
|---|---|---|---|
| Default Rate | 2.00% | 3.00% | 3.00% |

| | 2020 Q1 Implied YoY | 2020 Q1 Implied YoY |
|---|---|---|
| | 3.59% | 4.58% |
| **Average** | | 4.09% |
| **Delta** | | 1.09% |
| **Loan Originated in Q3 2019 M** | | 37,000.00 |
| **Effect on other costs M** | | 401.46 |
| **LX Risk Management Discount** | | 25% |
| **Total Under-reported Costs M** | | 372.35 |

Notes:

[1] Multiples for QFIN and FINV is based on 90 Days Delinquency Rates.

[2] Multiples for YRD is based on Cummulative Delinquency Rates due to lack of comparable metrics.

[3] Multiples for QD is based on D1 Delinquency Rates due to lack of comparable metrics.

[4] Multiple for QFIN's Default Data is based on Provision for financial assets receivable to Loan Origination during respective vintage periods. For instance, 1.8 is derived by (93.7/55965)/(25.1/26925)

[5] Multiple for YRD's Default Data is based on QoQ Vintage Charge-Off Rates

*Source: Grizzly Analysis, Company filings*

We compared delinquency data and default data of many publicly traded peers with LX to project the estimated potential effect on its income statement. The effect from delinquency data amounts to RMB 95M in one-time charges. The effect from defaults on costs amounts to over RMB 400M in one-time charges. We give the company the benefit of the doubt by applying a 25% discount to default charges due to LX's superior "Eagle Eye" risk management

system. The cumulative dollar effect amounts to RMB 372.35M.

As of Q1 2020, LX incurred RMB 678M in losses. To be fair, over RMB 1B in costs was due to provision for credit losses of contingent liabilities of guarantees due to the adoption of CECL. Nonetheless, even when we remove CECL effects, LX would still be unable to break-even in our model.

**Website**

https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION. © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Valuation

## Effect of Existential Risk due to Hurdle Interest Rate Changes

| in RMB Mil | 2019 Q4 | 2020 Normalized |
|---|---|---|
| Total Outstanding Principal | 60,600 | |
| Original APR | 27% | |
| New Suggested APR | 15% | |
| Credit Spread | -12% | |
| Reduction in Operating Revenue | -1,757 | -7,030 |
| Current Operating Revenue | 3,148 | 12,592 |
| New Operating Revenue | 1,391 | 5,562 |
| Total Operating Costs | 1,670 | 6,680 |
| **Gross Profit** | **-279** | **-1,118** |
| Total Operating expenses | 741 | 2,964 |
| **Net Income Original** | **518** | **2,072** |
| **Net Income Adjusted** | **-1,020** | **-4,082** |

*Source: Grizzly Analysis, Company filings*

The effect of the hurdle interest rate changes is devastating. Simply put, if the new policies came into effect LX's business model would be rendered uneconomical.

Currently, LX averages an overall 27% APR and spends around 8.1% on funding costs. Were the hurdle rate to decrease to 4x LPR rate, which currently stabilizes around 15.4%, LX should see an immediate decrease of 12% in credit spread. Note that funding costs are unlikely to decrease due to institutional investors demanding a risk premium when investing money in risky assets on LX's platform.

We removed any effect of the adoption of CECL. However, despite our courtesy, after considering the effect of hurdle rate changes, LX's still looks like it is facing a fundamentally broken business model. We forecast a whopping RMB 4B decrease in 2020's Net Income or approximately RMB 1B per quarter.

To be fair, we do believe this is an industry-wide headwind and will likely cause a similar impact on other companies. However, we believe LX will be hit harder than most, due to its higher loan origination volume and higher total outstanding loan balance.



| in RMB Bil | Loan Origination | Outstanding Balance | 1 Year Stock Price Change |
|---|---|---|---|
| LX | 34.1 | 58.5 | -20% |
| FINV | 19.08 | 24 | -48% |
| YRD | 1.8 | 32 | -67% |
| QD | 7 | 15.3 | -81% |
| QFIN | 51.77 | 73.1 | 27% |

*Source: Grizzly Analysis, Company filings*

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION.  © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

Exhibit 1
Page 27

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Valuation

## Effect of Legacy P2P Model Liabilities

As previously noted, Juzi Licai's old model is not covered by the newly implemented RSS. Rather they are protected by a quality assurance program that ceased operation in April 2018. Currently, there are still RMB 821.4M liabilities outstanding. We believe this is a direct impact on shareholder equity.

## Valuation Summary

| in RMB Mil except share price | 2020-Q1 | 2020-Q2 | 2020-Q3 | 2020-Q4 | FY2020 |
|---|---|---|---|---|---|
| Beginning BV of Original Shareholder Equity | 4,059 | 1,845 | 824 | -196 | 4,059 |
| One Time Decrease in NI due to Hidden Delinquency and Default Rates | -372 | - | - | - | -372 |
| New Net Income due to Changes in Hurdle Rate | -1,021 | -1,021 | -1,021 | -1,021 | -4,082 |
| One Time Effet of Legacy P2P Model Liabilities | -821 | - | - | - | -821 |
| Ending BV of Orignial Shareholder Equity | 1,845 | 824 | -196 | -1,217 | -1,217 |
| **P/B Ratio of LX** | **2** | | | | |
| **Shares Outstanding (in Mil)** | **352** | | | | |
| **Share Price in $USD** | | 1 | 1 | -0 | NA | NA |

*Source: Grizzly Analysis, Company filings*

After considering the full effect of all adjustments, we believe LX's share price will only continue to trend down. We conclude that LX will soon be worthless.

Some industry analysts consider LX a better player in an overall bad subprime lending industry, but we think LX is among the worst companies because:

- Under-reported delinquency rate and default rate, in our opinion, exaggerated the company's net income and shareholder equity to a large extent

- The company is still in the loan origination expansion mode, and also has a larger outstanding loan balance, which puts it in greater risk under the new hurdle rate policy. The issues are only exacerbated by the borderline fraudulent practices of LX masking its deteriorating loan quality

- Stock performed relatively well compared to competitors in the past year, yet but still faces the existential risk that the proposed new hurdle rate policy might just put every company in this sector out of business, which means LX might have further downside from here

- Weakness in corporate governance that make us question the integrity of LX's financials such as undisclosed related parties and large financial restatements in the past

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION. © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

Exhibit 1
Page 28

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Outrageous Financial Restatement in Q1 2019

The reason why LX entered into our radar was the outrageous Q1 2019 restatement that happened in the company's Q2 2019 earnings release. This restatement also serves as a red flag that investors should have recognized.

What really caught our eye is the big restatement of its previously reported Q1 2019 results. The table below illustrates the magnitude of the restatement.

| US$'000 | As Reported | As Restated | in $ | in % |
|---|---|---|---|---|
| Interest and financial services income and other revenues | 56,508 | 45,021 | (11,487) | -20.3% |
| Loan facilitation and servicing fees | 135,678 | 114,470 | (21,208) | -15.6% |
| Financial services income | 192,186 | 159,491 | (32,695) | -17.0% |
| | | | | |
| Net income | 86,866 | 61,811 | (25,055) | -28.8% |
| Adjusted net income | 92,738 | 67,551 | (25,187) | -27.2% |
| Non-GAAP EBIT | 110,617 | 80,369 | (30,248) | -27.3% |
| | | | | |
| Earnings per ADS | $0.48 | $0.34 | ($0.14) | -29.2% |
| Adjusted Earnings per ADS | $0.51 | $0.37 | ($0.14) | -27.2% |
| | | | | |
| | | | | |
| Retained earnings | 324,067 | 293,694 | (30,373) | -9.4% |

The reason for the restatement given by the company was mainly due to the "error" that was identified about the revenue from financial services income. The revenue from financial services income for the first quarter of 2019 was overstated by RMB 129 million, due to "certain discounts and interests waived were not appropriately recorded due to unintentional use of incorrect system reports in connection with the preparation of the financial statement adjustments for such discounts and waived interest." In addition, the company also recorded an out-of-period adjustment of RMB 66.1 million to financial services income for the first quarter of 2019 "to correct the cumulative effect of errors in recording discounts and interests waived in the periods prior to December 31, 2018. The out-of-period adjustment primarily resulted in a decrease of RMB63.6 million of interest and financial services income and other revenues, and financing receivables, respectively."

The fact that LX overstated results and had to adjust previously reported financials does not give the impression of great internal controls.

**Website**

https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION.  © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

29

Exhibit 1
Page 29

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Other Red Flags

## Audit Fees

LX's auditor has been PricewaterhouseCoopers Zhong Tian LLP since 2016. One thing we like to check is the audit fees trend along with the reported business development. Below is the table that summarizes the overall audit fees and operating metrics from 2016 to 2019.

| | 2016 | 2017 | 2018 | 2019 | % change from 2017 to 2019 |
|---|---|---|---|---|---|
| Audit fees (US$) | $691,637 | $2,462,867 | $2,268,926 | $2,528,082 | |
| Audit-related fees (US$) | — | — | $407,243 | — | |
| | | | | | |
| **Audit fees & Audit-related fees** | **$691,637** | **$2,462,867** | **$2,676,169** | **$2,528,082** | **2.6%** |
| | | | | | |
| **Annual Operating Revenue** | **$667** | **$858** | **$1,105** | **$1,523** | **77.5%** |
| **Outstanding Principal Balance of Loans (US$ M)** | **$1,521** | **$2,962** | **$4,712** | **$8,700** | **193.7%** |
| **Loan Originations (US$ M)** | **$3,412** | **$7,332** | **$9,612** | **$18,093** | **146.8%** |

LX went public in 2017, which might be the reason for the audit fee jump from 2016 to 2017. However, from 2017 to 2019, the annual total audit fees and audit-related fees together only increased from $2.46 million to $2.53 million, a 2.6% increase, yet the company's reported revenue increased 77.5%, the outstanding principal balance of loans increased 193.7% and loan originations increased 146.8%, respectively. We are not saying that audit fees should increase at the same rate as compared to these operating metrics' rate, however, the fact that the audit fees, in general, remained almost flat with the soared business development is something investors should pay attention to. In our opinion, this could be a red flag for weak auditing/supervision process and warrants investors' caution.

## Management Compensation

| Year | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| **Mgmt Comp (RMB Mil)** | 4.6 | 6.2 | 15.5 | 28.1 |
| **Rev (RMB Bil)** | 4.3 | 5.6 | 7.6 | 10.6 |

We are also cautious when it comes to management overpaying themselves, especially when growth in management compensation outpaces revenue growth by a large margin. In the case of LX, while revenue has only doubled, management compensation has 6 folded. We see this as another red flag.

## Insider Selling

What's perhaps more disturbing is the magnitude to which insiders have sold off their shares in the firm. Insider selling, typically regarded as a negative signal, is not an uncommon phenomenon. However, insider selling of this degree is clear sign of lack of confidence in the company in our opinion.

We see that over the course of three years, insider position has decreased by half from 81.7% to just under 40%.

| | Percentage of total Ordinary Shares | | |
|---|---|---|---|
| | 2017 | 2018 | 2019 |
| Installment Payment Investment Inc | 33.4 | 30.5 | 27.2 |
| K2 Partners entities | 14.2 | 13.3 | 11.9 |
| Matrix Partners China III Hong Kong Limited | 11 | 10.3 | * |
| JD.com Inc. and its affiliates | 11.2 | 8.4 | 3.4 |
| Magic Peak Investment Limited | 6 | 5.1 | * |
| Apoletto entities | 5.9 | * | * |
| **Total** | **81.7** | **67.6** | **39.1** |



*JD.com's invovlement has long been considered an confirmation for LX's value and future. However, in the past three years, JD has been consistently decreasing its position.*

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND. FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION. © 2020 GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

August 25th 2020



Research report on LexinFintech Holdings Ltd. (NASDAQ: LX)

# Conclusion

We have laid out in detail in this report why we are troubled by almost all aspects of LX. The company's fundamental set up is a "Heads I win, tails you lose" situation. US investors are essentially guaranteeing payment of what we believe to be predatory consumer loans. Beyond that, we believe LX is making a conscious effort to misrepresent the viability of its business and the credit quality of its platforms.

Recent reform on upper limit of interest rate essentially renders LX's business model non-feasible. According to our valuation model, LX's will be unable to be profitable. Moreover, we believe the income statement is affected by one-time charges of RMB 372M due to delinquency and default risk adjustments, and an annual decrease of RMB 4.082B in 2020 due to hurdle interest rate changes. As a result, shareholder equity is decreased to RMB 1.85B in 2020Q1, and to negative value by the third quarter of 2020. We believe the company is essentially insolvent.

The Coronavirus crisis and related quarantine measures have certainly had a profound impact on the global economy and China in particular. LX had run a low quality and potentially fraudulent credit business in China, and we believe the crisis has had a profound impact. Currently, LX is trying to stay alive by artificially extending extra credit to delinquent borrowers, but the Ponzi type nature of this activity will soon come to light. Make no mistake about it: We believe the Corona crisis has already put LX in a position where the public company is on the hook for a lot more liabilities than it purports– LX is just trying to masquerade that fact.

Management seems to agree with our negative assessment of the company: Insiders and early investors sold shares aggressively and management resorts to pocketing big cash compensations. The China hustle continues.

In conclusion, we give LX a target price of ZERO.

---

**Website**
https://grizzlyreports.com/

 @ResearchGrizzly

THE REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT. AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LX'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND.  FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION.  © 2020  GRIZZLY RESEARCH LLC. ALL RIGHTS RESERVED.

Exhibit 1
Page 31



# Full Legal Disclaimer

\*\*\*

IMPORTANT LEGAL DISCLAIMER

THIS REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH, AND ARE NOT STATEMENTS OF FACT.

Reports are based on generally available information, field research, inferences and deductions through Grizzly Research's due diligence and analytical process.

Our opinions are held in good faith, and we have based them upon publicly available facts and evidence collected and analyzed including our understanding of representations made by the management of the companies we analyze, all of which we set out in our research reports to support our opinions, all of which we set out herein. HOWEVER, THEY REMAIN OUR OPINIONS AND BELIEFS ONLY.

We conducted research and analysis based on public information in a manner than any person could have done if they had been interested in doing so. You can publicly access any piece of evidence cited in this report or that we relied on to write this report.

Grizzly Research makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use.

We are entitled to our opinions and to the right to express such opinions in a public forum. We believe that the publication of our opinions and the underlying facts about the public companies we research is in the public interest, and that publication is justified due to the fact that public investors and the market are connected in a common interest in the true value and share price of the public companies we research. All expressions of opinion are subject to change without notice, Grizzly Research does not undertake a duty to update or supplement this report or any of the information contained herein.

Recipients of the research report are professional investors who are expected to make their own judgment as to any reliance that they place on the research report. You represent that you have sufficient investment sophistication to critically assess the information, analysis and opinion on this website.

You further agree that you will not communicate the contents of reports and other materials on this site to any other person unless that person has agreed to be bound by these Terms of Use. If you access this website, download or receive the contents of reports or other materials on this website on your own behalf, you agree to and shall be bound by these Terms of Use. If you access our website, download or receive the contents of reports or other materials on this website as an agent for any other person, you are binding your principal to these same Terms of Use.

**AS OF THE PUBLICATION DATE OF THIS REPORT, GRIZZLY RESEARCH (POSSIBLY ALONG WITH OR THROUGH OUR MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AND/OR CONSULTANTS) ALONG WITH OUR CLIENTS AND/OR INVESTORS HAS A DIRECT OR INDIRECT SHORT POSITION IN THE STOCK (AND/OR OPTIONS, SWAPS, AND OTHER DERIVATIVES RELATED TO ONE OR MORE OF THESE SECURITIES) OF THE COMPANY COVERED HEREIN, AND THEREFORE STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THAT THE PRICE OF LexinFintech Holdings'S STOCK DECLINES. THEREFORE, USE GRIZZLY RESEARCH'S RESEARCH AT YOUR OWN RISK. YOU SHOULD DO YOUR OWN RESEARCH AND DUE DILIGENCE BEFORE MAKING ANY**

**INVESTMENT DECISION WITH RESPECT TO THE SECURITIES COVERED HEREIN. THE OPINIONS EXPRESSED IN THIS REPORT ARE NOT INVESTMENT ADVICE NOR SHOULD THEY BE CONSTRUED AS INVESTMENT ADVICE OR ANY RECOMMENDATION OF ANY KIND. FOLLOWING PUBLICATION OF THIS REPORT, WE MAY CONTINUE TRANSACTING IN THE SECURITIES COVERED THEREIN, AND WE MAY BE LONG, SHORT, OR NEUTRAL AT ANY TIME HEREAFTER REGARDLESS OF OUR INITIAL OPINION.**

To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. Note that LexinFintech Holdings. and insiders, agents, and legal representatives of LexinFintech Holdings. and other entities mentioned herein may be in possession of material non-public information that may be relevant to the matters discussed herein. Do not presume that any person or company mentioned herein has reviewed our report prior to its publication.

This is not an offer to sell or a solicitation of an offer to buy any security, nor shall any security be offered or sold to any person, in any jurisdiction in which such offer would be unlawful under the securities laws of such jurisdiction.

By downloading and opening this report you knowingly and independently agree: (i) that any dispute arising from your use of this report or viewing the material herein shall be governed by the laws of the State of [New York], without regard to any conflict of law provisions; (ii) to submit to the personal and exclusive jurisdiction of the superior courts located within the State of [New York] and waive your right to any other jurisdiction or applicable law, given that Grizzly Research is a Delaware limited liability company; and (iii) that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to use of this website or the material herein must be filed within one (1) year after such claim or cause of action arose or be forever barred. The failure of Grizzly Research to exercise or enforce any right or provision of this disclaimer shall not constitute a waiver of this right or provision. If any provision of this disclaimer is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision and rule that the other provisions of this disclaimer remain in full force and effect, in particular as to this governing law and jurisdiction provision. You agree that the information on this website is copyrighted, and you therefore agree not to distribute this information (whether the downloaded file, copies / images / reproductions, or the link to these files) in any manner other than by providing the following link: http://GRIZZLYREPORTS.COM. If you have obtained research published by Grizzly Research in any manner other than by download from that link, you may not read such research without going to that link and agreeing to the Terms of Use on the Grizzly Research designated website.

\*\*\*

Exhibit 1
Page 32

Historical Stock Prices August 25, 2020 to Present

| Date | Open | High | Low | Close | Adj Close | Volume |
|---|---|---|---|---|---|---|
| 8/25/2020 | 8.51 | 8.63 | 7.95 | 8.04 | 8.04 | 5447700 |
| 8/26/2020 | 8 | 8.34 | 7.91 | 7.94 | 7.94 | 1543000 |
| 8/27/2020 | 7.91 | 8.22 | 7.91 | 7.96 | 7.96 | 1554100 |
| 8/28/2020 | 7.97 | 8 | 7.74 | 7.77 | 7.77 | 1485100 |
| 8/31/2020 | 7.78 | 8.01 | 7.45 | 7.81 | 7.81 | 4158800 |
| 9/1/2020 | 7.8 | 7.8 | 7.53 | 7.73 | 7.73 | 3298000 |
| 9/2/2020 | 7.9 | 7.9 | 7.27 | 7.35 | 7.35 | 2884800 |
| 9/3/2020 | 7.24 | 7.26 | 6.628 | 6.97 | 6.97 | 2439900 |
| 9/4/2020 | 7.04 | 7.238 | 6.6 | 7.12 | 7.12 | 1613200 |
| 9/8/2020 | 6.85 | 7.49 | 6.85 | 7.28 | 7.28 | 1419800 |
| 9/9/2020 | 7.3 | 7.334 | 6.93 | 6.96 | 6.96 | 1204100 |
| 9/10/2020 | 6.98 | 7.003 | 6.45 | 6.54 | 6.54 | 1682900 |
| 9/11/2020 | 6.63 | 6.99 | 6.63 | 6.81 | 6.81 | 1002900 |
| 9/14/2020 | 7.1 | 8.025 | 6.96 | 7.86 | 7.86 | 2909900 |
| 9/15/2020 | 7.66 | 8.09 | 7.44 | 7.78 | 7.78 | 2550100 |
| 9/16/2020 | 7.67 | 7.73 | 6.95 | 7.01 | 7.01 | 4409600 |
| 9/17/2020 | 6.95 | 7.14 | 6.86 | 6.9 | 6.9 | 2142500 |
| 9/18/2020 | 6.97 | 6.99 | 6.68 | 6.84 | 6.84 | 1766500 |
| 9/21/2020 | 6.77 | 6.876 | 6.58 | 6.86 | 6.86 | 1381600 |
| 9/22/2020 | 6.72 | 7.03 | 6.64 | 6.77 | 6.77 | 1245400 |
| 9/23/2020 | 6.8 | 6.87 | 6.53 | 6.55 | 6.55 | 955900 |
| 9/24/2020 | 6.59 | 6.59 | 6.13 | 6.52 | 6.52 | 1652300 |
| 9/25/2020 | 6.37 | 6.48 | 6.35 | 6.41 | 6.41 | 620500 |
| 9/28/2020 | 6.5 | 6.59 | 6.2 | 6.25 | 6.25 | 1616000 |
| 9/29/2020 | 6.24 | 6.28 | 6.04 | 6.1 | 6.1 | 1391900 |
| 9/30/2020 | 6.12 | 6.902 | 6.12 | 6.85 | 6.85 | 3024300 |
| 10/1/2020 | 6.78 | 6.84 | 6.465 | 6.54 | 6.54 | 1597400 |
| 10/2/2020 | 6.32 | 6.86 | 6.3 | 6.56 | 6.56 | 1289300 |
| 10/5/2020 | 6.56 | 6.74 | 6.4 | 6.68 | 6.68 | 1145500 |
| 10/6/2020 | 6.6 | 6.92 | 6.53 | 6.76 | 6.76 | 1029100 |
| 10/7/2020 | 6.8 | 6.89 | 6.63 | 6.74 | 6.74 | 799200 |
| 10/8/2020 | 6.84 | 6.89 | 6.66 | 6.78 | 6.78 | 588500 |
| 10/9/2020 | 6.75 | 6.98 | 6.671 | 6.97 | 6.97 | 761800 |
| 10/12/2020 | 7.08 | 7.33 | 7 | 7.17 | 7.17 | 1609200 |
| 10/13/2020 | 7.19 | 7.2 | 6.92 | 7.04 | 7.04 | 896000 |
| 10/14/2020 | 7.12 | 7.14 | 6.665 | 6.9 | 6.9 | 1177000 |
| 10/15/2020 | 6.76 | 6.87 | 6.645 | 6.68 | 6.68 | 547600 |
| 10/16/2020 | 6.85 | 7.16 | 6.77 | 7.11 | 7.11 | 1499300 |
| 10/19/2020 | 7.07 | 7.39 | 6.96 | 7.18 | 7.18 | 614000 |
| 10/20/2020 | 7.23 | 7.6 | 7.23 | 7.5 | 7.5 | 805100 |
| 10/21/2020 | 7.54 | 7.79 | 7.44 | 7.57 | 7.57 | 751100 |
| 10/22/2020 | 7.6 | 7.865 | 7.47 | 7.85 | 7.85 | 771600 |
| 10/23/2020 | 7.89 | 7.89 | 7.66 | 7.82 | 7.82 | 365800 |
| 10/26/2020 | 7.72 | 7.777 | 7.4 | 7.5 | 7.5 | 573100 |
| 10/27/2020 | 7.4 | 7.73 | 7.3 | 7.64 | 7.64 | 531200 |
| 10/28/2020 | 7.44 | 7.77 | 7.34 | 7.66 | 7.66 | 736800 |
| 10/29/2020 | 7.77 | 8.75 | 7.66 | 8.59 | 8.59 | 2673300 |
| 10/30/2020 | 8.51 | 8.7 | 8.13 | 8.24 | 8.24 | 1100600 |
| 11/2/2020 | 8.67 | 8.67 | 7.33 | 7.41 | 7.41 | 2945300 |
| 11/3/2020 | 7.02 | 7.225 | 6.45 | 7.13 | 7.13 | 3000100 |
| 11/4/2020 | 7.21 | 7.48 | 6.88 | 6.95 | 6.95 | 1654200 |

Historical Stock Prices August 25, 2020 to Present

| | | | | | |
|---|---|---|---|---|---|
| 11/5/2020 | 7.18 | 7.24 | 6.68 | 7.12 | 7.12 | 2584200 |
| 11/6/2020 | 7.17 | 7.94 | 6.95 | 7.73 | 7.73 | 1730900 |
| 11/9/2020 | 8 | 8.24 | 7.52 | 8 | 8 | 1427400 |
| 11/10/2020 | 7.92 | 8 | 7.46 | 7.5 | 7.5 | 1457900 |
| 11/11/2020 | 7.61 | 7.843 | 7.46 | 7.7 | 7.7 | 624800 |
| 11/12/2020 | 7.71 | 8 | 7.58 | 7.71 | 7.71 | 786100 |
| 11/13/2020 | 7.81 | 8.17 | 7.78 | 8.08 | 8.08 | 821600 |
| 11/16/2020 | 8.27 | 8.27 | 7.71 | 7.81 | 7.81 | 996800 |
| 11/17/2020 | 7.79 | 8.04 | 7.68 | 7.85 | 7.85 | 459800 |
| 11/18/2020 | 7.84 | 8.04 | 7.65 | 7.68 | 7.68 | 1033800 |
| 11/19/2020 | 7.68 | 7.93 | 7.666 | 7.82 | 7.82 | 438900 |
| 11/20/2020 | 7.9 | 8.39 | 7.8 | 7.89 | 7.89 | 1203200 |
| 11/23/2020 | 8 | 8.39 | 7.91 | 8.3 | 8.3 | 2127100 |
| 11/24/2020 | 8.23 | 8.33 | 7.165 | 7.27 | 7.27 | 4967400 |
| 11/25/2020 | 7.4 | 7.41 | 6.97 | 7.06 | 7.06 | 2752800 |
| 11/27/2020 | 7.15 | 7.58 | 7.1 | 7.42 | 7.42 | 1650100 |
| 11/30/2020 | 7.57 | 7.6 | 7.19 | 7.47 | 7.47 | 3955900 |
| 12/1/2020 | 7.45 | 7.5 | 7.24 | 7.27 | 7.27 | 1086500 |
| 12/2/2020 | 7.21 | 7.33 | 7.05 | 7.27 | 7.27 | 654800 |
| 12/3/2020 | 7.28 | 7.318 | 7.07 | 7.08 | 7.08 | 1168800 |
| 12/4/2020 | 7.2 | 7.2 | 6.53 | 6.58 | 6.58 | 4476100 |
| 12/7/2020 | 6.66 | 6.838 | 6.63 | 6.72 | 6.72 | 1951800 |
| 12/8/2020 | 6.75 | 6.83 | 6.6 | 6.7 | 6.7 | 1005700 |
| 12/9/2020 | 6.68 | 6.74 | 6.35 | 6.51 | 6.51 | 2119600 |
| 12/10/2020 | 6.45 | 6.49 | 6.3 | 6.46 | 6.46 | 1130400 |
| 12/11/2020 | 6.51 | 7.13 | 6.51 | 6.88 | 6.88 | 2655600 |
| 12/14/2020 | 7.02 | 7.2 | 6.63 | 6.67 | 6.67 | 1514900 |
| 12/15/2020 | 6.7 | 6.75 | 6.52 | 6.64 | 6.64 | 1617900 |
| 12/16/2020 | 6.59 | 6.65 | 6.52 | 6.6 | 6.6 | 1017700 |
| 12/17/2020 | 6.62 | 6.67 | 6.48 | 6.52 | 6.52 | 1908900 |
| 12/18/2020 | 6.55 | 6.66 | 6.51 | 6.54 | 6.54 | 1468400 |
| 12/21/2020 | 6.51 | 6.53 | 6.28 | 6.3 | 6.3 | 1643400 |
| 12/22/2020 | 6.45 | 6.59 | 6.34 | 6.44 | 6.44 | 1503800 |
| 12/23/2020 | 6.49 | 6.79 | 6.43 | 6.74 | 6.74 | 2096400 |
| 12/24/2020 | 6.76 | 6.83 | 6.57 | 6.59 | 6.59 | 883100 |
| 12/28/2020 | 6.54 | 6.58 | 6.17 | 6.21 | 6.21 | 3069800 |
| 12/29/2020 | 6.3 | 6.42 | 6.115 | 6.19 | 6.19 | 2298000 |
| 12/30/2020 | 6.22 | 6.76 | 6.22 | 6.74 | 6.74 | 3646100 |
| 12/31/2020 | 6.72 | 6.8 | 6.49 | 6.7 | 6.7 | 742000 |
| 1/4/2021 | 6.75 | 6.775 | 6.485 | 6.67 | 6.67 | 1517100 |
| 1/5/2021 | 6.63 | 7.16 | 6.63 | 7.13 | 7.13 | 1815300 |
| 1/6/2021 | 7.08 | 7.13 | 6.619 | 6.67 | 6.67 | 1284700 |
| 1/7/2021 | 6.78 | 6.79 | 6.54 | 6.71 | 6.71 | 1016100 |
| 1/8/2021 | 6.73 | 7.05 | 6.64 | 7 | 7 | 1577000 |
| 1/11/2021 | 6.85 | 6.88 | 6.66 | 6.68 | 6.68 | 1962800 |
| 1/12/2021 | 6.71 | 6.76 | 6.43 | 6.61 | 6.61 | 2368000 |
| 1/13/2021 | 6.54 | 6.56 | 6.22 | 6.27 | 6.27 | 3795000 |
| 1/14/2021 | 6.3 | 6.58 | 6.21 | 6.56 | 6.56 | 2547500 |
| 1/15/2021 | 6.62 | 6.84 | 6.32 | 6.42 | 6.42 | 2623400 |
| 1/19/2021 | 6.55 | 6.745 | 6.466 | 6.74 | 6.74 | 2289700 |
| 1/20/2021 | 6.82 | 6.84 | 6.51 | 6.66 | 6.66 | 2209500 |
| 1/21/2021 | 6.61 | 6.76 | 6.41 | 6.61 | 6.61 | 3108600 |

Historical Stock Prices August 25, 2020 to Present

| 1/22/2021 | 6.66 | 6.72 | 6.46 | 6.6 | 6.6 | 1793300 |
|---|---|---|---|---|---|---|
| 1/25/2021 | 7 | 8.06 | 6.95 | 7.19 | 7.19 | 12619700 |
| 1/26/2021 | 7.53 | 7.78 | 7.07 | 7.7 | 7.7 | 5115400 |
| 1/27/2021 | 7.546 | 7.97 | 7.285 | 7.48 | 7.48 | 3688700 |
| 1/28/2021 | 7.5 | 7.59 | 7.26 | 7.56 | 7.56 | 2628600 |
| 1/29/2021 | 7.71 | 8.17 | 7.44 | 7.77 | 7.77 | 5032500 |
| 2/1/2021 | 7.98 | 8.48 | 7.86 | 8.18 | 8.18 | 3586700 |
| 2/2/2021 | 8.28 | 8.4 | 7.99 | 8.19 | 8.19 | 1752600 |
| 2/3/2021 | 8.2 | 9.79 | 8.2 | 9.71 | 9.71 | 6439500 |
| 2/4/2021 | 9.414 | 9.95 | 9.142 | 9.5 | 9.5 | 3997100 |
| 2/5/2021 | 9.66 | 10.05 | 9.1 | 9.99 | 9.99 | 3361500 |
| 2/8/2021 | 10.78 | 11.41 | 9.89 | 9.97 | 9.97 | 5348700 |
| 2/9/2021 | 10.05 | 10.81 | 9.755 | 10.6 | 10.6 | 3988600 |
| 2/10/2021 | 10.7 | 11.745 | 10.7 | 11.7 | 11.7 | 5867800 |
| 2/11/2021 | 11.82 | 12.67 | 11.35 | 12.31 | 12.31 | 3430600 |
| 2/12/2021 | 12.3 | 13.2 | 11.87 | 13.06 | 13.06 | 2841300 |
| 2/16/2021 | 13.71 | 14.47 | 13.02 | 14.45 | 14.45 | 3969900 |
| 2/17/2021 | 14.22 | 14.5 | 13.04 | 13.09 | 13.09 | 3855900 |
| 2/18/2021 | 12.31 | 14.06 | 12 | 13.69 | 13.69 | 3705600 |
| 2/19/2021 | 14.11 | 15.42 | 13.7 | 15.27 | 15.27 | 4249300 |
| 2/22/2021 | 14.31 | 14.4 | 12.57 | 12.62 | 12.62 | 5313000 |
| 2/23/2021 | 11.87 | 12.6 | 11 | 12.4 | 12.4 | 4021900 |
| 2/24/2021 | 11.71 | 12.35 | 11.31 | 11.66 | 11.66 | 2627700 |
| 2/25/2021 | 11.84 | 12.31 | 11.31 | 11.36 | 11.36 | 2062600 |
| 2/26/2021 | 11.3 | 11.99 | 11.06 | 11.36 | 11.36 | 2208400 |
| 3/1/2021 | 12.15 | 12.68 | 12.06 | 12.36 | 12.36 | 1144100 |
| 3/2/2021 | 12.28 | 12.45 | 11.717 | 11.75 | 11.75 | 937700 |
| 3/3/2021 | 11.9 | 12.06 | 11.13 | 11.25 | 11.25 | 1591800 |
| 3/4/2021 | 11.11 | 11.421 | 10.4 | 10.85 | 10.85 | 2391100 |
| 3/5/2021 | 11.004 | 11.004 | 9.26 | 10.52 | 10.52 | 2858900 |
| 3/8/2021 | 10.02 | 10.85 | 10.02 | 10.22 | 10.22 | 1253900 |
| 3/9/2021 | 10.6 | 11.13 | 10.6 | 10.89 | 10.89 | 1559400 |
| 3/10/2021 | 11.3 | 11.46 | 10.55 | 10.72 | 10.72 | 1525900 |
| 3/11/2021 | 11.11 | 13.25 | 11.07 | 13.21 | 13.21 | 4386800 |
| 3/12/2021 | 12.43 | 13.65 | 11.8 | 13.35 | 13.35 | 3043000 |
| 3/15/2021 | 13.8 | 13.8 | 12.56 | 12.78 | 12.78 | 2064600 |
| 3/16/2021 | 12.88 | 13.8 | 12.79 | 13.39 | 13.39 | 2294100 |
| 3/17/2021 | 13.28 | 13.59 | 12.83 | 13.54 | 13.54 | 1152300 |
| 3/18/2021 | 13.14 | 14.64 | 13.06 | 13.57 | 13.57 | 3191500 |
| 3/19/2021 | 12.51 | 12.5 | 11.02 | 11.36 | 11.36 | 6742164 |

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**Form 20-F**

*(Mark One)*

☐   **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

or

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
 **For the fiscal year ended December 31, 2019.**

or

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
 **For the transition period from          to**

or

☐   **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of event requiring this shell company report:

Commission file number: 001-38328

# LexinFintech Holdings Ltd.

(Exact name of registrant as specified in its charter)

**N/A**

(Translation of Registrant's name into English)

**Cayman Islands**

(Jurisdiction of incorporation or organization)

**27/F CES Tower**
**No. 3099 Keyuan South Road**
**Nanshan District, Shenzhen 518057**
**The People's Republic of China**

(Address of principal executive offices)

**Craig Yan Zeng, Chief Financial Officer**
**Telephone: +86 755 3637 8888**
**Email: IR@lexin.com**
**27/F CES Tower**
**No. 3099 Keyuan South Road**
**Nanshan District, Shenzhen 518057**
**The People's Republic of China**

(Name, Telephone, Email and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on Which Registered |
|---|---|---|
| American depositary shares (one American depositary share representing two Class A ordinary shares, par value US$0.0001 per share) | LX | The Nasdaq Stock Market LLC (The Nasdaq Global Market) |
| Class A ordinary shares, par value US$0.0001 per share* | | The Nasdaq Stock Market LLC (The Nasdaq Global Market) |

*   Not for trading, but only in connection with the listing on The Nasdaq Global Market of American depositary shares.

Securities registered or to be registered pursuant to Section 12(g) of the Act:

**None**

(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act.

**None**

Exhibit 3
Page 1

Table of Contents

(Title of Class)

Indicate the number of outstanding shares of each of the Issuer's classes of capital or common stock as of the close of the period covered by the annual report.

**As of December 31, 2019, there were 359,417,329 ordinary shares issued and outstanding, consisting of 258,690,272 Class A ordinary shares (excluding the 4,924,310 Class A ordinary shares issued to the depositary bank for bulk issuance of ADSs reserved for future issuances upon the exercise or vesting of awards granted under the Share Incentive Plan and the 2017 Share Incentive Plan), par value US$0.0001 per share, and 100,727,057 Class B ordinary shares, par value US$0.0001 per share.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

☒ Yes ☐ No

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.

☐ Yes ☒ No

Note – Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 from their obligations under those Sections.

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).

☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act. ☐

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐          Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☒          International Financial Reporting Standards as issued          Other ☐

by the International Accounting Standards Board ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.

☐ Item 17  ☐ Item 18

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

☐ Yes ☒ No

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.

☐ Yes ☐ No

Exhibit 3
Page 2

Table of Contents

Given the increasingly tightening trend of restrictions on online consumer financing, we have gradually shifted our business model away from individual funding and further diversified our funding sources in 2019 in line with regulatory guidance. We have ceased facilitating new loans with funding from individual investors on *Juzi Licai* platform since November 2019. As of March 31, 2020, the outstanding balance of loans invested by individual investors on *Juzi Licai* platform was approximately RMB5.3 billion (US$755.3 million). However, we cannot assure you that such business modifications will be successful or that we can completely cease sourcing funding from individual investors without adversely affecting our business. With the increasing regulatory scrutiny on funding from individual investors, individual funding may not remain a viable funding source for us. We may have to further change the business model of *Juzi Licai* or terminate its operation in its entirety, which may result in material and adverse impact on our business operations and prospects and our financial results. We may also be required to guarantee the repayment of outstanding balances and interests to individual investors as we gradually reduce loan balances on *Juzi Licai*, and our business, financial condition and result of operations may be materially and adversely affected. We plan to continue our shift towards institutional funding while ensuring smooth closing of the existing loans facilitated on *Juzi Licai*.

Our online consumer finance platform, *Fenqile*, does not itself engage in direct loan facilitation between peers. *Fenqile* merely facilitates transactions that are funded by our institutional funding partners and *Juzi Licai*. As such, we do not consider *Fenqile* as an "online information intermediary" regulated under the Interim Measures. However, we cannot assure you that the China Banking and Insurance Regulatory Commission, or the CBIRC, or other regulatory agencies would not expand the applicability of the Interim Measures or otherwise regard Shenzhen Fenqile as an online lending information intermediary. In the event that *Fenqile* is deemed as an online lending information intermediary by the PRC regulatory authorities in the future, we may be required to register with local financial regulatory authorities and our current business practices would need to be modified to adapt to the regulatory requirements as an online lending information intermediary. If such situations were to occur, our business, financial condition and results of operations could be materially and adversely affected.

***If any of our online lending information intermediary services is deemed to violate any PRC laws or regulations, our business, financial condition and results of operations would be materially and adversely affected.***

Pursuant to the Guidelines and the Interim Measures, intermediaries that provide online lending information intermediary services may not engage in certain activities, including, among others, (i) fund-raising for the online lending information intermediaries themselves, (ii) holding lenders' funds or setting up capital pools with lenders' funds, (iii) providing security or guarantee to lenders as to the principals and returns of the investment, (iv) issuing or selling any wealth management products, (v) splitting the terms of any financing project, (vi) securitization, (vii) promoting its financial products on physical premises, and (viii) equity crowd-funding. The Interim Measures also require the intermediaries that provide online lending information services to strengthen their risk management, enhance screening and verifying efforts on the borrowers' and lenders' information, to set up custody accounts with qualified banks to hold borrowers' funds, and to disclose the basic information of the borrower and the financing projects. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Online Consumer Finance Services."

10

Exhibit 3
Page 3

Table of Contents

***If we are unable to effectively maintain the quality of our loan portfolio, our business, financial condition and results of operations may be materially and adversely affected.***

Our financial condition and results of operations are affected by our ability to effectively maintain the quality of our loan portfolio. There is no assurance that the quality of our loan portfolio will remain at the current level or improve. In 2017, 2018 and 2019, we originated RMB47.7 billion, RMB66.1 billion and RMB126 billion (US$18.1 billion) in loans, respectively. As of December 31, 2015, 2016, 2017, 2018 and 2019, our outstanding principal balance of loans was approximately RMB3.4 billion, RMB9.9 billion, RMB19.3 billion, RMB32.4 billion and RMB60.6 billion (US$8.7 billion), respectively. Our financing receivables, net amounted to RMB11,642 million, RMB6,424 million and RMB4,411 million (US$634 million) as of December 31, 2017, 2018 and 2019, respectively. Our vintage charge-off rates as of December 31, 2019 were just over 3.0% for each vintage of a three-month period from January 1, 2015 through December 31, 2019. The quality of our loan portfolio may be negatively affected by a variety of factors, many of which are beyond our control. These factors include, among others, the slowdown and structural reform of the PRC economy, adverse development in general economic conditions, an increase in unemployment rates among our target users, epidemics and natural disasters. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—Our business has been and is likely to continue to be materially adversely affected by the outbreak of COVID-19 in China." The quality of our loan portfolio may also deteriorate if we are not able to manage credit risks. In addition, we may experience an adverse change in user credit risk as we expand our user base and offer new product features and higher credit lines to users. For example, while we have set certain requirements for the use of flexible repayment options, such as requiring minimum monthly repayments and keeping the user's credit line at the approved amount, the flexible repayment options may affect our loan delinquencies and charge-offs as the outstanding principal balance of the new loan borrowed by a user using the flexible repayment options will be considered as current, as long as the user meets the payment schedule of the new loan agreed to by the user and us. We may also experience an adverse change in user credit risk if our credit assessment and control process fails to effectively contain the credit exposures of higher-risk users in using our existing or new credit products. Moreover, our risk management system and policies are subject to change from time to time. We cannot assure you that our risk management system and policies have been, or will be, effective in managing our credit risks and hence the asset quality of our loan portfolio.

Furthermore, we use our proprietary *Hawkeye* engine to assess credit risks of our users. While we continually improve our risk management capabilities as we accumulate user data, the *Hawkeye* engine may inaccurately predict future credit losses under certain circumstances. For instance, after initial credit lines are granted, a user's risk profile may change due to a variety of factors, such as deteriorating financial situations, and there is no assurance that such changes will be captured by the *Hawkeye* engine in a timely manner. The models and algorithms used by the *Hawkeye* engine may contain errors, flaws or other deficiencies that may lead to inaccurate credit assessment, and the data provided by users and external data sources may be incorrect or obsolete. If any of the foregoing were to occur in the future, our loan pricing and approval process could be negatively affected, resulting in misclassified loans or incorrect approvals or denials of credit applications.

If we are unable to effectively maintain and manage the quality of our loan portfolio due to any reason, the delinquency rates and the charge-offs of our loan portfolio may increase. Moreover, if the quality of our loan portfolio were to deteriorate, investors may try to rescind their affected investments, institutional funding partners may decide not to continue to cooperate with us, and users may seek to revise the terms of their loans or reduce the use of our platform for borrowing. If any of the foregoing were to occur, our business, competitive position, financial condition and results of operations may be materially and adversely affected.

15

Exhibit 3
Page 4

Table of Contents

***We need adequate funding at reasonable cost to successfully operate our business, and access to adequate funding at a reasonable cost cannot be assured.***

The growth and success of our operations depend on the availability of adequate funding to meet user demand for loans on our platform. We derive our funding for our platform from a variety of sources and types of investors, including our institutional funding partners in our direct lending programs, individual investors on *Juzi Licai* and investors of asset-backed securities. We obtained the majority of our funding from *Juzi Licai* in 2016 and 2017, and from institutional funding partners in 2018 and 2019. Our ability to diversify funding sources is subject to the development of regulatory requirements. For example, the Circular 141 prohibits banking financial institutions from providing loans to persons without source of income or investing in asset-backed securities with underlying assets consisting of "cash loans" or "campus loans." If college students are deemed as persons without source of income, the funding of loans to college students provided by financial institutions may need to be terminated. Although investors of asset-backed securities were not our major source of funding in historical periods, to the extent we intend to increase funds obtained through asset-back securities, the foregoing requirement would affect the amount of funding that we could obtain through this channel. To the extent there is insufficient funding from investors or funding partners willing to accept the risk of default posed by potential users or the particular type of funding could be matched to only certain group of our users due to restrictions imposed by current or existing laws or regulations, our platform will be unable to fund loan originations. If adequate funds are not available to meet users' demand for loans, loan originations on our platform may be significantly impacted. Also, to the extent that risk-adjusted return requirements of our funding sources change, funding sources may choose not to fund loans originated on our platform. In addition, our growth strategy involves offering our users competitively priced financial products and services. As the online consumer finance market is intensely competitive, we may attempt to further reduce our funding cost by modifying the investment products offered to our investors and the terms and conditions of cooperation agreements with our funding partners. To the extent that our funding sources find the risk-adjusted returns with us less attractive, we may not be able to obtain the requisite level of funding. As some of our funding partners require us to provide deposits and compensate them in case of default while others do not require such deposits but offer us less favorable terms, we have to adjust our funding model from time to time to balance the amount of deposits paid to funding sources and the commercial viability of funding terms. If our platform is unable to provide potential users with loans or fund the loans on a timely basis due to insufficient funding or less favorable pricing compared to that of our competitors, it would harm our business, financial condition and results of operations.

***Our expansion into offering our users higher credit lines, new loan products and financial services, and new product categories on our e-commerce channel, and our expansion into serving increased numbers of educated young professional users, may expose us to new challenges and more risks.***

We have a limited operating history and have been rapidly expanding our products and services and our user base since our inception. For example, we started to offer personal installment loans to our users in addition to installment purchase loans in 2014. In 2015, we began to offer flexible repayment options, which allow users who meet our criteria to reschedule or postpone their current monthly payment. In recent years, we have expanded our product offerings to include a wide range of products including apparel and footwear, bags, fashion accessories, household goods, cosmetics, personal care products, baby and maternity products, food and beverages, and virtual goods. To serve our expanded user base and our users' evolving credit needs, we continuously offer new credit products and offer our users higher credit lines as they obtain higher incomes with greater ability to repay. In 2019, we launched our *Le Card* membership and benefits program to offer a wide range of savings, benefits and membership privileges across various retailers, products, channels, and brands. Expansion into diverse new products and service categories involves new risks and challenges. Our lack of familiarity with these new product and service offerings and lack of relevant user data may make it more difficult for us to anticipate user demand and preferences and manage credit risk. We may misjudge user demand, resulting in inventory buildup and possible inventory write-down. It may also make it more difficult for us to inspect and control quality and ensure proper handling, storage and delivery. We may experience higher return rates on new products, receive more customer complaints and become subject to costly product liability claims as a result of selling certain products, which would harm our brand and reputation as well as our financial performance. We cannot assure you that we will be able to recoup our investments in introducing these new product and service categories. In addition, as our user base shifts to consist of more educated young professionals, it may also make it more difficult for us to accurately assess the credit risks of these new users due to our lack of credit data and experience. Higher credit limit products may also carry more risks, and we may not be able to adequately address the default risk of our loans originated under these higher credit limit products due to lack of historical data. Serving a changing user base may also expose us to new challenges and more risks. If we fail to execute our growth strategies, or if we fail to address the challenges and risks we encounter when executing our growth strategies, our business and results of operations could be materially and adversely affected.

16

Exhibit 3
Page 5

Table of Contents

***Any negative publicity or user complaints with respect to us, the consumer finance industry in general and our third-party service providers may materially and adversely affect our business and results of operations.***

The reputation of our brands is critical to our business and competitiveness. Any malicious or negative publicity or any publicized incidents in connection with the use of our products or services, whether or not we are negligent or at fault, including but not limited to those relating to our management, business, compliance with the law, financial condition or prospects and our business operations related to campus online lending, whether with or without merit, could severely compromise our reputation and harm our business and operating results. As China's consumer finance industry is new and the regulatory framework for this industry is also evolving, negative publicity about this industry and the market segment in which we operate may arise from time to time. Negative publicity about China's consumer finance industry in general may also have a negative impact on our reputation, regardless of whether or not we have engaged in any inappropriate activities. The PRC government has recently instituted specific rules, including the Guidelines, Interim Measures, and the Circular 141, to develop a more transparent regulatory environment for the online consumer finance industry. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Online Consumer Finance Services." Any players in China's online consumer finance industry who are not in compliance with these regulations may adversely impact the reputation of the industry as a whole. Furthermore, any negative development or perception of the consumer finance industry as a whole, including campus lending, even if factually incorrect or based on isolated incidents or as result of conduct by other market players, could compromise our image, undermine our trust and credibility, and negatively impact our ability to attract new users, investors and institutional funding partners. Negative developments in the consumer finance industry, such as widespread user defaults, fraudulent behavior, the closure of other online consumer finance platforms, or incidents indirectly resulting from the accumulation of large amounts of debt and inability to repay by any particular user, may also lead to tightened regulatory scrutiny of the sector and limit the scope of permissible business activities that may be conducted by market players in the consumer finance industry. For instance, since 2015, there has been a number of reports of business failures of, or accusations of fraud and unfair dealing against, certain companies in the consumer finance industry in China. In addition, any actual or claimed incidents related to aggressive or illegal loan collection activities may harm our reputation, and if users, investors or institutional funding partners associate us with other peers in the industry who have been implicated in such incidents, they may be less willing to engage in borrowing or funding activities on our platform. Moreover, in the ordinary course of our business, we may need to bring lawsuits against certain borrowers for delinquent loans. If courts do not support our claims, such legal proceedings may also negative impact our reputation and brand image. If any of the foregoing takes place, our business and results of operations could be materially and adversely affected.

***If we fail to continue the risk safeguard scheme successfully, our financial results and competitive position may be harmed.***

We have limited experience operating our risk safeguard scheme, which was established in April 2018 for *Juzi Licai*. We set aside a portion of each repayment equal to a certain percentage of the outstanding principal balance of the loan and transfer such amount to a custody account managed by an independent guarantee company, which we refer to as risk safeguard funds. Such independent guarantee company provides make-up payments to an investor using the risk safeguard funds when a user fails to satisfy his interest or principal repayment obligations. Under these agreements between users and investors relating to the risk safeguard scheme, the amount of make-up payments is up to the available balance of the risk safeguard funds.

As a result of continued introduction of new products and changes in the composition of the underlying loan assets, we may not be able to accurately forecast delinquencies and charge-offs for our target user cohort based on information on historical delinquency rates and charge off rates. Given these challenges, it is possible that we will under- or over-fund to the risk safeguard funds. If we under-fund the risk safeguard funds, and we do not or are unable to replenish the risk safeguard funds to a sufficient level in time, individual investors may not be fully protected from losses, which may result in negative publicity and reduce the attractiveness of our online investment platform. Conversely, if we over-fund the risk safeguard funds, this will reduce our income and revenue. In the event any investor is not fully compensated by the risk safeguard funds for delinquent payments, a dispute may arise between the investor and us as a result of the investor's uncompensated loss, which may adversely affect our reputation, the perception of us by the investors and regulatory authorities, or our business.

We have entered into a cooperation agreement with the guarantee company that is currently managing the risk safeguard fund. We cannot assure you that we will be able to extend the cooperation agreement before its expiration or that the risk safeguard scheme will be successfully continued in the future. In the event that our cooperation with the current guarantee company partner is terminated, we may not be able to find an alternative guarantee company that is willing to manage the risk safeguard scheme on terms reasonable to us, or at all. If we fail to do the foregoing, the investors may lose confidence in our platform.

Since the fourth quarter of 2019, the operators of online lending information intermediary have started to obtain access the Credit Reference Center of the PBOC, the official credit database in China. Currently, we are in progress of connecting to the center.

18

Exhibit 3
Page 6

Table of Contents

***If our ability to collect delinquent loans is impaired, or if the collection efforts of our in-house team or third-party service providers are impaired, our business and results of operations might be materially and adversely affected.***

We have built a collection team with both in-house employees and third-party service providers to handle the collection of delinquent loans. If either our employees or our third-party service providers' collection methods, such as phone calls, text messages, in-person visits, legal letters and litigations and/or arbitrations, are not effective and we fail to respond quickly and improve our collection methods, our delinquent loan collection rate may decrease. While we have implemented and enforced policies and procedures relating to collection activities by us and third-party service providers, including initiating litigations and arbitrations against delinquent users, if those collection methods were to be viewed by the users or regulatory authorities as harassments, threats or other illegal conducts, we may be subject to lawsuits initiated by the users or prohibited by the regulatory authorities from using certain collection methods. If this were to happen and we fail to adopt alternative collection methods in a timely manner or the alternative collection methods are proven to be ineffective, we might not be able to maintain our delinquent loan collection rate and the funding sources' confidence in our platform may be negatively impacted. If any of the foregoing takes place and impairs our ability to collect delinquent loans, the loan originations on our platform will decrease, and our business and the results of operations could be materially and adversely affected.

The recent outbreak of COVID-19 in China has also negatively impacted the effectiveness of our collection efforts. As our collections team is primarily based in Wuhan, the ongoing pandemic has, and may continue to have, a negative impact on our collection efforts. This has negatively impacted, and may continue to negatively impact, our delinquency rates and our credit statistics. The ongoing outbreak has caused, and may continue to cause us to implement temporary adjustment of work schemes for our collections team, allowing our employees to work from home and adopt remote collaboration, even after the suspension of the travel ban from and to Wuhan. We have taken measures to reduce the impact of this epidemic outbreak, including upgrading our telecommuting system, monitoring our employees' health on a daily basis and optimizing our technology system to meet the ongoing requirements. However, we have and may continue to experience lower work efficiency and productivity, which may adversely affect our service quality and collections efforts. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—Our business has been and is likely to continue to be materially adversely affected by the outbreak of COVID-19 in China."

Moreover, the current regulatory regime for debt collection in China remains unclear. Although we aim to ensure compliance of our collection efforts with the relevant laws and regulations and we have established strict internal policies to prohibit our collections team from engaging in aggressive practices, we cannot assure you that our collection activities will not engage in any misconduct as part of their collection efforts. Any such misconduct by our collection personnel or the perception that our collection practices are considered to be aggressive and not compliant with the relevant laws and regulations in China may result in harm to our reputation and business, which could further reduce our ability to collect payments from borrowers, lead to a decrease in the willingness of prospective customers to use our products or fines and penalties imposed by the relevant regulatory authorities, any of which may have a material adverse effect on our results of operations.

***Uncertainties relating to the growth and profitability of the online retail industry in China in general, and the e-commerce industry in particular, could adversely affect our operating revenue and business prospects.***

Online direct sales on our e-commerce channel account for a significant portion of our total operating revenue and loan originations. Our future results of operations will depend on numerous factors affecting the development of the e-commerce industry in China, which may be beyond our control. These factors include:

- the growth of internet, broadband, personal computer and mobile penetration and usage in China, and the rate of any such growth;

- the level of trust and confidence of Chinese consumers in online shopping, as well as changes in user demographics and consumer tastes and preferences;

- the selection, price and popularity of products that we and our competitors offer online;

- whether alternative retail channels or business models that better address the needs of consumers emerge in China; and

- the development of fulfillment, payment and other ancillary services associated with online purchases.

25

Exhibit 3
Page 7

Table of Contents

financial services income by charging fees from financial institutions. These fee rates may also be affected by a change over time in the mix of the types of products we provide to our users and investors, the macroeconomic factors, as well as the competition in the online consumer finance industry. In line with the general regulatory trends in enforcing a lower maximum percentage on fees charged for financial services, we may have to further reduce our fee rates. Any material reduction in our fee rates could have a material adverse effect on our business, results of operations and financial condition.

***Changes in PRC regulations relating to interest rates and fees for online consumer finance platforms and microcredit lending could have a material adverse effect on our business.***

The interest rate permitted to be charged on loans originated on our platform is subject to limitations set forth in the Provisions on Several Issues Concerning Laws Applicable to Trials of Private Lending Cases issued by the Supreme People's Court in August 2015 and effective in September 2015, or the Private Lending Judicial Interpretations, which provide that (i) when the interest rate agreed between the borrower and lender does not exceed an annual interest rate of 24%, the People's Court will uphold the interest rate charged by the lender, and (ii) when the interest rate agreed between the borrower and lender exceeds an annual interest rate of 36%, the portion in excess of 36% is void and the People's Court will uphold the borrower's claim for return of the excess portion to the borrower. For loans with interest rates per annum between 24% and 36%, if the interest on the loans has already been paid to the lenders, and so long as such payment has not damaged the interest of the state, the community or any third parties, the courts will likely not enforce the borrower's demand for the return of such interest payment.

Ji'an Microcredit, is subject to regulations applicable to micro-credit companies. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Microcredit." These regulations provide that "integrated actual interest" (namely the aggregated borrowing costs charged to borrowers in the forms of interest and various fees) shall be subject to the limit on interest rate of private lending set forth in the Private Lending Judicial Interpretations issued by the Supreme People's Court. The loans originated on our platform and by Ji'an Microcredit will be subject to the aforementioned interest rate restrictions, which could affect our ability to originate loans to certain users and may have a material adverse effect on our business.

Certain Opinions Regarding Further Strengthening the Financial Judgment Work issued by the Supreme People's Court in August 2017, or the Opinions for Financial Judgment Work, provide more detailed rules on the legal limits of interest and fees charged in connection with a loan and specify that the intermediary service fees charged by an online lending intermediary to circumvent the legal limit of interest of private lending shall be invalid. The Circular 141 further clarifies that the total amount of interest and fees charged to borrowers must be within the limit set forth in the Private Lending Judicial Interpretations. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Online Consumer Finance Services—Regulations Relating to Loans Between Individuals."

Currently, none of our loans facilitated by us has an overall annualized interest rate exceeding 36%. We believe the current service fees and various other fees charged to the users on our platform are reasonable and in compliance with relevant requirements under the above PRC laws, regulations or rules. However, if our current fee level is deemed to be excessive or constitutes usurious loans under any existing or future relevant PRC laws, regulations and rules, we may face, among others, regulatory warning, correction order, condemnation, fines and criminal liability and may be required to reduce the fees and annual interest rate we charge to our users. If such situations were to occur, our business, financial condition, results of operations and prospects would be materially and adversely affected.

***The origination of loans on our platform could give rise to liabilities under PRC laws and regulations that prohibit illegal fundraising and unauthorized public offerings.***

PRC laws and regulations prohibit persons and companies from raising funds by advertising to the public a promise to repay premium or interest payments over time through payments in cash or in kind except with the prior approval of the applicable government authorities. Failure to comply with these laws and regulations may result in penalties imposed by the PBOC, the SAMR, and other governmental authorities, and can lead to civil or criminal lawsuits.

We have taken measures to avoid conducting any activities that are prohibited under the illegal-funding related laws and regulations. We act as online lending information intermediaries for users and individual investors. In addition, we do not directly receive any funds from individual investors in our own accounts as funds from individual investors are deposited into and settled by a third-party custody account managed by China Guangfa Bank. To date, our platform has not been subject to any fines or other penalties under any PRC laws and regulations that prohibit illegal fundraising. Nevertheless, considerable uncertainties exist with respect to the PBOC, the SAMR and other governmental authorities' interpretations of the fundraising-related laws and regulations. Therefore, we cannot guarantee you that our current services provided to investors will not be deemed to violate illegal fundraising laws and regulations in the future.

29

Exhibit 3
Page 8

Table of Contents

***Any significant disruption in service on our platforms, our computer systems or third-party service providers' systems, including events beyond our control, could reduce the attractiveness of our platforms and result in a loss of users or investors.***

In the event of a platform outage and physical data loss, our ability to perform our servicing obligations, process loan applications or make funds available on our platforms would be materially and adversely affected. The satisfactory performance, reliability and availability of our platforms and our underlying network infrastructure are critical to our operations, user service, reputation, and ability to retain existing and attract new users, investors and institutional funding partners. Much of our system hardware is hosted in leased facilities located in Shenzhen, Guangzhou and Beijing. We also rely significantly on our third-party service providers for the operation of our platform. Our operations depend on our ability to protect our systems against damage or interruption from natural disasters, power or telecommunications failures, air quality issues, environmental conditions, computer viruses, or attempts to harm our systems, criminal acts and similar events. If there is a lapse in service or damage to our leased facilities in Shenzhen, Guangzhou and Beijing, we could experience interruptions and delays in our service and may incur additional expenses in arranging new facilities.

Any interruptions or delays in our service, whether as a result of third-party or our error, natural disasters, health pandemics such as the ongoing COVID-19 or security breaches, whether accidental or willful, could harm our relationships with our users, investors and institutional funding partners and our reputation. Our disaster recovery plan has not been tested under actual disaster conditions, and we may not have sufficient capacity to recover all data and services in the event of an outage. These factors could prevent us from processing or posting payments on loans, damage our brand and reputation, divert our employees' attention, subject us to liability and cause users, investors and institutional funding partners to abandon our platforms, any of which could adversely affect our business, financial condition and results of operations.

***We rely on App Stores to disseminate our mobile applications.***

We offer our services mainly through our mobile applications. Our mobile applications are offered via App Stores operated by third parties, such as Apple's App Store, which could suspend or terminate users' access to our mobile applications, increase access costs or change the terms of access in a way that makes our applications more difficult to access. As a result, our ability to expand our user base may be adversely affected if potential users experience difficulties in or are prevented from accessing our mobile applications. In the past, our mobile applications were taken down from certain third-party App Stores for a short period of time. We cannot assure you that we will not experience incidents of similar nature in the future, and occurrence of such incidents may adversely affect our brand and reputation, business, financial condition and results of operations.

***Our platforms and internal systems rely on software that is highly technical, and if it contains undetected errors, our business could be adversely affected.***

Our platforms and internal systems rely on software that is highly technical and complex. In addition, our platform and internal systems depend on the ability of such software to store, retrieve, process and manage immense amounts of data. The software on which we rely has contained, and may now or in the future contain, undetected errors or bugs. Errors or other design defects within the software on which we rely may result in a negative experience for users and funding sources, delay introductions of new features or enhancements, result in errors or compromise our ability to protect user or investor data or our intellectual property. Any errors, bugs or defects discovered in the software on which we rely could result in harm to our reputation, loss of users or investors or liability for damages, any of which could adversely affect our business, results of operations and financial condition.

***We may not be able to prevent others from unauthorized use of our intellectual property, which could harm our business and competitive position.***

We believe that trademarks, trade secrets, copyright and other intellectual property we use are critical to our business. We rely on a combination of trademark, copyright and trade secret protection laws in China, as well as confidentiality procedures and contractual provisions to protect our intellectual property and our brand. Despite these measures, any of our intellectual property rights could be challenged, invalidated, circumvented or misappropriated, or such intellectual property may not be sufficient to provide us with competitive advantages. For example, we regularly file applications to register our trademarks in China, but these applications may not be successful and may be challenged by third parties. Meanwhile, intellectual property rights and confidentiality protections in China may not be as effective as those in the U.S. or other countries for many reasons, including lack of procedural rules for discovery and evidence, and low damage awards. Implementation and enforcement of China intellectual property laws have historically been deficient and ineffective. As a result, we may not be able to adequately protect our intellectual property rights, which could adversely affect our revenues and competitive position.

32

Exhibit 3
Page 9

Table of Contents

**B.      Business Overview**

**Overview**

We are a leading online consumption and consumer finance platform for educated young professionals in China. We provide a range of services including financial technology services, membership benefits, and a point redemption system through our *Fenqile* ecommerce platform and *Le Card* membership platform. We work with financial institutions and both online and offline brands and retailers to provide a comprehensive consumption ecosystem catering to the needs of young professionals in China. We utilize advanced technologies such as big data, cloud computing and artificial intelligence throughout our services and operations to better serve our customers. The use of these technologies encompasses our risk management and loan facilitation systems, which allow for the near-instantaneous matching of users' funding requests with offers from over 50 funding partners.

We strategically focus on serving the needs of educated young professionals in China between the ages of 18 and 36. These are the customers, we believe, with high income potential, more advanced educational background, higher consumption needs, a temporary mismatch between their needs and their income levels (which creates needs for consumption smoothing), a strong desire to build their credit profile, and an appreciation for an efficient user experience. In addition, we believe that the educated young professionals in China will mature to become what we term as the "New Consumption" or the primary group of consumers within the Chinese economy in the future. Our online ecommerce, consumption and consumer finance platform, *Fenqile*, addresses our users' needs by offering an array of products and services as well as credit lines. We offer a wide variety of competitively priced products on our e-commerce channel and allow users to directly use their credit lines to finance purchases. Through our *Le Hua Card*, we also enable our customers to connect their preferred payment tool directly to their credit line with us, allowing them to draw down directly from their credit line when they make each individual purchase. The individual loans that we provide to our customers are matched with diversified funding sources, which are primarily institutional funding partners in our lending programs. Our institutional funding partners include major Chinese banks, consumer finance companies, and other financial institutions and organizations.

**Our Users**

From our inception in August 2013 through the end of 2019, we originated loans to over 13.3 million users on a cumulative basis. In 2017, 2018 and 2019, we originated loans to approximately 4.1 million, 4.9 million and 9.9 million active users through our platform, representing a compound annual growth rate, or CAGR, of 55.4%. Our online consumer finance platform features a high proportion of repeat users. Of all active users on our platform in 2017, 2018 and 2019, approximately 80%, 80% and 81%, respectively, were repeat users who had made at least one transaction on our platform before in the same year or in the previous year. As of December 31, 2019, we had over 19.4 million users with an approved credit line and over 73.3 million registered users.

*User acquisition and retention*

We strategically focus on serving educated young professionals in China, or what we would term as the "New Generation" of consumers in China, who is our target user cohort. As of December 31, 2019, this target user group represented over 90% of our total user base. To date, we have successfully accumulated a large user base and achieved deep market penetration among educated young professionals in China by providing an online consumption platform that integrates high quality financial services, online and offline consumption scenarios, membership benefits, and an efficient customer experience.

We acquire customers primarily through three methods: (i) online advertising and related channels, including online platforms and Apps such as Douyin and Weixin, consisting of paid placements and advertisements that target our core users and help increase brand awareness and generates traffic; (ii) natural traffic, which consists of internet traffic generated from our brand recognition, as well as referrals from our existing customers, with a focus on referrals and benefits that are targeted and customized to the tastes and needs of our target group of educated young professionals; and (iii) our sales force and e-commerce channel which actively engage with educated young professionals by directly interacting with them on a face-to-face basis and by providing them with targeted products that meet their specific consumption tastes and needs. In addition, we also have an increasing number of partnerships and cooperation agreements with numerous offline and online retail brands, third-party e-commerce platforms, and commercial banks. As a whole, our marketing efforts are targeted based on the consumption and lifestyle needs and preferences of our target user cohort. As their tastes and preferences change, we may change or adjust our customer acquisition methods from time to time accordingly.

Exhibit 3
Page 10

Table of Contents

Users approved for our credit line are automatically eligible to use the *Le Hua Card*, a virtual credit card which can be connected directly to their preferred payment solution provider, including Alipay, WeChat Pay, and UnionPay. Instalment terms generally range from 1 to 36 months. By directly connecting the *Le Hua Card* to their preferred payment solution provider, customers can draw down on their credit lines with us as they are using it, as oppose to drawing down and obtaining a full personal installment loan first as the full amount of such credit lines may not be immediately needed. Customers can therefore apply the use of the *Le Hua Card* to any offline and online sales where their preferred payment solution is accepted. This allows our customers to use their credit line directly for each individual, everyday purchase instantly on the point. Unlike traditional credit cards, the *Le Hua Card* does not have an interest free period and interest will immediately accumulate upon the drawdown of the credit line. As each individual loan occurs at the moment of purchase, we are also able to track the specific use of each loan or drawdown from the *Le Hua Card*.

We offer users who meet certain criteria, including user's credit profile and repayment history, flexible repayment options such as early repayment. These include the option to postpone their current monthly repayment to the next scheduled payment date or finance the repayment of a particular monthly repayment with a new loan. The flexible repayment options will not increase the available credit line for each user approved by us. We have set certain requirements for the use of flexible repayment options, such as minimum monthly repayments. Moreover, our users currently may not use the flexible repayment options for any new loan that is borrowed to finance the repayment of a monthly repayment. We may adjust the features of the flexible repayment options based on credit performance and our risk management approach from time to time. The flexible repayment options are designed to assist those users who have relatively high consumption needs, and the willingness and potential ability to repay their loans. The new loans are newly originated personal installment loans at higher APRs than other personal installment loans.

The APR for personal installment loans currently ranges from 14% to 36%. In 2017, 2018 and 2019, the total amount of personal installment loans originated on our platform was approximately RMB44.8 billion, RMB63.3 billion and RMB122 billion (US$17.5 billion), respectively. The outstanding principal balance of these loans (including on- and off-balance sheet loans) was RMB58.2 billion (US$8.4 billion) as of December 31, 2019.

***Installment purchase loans***

A user approved for our credit line can use the available credit line to purchase a variety of products available for sale on direct sales on our e-commerce channel, subject to the approved credit limit available to the user. See "—Our E-Commerce Channel." Our e-commerce channel enables us to track the users' use of loans when they are borrowed to finance purchases on our e-commerce channel. We provide financing solutions to help our users finance a purchase by offering installment payment options with flexible minimum down payments ranging from 0% to 50% as well as various loan term ranging from 1 to 36 months, depending on the product, price, supplier and source of funding. Shoppers have the option to choose any combination of these terms, and our system will automatically calculate monthly payments and service fees. The APR for installment purchase loans currently ranges from 18% to 36%. In 2017, 2018 and 2019, the total amount of installment purchase loans originated on our platform was approximately RMB2.9 billion, RMB2.7 billion and RMB3.9 billion (US$563 million), respectively. The outstanding principal balance of installment purchase loans (including on- and off-balance sheet loans) was RMB2.4 billion (US$340 million) as of December 31, 2019.

***Loan pricing***

Our loan pricing mechanism consists of two components, APRs and credit lines. We price our loans with different APRs based on different products to address product-related credit risks and as a function of market competition and supply and demand.

We primarily address credit risks by varying the amount of credit lines approved for each user. To enhance user experience, we seek to maintain consistency in terms of credit lines among newly acquired users in the same geographic area as they are likely to share their experience with each other. This approach is also consistent with the fact that the risk profiles of similarly situated users are largely homogenous and we utilize grouping as our primary method of credit assessment for new users. For the determination of credit limit based on the level of credit risks, see "—Our Loan Application and Approval Process—Step 3: Credit risk assessment."

Exhibit 3
Page 11

Table of Contents

*Investment programs offered on Juzi Licai*. We offer investment programs and tools that enable individual investors to manage their investments. Investors can choose from several investment programs with different terms and estimated rates of return and commit a minimum amount of RMB100 (US$14.4). Once the funds are committed, they are automatically matched with our approved users. Our platform automatically reinvests investors' funds as soon as a loan is repaid. If an investment period ends during the loan terms of the underlying loans, we will facilitate the investor's exit by transferring, on the investor's behalf, his or her creditor's rights with respect to the underlying loans; provided however, the exit is not guaranteed and the transfer would not occur until transferees are identified. We do not maintain a secondary loan market on our investment platform. Investors can monitor the performance of their investment in real time through our website or mobile application. Depending on the type of investment program an individual investor chooses, an investing period could be as short as one week and as long as 24 months.

**Protection of investors and funding partners**

*Funding partners in direct lending programs*. Historically, we provided our institutional funding partners a deposit using our own funds at an amount equal to a percentage of the total loans funded by the institutional funding partners and are required to replenish such deposit from time to time, in order to compensate them for the principal and interest repayment of loans in the event of a user default. In an effort to ensure compliance with the requirements of applicable laws and regulations issued recently, we have proactively adjusted our practice and currently conduct a part of the investor protection program through our own financial guarantee companies which are qualified to provide financing guarantee for the users on our platform and charge guarantee fees directly to users. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry— If our current investor protection measures for institutional funding partners are deemed to violate the relevant laws and regulations, or if we are deemed to have operated financial guarantee business by the PRC regulatory authorities, our business, financial condition and results of operations would be materially and adversely affected." Due to the restriction on the outstanding guarantee liabilities of our own financing guarantee companies, we also cooperate with other third-party financing guarantee companies or commercial insurance companies, which provide guarantee or insurance services for the users on our platform, provided that for some of such cooperation, Shenzhen Fenqile, one of our variable interest entities without the financing guarantee qualification, has been required to provide the third-party financing guarantee companies and/or the commercial insurance companies with a back-to-back guarantee or a deposit to compensate them in the event that such financing guarantee company or commercial insurance companies performed its guarantee or insurance obligation upon the defaults of our users.

We cooperate with institutional funding partners through our own financial guarantee companies qualified to provide financing guarantee for the users on our platform and to charge fees for the relevant guarantee services. For personal installment loans funded by banking financial institutions and network microcredit companies, our own financial guarantee companies charge users fees for the guarantee services they provide to users in favor of our institutional funding partners. Some of our institutional funding partners charge fees directly to borrowers. See also "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—If our current investor protection measures for institutional funding partners are deemed to violate the relevant laws and regulations, or if we are deemed to have operated financial guarantee business by the PRC regulatory authorities, our business, financial condition and results of operations would be materially and adversely affected."

*Juzi Licai*. Our current risk safeguard scheme with respect to individual investors is managed by a third-party guarantee company. We set aside a portion of each repayment equal to certain percentage of the outstanding principal balance of the loan and transfer such amount to a custody account managed by an independent guarantee company, which we refer to as risk safeguard funds. Such independent guarantee company will provide make-up payments to an investor using the risk safeguard funds when a user fails to satisfy his interest or principal repayment obligations. The maximum amount of make-up payments will not exceed the available balance of the risk safeguard funds.

We determine the percentage of the outstanding principal balance to be transferred to the custody account based on, among other factors, historical loan performance such as the percentage of loans that are more than seven days delinquent, and expected repayments (including prepayments) by users. We also consider market conditions, our product lines, profitability, cash position and the actual and expected payouts of the risk safeguard funds. The risk safeguard scheme only applies to loans newly funded by individual investors on *Juzi Licai* on or after April 24, 2018. Loans funded by individual investors on *Juzi Licai* between July 7, 2017 and April 24, 2018 are covered by a quality assurance program managed by China Guangfa Bank, which holds in the custody account a portion of each repayment by the users until the corresponding investment on *Juzi Licai* is repaid to the relevant individual investors.

66

Exhibit 3
Page 12

Table of Contents

*Foreign Investment in Value-Added Telecommunication Services*

According to the Provisions on the Administration of Foreign-Invested Telecommunications Enterprises issued by the State Council in December 2001 and amended in September 2008 and February 2016, foreign-invested value-added telecommunications enterprises must be in the form of Sino-foreign equity joint ventures. The regulations restrict the ultimate capital contribution percentage held by foreign investors in a foreign-invested value- added telecommunications enterprise to 50% or less and require the primary foreign investor in a foreign-invested value-added telecommunications enterprise to have a good track record and operational experience in the value-added telecommunications industry. The Circular of the Ministry of Industry and Information Technology on Liberalizing the Restrictions on Foreign Shareholding Percentages in Online Data Processing and Transaction Processing Business (for-profit e-commerce business) promulgated by the MIIT, in June 2015, or Circular 196, allow a foreign investor to own more than 50% of the total equity interest in an e-commerce business.

In July 2006, the Ministry of Information Industry (which was integrated into the MIIT with other governmental departments in March 2008), issued the Notice of the Ministry of Information Industry on Strengthening the Administration over Foreign Investment in the Operation of Value-Added Telecommunications Business, or the MIIT Notice. According to the MIIT Notice, a foreign investor in the telecommunications service industry must establish a foreign invested enterprise and apply for a telecommunications service license. The MIIT Notice also requires that: (i) PRC domestic telecommunications enterprises must not, through any form, lease, transfer or sell a telecommunications service license to a foreign investor, or provide resources, offices and working places, facilities or other assistance to support illegal telecommunications services operations by a foreign investor; (ii) value- added telecommunications enterprises or their shareholders must directly own the domain names and trademarks used in their daily operations; and (iii) each value-added telecommunications enterprise must have necessary facilities for its approved business operations and maintain such facilities only in the regions covered by its license. The Negative List (2019 Revision) stipulates that the ultimate foreign equity ownership in a value-added telecommunications service provider shall not exceed 50%, except for e-commerce business, domestic multi-party communications services business, store-and-forward business and call center business which may be 100% owned by foreign investors.

In light of the above restrictions and requirements, we provide the value-added telecommunication services through our consolidated variable interest entities, and such variable interest entities own the relevant domain names and registered trademarks and have the necessary personnel to operate the website.

*Licenses and Permits*

We are required to hold a variety of licenses and permits in connection with various aspects of our business, including the following:

*Value-added Telecommunication Service License*

The Telecommunications Regulations of PRC promulgated in September 2000 and amended in July 2014 and February 2016, respectively, by the State Council and its related implementation rules, including the Catalog of Classification of Telecommunications Business issued and amended in June 2019 by the MIIT, categorize various types of telecommunications and telecommunications-related activities into basic or value-added telecommunications services. The Administrative Measures on Telecommunications Business Operating, promulgated by the MIIT in 2009 and most recently amended in July 2017, set forth more specific provisions regarding the types of licenses required to operate value-added telecommunications services, the qualifications and procedures for obtaining such licenses and the administration and supervision of such licenses. Under these regulations, a commercial operator of value-added telecommunications services must first obtain a license for value-added telecommunications business, or value-added telecommunications service license, from the MIIT or its provincial level counterparts.

The Interim Measures for Administration of the Business Activities of Online Lending Information Intermediary Agencies published in August 2016, or the Interim Measures, provide that the "online lending information intermediary agencies," or online lending intermediaries, must apply for applicable telecommunications service license in accordance with relevant provisions of telecommunications authorities after record-filing with a local financial regulatory authority. However, PRC telecommunication authorities have not explicitly stipulated which kind of telecommunications service license is required for online lending intermediaries (including in the form of a website or mobile application) engaged in telecommunication services.

Exhibit 3
Page 13

Table of Contents

Administration of mobile internet application information services is strengthened through the Regulations for Administration of Mobile Internet Application Information Services, or the MIAIS Regulations, issued in June 2016 and effective in August 2016. The MIAIS Regulations were enacted to regulate mobile application information services, or the App, the App providers (including App owners or operators) and online App stores. App service providers are required to obtain relevant qualifications pursuant to PRC laws and regulations.

Our online consumer finance platform, *Fenqile*, operated by Shenzhen Fenqile, has obtained (i) certain value-added telecommunications service license for the operation of domestic call center service and content service (excluding internet content service) from MIIT in July 2017, which will remain valid until July 2022; and (ii) certain value-added telecommunications service license for online data processing and transaction processing from the Guangdong Administration of Telecommunications in July 2019, which will remain valid until July 2024. Our membership platform, *Le Card*, operated by Mengtian Technology, one of our variable interest entities, has obtained certain value-added telecommunications service license for the operations of internet content service from the Guangdong Administration of Telecommunications in January 2019, which will remain valid until January 2024. Our online investment platform, *Juzi Licai*, operated by Qianhai Juzi, would be required to obtain a certain telecommunications service licenses in accordance with the Interim Measures and the relevant provisions of telecommunications authorities after record- filing with a local financial regulatory authority. Furthermore, it is uncertain if our variable interest entities and their subsidiaries will be required to obtain a separate operating license with respect to our mobile applications in addition to the value-added telecommunications business license.

*Online Culture Operating Permit*

The Provisional Measures on Administration of Internet Culture issued by the Ministry of Culture (which was integrated into the Ministry of Culture and Tourism, or the MCT, with other governmental departments in March 2018) in February 2011 and amended in December 2017, and other related rules require an entity to obtain an Online Culture Operating Permit from the applicable provincial level cultural administrative authority before engaging in activities related to "online cultural products," which is defined as cultural products produced, disseminated and circulated via the internet. Pursuant to Interim Measures for the Administration of Online Games promulgated by the Ministry of Culture in June 2010 and amended in December 2017, an entity is required to obtain an Online Culture Operating Permit to engage in transaction service of virtual currencies used for online games. However, in May 2019, the General Office of the MCT promulgated the Circular on Adjusting the Scope of Approval for Online Culture Operating Permit and Further Standardizing the Approval Work, or the MCT Circular 81, pursuant to which the MCT no longer assumed the management responsibilities in relation to the online games industry. Meanwhile, the MCT Circular 81 set forth that, among others, the Online Culture Operating Permit, the scope of which only includes transaction service of virtual currencies used for online games, issued before the date of the circular should remain effective during the validity period while such permit should not be renewed after expiration. Furthermore, the Interim Measures for the Administration of Online Games was annulled by the MCT in July 2019. We provide platform services for trading virtual currencies used for online games on *Fenqile*. We have obtained an Online Culture Operating Permit from the Guangdong Municipal Bureau of Culture in March 2017. However, such Online Culture Operating Permit was expired in March 2020 and could not be renewed due to the MCT Circular 81. It is possible that the PRC government will promulgate new laws and regulations and require additional approvals or licenses or imposes additional restrictions on the transaction service of virtual currencies used for online games, and we cannot assure you that we will be able to obtain such new approvals or licenses.

*Regulations Relating to Online Consumer Finance Services*

*Regulations Relating to Loans Between Individuals*

The PRC Contract Law recognizes the validity of loan agreement between natural persons and provides that a loan agreement becomes effective when an individual lender provides the loan to an individual borrower. The Contract Law requires that the interest rates charged under the loan agreement must not violate the applicable provisions of the PRC laws and regulations. In accordance with the Provisions on Several Issues Concerning Laws Applicable to Trials of Private Lending Cases issued by the Supreme People's Court in August 2015 and effective in September 2015, or the Private Lending Judicial Interpretations, agreements between a lender and a borrower on loans with annual interest rates below 24% are valid and enforceable. With respect to loans with annual interest rates between 24% and 36%, if the interest on the loans has already been paid to the lender, and so long as such payment has not damaged the interest of the state, the community or any third parties, the courts will likely turn down the borrower's request to demand the return of the interest payment. If the annual interest rate of a private loan is higher than 36%, the obligations to pay interest payment in excess of the maximum interest rate allowed will be invalidated.

75

Exhibit 3
Page 14

Table of Contents

In addition, according to the Contract Law, an intermediation contract is defined as a contract whereby an intermediary presents to its client an opportunity for entering into a contract or provides the client with other intermediary services in connection with the conclusion of a contract, and the client pays the intermediary service fees. Pursuant to the Contract Law, an intermediary must provide true information relating to the proposed contract. If an intermediary conceals any material fact intentionally or provides false information in connection with the conclusion of the proposed contract, which results in harm to the client's interests, the intermediary may not claim for service fees and is liable for the damages caused. The Opinions for Financial Judgment Work issued by the Supreme People's Court in August 2017 further specify that the relationship between online lending intermediary and each party of online lending loan agreement shall be defined as an intermediary contractual relationship, and the intermediary service fees charged by an online lending intermediary to circumvent the legal limit of interest of private lending shall be invalid. Our services offered on *Juzi Licai* constitute intermediary service, and the agreements by and between Qianhai Juzi, users and/or individual investors on *Juzi Licai* are intermediation contracts under the Contract Law.

*Regulations Relating to Illegal Fund-Raising and Unapproved Loan Facilitation*

Raising funds by entities or individuals from the general public must be conducted in strict compliance with applicable PRC laws and regulations to avoid administrative and criminal liabilities. The Measures for the Banning of Illegal Financial Institutions and Illegal Financial Business Operations promulgated by the State Council in July 1998 and amended in January 2011, or the Measures for the Banning of Illegal Financial Business Operations, and the Notice on Relevant Issues Concerning the Penalty on Illegal Fund-Raising issued by the General Office of the State Council in July 2007, explicitly prohibit illegal public fund-raising. The main features of illegal public fund-raising include: (i) illegally soliciting and raising funds from the general public by means of issuing stocks, bonds, lotteries or other securities without obtaining the approval of relevant authorities, (ii) promising a return of interest or profits or investment returns in cash, properties or other forms within a specified period of time and (iii) using a legitimate form to disguise the unlawful purpose.

To further clarify the criminal charges and punishments relating to illegal public fund-raising, the Supreme People's Court promulgated the Judicial Interpretations to Issues Concerning Applications of Laws for Trial of Criminal Cases on Illegal Fund-Raising which came into force in January 2011, or the Illegal Fund-Raising Judicial Interpretations. The Illegal Fund-Raising Judicial Interpretations provide that a public fund-raising will constitute a criminal offense related to "illegally soliciting deposits from the public" under the PRC Criminal Law, if it meets all of the following four criteria: (i) the fund-raising has not been approved by the relevant authorities or is concealed under the guise of legitimate acts; (ii) the fundraising employs general solicitation or advertising such as social media, promotion meetings, leafleting and short messaging service advertising; (iii) the fundraiser promises to repay, after a specified period of time, the capital and interests, or investment returns in cash, properties in kind and other forms; and (iv) the fund-raising targets at the general public as opposed to specific individuals. An illegal fund-raising activity will be fined or prosecuted in the event that it constitutes a criminal offense. Pursuant to the Illegal Fund-Raising Judicial Interpretations, an offender that is an entity will be subject to criminal liabilities, if it illegally solicits deposits from the general public or illegally solicits deposits in disguised form (i) in an amount exceeding RMB1,000,000, (ii) with over 150 fund-raising targets involved, or (iii) with the direct economic loss caused to fund-raising targets exceeding RMB500,000, or (iv) the illegal fundraising activities have caused baneful influences to the public or have led to other severe consequences. An offender who is a natural person is also subject to criminal liabilities but with lower thresholds.

In January 2019, the Supreme People's Court, Supreme People's Procuratorate and Ministry of Public Security issued the Opinions on Handling Criminal Cases of Illegal Fund-raising, which further clarified, among other things, that the PRC financial administration laws and regulations shall be considered as the basis for determining the illegality of illegal fund-raising.

We have taken measures to avoid conducting any activities that are prohibited under the illegal-funding related laws and regulations. We act as intermediaries for users and retail investors. In addition, we do not directly receive any funds from retail investors in our own accounts, as funds loaned through our platform are deposited into and settled by a third-party custody account managed by China Guangfa Bank.

The Measures for the Banning of Illegal Financial Business Operations also prohibits facilitating loans to the public without the approval of the PBOC. The General Rules on Loans issued by the PBOC in June 1996 further provides that a financial institution shall conduct the loan business with the approval of the PBOC.

To further clarify the criminal liability and punishments relating to illegal loan facilitation, the Supreme People's Court, the Supreme People's Procuratorate, the Ministry of Public Security and the Ministry of Justice jointly issued the Opinions on Several Issues Concerning Handling Criminal Cases involving Illegal Loan Lending, or the Illegal Loan Lending Opinions, in July 2019, which became effective in October 2019. Pursuant to the Illegal Loan Lending Opinions, anyone who illegally offers loans to

76

Exhibit 3
Page 15

Table of Contents

unspecific targets (including entities and individuals) in the society for profit-making purposes without the approval by the regulatory authorities or beyond its business scope ten times or more within two years, which disturbs the financial market order and involves serious circumstances, shall be convicted of the crime of illegal business operation and punished accordingly in accordance with the PRC Criminal Law. The Illegal Loan Lending Opinions also clarified that, to involve "serios circumstances," the illegal lendings shall fulfill the condition that the actual annual interest rate exceeds 36%, provided that the introduction fee, consulting fee, management fee, overdue interest and liquidated damages shall be included in the calculation of actual annual interest rate.

The funding of loans by us going through the trusts may render us to be deemed as a lender or a provider of financial services by the PRC regulatory authorities, and we may be subject to supervision and restrictions on lending under such PRC laws and regulations.

*Regulations Relating to Online Lending Information Intermediary Service Agency*

In July 2015, ten PRC regulatory agencies, including the PBOC, the MIIT and the CBRC jointly issued the Guidelines on Promoting the Healthy Development of Internet Finance, or the Guidelines. The Guidelines call for active government support of China's internet finance industry, including the online peer-to-peer lending service industry, and clarify the division of responsibility among regulatory agencies. The Guidelines specify that the CBRC will have primary regulatory responsibility for the online peer-to-peer lending service industry in China and state that online peer-to-peer lending service providers shall act as an intermediary platform to provide information exchange, matching, credit assessment and other intermediary services, and must not provide credit enhancement services and/or engage in illegal fundraising. The Guidelines provide additional requirements for China's internet finance industry, including the use of custody accounts with qualified banks to hold user funds as well as information disclosure requirements.

In August 2016, four PRC regulatory agencies, including the CBRC, the MIIT, the MPS and Cyberspace Administration of China, published the Interim Measures. The Interim Measures define online lending intermediaries as the financial information intermediaries that are engaged in online peer-to-peer lending information business and provide lenders and borrowers with lending information services, such as information collection and publication, credit rating, information interaction and loan facilitation. Consistent with the Guidelines, the Interim Measures prohibit online lending intermediaries from providing credit enhancement services and collecting funds directly or indirectly, and require, among others, (i) that online lending intermediaries intending to provide online lending information agency services and its subsidiaries and branches must make relevant record-filing with local financial regulatory authorities with which it is registered after obtaining the business license; (ii) that online lending intermediaries operating telecommunication services must apply for relevant telecommunication service license after the completion of the record-filing and registration with the local financial regulatory authority; and (iii) that online lending intermediaries must materially specify the online lending information intermediary in the business scope.

Exhibit 3
Page 16

Table of Contents

The Interim Measures list the following businesses that an online lending intermediary must not, by itself or on behalf of a third party, participate in: (i) financing for themselves whether or not in disguised form; (ii) accepting or collecting directly or indirectly the funds of lenders; (iii) providing lenders with guarantee or promise on guarantee of principal and interest directly or in disguised form; (iv) publicizing or promoting financing projects at physical locations; (v) extending loans, except otherwise as provided by laws and regulations; (vi) splitting the term of any financing project; (vii) offering wealth management and other financial products by themselves to raise funds, and selling as an agent bank wealth management, securities company asset management, fund, insurance or trust products and other financial products; (viii) conducting asset securitization business or realizing transfer of creditors' rights in the forms of asset packaging, asset securitization, trust assets, fund shares, etc.; (ix) engaging in any form of mixture, bundling or agency with other institutions in investment, agency in sale, brokerage and other business except as permitted by laws, regulations and relevant regulatory provisions on online peer-to-peer lending; (x) falsifying or exaggerating earnings outlook of financing projects, concealing the defects and risks of financing projects, making false advertising or promotion, etc., by using ambiguous words or other fraudulent means, fabricating or spreading false or incomplete information impairing the business reputation of others or misleading lenders or borrowers; (xi) providing information intermediary services for high-risk financing which uses the borrowed funds for investment in stocks, over-the-counter fund distribution, futures contracts, structured funds and other derivative products; (xii) engaging in businesses such as crowd-funding in equity; and (xiii) other activities prohibited by the laws, regulations and the regulatory provisions on online peer-to-peer lending. In addition, the Interim Measures stipulate that online lending intermediaries shall not operate businesses other than risk management and necessary business processes such as information collection and confirmation, post-loan tracking and pledge management in accordance with online lending regulations, via offline physical locations. Furthermore, the Interim Measures provide that online lending intermediaries shall, based on their risk management capabilities, set upper limits on the loan balance of a single borrower borrowing both from one online lending intermediary and from all online lending intermediaries. In the case of natural persons, this limit shall not be more than RMB200,000 for one online lending intermediary and not more than RMB1 million in total from all platforms, while the limit for a legal person or organization shall not be more than RMB1 million for one online lending intermediary and not more than RMB5 million in total from all platforms.

Moreover, the Interim Measures require that each online lending intermediary (i) separate its own capital from funds received from lenders and borrowers and (ii) select a qualified banking financial institution as its funding custodian institution, which shall perform custody and administrative responsibilities as required.

The Interim Measures also set out certain additional requirements applicable to online lending intermediaries on, among other things, the real-name registration of lenders and borrowers, the risk control, internet and information security, limits on the fund collection period (up to 20 business days), allocation of charges, personal credit management, file management, lenders and borrowers protection, prohibition on making decisions by online lending intermediaries on behalf of the lender without the authorization of the lender, administration of electronic signatures and information disclosure.

Any violation of the Interim Measures by an online lending intermediary may subject such online lending intermediary to certain penalties as determined by applicable laws, and regulations, or by relevant government authorities if the applicable laws and regulations are silent on the penalties. The applicable penalties may include but are not limited to, criminal liabilities, warning, rectification, tainted integrity record and fines of up to RMB30,000.

If any online lending intermediary established prior to the implementation of these Interim Measures fail to conform to the provisions of these Interim Measures, the local financial regulatory authority shall require such online lending intermediary to make rectification, and the rectification period shall not exceed 12 months.

In April 2017, CBRC issued the Guidelines on Prevention and Control of the Risks in Banking Industry, to further emphasize that the Interim Measures and the supporting mechanism (including but not limited to the record-filing mechanism and the fund custodian mechanism) shall be strictly implemented.

*Regulations Relating to Record-filings of Online Lending Information Intermediary Service Agency*

In November 2016, the CBRC, the MIIT and the SAIC, jointly published the Guidelines on the Administration of Record-filings of Online Lending Information Intermediary Agencies, or the Record-filings Guidelines, to establish and improve the record-filing mechanisms for online lending intermediaries.

78

Exhibit 3
Page 17

Table of Contents

According to the Record-filings Guidelines, a newly established online lending information intermediary shall make the record-filings and registration with the local financial regulatory authority after obtaining the business license; while with respect to any online lending information intermediary which is established and begins to conduct the business prior to the publication of this Record-filings Guidelines, the local financial regulatory authority shall, pursuant to relevant arrangement of specific rectification work for risks in online peer-to-peer lending, accept the application for record-filings and registration submitted by a qualified online lending information intermediary, or any online lending information intermediary which has completed the rectification confirmed by relevant authorities.

On December 8, 2017, the Online Lending Rectification Office issued the Notice on the Rectification and Inspection Acceptance of Risk of Online Lending Information Intermediaries, or the Circular 57, providing further clarification on several matters in connection with the rectification and record-filing of online lending information intermediaries, including, among other things:

- *Requirements relating to risk reserve funds.* The online lending information intermediaries shall discontinue setting aside additional funds as risk reserve funds or originating new risk reserve funds. In addition, the existing balance of risk reserve funds shall be gradually reduced. Moreover, online lending information intermediaries are prohibited from promoting their services by publicizing the risk reserve funds, and authorities shall actively encourage the online lending information intermediaries to seek third parties to provide lenders with alternate means of investors protection, including third-party guarantee arrangements.

- *Requirements to qualify for record-filing.* The Circular 57 sets forth certain requirements which an online lending information intermediary shall not be in breach before it can qualify for the record-filing, including: (i) an online lending information intermediary may not conduct the "thirteen prohibited actions" or exceed the Individual Lending Amount Limit after August 24, 2016, and shall gradually reduce the balance; (ii) an online lending information intermediary which has participated in businesses of the real estate mortgage, campus loan or "cash loan," is required to suspend the new loan origination and the outstanding balance of the abovementioned loan shall be gradually reduced within a certain timetable as required under the Circular 141; and (iii) the online lending intermediaries are required to set up custody accounts with qualified banks that have passed certain testing and evaluation procedures run by the Online Lending Rectification Office to hold user funds. For the online lending intermediaries that are unable to accomplish the rectification and record-filing but are continuing to participate in the online lending business, the relevant authorities shall subject online lending intermediaries to administrative sanctions, including but not limited to revoking their telecommunicating business operation license, shutting down their business websites and requesting financial institutions not to provide any financial services to such online lending intermediaries.

- *Requirements relating to the timing of record-filing.* The local governmental authorities shall conduct and complete acceptance inspection of the rectification with the following timetable: (i) completion of record-filing for major online lending information intermediaries by the end of April 2018; (ii) with respect to online lending information intermediaries with substantial outstanding balance of those loans prohibited under the relevant laws and regulations and timely reduction of those balance is difficult, the relevant business and outstanding balance shall be disposed and/or carved out, and record-filing shall be completed by the end of May 2018; (iii) with respect to those online lending information intermediaries with complex and extraordinary circumstances and substantial difficulties exist to complete rectification, the "relevant work" shall be completed by the end of June 2018.

79

Exhibit 3
Page 18

Table of Contents

From August 2018 to the date of this annual report, the Online Lending Rectification Office, the National Internet Finance Rectification Office, or the Internet Finance Rectification Office, and/or other competent authorities implemented certain rules, including but without limitation (i) the Notice Regarding Conducting Compliance Inspections on Online Lending Information Intermediary issued by the Online Lending Rectification Office in August 2018, or the Circular 63, (ii) the Notice Regarding the Establishment of Online Lending Information Intermediaries Data Reporting System issued by the Online Lending Rectification Office in November 2018, or the Circular 73, (iii) the Notice on Proper Disposal of Online Lending Information Intermediaries in a Classified Manner and Risk Control jointly issued by the Internet Finance Rectification Office and the Online Lending Rectification Office in December 2018, or the Circular 175, and (iv) the Notice on Further Implementation of Online Lending Information Intermediaries Compliance Inspection and Follow-up Work issued by the Online Lending Rectification Office in January 2019, or the Circular 1. Those rules further set forth several matters in connection with the rectification of the online lending information intermediaries, including, among other things:

● *Compliance Inspection.* Circular 63 requires that each online lending information intermediary shall start three types of inspection in accordance with the *Issues List for Compliance Inspection on Online Lending Information Intermediaries* attached thereto, or the Compliance Inspection Issues List, including (i) the self-inspection conducted by the online lending information intermediary itself, (ii) the self-discipline inspection conducted by local internet finance associations or other local organizations, and (iii) the administrative inspection conducted by the local online lending rectification offices. All of these compliance inspections shall be completed before the end of 2018. However, the Circular 1 issued in January 2019 specified that by the end of 2018, all self-inspection has been completed, but the administrative inspection could be completed in only a few jurisdictions. Thus the administrative inspection shall be conducted in the first quarter of 2019. *Juzi Licai* has completed all three types of inspections listed above and received the confirmation letter related to the result of the administrative inspection in May 2019. We have also implemented respective measures to fully comply with the requirement set forth in the above letter and reported such implementation to the local financial regulatory authority in June 2019. As of the date of this annual report, we have not received any further communication from the local financial regulatory authority.

● *Disposal in a Classified Manner.* Circular 175 emphasizes again that the online lending information intermediaries shall be disposed of in a classified manner, based on current results of identification in accordance with Circular 63 and other applicable circulars. Circular 175 further provides that an online lending information intermediary shall be classified into two general categories: (i) Intermediary with Incurred Risk, which means any online lending information intermediary having been exposed to high risks such as delinquency and not able to run its business in a consistent manner; and (ii) Intermediary without Incurred Risk, which means any online lending information intermediary having not been exposed to any high risk. The Intermediary without Incurred Risk shall be further divided into certain categories, including but not limited to a zombie intermediary, an online lending intermediary with high risk, and a normally running online lending intermediary, among which only the normally running online lending intermediaries could be subject to further compliance inspection. From the issuance of Circular 175 to the date of this annual report, the competent authorities implemented certain rules to detail the classified manners above. For example, as to the transformation of online lending information intermediaries, the Internet Finance Rectification Office and the Online Lending Rectification Office jointly issued the Guidelines on Transformation from Online Lending Information Intermediaries to Microcredit Company in November 2019. As to the market exit of online lending information intermediaries, Shenzhen Internet Finance Association issued the Guidelines on Favorable Market Exit Mechanism of Shenzhen Online Lending Information Intermediaries in March 2019. As of the date of this annual report, we have not been informed by any regulatory authorities that we would be classified as an Intermediary with Incurred Risk, a zombie intermediary, or an online lending intermediary with high risk.

● *Access to Data Reporting System.* Circular 73 and Circular 175 require that all online lending information intermediaries shall be accessed to the Specific Rectification of Online Lending Information Intermediaries Data Reporting System, and any online lending information intermediary not listed in such system shall be transferred to designated local authorities dealing with illegal fund-raising for further disposition. As of the date of this annual report, we have successfully registered for such data reporting system.

● *Reduction of Business Volume.* According to the Circular 1, (x) with respect to administrative regions, the number of online lending intermediaries, the number of investors and the business volume therein shall be reduced, (y) with respect to an online lending intermediary, the number of investors, business volume and number of lenders thereon shall be reduced. The Note on Further Regulating Relevant Performance During the Special Rectification of Online Lending Intermediaries Industry issued by Shenzhen Internet Finance Association in December 2018 also requires the online lending intermediaries with registered address or place of actual business within the administrative region of Shenzhen, among other things: (i) not to increase the outstanding balance of loan; (ii) not to increase the number of lenders and reduce the number of lenders in an orderly manner; and (iii) not to establish new branches and reduce the number of offline stores.

Exhibit 3
Page 19

Table of Contents

Notwithstanding the forgoing, the local financial regulatory authority in Shenzhen are still in the process of drafting detailed implementation rules regarding the record-filing procedures, and to our knowledge, none of the online information intermediaries, including us, have been permitted to submit such application for record-filing in Shenzhen, and we cannot assure you that once submitted, our application will be accepted by the relevant government authorities.

*Regulations Relating to Funds Custodian of Online Lending*

The Interim Measures purport, among other things, to require an online lending intermediary to carry out isolated management of its proprietary funds and the funds of lenders and borrowers and choose an eligible banking financial institution as the custodian institution for the funds of lenders and borrowers. Pursuant to the Interim Measures, the custodian shall enter into fund custodian agreements with an online Information Intermediary, the borrowers, the lenders and/or other related parties, and conduct custodian, transfer, payment, accounting and supervision of the funds of lenders and borrowers pursuant to such agreements.

In February 2017, the CBRC released the Guidelines to Regulate Funds Custodian for online lending intermediaries, or the Custodian Guidelines. The Custodian Guidelines define custodian as commercial banks that provide online lending fund custodian services, and stipulate that the custodian banks shall not engage in offering any guarantee, including: (i) offering guarantees for lending transaction activities conducted by online lending intermediaries, or undertaking any liability for breach of contract related to such activities; (ii) offering guarantees to lenders, guaranteeing principal and dividend payments or bearing the risks associated with fund lending operations for lenders.

Apart from the requirements set forth in the Interim Measures and the Guidelines, the Custodian Guidelines impose certain responsibilities on online lending intermediaries, including entering into fund custodian agreements with only one commercial bank to provide fund custodian services, and organizing independent audit on funds custodian accounts of borrowers and investors and various other services. The Custodian Guidelines also provide that online lending intermediaries are permitted to develop an online lending fund custodian business only after satisfying certain conditions, including: (i) completing registration, filing records and obtaining a business license from the competent industry and commerce administration authority; (ii) filing records with the local financial regulatory authority; and (iii) applying for a corresponding telecommunications service license pursuant with the relevant telecommunication authorities. The Custodian Guidelines also require online lending intermediaries to perform various obligations, and prohibits them from advertising their services except in accordance with certain exposure requirements, the interpretation and applicability of which is unclear, as well as certain oversight requirements. The Custodian Guidelines also sets forth other business standards and miscellaneous requirements for custodian banks and online lending intermediaries as well. Online lending intermediaries and commercial banks conducting the online custodian services prior to the effectiveness of the Custodian Guidelines have a six-month grace period to rectify any activities not in compliance with the Custodian Guidelines.

On December 8, 2017, the Online Lending Rectification Office issued the Circular 57, which requires that online lending intermediaries set up custody accounts with qualified banks that have passed certain testing and evaluation procedures run by the Online Lending Rectification Office to hold funds of borrowers and investors. In November 2017, the Online Lending Rectification Office and National Internet Finance Association of China jointly issued the Notice on the Testing and Evaluation of Funds Custodian for Online Lending Intermediaries to clarify the requirements of the testing and evaluation work. In September 2019, the Notice on Further Strengthening the Testing and Evaluation of Funds Custodian for Online Lending Intermediaries was issued jointly by the Online Lending Rectification Office and National Internet Finance Association of China, which further stipulated that the valid period of the testing and evaluation were two (2) years, and the custodian banks passing the procedures shall be further subject to the reporting obligation in case certain major events related to custodian services occur, including the entrance or exit of online lending intermediaries and the block of custodian accounts by relevant authorities.

We have entered into an online lending fund custodian agreement with China Guangfa Bank, pursuant to which China Guangfa Bank shall set up separate custodian accounts for funds of lenders and users on *Juzi Licai*, and shall perform fund custody, payment and settlement services on *Juzi Licai*.

*Regulations Relating to Information Disclosure by Online Lending Intermediary*

The Interim Measures stipulate certain requirements on the information disclosure by an online lending intermediary, which include, among other things: (i) full disclosure of the basic information of borrowers and the financing projects, the risk assessment results and potential risk of the projects, the use of funds, and other related information on the official websites; and (ii) submission of the regular information disclosure announcements and other relevant documents to the local financial regulatory authorities for records, and preservation of such documents at the intermediary's domicile for inspection by the public. Pursuant to the Interim Measures, detailed rules on the information disclosure by an online lending intermediary shall be formulated separately.

81

Exhibit 3
Page 20

Table of Contents

In August 2017, the General Office of the CBRC released the Guidelines on Information Disclosure of Business Activities of Online Lending Information Intermediaries, or the Information Disclosure Guidelines. Consistent with the Interim Measures, the Information Disclosure Guidelines emphasize the requirement of information disclosure by an online lending intermediary and further, detail the frequency and scope of such information disclosure. Any violation of the Information Disclosure Guidelines by an online lending intermediary may subject the online lending intermediary to certain penalties under Interim Measures. In addition, the Information Disclosure Guidelines require online lending intermediaries that do not fully comply with the Information Disclosure Guidelines in conducting their business to rectify the relevant activities within six months after the release of the Information Disclosure Guidelines.

We have implemented and will continue to implement various policies and procedures to conduct our business and operations to comply such Interim Measures and the Information Disclosure Guidelines, including: maintaining a section on official website and APPs for disclosing the basic information of *Juzi Licai*, the borrowers and the financing projects on *Juzi Licai*.

*Regulations Relating to Campus Online Lending*

In April 2016, the General Office of the Ministry of Education, or the MOE, and the General Office of the CBRC jointly issued the Notice on Education and Guidance Work and Strengthening the Risks Prevention of Campus Delinquency Online Lending, or the Education and Guidance Work Notice. The Education and Guidance Work Notice provides that (i) the local financial regulatory authority shall closely monitor the online lending intermediaries' actions, such as false and misleading advertising and promotion, or other actions that may mislead the lenders or borrowers, and strengthen the supervision and the risk warnings of online lending intermediaries' advertising and promotional activities focusing on those college students, as well as those online lending intermediaries who neglect to conduct borrower qualification examination; and (ii) the corresponding response measures and plan for non-compliant campus online lending shall be established and improved; and any non-compliant online lending intermediary that has advertised and promoted its services within the campus and thus may infringe upon the legal rights of the students, cause safety hazards or lack advance permission, shall promptly be reported to the relevant regulatory authorities and be dealt with pursuant to the applicable laws.

In October 2016, six PRC regulatory agencies, including the CBRC, the Office of the Central Leading Group for Cyberspace Affairs and the MOE, jointly issued the Notice on Further Strengthening the Rectification of Campus Online Lending, or Rectification of Campus Online Lending Notice. The Rectification of Campus Online Lending Notice strengthens and details the remediation measures of the online lending business focusing on the students, or campus online lending, and provides the following: (i) providing online lending service to college students under the age of eighteen is prohibited (for college students over eighteen, the person engaging in campus online lending must verify the secondary repayment source of such borrower (which could be the borrower's parents, guardian, or other custodian), obtain the written undertaking documents consenting to the loan and the repayment guarantee from the secondary repayment source of such borrower, and verify the identity of the secondary repayment source of such borrower through the phone or other methods); (ii) prohibits false and fraudulent advertising and promotion through the use of discriminatory and misleading language or other methods, and the distribution of false or incomplete information to mislead college students borrowers; (iii) prohibits publicizing or promoting lending services at physical locations (excluding electronic means such as the internet) either by persons engaging in campus online lending themselves or by a third party; or (iv) prohibits usurious loans in disguised forms by charging various fees such as procedure fee, overdue fine, service fee and recovery fee, or forcing repayment by illegal collection.

In addition, the Rectification of Campus Online Lending Notice requires that the person engaging in campus online lending shall establish the three mechanisms, namely borrower qualification examination, risk monitoring and user information protection, as follows: (i) to establish borrower qualification examination and classification system to ensure that the borrowers have the repayment capacity for the loan pursuant to the relevant agreement; (ii) to establish risk monitoring system to further strengthen information disclosure and to provide risk warnings to borrowers, and to ensure that the lending procedures and the key elements of the loan are open and transparent; and (iii) to establish the user information protection mechanism, by implementing the Order for the Protection of Telecommunication and Internet User Personal Information and other relevant criteria and by conducting the information system gradation registration and testing, to strength user information protection and ensure the legality and information security during the collection, settlement and use of lenders' and borrowers' information.

Exhibit 3
Page 21

Table of Contents

Pursuant to the Rectification of Campus Online Lending Notice, the local financial regulatory authorities and the branches of the CBRC shall jointly conduct a thorough examination and centralized rectification of persons engaging in campus online lending. When the violation is determined to be minor, rectification shall be made within a prescribed time limit; and when the conduction of the rectification is refused or the violation is determined to be material, such person's business of campus online lending could be suspended, shut down or banned according to the applicable laws. Any person that is suspected to be involved in any malicious fraud or other serious extraordinary activities shall be severely punished. In any case involving criminal activities, the relevant person shall be dealt with by relevant judicial authorities.

In April 2017, the CBRC issued the Guidelines on Prevention and Control of the Risks in Banking Industry, to further emphasize the relevant requirements on the campus online lending business provided in the Rectification of Campus Online Lending Notice, which include the prohibitions of: (i) marketing to individuals unable to repay loans; (ii) providing online lending service to college students under the age of eighteen; (iii) conducting false and fraudulent advertising and promotion; or (iv) providing usurious loans in disguised forms.

In May 2017, the CBRC, MOE and Ministry of Human Resources and Social Security issued the Notice on Further Strengthening the Regulation and Management Work of Campus Online Lending Business, or the CBRC Circular 26, which provides that (i) the commercial banks and the policy banks may research and develop financial products and provide loans that provide general assistance to college students and support them in areas such as learning and training, consumption and entrepreneurship, and provide customized and quality financial services to college students with reasonable credit limits and interest rates; (ii) any entity established without approval of the relevant banking regulatory authority shall not provide any credit services to college students so as to eliminate fraud, usurious loans or violent loan collections; and (iii) all campus online lending business conducted by the online lending information intermediaries shall be suspended and the outstanding balance of campus online lending loans shall be gradually reduced until reaching a zero balance.

*Regulations Relating to Cash Loan Business*

In April 2017 the Online Lending Rectification Office issued the Notice on the Performance of Check and Rectification of Cash Loan Business Activities and a supplementary notice, or the Notice on Cash Loan. The Notice on Cash Loan requires the local branches of the Online Lending Rectification Office to conduct a comprehensive review and inspection of the cash loan business of online lending platforms and require such platforms to implement necessary improvements and remediation within a specific period to comply with the relevant requirements under the applicable laws and regulations. The Notice on Cash Loan focuses on preventing malicious fraudulent activities, loans that are offered at excessive interest rates and violence in the loan collection processes in the cash loan business operation of online lending platforms. The Online Lending Rectification Office also issued a list of cash loan business activities that are to be examined.

In December 2017, the Internet Finance Rectification Office and the Online Lending Rectification Office jointly issued the Circular 141, outlining general requirements on the "cash loan" business conducted by network microcredit companies, banking financial institutions and online lending information intermediaries. The Circular 141 specifies the features of "cash loans" as not relying on consumption scenarios, with no specified use of loan proceeds, no qualification requirement on users and unsecured etc. The Circular 141 sets forth several general requirements with respect to "cash loan" business, including, without limitation: (i) no organizations or individuals may conduct the lending business without obtaining approvals for the lending business; (ii) the aggregated borrowing costs of borrowers charged by institutions in the forms of interest and various fees should be annualized and subject to the limit on interest rate of private lending set forth in the Private Lending Judicial Interpretations issued by the Supreme People's Court; (iii) all relevant institutions shall follow the "know-your-customer" principle and prudentially assess and determine the borrower's eligibility, credit limit and cooling-off period, etc. Loans to any borrower without income sources are prohibited; and (iv) all relevant institutions shall enhance the internal risk control and prudentially use the "data-driven" risk management model.

With respect to network microcredit companies, the Circular 141 requires the relevant regulatory authorities to suspend the approval of the establishment of network microcredit companies and the approval of any microcredit business across provinces. The Circular 141 also specifies that network microcredit companies shall not provide campus loans, and should suspend the funding of network micro-loans with no specific scenario or designated use of loan proceeds, gradually reduce the volume of the existing business relating to such loans and take rectification measures in a period to be separately specified by authorities. Further detailed requirements on network microcredit companies are provided in a rectification implementation plan issued by the Online Lending Rectification Office on December 8, 2017. See "Item 4. Information on the Company—B. Business Overview—Regulations Relating to Microcredit."

83

Exhibit 3
Page 22

Table of Contents

The Circular 141 also sets forth several requirements on banking financial institutions participating in "cash loan" business, including, among other things, (i) such banking financial institutions shall not extend loans jointly with any third-party institution which has not obtained approvals for the lending business, or fund such institution for the purpose of extending loans in any form; (ii) with respect to the loan business conducted in cooperation with third-party institutions, such banking financial institutions shall not outsource the core business (including the credit assessment and risk control), and shall not accept any credit enhancement service whether or not in a disguised form (including the commitment to taking default risks) provided by any third-party institutions with no guarantee qualification and (iii) such banking financial institutions must require and ensure that the third-party institutions shall not collect any interests or fees from the borrowers.

Any violation of the Circular 141 may result in penalties, including but not limited to suspension of operation, orders to make rectification, condemnation, revocation of license, order to cease business operation, and criminal liabilities.

*Regulations Relating to Microcredit*

The Guidance on the Pilot Establishment of Microcredit Companies jointly promulgated by the CBRC and the PBOC in May 2008 allows provincial governments to approve the establishment of microcredit companies on a test basis. Based on this guidance, many provincial governments in China, including that of Jiangxi Province, promulgated local implementation rules on the administration of microcredit companies. For example, Jiangxi Financial Service Office, the regulatory authority for microcredit companies in Jiangxi Province, promulgated Measures for the Supervision and Administration of Microcredit Companies in Jiangxi Province (Trial Version) in March 2012, to impose the management duties upon the relevant regulatory authorities and to specify more detailed requirements on the microcredit companies, in accordance with which, among other requirements, (i) the microcredit companies are prohibited from engaging in deposit taking activities from the public and illegal fund-raising; (ii) the modification of certain company registration issues shall be subject to the approval by the relevant regulatory authorities; and (iii) the microcredit company shall engage in the loan business in the place of registration and in or around the surrounding counties within the same municipality of the place of registration, and the loan balance for the borrowers in the county of registration shall not be less than the 60% of the aggregate loan balance.

Jiangxi Financial Service Office further issued the Guidelines for the Supervision and Administration of Network Microcredit Companies of Jiangxi Province (for Trial Implementation) in September 2016, or Jiangxi Network Microcredit Companies Guidelines, to provide more specific rules on the supervision and administration of network microcredit companies in Jiangxi Province, pursuant to which, among other things, the network microcredit company could raise funds through transferring credit asset and asset-backed securitization with the approval of the regulatory authority, apart from the capital contributions paid by its shareholders and loans from no more than two banking financial institutions. In addition, Jiangxi Network Microcredit Companies Guidelines require that (i) the network microcredit company shall primarily conduct its microcredit loan business through the internet, and that the working capital used in the microcredit loan business through the internet shall be no less than 70% of the aggregate working capital of such network microcredit company, and (ii) the aggregate loan balance within the municipality where such network microcredit company is located shall be no less than 30% of the aggregate loan balance of the network microcredit company.

In November 2017, the Internet Finance Rectification Office issued the Notice on the Immediate Suspension of Approvals for the Establishment of Network Microcredit Companies, which became effective immediately and provides that the relevant regulatory authorities of microcredit companies at all levels shall suspend the approval of the establishment of network microcredit companies and the approval of any microcredit business conducted across provincial lines.

On December 1, 2017, the Internet Finance Rectification Office and the Online Lending Rectification Office jointly issued the Circular 141, which emphasizes the suspension of approving new network microcredit companies and further imposes measures to strengthen the regulation of network microcredit companies. See "—Regulations Relating to Cash Loan Business."

On December 8, 2017, the Online Lending Rectification Office promulgated the Rectification Implementation Plans of Network Microcredit Companies. Pursuant to the Rectification Implementation Plans of Network Microcredit Companies, "network micro-loans" are defined as micro-loans provided through the internet by network microcredit companies controlled by internet enterprise. The features of network micro-loans include online borrower acquisition, credit assessment based on the online information collected from the business operation and internet consumption, as well as online loan application, approval and funding.

84

Exhibit 3
Page 23

Table of Contents

**D.    Property, Plant and Equipment**

Our corporate headquarters is located in Shenzhen, China, where we lease office space with an area of approximately 16,000 square meters as of the date of this annual report. For our user services, data verification services and collection services, we lease office space in four cities in Central China, namely Wuhan, Nanchang, Changsha and Ji'an, with aggregate area of approximately 17,000 square meters. We also lease office space in various locations in the PRC, with an aggregate area of approximately 11,000 square meters. We lease our premises from unrelated third parties under operating lease agreements. The lease terms vary from 6 months to 5 years. Our servers are primarily hosted at internet data centers owned by major domestic internet data center providers. We believe that our existing facilities are generally adequate to meet our current needs, but we expect to seek additional space as needed to accommodate future growth.

In February 2020, we have successfully bid for a plot of land of 2,911.25 square meters in Shenzhen's Nanshan district and entered into a land use purchase agreement with the municipal government. Total purchase price for the acquisition of the land plot is RMB1.032 billion. We expect to use this land to our continued growth and expansion, as we plan to build our new headquarters in this new location.

**Item 4A.    Unresolved Staff Comments**

None.

**Item 5.    Operating and Financial Review and Prospects**

The following discussion of our financial condition and results of operations is based upon, and should be read in conjunction with, our audited consolidated financial statements and the related notes included in this annual report on Form 20-F. This report contains forward-looking statements. See "Forward-Looking Information." In evaluating our business, you should carefully consider the information provided under the caption "Item 3. Key Information—D. Risk Factors" in this annual report on Form 20-F. We caution you that our businesses and financial performance are subject to substantial risks and uncertainties.

**A.    Operating Results**

**Overview**

We are a leading online consumer finance platform for educated young professionals in China. We strategically focus on serving the credit needs of educated young professionals in China.

Our online consumer finance platform, *Fenqile*, offers users personal installment loans, installment purchase loans and other loan products. We match user loans with diversified funding sources, including institutional funding partners on our direct lending programs, individual investors on our *Juzi Licai* platform, investors of our asset-backed securities and others. We charge fees for our matching services.

We have expanded the scale of our platform rapidly since our inception. From our inception in August 2013 through the end of 2019, we cumulatively originated RMB269 billion (US$38.6 billion) in loans. In 2017, 2018 and 2019, we originated RMB47.7 billion, RMB66.1 billion and RMB126 billion (US$18.1 billion) in loans, respectively, representing a CAGR of 62.5%. As of December 31, 2017, 2018 and 2019, our outstanding principal balance of loans was approximately RMB19.3 billion, RMB32.4 billion and RMB60.6 billion (US$8.7 billion), respectively. The weighted average tenor of loans originated on our platform in 2018 and 2019 was approximately 14.2 months and 12.5 months, respectively.

98

Exhibit 3
Page 24

Table of Contents

In a strong economic climate, demand for our products and services may increase as consumer spending increases. In addition, additional potential users may qualify for a higher credit limit based on our credit assessment. Traditional lenders may also approve loans for a higher percentage of our potential users. Young professionals may receive higher and more stable salaries or other income, which may result in lower loan losses. In a weakening economic climate or recession, the opposite may occur. In particular, demand for our products and services may be materially and adversely impacted by severe and prolonged economic downturns as a result of the ongoing outbreak of COVID-19 and other factors. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—Our business has been and is likely to continue to be materially adversely affected by the outbreak of COVID-19 in China" and "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry— A severe or prolonged downturn in the Chinese or global economy and changes in the level of consumer confidence could reduce the demand for consumer loans and investments, which could materially and adversely affect our business and financial condition."

Sudden changes in economic conditions as a result of the ongoing COVID-19 or other factors are likely to affect our actual loan losses. These effects may be partly mitigated by the fact each loan borrowed by our users is relatively small, which should be less affected by adverse economic conditions than if the principal amount of each loan were larger.

**Key Specific Factors Affecting Our Results of Operations**

Major specific factors affecting our results of operations include the following:

*Ability to attract and retain users*

Our operating revenue grew significantly in 2017, 2018 and 2019 primarily as a result of growth in loan originations on our platform. In 2017, 2018 and 2019, we originated RMB47.7 billion, RMB66.1 billion, and RMB126 billion (US$18.1 billion) in loans, respectively. As of December 31, 2017, 2018 and 2019, we had approximately RMB19.3 billion, RMB32.4 billion and RMB60.6 billion (US$8.7 billion), respectively, in outstanding principal balance of loans. Growth in our loan originations and outstanding principal balance has been driven primarily by the addition of new users and increasing business from existing users. The number of our active users grew from approximately 4.1 million in 2017 to approximately 4.9 million in 2018, and further grew to approximately 9.9 million in 2019. We anticipate that our future growth will continue to depend in part on attracting new users.

In addition, we believe the repeat borrowing behavior of our existing users will be important to our future growth. Of all active users on our platform in 2017, 2018 and 2019, approximately 80%, 80% and 81%, respectively, were repeat users who had successfully borrowed on our platform at least once previously. We believe our significant number of repeat users is primarily due to our ability to address the credit needs of our targeted user cohort, the superior user experience on our platform and the competitiveness of loan pricing. The extent to which we generate repeat business from our users will be an important factor in our continued revenue growth.

*Ability to satisfy our users' growing financial needs*

Creating value by satisfying our users' growing financial needs will be an important component of our future performance. We seek to grow with our users and capture their long-term growth potential by effectively managing the mix of our product and service offerings to cater to their evolving consumption needs. In late 2014, we began to offer personal installment loans in addition to installment purchase loans on our platform. The outstanding principal balance of personal installment loans grew significantly from RMB17.6 billion as of December 31, 2017 to RMB30.8 billion as of December 31, 2018, and further grew to RMB58.2 billion (US$8.4 billion) as of December 31, 2019. In addition, as our college student users build their credit history with us and enter the workforce, we offer them higher credit lines and the ability to borrow personal installment loans to obtain cash up to a higher limit, in anticipation of their expanding consumption requirements.

101

Exhibit 3
Page 25

Table of Contents

*Short-term funding debts*

Short-term funding debts decreased by 19.2% from RMB4,646 million as of December 31, 2018 to RMB3,756 million (US$539 million) as of December 31, 2019, primarily due to the decrease in on-balance sheet loans originated as the business model adjustments made to *Juzi Licai* in the second quarter of 2018, partially offset by the increase in on-balance sheet loans funded by other funding partners.

*Accrued expenses and other current liabilities*

Accrued expenses and other current liabilities increased by 2.3% from RMB1,364 million as of December 31, 2018 to RMB1,395 million (US$200 million) as of December 31, 2019, primarily due to an increase in funds payable to institutional funding partners, accrued payroll and welfare, tax payable, and partially offset by a decrease in liabilities to Pre-IPO Series C-1 preferred shareholders.

*Funds payable to Individual Investors*

Funds payable to Individual Investors decreased by 20.9% from RMB782 million as of December 31, 2018 to RMB619 million (US$88.9 million) as of December 31, 2019. The decrease was due to the fact that we have gradually shifted our business model away from individual funding and ceased facilitating new loans with funding from individual investors on *Juzi Licai* since November 2019 in order to fully comply with the requirements of the PRC regulatory authorities. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—We may be forced to terminate our online lending information intermediary services if we fail to complete the record-filing for our online lending information intermediary services. We may also be required to gradually reduce the balance of loans on *Juzi Licai*."

*Convertible notes*

Convertible notes represented the US$300 million convertible senior notes we issued through a private placement in September 2019. The notes will mature in seven years, bearing interest at a rate of 2.0% per annum.

**Inflation**

Since our inception, inflation in China has not materially affected our results of operations. According to the National Bureau of Statistics of China, the year-over-year percent changes in the consumer price index for December 2017, 2018 and 2019 were increases of 1.8%, 1.9% and 4.5%, respectively. Although we have not been materially affected by inflation in the past, we may be affected if China experiences higher rates of inflation in the future.

**Critical Accounting Policies**

We prepare financial statements in accordance with U.S. GAAP, which requires us to make judgments, estimates and assumptions that affect the reported amounts of our assets and liabilities and the disclosure of our contingent assets and liabilities at the end of each fiscal period and the reported amounts of revenues and expenses during each fiscal period. We continually evaluate these judgments and estimates based on our own historical experience, knowledge and assessment of current business and other conditions, our expectations regarding the future based on available information and assumptions that we believe to be reasonable, which together form our basis for making judgments about matters that are not readily apparent from other sources. Since the use of estimates is an integral component of the financial reporting process, our actual results could differ from those estimates. Some of our accounting policies require a higher degree of judgment than others in their application.

The selection of critical accounting policies, the judgments and other uncertainties affecting application of those policies and the sensitivity of reported results to changes in conditions and assumptions are factors that should be considered when reviewing our financial statements. For further information on our significant accounting policies, see Note 2 to our consolidated financial statements. We believe the following accounting policies involve the most significant judgments and estimates used in the preparation of our financial statements.

115

Exhibit 3
Page 26

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# Form 20-F

**(Mark One)**

○  **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

**or**

✕  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2018.**

**or**

○  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from          to**

**or**

○  **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of event requiring this shell company report:

Commission file number: 001-38328

# LexinFintech Holdings Ltd.

(Exact name of Registrant as specified in its charter)

**N/A**
(Translation of Registrant's name into English)

**Cayman Islands**
(Jurisdiction of incorporation or organization)

**27/F CES Tower**
**No. 3099 Keyuan South Road**
**Nanshan District, Shenzhen 518052**
**The People's Republic of China**
(Address of principal executive offices)

**Craig Yan Zeng, Chief Financial Officer**
**Telephone: +86 755 3637 8888**
**Email: IR@lexin.com**
**27/F CES Tower**
**No. 3099 Keyuan South Road**
**Nanshan District, Shenzhen 518052**
**The People's Republic of China**
(Name, Telephone, Email and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| American depositary shares (one American depositary share representing two Class A ordinary shares, par value US$0.0001 per share) | The Nasdaq Stock Market LLC (The Nasdaq Global Market) |
| Class A ordinary shares, par value US$0.0001 per share* | The Nasdaq Stock Market LLC (The Nasdaq Global Market) |

\*    Not for trading, but only in connection with the listing on The Nasdaq Global Market of American depositary shares. Securities registered or to be registered pursuant to Section 12(g) of the Act:

Table of Contents

**None**
(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:

**None**
(Title of Class)

Indicate the number of outstanding shares of each of the Issuer's classes of capital or common stock as of the close of the period covered by the annual report.

**As of December 31, 2018, there were 351,237,307 ordinary shares outstanding, consisting of 243,090,108 Class A ordinary shares, par value US$0.0001 per share, and 108,147,199 Class B ordinary**

Exhibit 4
Page 1

**shares, par value US$0.0001 per share.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

☒ Yes   ○ No

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.

○ Yes   ☒ No

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

☒ Yes   ○ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).

☒ Yes   ○ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act. ○

Large accelerated filer ○          Accelerated filer ☒          Non-accelerated filer ○          Emerging growth company ○

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ○

†The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☒          International Financial Reporting Standards as issued by the International Accounting Standards Board ○          Other ○

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.

○ Item 17   ○ Item 18

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

○ Yes   ☒ No

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.

○ Yes   ○ No

Table of Contents

## TABLE OF CONTENTS

| | | |
|---|---|---:|
| INTRODUCTION | | 1 |
| FORWARD-LOOKING INFORMATION | | 2 |
| PART I | | 3 |
| Item 1. | Identity of Directors, Senior Management and Advisers | 3 |
| Item 2. | Offer Statistics and Expected Timetable | 3 |
| Item 3. | Key Information | 3 |
| Item 4. | Information on the Company | 52 |
| Item 4A. | Unresolved Staff Comments | 89 |
| Item 5. | Operating and Financial Review and Prospects | 89 |
| Item 6. | Directors, Senior Management and Employees | 125 |
| Item 7. | Major Shareholders and Related Party Transactions | 134 |
| Item 8. | Financial Information | 136 |
| Item 9. | The Offer and Listing | 137 |
| Item 10. | Additional Information | 137 |
| Item 11. | Quantitative and Qualitative Disclosures about Market Risk | 150 |
| Item 12. | Description of Securities Other Than Equity Securities | 150 |
| PART II | | 152 |
| Item 13. | Defaults, Dividend Arrearages and Delinquencies | 152 |
| Item 14. | Material Modifications to the Rights of Security Holders and Use of Proceeds | 152 |
| Item 15. | Controls and Procedures | 152 |
| Item 16A. | Audit Committee Financial Expert | 153 |
| Item 16B. | Code of Ethics | 153 |
| Item 16C. | Principal Accountant Fees and Services | 153 |
| Item 16D. | Exemptions from the Listing Standards for Audit Committees | 153 |
| Item 16E. | Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 154 |
| Item 16F. | Change in Registrant's Certifying Accountant | 154 |
| Item 16G. | Corporate Governance | 154 |
| Item 16H. | Mine Safety Disclosure | 154 |
| PART III | | 154 |
| Item 17. | Financial Statements | 154 |
| Item 18. | Financial Statements | 154 |
| Item 19. | Exhibits | 154 |
| SIGNATURES | | 158 |

Exhibit 4
Page 2

borrowers any interest or fees to borrowers. The Circular 141 specifies the features of "cash loans" as not relying on consumption scenarios, with no specified use of loan proceeds, no qualification requirement on the part of users and no security to the loans, etc. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Online Consumer Finance Services." It is unclear whether our personal installment loans would be viewed as the "cash loans" specified in the Circular 141 and thus be subject to the provisions thereunder. Nevertheless, to comply with this new requirement, we have proactively made an adjustment to our cooperation model with institutional funding partners. We have adjusted our cooperation model with institutional funding partners through Shenzhen Lexin Financing Guarantee Co., Ltd., a subsidiary of Shenzhen Fenqile, which is qualified to provide funding guarantee for the users on our platform and to charge fees for the relevant guarantee services. For personal installment loans funded by banking financial institutions and network microcredit companies, Shenzhen Fenqile has discontinued to charge any fees to users. Instead, Shenzhen Lexin Financing Guarantee Co., Ltd. has started to charge users fees for the guarantee services it provides to users in favor of our institutional funding partners. We have further adjusted our cooperation model with certain institutional funding partners by having them charge fees directly to borrowers and pay certain fees to us. However, we cannot assure you that our interpretation of the relevant regulations will be the same as the view of authorities, or our solutions, including the ways the fees are charged, will be viable. First, it is uncertain whether the adjusted cooperation model would be accepted by our institutional funding partners at reasonable commercial terms. As of the date of this annual report, certain institutional funding partners require us to provide them with a deposit to compensate them in the event of a user default, as they believe our personal installment loans would not be deemed as "cash loans" specified in Circular 141 and thus would be subject to the requirements thereunder. As required, we may also cooperate with other third-party financing guarantee companies or commercial insurance companies, which provide guarantee or insurance services for the borrowers on our platform. Second, due to the restriction on the outstanding guarantee liabilities and the assets ratio of a financing guarantee company set forth in the applicable PRC laws and regulations (see "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Financing Guarantee"), we may need to take necessary measures as our business grows, such as increasing the registered capital of Shenzhen Lexin Financing Guarantee Co., Ltd. from time to time, or cooperating with other financing guarantee companies or insurance companies, which may have an impact on our financial condition. Third, due to the lack of interpretation and implementation rules and the fact that the laws and regulations are rapidly evolving, even if we implement such measures, we cannot assure you that the adjusted business model will be in full compliance with existing and future laws and regulations, nor can we assure you that we would not be required to make further change to our business in the future. If any of the foregoing were to occur, our business, financial condition and results of operations would be materially and adversely affected. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Financing Guarantee."

12

Table of Contents

***We cooperate with institutional funding partners, whose compliance with PRC laws and regulations may affect our business.***

As we do not hold relevant permits or licenses for lending activities, we rely on our funding partners for our loan products. Our collaboration with institutional funding partners has exposed us to and may continue to expose us to additional regulatory uncertainties faced by such institutional funding partners. For example, the Circular 141 jointly issued by the Internet Finance Rectification Office and the Online Lending Rectification Office in December 2017 provides a series of guidance on the cash loan business of financial institutions. See "Item 4. Information on the Company—B. Business Overview—Regulations —Regulations Relating to Online Consumer Finance Services." To comply with such guidance, our institutional funding partners, such as banks and consumer finance companies, may need to adopt changes to the cooperation model with their business partners, including us, which changes may adversely affect our business. In addition, we cannot assure you that the business operations of our institutional funding partners currently are or will be in compliance with the relevant PRC laws and regulations, and in the event that our institutional funding partners do not operate their businesses in accordance with the relevant PRC laws and regulations, they will be exposed to various regulatory risks and therefore, our business, financial condition and prospects would be materially and adversely affected.

For example, the Circular 141 requires network microcredit companies, such as Ji'an Microcredit, to suspend the funding of microloans with no specific consumption scenario or designated use of loan proceeds, gradually reduce the volume of the existing business relating to such loans and take rectification measures in the period to be separately specified by authorities. The Notification also prohibits online lending information intermediaries, such as *Juzi Licai*, from facilitating loans with no designated use of loan proceeds. The banking financial institutions are also prohibited from providing loans with no designated use of loan proceeds under the relevant PRC laws and regulations. For personal installment loans, we require users to select one of the specified permissible uses of loan proceeds in their loan applications, such as education, cost of living or driving school expenses, and we track actual use of the loans with reasonable measures. It is unclear whether such personal installment loans would be deemed as loans with no designated use of loan proceeds and thus be subject to the foregoing requirements under the Circular 141. If such personal installment loans were deemed as loans with no designated use of loan proceeds, Ji'an Microcredit and *Juzi Licai* would need to take necessary measures to track the actual use of loans, and the financial institutions would also need to take necessary measures to track the actual use of loans and may require us to cooperate with them and upgrade our system, both of which could cause us to incur substantial additional expenses. If we were unable to effectively implement the foregoing or other rectification measures, we might need to reduce or even cease the funding and facilitation of such personal installment loans. If the foregoing were to occur, our business, financial condition and results of operations would be materially and adversely affected.

13

Table of Contents

***If we are unable to effectively maintain the quality of our loan portfolio, our business, financial conditions and results of operations may be materially and adversely affected.***

Our financial condition and results of operations are affected by our ability to effectively maintain the quality of our loan portfolio. There is no assurance that the quality of our loan portfolio will remain at the current level or improve. In 2016, 2017 and 2018, we originated RMB22.2 billion, RMB47.7 billion and RMB66.1 billion (US$9.6 billion) in loans, respectively. As of December 31, 2014, 2015, 2016, 2017 and 2018, our outstanding principal balance of loans was approximately RMB374 million, RMB3.4 billion, RMB9.9 billion, RMB19.3 billion and RMB32.4 billion (US$4.7 billion), respectively. Our financing receivables, net amounted to RMB7,537 million, RMB11,642 million and RMB6,424 million (US$934 million) as of December 31, 2016, 2017 and 2018, respectively. Our vintage charge-off rates as of December 31, 2018 were approximately 2% for each vintage of a three-month period from January 1, 2015 through December 31, 2018. The quality of our loan portfolio may be negatively affected by a variety of factors, many of which are beyond our control. These factors include, among others, the slowdown and structural reform of the PRC economy, adverse development in general economic conditions, an increase in unemployment rates among our target users, and natural disasters. The quality of our loan portfolio may also deteriorate if we are not able to manage credit risks. In addition, we may experience an adverse change in user credit risk as we expand our user base and offer new product features and higher credit lines to users. For example, while we have set certain requirements for the use of flexible repayment options, such as requiring minimum monthly repayments and keeping the user's credit line at the approved amount, the flexible repayment options may affect our loan delinquencies and charge-offs as the outstanding principal balance of the new loan borrowed by a user using the flexible repayment options will be considered as current, as long as the user meets the payment schedule of the new loan agreed to by the user and us. We may also experience an adverse change in user credit risk if our credit assessment and control process fails to effectively contain the credit exposures of higher-risk users in using our existing or new credit products. Moreover, our risk management system and policies are subject to change from time to time. We cannot assure you that our risk management system and policies have been, or will be, effective in managing our credit risks and hence the asset quality of our loan portfolio.

Furthermore, we use our proprietary *Hawkeye* engine to assess credit risks of our users. While we continually improve our risk management capabilities as we accumulate user data, the *Hawkeye* engine may inaccurately predict future credit losses under certain circumstances. For instance, after initial credit lines are granted, a user's risk profile may change due to a variety of factors, such as deteriorating financial situations, and there is no assurance that such changes will be captured by the *Hawkeye* engine in a timely manner. The models and algorithms used by the *Hawkeye* engine may contain errors, flaws or other deficiencies that may lead to inaccurate credit assessment, and the data provided by users and external data sources may be incorrect or obsolete. If any of the foregoing were to occur in the future, our loan pricing and approval process could be negatively affected, resulting in misclassified loans or incorrect approvals or denials of credit applications.

If we are unable to effectively maintain and manage the quality of our loan portfolio due to any reason, the delinquency rates and the charge-offs of our loan portfolio may increase. Moreover, if the quality of our loan portfolio were to deteriorate, investors may try to rescind their affected investments, institutional funding partners may decide not to continue to cooperate with us, and users may seek to revise the terms of their loans or reduce the use of our platform for borrowing. If any of the foregoing were to occur, our business, competitive position, financial condition and results of operations may be materially and adversely affected.

***We need adequate funding at reasonable cost to successfully operate our business, and access to adequate funding at a reasonable cost cannot be assured.***

The growth and success of our operations depend on the availability of adequate funding to meet user demand for loans on our platform. We derive our funding for our platform from a variety of sources and types of investors, including individual investors on *Juzi Licai*, our institutional funding partners in our direct lending programs and investors of asset-backed securities. We obtained the majority of our funding from *Juzi Licai* in 2016 and 2017, and from institutional funding partners in 2018. Our ability to diversify funding sources is subject to the development of regulatory requirements. For example, the Circular 141 prohibits banking financial institutions from providing loans to persons without source of income or investing in asset-backed securities with underlying assets consisting of "cash loans" or "campus loans." If college students are deemed as persons without source of income, the funding of loans to college students provided by financial institutions may need to be terminated. Although investors of asset-backed securities were not our major source of funding in historical periods, to the extent we intend to

Exhibit 4<br/>Page 3

increase funds obtained through asset-back securities, the foregoing requirement would affect the amount of funding that we could obtain through this channel. To the extent there is insufficient funding from investors or funding partners willing to accept the risk of default posed by potential users or the particular type of funding could be matched to only certain group of our users due to restrictions imposed by current or existing laws or regulations, our platform will be unable to fund loan originations. If adequate funds are not available to meet users' demand for loans, loan originations on our platform may be significantly impacted. Also, to the extent that risk-adjusted return requirements of our funding sources change, funding sources may choose not to fund loans originated on our platform. In addition, our growth strategy involves offering our users competitively priced financial products and services. As the online consumer finance market is intensely competitive, we may attempt to further reduce our funding cost by modifying the investment products offered to our investors and the terms and conditions of cooperation agreements with our funding partners. To the extent that our funding sources find the risk-adjusted returns with us less attractive, we may not be able to obtain the requisite level of funding. If our platform is unable to provide potential users with loans or fund the loans on a timely basis due to insufficient funding or less favorable pricing compared to that of our competitors, it would harm our business, financial condition and results of operations.

14

Table of Contents

***Our expansion into offering our users higher credit lines, new loan products and financial services, and new product categories on our e-commerce channel, and our expansion into serving increased numbers of educated young adult users, may expose us to new challenges and more risks.***

We have a limited operating history and have been rapidly expanding our products and services and our user base since our inception. For example, we started to offer personal installment loans to our users in addition to installment purchase loans in 2014. In 2015, we began to offer flexible repayment options, which allow users who meet our criteria to reschedule or postpone their current monthly payment. We have also expanded our product offerings on our e-commerce channel to include a wider range of products, including more apparel, cosmetics and home appliances. To serve our expanded user base and our users' evolving credit needs, we continuously offer new credit products and offer our users higher credit lines as they obtain higher incomes with greater ability to repay. Expansion into diverse new products and service categories involves new risks and challenges. Our lack of familiarity with these new product and service offerings and lack of relevant user data may make it more difficult for us to anticipate user demand and preferences and manage credit risk. We may misjudge user demand, resulting in inventory buildup and possible inventory write-down. We cannot assure you that we will be able to recoup our investments in introducing these new product and service categories. In addition, as our user base shifts to consist of more educated young professionals, it may also make it more difficult for us to accurately assess the credit risks of these new users due to our lack of credit data and experience. Higher credit limit products may also carry more risks, and we may not be able to adequately address the default risk of our loans originated under these higher credit limit products due to lack of historical data. Serving a changing user base may also expose us to new challenges and more risks. If we fail to execute our growth strategies, or if we fail to address the challenges and risks we encounter when executing our growth strategies, our business and results of operations could be materially and adversely affected.

***If our existing and new loan products or financial services do not maintain or achieve sufficient market acceptance, our financial results and competitive position will be harmed.***

We have devoted significant resources to, and will continue to put an emphasis on, upgrading and marketing our existing loan products and enhancing their market awareness. We also incur expenses and expend resources upfront to develop and market new loan products and financial services that incorporate additional features, improve functionality or otherwise make our platform more attractive to users. New loan products and financial services must achieve high levels of market acceptance in order for us to recoup our investments in developing and marketing them.

Our existing and new loan products and financial services could fail to attain sufficient market acceptance for many reasons, including:

15

Table of Contents

users may not find the terms of our loan products, such as the costs and credit limits, competitive or appealing;

we may fail to predict market demand accurately and provide loan products and financial services that meet this demand in a timely fashion;

users, investors and institutional funding partners using our platforms may not like, find useful or agree with, the changes we make;

there may be defects, errors or failures on our platforms;

there may be negative publicity about our loan products or financial services, or our platform's performance or effectiveness;

regulatory authorities may take the view that the new products, financial services or platform changes do not comply with PRC laws, regulations or rules applicable to us; and

there may be competing products or services introduced or anticipated to be introduced by our competitors.

If our existing and new loan products and services and investment products do not maintain or achieve adequate acceptance in the market, our competitive position, results of operations and financial condition could be materially and adversely affected.

***If we fail to promote and maintain our brand in an effective and cost-efficient way, our business and results of operations may be harmed.***

We believe that effectively developing and maintaining awareness of our brand is critical to attracting and retaining users. This in turn largely depends on the effectiveness of our user acquisition strategy, our marketing efforts, our cooperation with institutional funding partners and the success of the channels we use to promote our platform. If any of our current user acquisition strategies or marketing channels becomes less effective, more costly or no longer feasible, we may not be able to attract new users in a cost-effective manner or convert potential users into active users.

Our efforts to build our brand have caused us to incur expenses, and it is likely that our future marketing efforts will require us to incur additional expenses. These efforts may not result in increased operating revenue in the immediate future or any increases at all and, even if they do, any increases in operating revenue may not offset the expenses incurred. If we fail to successfully promote and maintain our brand while incurring additional expenses, our results of operations and financial condition would be adversely affected, and our ability to grow our business may be impaired.

***Any negative publicity or user complaints with respect to us, the consumer finance industry in general and our third-party service providers may materially and adversely affect our business and results of operations.***

The reputation of our brands is critical to our business and competitiveness. Any malicious or negative publicity or any publicized incidents in connection with the use of our products or services, whether or not we are negligent or at fault, including but not limited to those relating to our management, business, compliance with the law, financial conditions or prospects, whether with or without merit, could severely compromise our reputation and harm our business and operating results.

As China's consumer finance industry is new and the regulatory framework for this industry is also evolving, negative publicity about this industry and the market segment in which we operate may arise from time to time. Negative publicity about China's consumer finance industry in general may also have a negative impact on our reputation, regardless of whether or not we have engaged in any inappropriate activities. The PRC government has recently instituted specific rules, including the Guidelines, Interim Measures, the CBRC Circular 26 and the Circular 141, to develop a more transparent regulatory environment for the online consumer finance industry. See "Item 4. Information on the Company—B. Business Overview—Regulations— Regulations Relating to Online Consumer Finance Services." Any players in China's online consumer finance industry who are not in compliance with these regulations may adversely impact the reputation of the industry as a whole. Furthermore, any negative development or perception of the consumer finance industry as a whole, including campus lending, even if factually incorrect or based on isolated incidents or as result of conduct by other market players, could compromise our image, undermine our trust and credibility, and negatively impact our ability to attract new users, investors and institutional funding partners. Negative developments in the consumer finance industry, such as widespread user defaults, fraudulent behavior, the closure of other online consumer finance platforms, or incidents indirectly resulting from the accumulation of large amounts of debt and inability to repay by any particular user, may also lead to tightened regulatory scrutiny of the sector and limit the scope of permissible business activities that may be conducted by market players in the consumer finance industry. For instance, since 2015, there has been a number of reports of business failures of, or accusations of fraud and unfair dealing against, certain companies in the consumer finance industry in China. If users, investors or

Exhibit 4
Page 4

The profitability of our business depends on the interest rates at which our users are willing to borrow, and the interest rates at which our funding partners are willing to lend. If we fail to respond to the fluctuations in interest rates in a timely manner and reprice our loan products, our loan products may become less attractive to our users. For example, in a falling interest rate environment, potential users may seek lower priced loans from other channels if we do not lower the interest rates on our loan products. Similarly, in a rising interest rate environment, potential investors may seek higher return investments from other channels if we do not increase the return on our investment products. Moreover, if we are unable to reprice our loan products and investment products correspondingly, the spreads between the interest rates on our loan products and the expected rates of return on our investment products may be reduced, and our profitability may be adversely affected.

***We rely on the sale of computers, smartphones and other consumer electronics for a significant portion of our loans originated to finance user purchases on our e-commerce channel.***

Historically, online sales of electronic products, including computers and smartphones, have accounted for a majority of purchases on our e-commerce channel, and thus a significant portion of online direct sales and services income. Electronic products sold on our e-commerce channel accounted for approximately 77%, 69% and 52% of our total loans originated to finance user purchases on our e-commerce channel in 2016, 2017 and 2018. We expect that sales of these products will continue to translate into a significant portion of our total operating revenue and loans originated to finance user purchases on our e-commerce channel in the near future. We have increased our offerings on our e-commerce channel to include other product categories, and we have continuously added new products within each product category. However, due to the demographic characteristics of our target user cohort and their demand, our sales of these new products and services may not increase to a level that would substantially reduce our dependence on the sales of electronic products. We face intense competition from online sellers of electronic products and from established companies with physical stores that are moving into online retail, such as Taobao.com, Tmall.com, JD.com and Suning. Any event that results in a reduction in our sales of electronic products could materially and adversely affect our ability to maintain or increase the level of our operating revenue and loan originations and to maintain or improve our business prospects.

21

Table of Contents

***If we fail to manage our inventory effectively, our results of operations, financial condition and liquidity may be materially and adversely affected.***

Our scale and business model require us to manage our inventory effectively. We depend on our demand forecasts for various kinds of products to make purchase decisions and to manage our inventory. Demand for products, however, can change significantly between the time inventory is ordered and the date by which we hope to sell it. Demand may be affected by seasonality, new product launches, changes in product cycles and pricing, product defects, changes in consumer spending patterns, changes in consumer tastes and other factors, and our users may not order products in the quantities that we expect. In addition, when we begin selling a new product, it may be difficult to establish supplier relationships, determine appropriate product selection, and accurately forecast demand. The acquisition of certain types of inventory may require significant lead time and prepayment and they may not be returnable.

Furthermore, as we plan to continue expanding our product offerings, we expect to include more products in our inventory, which will make it more challenging for us to manage our inventory and logistics effectively. If we fail to manage our inventory effectively, we may be subject to a heightened risk of inventory obsolescence, a decline in inventory value, and significant inventory write-downs or write-offs. In addition, we may be required to lower sale prices in order to reduce inventory level, which may lead to lower gross margins. High inventory levels may also require us to commit substantial capital resources, preventing us from using that capital for other purposes. Any of the above may materially and adversely affect our results of operations and financial condition. On the other hand, if we underestimate demand for our products, or if our suppliers fail to supply quality products in a timely manner, we may experience inventory shortages, which might result in missed sales, diminished brand loyalty and lost revenues, any of which could harm our business and reputation.

***Limited liquidity exists for investments made on Juzi Licai, which may make these investments less attractive to investors.***

There currently exists no trading market for the loans invested by individual investors on *Juzi Licai*. Individual investors are not permitted to directly transfer their investments to other individual investors prior to maturity. For fixed maturities investment programs, investors are only allowed to withdraw their funds upon maturity. For step-up returns investment programs, individual investors are allowed to withdraw their funds on the condition that withdrawals be made on specified dates during each weekly or monthly period. In the event that investors request to withdraw a substantial amount of their investments at the same time or within a short time period, it may cause a run on our investment programs and we may be unable to meet the investors' withdrawal demands on a timely basis, or at all. To the extent that individual investors are not able to transfer loans at all or withdraw their funds when needs for liquidity arise, individual investors may be discouraged from investing on *Juzi Licai* in the future, which may have a material and adverse effect on our business and competitive position.

***Misconduct, errors and failure to perform by our employees could harm our business and reputation.***

We are exposed to many types of operational risks, including the risk of misconduct and errors by our employees. Our business depends on our employees to interact with users and investors, process large numbers of transactions and support the loan collection process, all of which involve the use and disclosure of personal information. We could be materially and adversely affected if transactions were redirected, misappropriated or otherwise improperly executed, if personal information was disclosed to unintended recipients, or if an operational breakdown or failure in the processing of transactions occurred, whether as a result of human error, purposeful sabotage or fraudulent manipulation of our operations or systems. In addition, the manner in which we store and use certain personal information and interact with users and investors is governed by various PRC laws. It is not always possible to identify and deter misconduct or errors by employees, and the precautions we take to detect and prevent this activity may not be effective in controlling unknown or unmanaged risks or losses. If any of our employees take, convert or misuse funds, documents or data or fail to follow protocol when interacting with users and investors, we could be liable for damages and subject to regulatory actions and penalties. We could also be perceived to have facilitated or participated in the illegal misappropriation of funds, documents or data, or have failed to follow protocol, and therefore be subject to civil or criminal liability.

22

Table of Contents

***If our ability to collect delinquent loans is impaired, or if the collection efforts of our in-house team or third-party service providers are impaired, our business and results of operations might be materially and adversely affected.***

Our in-house collection team handles the collection of delinquent loans. We also engage certain third-party collection service providers from time to time. If either our or our third-party service providers' collection methods, such as phone calls, text messages, in-person visits and legal letters, are not effective and we fail to respond quickly and improve our collection methods, our delinquent loan collection rate may decrease. While we have implemented and enforced policies and procedures relating to collection activities by us and third-party service providers, if those collection methods were to be viewed by the users or regulatory authorities as harassments, threats or other illegal conducts, we may be subject to lawsuits initiated by the users or prohibited by the regulatory authorities from using certain collection methods. If this were to happen and we fail to adopt alternative collection methods in a timely manner or the alternative collection methods are proven to be ineffective, we might not be able to maintain our delinquent loan collection rate and the funding sources' confidence in our platform may be negatively impacted. If any of the foregoing takes place and impairs our ability to collect delinquent loans, the loan originations on our platform will decrease, and our business and the results of operations could be materially and adversely affected.

***Uncertainties relating to the growth and profitability of the online retail industry in China in general, and the e-commerce industry in particular, could adversely affect our operating revenue and business prospects.***

Online direct sales on our e-commerce channel account for a significant portion of our total operating revenue and loan originations. Our future results of operations will depend on numerous factors affecting the development of the e-commerce industry in China, which may be beyond our control. These factors include:

the growth of internet, broadband, personal computer and mobile penetration and usage in China, and the rate of any such growth;

the level of trust and confidence of Chinese consumers in online shopping, as well as changes in user demographics and consumer tastes and preferences;

the selection, price and popularity of products that we and our competitors offer online;

whether alternative retail channels or business models that better address the needs of consumers emerge in China; and

Exhibit 4
Page 5

the development of fulfillment, payment and other ancillary services associated with online purchases.

A decline in the popularity of online shopping in general, or any failure by us to adapt our website and improve the online shopping experience of our users in response to trends and consumer requirements, may adversely affect our operating revenue and business prospects.

Furthermore, the e-commerce industry is subject to macroeconomic changes, and retail purchases tend to decline during recessionary periods. Many factors outside of our control, including inflation and deflation, currency exchange rate fluctuation, volatility of stock and property markets, interest rates, tax rates, other government policies, and unemployment rates, can adversely affect consumer confidence and spending, which could in turn materially and adversely affect our growth and profitability. Unfavorable developments in domestic and international politics, including military conflicts, political turmoil and social instability, may also adversely affect consumer confidence and reduce spending, which could in turn materially and adversely affect our growth and profitability.

***Our delivery, return and exchange policies may materially and adversely affect our results of operations.***

We have adopted user-friendly return and exchange policies. We may also be required by law to adopt new or amend existing return and exchange policies from time to time. For example, pursuant to the PRC Consumer Rights and Interests Protection Law and the Measures on the Administration of Online Transactions promulgated by the SAIC, in January 2014, which became effective in March 2014, or the Online Transactions Measures, consumers are entitled to return goods purchased online within seven days upon receipt of such goods for no reason, subject to certain exceptions. See "Item 4. Information on the Company—B. Business Overview— Regulations—Regulations Relating to Product Quality and Consumer Rights Protection." These policies improve users' shopping experience and promote user loyalty, which in turn help us acquire and retain users. However, these policies also subject us to additional costs and expenses which we may not be able to recoup with increased revenue. Our ability to handle a large volume of returns is unproven. If our return and exchange policy is misused by a significant number of users, our costs may increase significantly and our results of operations may be materially and adversely affected. If we revise these policies to reduce our costs and expenses, our users may be dissatisfied, which may result in a loss of existing users or failure to acquire new users at a desirable pace, and may materially and adversely affect our results of operations as a result.

23

Table of Contents

***If we fail to compete effectively, our results of operations and market share could be harmed.***

The online consumer finance industry in China is highly competitive and evolving. As a leading online consumer finance platform in China, we face competition from other online platforms, major internet players, traditional financial institutions as well as other installment loan service providers. Our competitors include, among others, Ant Financial Services Group, JD Finance and WeBank. We also compete with traditional financial institutions, including credit card issuers, consumer finance business units in commercial banks and other consumer finance companies.

Our competitors operate with different business models, have different cost structures or participate selectively in different market segments. They may ultimately prove more successful or more adaptable to new regulatory, technological and other developments. Some of our current and potential competitors have significantly more financial, technical, marketing and other resources than we do, and may be able to devote greater resources to the development, promotion, sale and support of their platforms. Our competitors may also have longer operating histories, more extensive user or investor bases, larger amounts of data, greater brand recognition and loyalty, and broader partner relationships than we do. Additionally, a current or potential competitor may acquire one or more of our existing competitors or form a strategic alliance with one or more of our competitors. Any of the foregoing could adversely affect our business, results of operations, financial condition and future growth.

In addition, our competitors may be better at developing new products, responding to new technologies, charging lower fees on loans and undertaking more extensive marketing campaigns. When new competitors seek to enter our target market, or when existing market participants seek to increase their market share, they sometimes undercut the pricing and/or terms prevalent in that market, which could adversely affect our market share or ability to exploit new market opportunities. Also, since the online consumer finance industry in China is relatively new and fast evolving, potential investors and users may not fully understand how our platform works. Our pricing and terms could deteriorate if we fail to act to meet these competitive challenges. In addition, in response to more stringent PRC laws and regulations regarding cash loans, more online lending platforms may expand their services and products to scenario-based lending, including partnering with e-commerce platforms, which may drive up the competition among online lending platforms. Such intensified competition may increase our operation costs and adversely affect our results of operations and profitability. Furthermore, to the extent that our competitors are able to offer more attractive terms to our business partners, such business partners may choose to terminate their relationships with us. In addition, as our competitors may implement certain procedures to reduce their fees in response to the current or potential PRC regulations on interest rates and fees charged by online lending platforms, we may need to reduce our fees as well to comply with such regulations and to remain competitive in the online lending industry. If we are unable to compete with our competitors, or if we are forced to charge lower fees due to competitive pressures, we could experience reduced revenues or our platforms could fail to achieve market acceptance, any of which could materially and adversely affect our business and results of operations.

***If the total addressable market for our target user cohort is smaller than what we believe it is, our results of operations may be adversely affected and our business may suffer.***

It is very difficult to estimate the total addressable market for our target user cohort due to factors such as market demand, PRC regulations of the credit industry, competition, general economic conditions and the relatively short history of the online consumer finance industry in China. We believe that our total addressable market of users consists of educated young adults. However, if there is less demand than we anticipate for loan products offered on our platform, it may materially and adversely impact our business, financial condition and results of operations.

24

Table of Contents

***Our quarterly results may fluctuate significantly due to the seasonality of our business and may not fully reflect the underlying performance of our business.***

We experience some seasonality in our business, reflecting a combination of seasonal demand for consumer loans and seasonality patterns associated with the online retail industry. For example, we generally experience less user traffic and purchase orders during national holidays in China, particularly during the Chinese New Year holiday season in the first quarter of each year. Furthermore, e-commerce companies in China hold special promotional campaigns on November 11 each year, which improve our results for that quarter. The demand for our products and services is higher in March, April, September, October and November, which generally corresponds to the start of school and our promotional activities around November 11. While our rapid growth has somewhat masked this seasonality, our quarterly operating results could be affected by such seasonality in the future.

Therefore, our quarterly results of operations, including our operating revenue, expenses, net loss or income and other key metrics, may vary significantly in the future, and period-to-period comparisons of our operating results may not be meaningful. Accordingly, the results for any single quarter are not necessarily an indication of future performance.

***We may not be able to obtain additional operating capital on favorable terms or at all.***

Our consolidated financial statements have been prepared on a going concern basis. We believe that our current cash, cash provided by operating activities and funds available through our bank loans and credit facilities, will be sufficient to meet our current and anticipated needs for general corporate purposes for at least the next 12 months. However, we need to make continued investments in facilities, hardware, software, technological systems and to retain talents to remain competitive. Due to the unpredictable nature of the capital markets and our industry, we cannot assure you that we will be able to raise additional capital on terms favorable to us, or at all, if and when required, especially if we experience disappointing operating results. If adequate capital is not available to us as required, our ability to fund our operations, take advantage of unanticipated opportunities, develop or enhance our infrastructure or respond to competitive pressures could be significantly limited, which would adversely affect our business, financial condition and results of operations. In such event, there may also be significant doubt as to our ability to continue as a going concern. If we do raise additional funds through the issuance of equity or convertible debt securities, the ownership interests of our shareholders could be significantly diluted. These newly issued securities may have rights, preferences or privileges senior to those of existing shareholders.

***We have obligations to verify information relating to users and to detect fraud. If we fail to perform such obligations to meet the requirements of relevant laws and regulations, we may be subject to liabilities.***

Our business of connecting individual investors and users on *Juzi Licai* constitutes an intermediary service, and Qianhai Juzi's contracts with individual investors and/or users on

Exhibit 4
Page 6

*Juzi Licai* are intermediation contracts under the PRC Contract Law. Under the PRC Contract Law, an intermediary that intentionally conceals any material information or provides false information in connection with the conclusion of the proposed contract, which results in harm to the client's interests, may not claim any service fee for its intermediary services and is liable for any damage incurred by the client. In addition, the Interim Measures have imposed on us additional obligations to verify the truthfulness of the information provided by or in relation to users, and to actively detect fraud. Therefore, if we intentionally conceal any material information or provide false information to funding sources, or fail to verify the truthfulness of the information provided by or in relation to our users or to actively detect fraud, we could be subject to liabilities as an intermediary under the PRC Contract Law and liabilities under the Interim Measures, and our results of operations and financial condition could be materially and adversely affected.

***Changes in PRC regulations relating to interest rates and fees for online consumer finance platforms and microcredit lending, including campus online lending, could have a material adverse effect on our business.***

The interest rate permitted to be charged on loans originated on our platform is subject to limitations set forth in the Provisions on Several Issues Concerning Laws Applicable to Trials of Private Lending Cases issued by the Supreme People's Court in August 2015 and effective in September 2015, or the Private Lending Judicial Interpretations, which provide that (i) when the interest rate agreed between the borrower and lender does not exceed an annual interest rate of 24%, the People's Court will uphold the interest rate charged by the lender, and (ii) when the interest rate agreed between the borrower and lender exceeds an annual interest rate of 36%, the portion in excess of 36% is void and the People's Court will uphold the borrower's claim for return of the excess portion to the borrower. For loans with interest rates per annum between 24% and 36%, if the interest on the loans has already been paid to the lenders, and so long as such payment has not damaged the interest of the state, the community or any third parties, the courts will likely not enforce the borrower's demand for the return of such interest payment.

25

Table of Contents

Ji'an Microcredit, is subject to regulations applicable to micro-credit companies. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Microcredit." These regulations provide that "integrated actual interest" (namely the aggregated borrowing costs charged to borrowers in the forms of interest and various fees) shall be subject to the limit on interest rate of private lending set forth in the Private Lending Judicial Interpretations issued by the Supreme People's Court. The loans originated on our platform and by Ji'an Microcredit will be subject to the aforementioned interest rate restrictions, which could affect our ability to originate loans to certain users and may have a material adverse effect on our business.

In addition, the Notice on Further Strengthening the Rectification of Campus Online Lending issued by six PRC regulatory agencies in October 2016 prohibits, among other things, providing usurious loans by charging various fees such as procedure fee, overdue fine, service fee and recovery fee.

Certain Opinions Regarding Further Strengthening the Financial Judgment Work issued by the Supreme People's Court in August 2017, or the Opinions for Financial Judgment Work, provide more detailed rules on the legal limits of interest and fees charged in connection with a loan and specify that the intermediary service fees charged by an online lending intermediary to circumvent the legal limit of interest of private lending shall be invalid. The Circular 141 jointly issued by the Internet Finance Rectification Office and the Online Lending Rectification Office in December 2017 further clarifies that the total amount of interest and fees charged to borrowers must be within the limit set forth in the Private Lending Judicial Interpretations. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Online Consumer Finance Services—Regulations Relating to Loans Between Individuals."

Currently, none of our loans facilitated by us has an overall annualized interest rate exceeding 36%. We believe our current service fees and various other fees charged to our users are reasonable and in compliance with relevant requirements under the Provisions on Several Issues Concerning Laws Applicable to Trials of Private Lending Cases, the Notice on Further Strengthening the Rectification of Campus Online Lending, the CBRC Circular 26 and the Opinions for Financial Judgment Work. However, if our current fee level is deemed to be excessive or constitutes usurious loans under any existing or future relevant PRC laws, regulations and rules, we may face, among others, regulatory warning, correction order, condemnation, fines and criminal liability and may be required to reduce the fees and annual interest rate we charge to our users. If such situations were to occur, our business, financial condition, results of operations and prospects would be materially and adversely affected.

***The origination of loans on our platform could give rise to liabilities under PRC laws and regulations that prohibit illegal fundraising and unauthorized public offerings.***

PRC laws and regulations prohibit persons and companies from raising funds by advertising to the public a promise to repay premium or interest payments over time through payments in cash or in kind except with the prior approval of the applicable government authorities. Failure to comply with these laws and regulations may result in penalties imposed by the PBOC, the SAIC, and other governmental authorities, and can lead to civil or criminal lawsuits.

We have taken measures to avoid conducting any activities that are prohibited under the illegal-funding related laws and regulations. We act as online lending information intermediaries for users and individual investors. In addition, we do not directly receive any funds from individual investors in our own accounts as funds from individual investors are deposited into and settled by a third-party custody account managed by China Guangfa Bank. To date, our platform has not been subject to any fines or other penalties under any PRC laws and regulations that prohibit illegal fundraising. Nevertheless, considerable uncertainties exist with respect to the PBOC, the SAIC and other governmental authorities' interpretations of the fundraising-related laws and regulations. Therefore, we cannot guarantee you that our current services provided to investors will not be deemed to violate illegal fundraising laws and regulations in the future.

26

Table of Contents

The PRC Securities Law prohibits the issuance of securities for public offering without obtaining prior approval in accordance with the provisions of the law. The following offerings are deemed to be public offerings under the PRC Securities Law: (i) offering of securities to non-specific targets; (ii) offering of securities to more than 200 specific targets; and (iii) other offerings provided by the laws and administrative regulations. Additionally, private offerings of securities may not be carried out through advertising, open solicitation and disguised publicity campaigns. If any transaction between a user and multiple individual investors is identified as a public offering by PRC government authorities, we may be subject to sanctions under PRC laws and our business may be adversely affected.

***Credit and other information that we receive from prospective users and third parties about a user may be inaccurate and thus may not accurately reflect the user's creditworthiness, which may compromise the accuracy of our credit assessment.***

For our credit assessment, we obtain from prospective users and third parties certain information of the prospective users, which may not be complete, accurate or reliable. Our credit assessment of a user may not reflect that particular user's actual creditworthiness due to outdated, incomplete or inaccurate user information. Additionally, once we have obtained a user's information, the user may subsequently (i) become delinquent in the payment of an outstanding obligation; (ii) default on a pre-existing debt obligation; (iii) take on additional debt; or (iv) experience other adverse financial events, making the information we previously obtained inaccurate. We currently determine whether users have outstanding loans through consumer finance platforms using external databases at the time they obtain a loan from us. We also compare a user's name against our database on a regular basis. Once we detect that a user has multiple outstanding loans with substantial aggregate balances and poses a high credit risk, we will place such user on a high risk user list and closely monitor the user going forward. However, there is no assurance that we have complete and accurate information relating to all of our users' outstanding loans. For example, a user may borrow money through our platform in order to pay off loans on other consumer finance platforms, and vice versa. If a user incurs additional debt before fully repaying any loan that user takes out on our platform, the additional debt may impair the ability of that user to make payments on his or her loan with us and our funding sources, ability to receive investment returns associated with such loan. In addition, the additional debt may adversely affect the user's creditworthiness generally and could result in the financial distress or insolvency of the user. To the extent that a user has other indebtedness and cannot repay all of his or her indebtedness, the user may choose to make payments to other platforms instead of us.

Such inaccurate or incomplete user information could affect the accuracy of our credit assessment and the effectiveness of our risk management, which could in turn harm our reputation, and as a result, our business and results of operations could be materially and adversely affected.

***Our ability to protect the confidential information of our users and funding sources and our ability to conduct our business may be adversely affected by cyber-attacks, computer viruses, physical or electronic break-ins or similar disruptions and we may be subject to liabilities imposed by the relevant government regulations.***

Our platform collects, stores and processes certain personal and other sensitive data from our users and funding sources. There are numerous laws governing privacy and the storage, sharing, use, disclosure and protection of personally identifiable information and user data. Specifically, personally identifiable and other confidential information is increasingly subject to

Exhibit 4
Page 7

the following four criteria: (i) the fund-raising has not been approved by the relevant authorities or is concealed under the guise of legitimate acts; (ii) the fundraising employs general solicitation or advertising such as social media, promotion meetings, leafleting and short messaging service advertising; (iii) the fundraiser promises to repay, after a specified period of time, the capital and interests, or investment returns in cash, properties in kind and other forms; and (iv) the fund-raising targets at the general public as opposed to specific individuals. An illegal fund-raising activity will be fined or prosecuted in the event that it constitutes a criminal offense. Pursuant to the Illegal Fund-Raising Judicial Interpretations, an offender that is an entity will be subject to criminal liabilities, if it illegally solicits deposits from the general public or illegally solicits deposits in disguised form (i) in an amount exceeding RMB1,000,000, (ii) with over 150 fund-raising targets involved, or (iii) with the direct economic loss caused to fund-raising targets exceeding RMB500,000, or (iv) the illegal fundraising activities have caused baneful influences to the public or have led to other severe consequences. An offender who is a natural person is also subject to criminal liabilities but with lower thresholds.

In January 2019, the Supreme People's Court, Supreme People's Procuratorate and Ministry of Public Security issued the Opinions on Handling Criminal Cases of Illegal Fund-raising, which further clarified, among other things, that the PRC financial administration laws and regulations shall be considered as the basis for determining the illegality of illegal fund-raising.

We have taken measures to avoid conducting any activities that are prohibited under the illegal-funding related laws and regulations. We act as intermediaries for users and retail investors. In addition, we do not directly receive any funds from retail investors in our own accounts, as funds loaned through our platform are deposited into and settled by a third-party custody account managed by China Guangfa Bank.

The Measures for the Banning of Illegal Financial Business Operations also prohibits facilitating loans to the public without the approval of the PBOC. The General Rules on Loans issued by the PBOC in June 1996 further provides that a financial institution shall conduct the loan business with the approval of the PBOC. The funding of loans by us without going through network microcredit companies or trusts may render us to be deemed as a lender or a provider of financial services by the PRC regulatory authorities, and we may be subject to supervision and restrictions on lending under such PRC laws and regulations.

68

Table of Contents

*Regulations Relating to Online Lending Information Intermediary Service Agency*

In July 2015, ten PRC regulatory agencies, including the PBOC, the MIIT and the CBRC jointly issued the Guidelines on Promoting the Healthy Development of Internet Finance, or the Guidelines. The Guidelines call for active government support of China's internet finance industry, including the online peer-to-peer lending service industry, and clarify the division of responsibility among regulatory agencies. The Guidelines specify that the CBRC will have primary regulatory responsibility for the online peer-to-peer lending service industry in China and state that online peer-to-peer lending service providers shall act as an intermediary platform to provide information exchange, matching, credit assessment and other intermediary services, and must not provide credit enhancement services and/or engage in illegal fundraising. The Guidelines provide additional requirements for China's internet finance industry, including the use of custody accounts with qualified banks to hold user funds as well as information disclosure requirements.

In April 2016, to further implement the requirements specified in the Guidelines, the General Office of the State Council and fifteen regulatory agencies (including the CBRC) promulgated the Implementation Plan of Specific Rectification for Risks in Internet Finance and the Implementation Plan of Specific Rectification for Risks in Online Peer-to-Peer Lending, or the Implementation Plans. The Implementation Plans emphasize several requirements that are contemplated for the rectification of the peer-to-peer lending service industry, which include, among others, that (i) an online peer-to-peer lending service provider is an information intermediary; (ii) the lending through the online platform conducted by such service provider meets the standards of direct lending, namely the direct lending from individuals to individuals realized through the online platform; (iii) the online peer-to-peer lending service provider shall not violate regulatory "red lines", including setting up any capital pools, financing for itself, promising on a guarantee of principal and interest and etc.; (iv) the funds of lenders and borrowers shall be deposited with eligible third-party custodian accounts and (v) full, timely and objective disclosure of the information, and the establishment of information security measures.

In August 2016, four PRC regulatory agencies, including the CBRC, the MIIT, the MPS and Cyberspace Administration of China, published the Interim Measures. The Interim Measures define online lending intermediaries as the financial information intermediaries that are engaged in online peer-to-peer lending information business and provide lenders and borrowers with lending information services, such as information collection and publication, credit rating, information interaction and loan facilitation. Consistent with the Guidelines, the Interim Measures prohibit online lending intermediaries from providing credit enhancement services and collecting funds directly or indirectly, and require, among others, (i) that online lending intermediaries intending to provide online lending information agency services and its subsidiaries and branches must make relevant record-filing with local financial regulatory authorities with which it is registered after obtaining the business license; (ii) that online lending intermediaries operating telecommunication services must apply for relevant telecommunication service license after the completion of the record-filing and registration with the local financial regulatory authority; and (iii) that online lending intermediaries must materially specify the online lending information intermediary in the business scope.

The Interim Measures list the following businesses that an online lending intermediary must not, by itself or on behalf of a third party, participate in: (i) financing for themselves whether or not in disguised form; (ii) accepting or collecting directly or indirectly the funds of lenders; (iii) providing lenders with guarantee or promise on guarantee of principal and interest directly or in disguised form; (iv) publicizing or promoting financing projects at physical locations; (v) extending loans, except otherwise as provided by laws and regulations; (vi) splitting the term of any financing project; (vii) offering wealth management and other financial products by themselves to raise funds, and selling as an agent bank wealth management, securities company asset management, fund, insurance or trust products and other financial products; (viii) conducting asset securitization business or realizing transfer of creditors' rights in the forms of asset packaging, asset securitization, trust assets, fund shares, etc.; (ix) engaging in any form of mixture, bundling or agency with other institutions in investment, agency in sale, brokerage and other business except as permitted by laws, regulations and relevant regulatory provisions on online peer-to-peer lending; (x) falsifying or exaggerating earnings outlook of financing projects, concealing the defects and risks of financing projects, making false advertising or promotion, etc., by using ambiguous words or other fraudulent means, fabricating or spreading false or incomplete information impairing the business reputation of others or misleading lenders or borrowers; (xi) providing information intermediary services for high-risk financing which uses the borrowed funds for investment in stocks, over-the-counter fund distribution, futures contracts, structured funds and other derivative products; (xii) engaging in businesses such as crowd-funding in equity; and (xiii) other activities prohibited by the laws, regulations and the regulatory provisions on online peer-to-peer lending. In addition, the Interim Measures stipulate that online lending intermediaries shall not operate businesses other than risk management and necessary business processes such as information collection and confirmation, post-loan tracking and pledge management in accordance with online lending regulations, via offline physical locations. Furthermore, the Interim Measures provide that online lending intermediaries shall, based on their risk management capabilities, set upper limits on the loan balance of a single borrower borrowing both from one online lending intermediary and from all online lending intermediaries. In the case of natural persons, this limit shall not be more than RMB200,000 for one online lending intermediary and not more than RMB1 million in total from all platforms, while the limit for a legal person or organization shall not be more than RMB1 million for one online lending intermediary and not more than RMB5 million in total from all platforms.

69

Table of Contents

Moreover, the Interim Measures require that each online lending intermediary (i) separate its own capital from funds received from lenders and borrowers and (ii) select a qualified banking financial institution as its funding custodian institution, which shall perform custody and administrative responsibilities as required.

The Interim Measures also set out certain additional requirements applicable to online lending intermediaries on, among other things, the real-name registration of lenders and borrowers, the risk control, internet and information security, limits on the fund collection period (up to 20 business days), allocation of charges, personal credit management, file management, lenders and borrowers protection, prohibition on making decisions by online lending intermediaries on behalf of the lender without the authorization of the lender, administration of electronic signatures and information disclosure.

Any violation of the Interim Measures by an online lending intermediary may subject such online lending intermediary to certain penalties as determined by applicable laws, and regulations, or by relevant government authorities if the applicable laws and regulations are silent on the penalties. The applicable penalties may include but are not limited to, criminal liabilities, warning, rectification, tainted integrity record and fines of up to RMB30,000.

If any online lending intermediary established prior to the implementation of these Interim Measures fail to conform to the provisions of these Interim Measures, the local financial regulatory authority shall require such online lending intermediary to make rectification, and the rectification period shall not exceed 12 months.

In April 2017, CBRC issued the Guidelines on Prevention and Control of the Risks in Banking Industry, to further emphasize that the Interim Measures and the supporting mechanism (including but not limited to the record-filing mechanism and the fund custodian mechanism) shall be strictly implemented.

Exhibit 4
Page 8

In April 2017, the Online Lending Rectification Office issued the Notice on the Performance of Check and Rectification of Cash Loan Business Activities and a supplementary notice, or the Notice on Cash Loan. The Notice on Cash Loan requires the local branches of the Online Lending Rectification Office to conduct a comprehensive review and inspection of the cash loan business of online lending platforms and require such platforms to implement necessary improvements and remediation within a specific period to comply with the relevant requirements under the applicable laws and regulations. The Notice on Cash Loan focuses on preventing malicious fraudulent activities, loans that are offered at excessive interest rates and violence in the loan collection processes in the cash loan business operation of online lending platforms. The Online Lending Rectification Office also issued a list of cash loan business activities that are to be examined.

In December 2017, the Internet Finance Rectification Office and the Online Lending Rectification Office jointly issued the Circular 141, outlining general requirements on the "cash loan" business conducted by network microcredit companies, banking financial institutions and online lending information intermediaries. The Circular 141 specifies the features of "cash loans" as not relying on consumption scenarios, with no specified use of loan proceeds, no qualification requirement on users and unsecured etc. The Circular 141 sets forth several general requirements with respect to "cash loan" business, including, without limitation: (i) no organizations or individuals may conduct the lending business without obtaining approvals for the lending business; (ii) the aggregated borrowing costs of borrowers charged by institutions in the forms of interest and various fees should be annualized and subject to the limit on interest rate of private lending set forth in the Private Lending Judicial Interpretations issued by the Supreme People's Court; (iii) all relevant institutions shall follow the "know-your-customer" principle and prudentially assess and determine the borrower's eligibility, credit limit and cooling-off period, etc. Loans to any borrower without income sources are prohibited; and (iv) all relevant institutions shall enhance the internal risk control and prudentially use the "data-driven" risk management model.

70

Table of Contents

With respect to network microcredit companies, the Circular 141 requires the relevant regulatory authorities to suspend the approval of the establishment of network microcredit companies and the approval of any microcredit business across provinces. The Circular 141 also specifies that network microcredit companies shall not provide campus loans, and should suspend the funding of network micro-loans with no specific scenario or designated use of loan proceeds, gradually reduce the volume of the existing business relating to such loans and take rectification measures in a period to be separately specified by authorities. Further detailed requirements on network microcredit companies are provided in a rectification implementation plan issued by the Online Lending Rectification Office on December 8, 2017. See "Item 4. Information on the Company—B. Business Overview—Regulations Relating to Microcredit."

The Circular 141 also sets forth several requirements on banking financial institutions participating in "cash loan" business, including, among other things, (i) such banking financial institutions shall not extend loans jointly with any third-party institution which has not obtained approvals for the lending business, or fund such institution for the purpose of extending loans in any form; (ii) with respect to the loan business conducted in cooperation with third-party institutions, such banking financial institutions shall not outsource the core business (including the credit assessment and risk control), and shall not accept any credit enhancement service whether or not in a disguised form (including the commitment to taking default risks) provided by any third-party institutions with no guarantee qualification and (iii) such banking financial institutions must require and ensure that the third-party institutions shall not collect any interests or fees from the borrowers.

In additions, the Circular 141 emphasizes several requirements on the online lending information intermediaries. For instance, such intermediaries are prohibited from facilitating any loans to students or other persons without repayment source or repayment capacity, or loans with no designated use of proceeds. Also, such intermediaries are not permitted to deduct interest, handling fee, management fee or deposit from the principal of loans provided to the borrowers in advance.

Any violation of the Circular 141 may result in penalties, including but not limited to suspension of operation, orders to make rectification, condemnation, revocation of license, order to cease business operation, and criminal liabilities.

*Regulations Relating to Record-filings of Online Lending Information Intermediary Service Agency*

In November 2016, the CBRC, the MIIT and the SAIC, jointly published the Guidelines on the Administration of Record-filings of Online Lending Information Intermediary Agencies, or the Record-filings Guidelines, to establish and improve the record-filing mechanisms for online lending intermediaries.

According to the Record-filings Guidelines, a newly established online lending information intermediary shall make the record-filings and registration with the local financial regulatory authority after obtaining the business license; while with respect to any online lending information intermediary which is established and begins to conduct the business prior to the publication of this Record-filings Guidelines, the local financial regulatory authority shall, pursuant to relevant arrangement of specific rectification work for risks in online peer-to-peer lending, accept the application for record-filings and registration submitted by a qualified online lending information intermediary, or any online lending information intermediary which has completed the rectification confirmed by relevant authorities.

On December 8, 2017, the Online Lending Rectification Office issued the Notice on the Rectification and Inspection Acceptance of Risk of Online Lending Information Intermediaries, or the Circular 57, providing further clarification on several matters in connection with the rectification and record-filing of online lending information intermediaries, including, among other things:

71

Table of Contents

*Requirements relating to risk reserve funds.* The online lending information intermediaries shall discontinue setting aside additional funds as risk reserve funds or originating new risk reserve funds. In addition, the existing balance of risk reserve funds shall be gradually reduced. Moreover, online lending information intermediaries are prohibited from promoting their services by publicizing the risk reserve funds, and authorities shall actively encourage the online lending information intermediaries to seek third parties to provide lenders with alternate means of investors protection, including third-party guarantee arrangements.

*Requirements to qualify for record-filing.* The Circular 57 sets forth certain requirements which an online lending information intermediary shall not be in breach before it can qualify for the record-filing, including: (i) an online lending information intermediary may not conduct the "thirteen prohibited actions" or exceed the Individual Lending Amount Limit after August 24, 2016, and shall gradually reduce the balance; (ii) an online lending information intermediary which has participated in businesses of the real estate mortgage, campus loan or "cash loan," is required to suspend the new loan origination and the outstanding balance of the abovementioned loan shall be gradually reduced within a certain timetable as required under the CBRC Circular 26 and the Circular 141; and (iii) the online lending intermediaries are required to set up custody accounts with qualified banks that have passed certain testing and evaluation procedures run by the Online Lending Rectification Office to hold user funds. For the online lending intermediaries that are unable to accomplish the rectification and record-filing but are continuing to participate in the online lending business, the relevant authorities shall subject online lending intermediaries to administrative sanctions, including but not limited to revoking their telecommunicating business operation license, shutting down their business websites and requesting financial institutions not to provide any financial services to such online lending intermediaries.

*Requirements relating to the timing of record-filing.* The local governmental authorities shall conduct and complete acceptance inspection of the rectification with the following timetable: (i) completion of record-filing for major online lending information intermediaries by the end of April 2018; (ii) with respect to online lending information intermediaries with substantial outstanding balance of those loans prohibited under the relevant laws and regulations and timely reduction of those balance is difficult, the relevant business and outstanding balance shall be disposed and/or carved out, and record-filing shall be completed by the end of May 2018; (iii) with respect to those online lending information intermediaries with complex and extraordinary circumstances and substantial difficulties exist to complete rectification, the "relevant work" shall be completed by the end of June 2018.

From August 2018 to the date of this annual report, the Online Lending Rectification Office, the Internet Finance Rectification Office and/or other competent authorities implemented certain rules, including but without limitation (i) the Notice Regarding Conducting Compliance Inspections on Online Lending Information Intermediary issued by the Online Lending Rectification Office in August 2018, or the Circular 63, (ii) the Notice Regarding the Establishment of Online Lending Information Intermediaries Data Reporting System issued by the Online Lending Rectification Office in November 2018, or the Circular 73, (iii) the Notice on Proper Disposal of Online Lending Information Intermediaries in a Classified Manner and Risk Control jointly issued by the Internet Finance Rectification Office and the Online Lending Rectification Office in December 2018, or the Circular 175, and (iv) the Notice on Further Implementation of Online Lending Intermediaries Compliance Inspection and Follow-up Work issued by the Online Lending Rectification Office in January 2019, or the Circular 1. Those rules further set forth several matters in connection with the rectification of the online lending information intermediaries, including, among other things:

*Compliance Inspection.* Circular 63 requires that each online lending information intermediary shall start three types of inspection in accordance with the *Issues List for*

Exhibit 4
Page 9

*Compliance Inspection on Online Lending Information Intermediaries* attached thereto, or the Compliance Inspection Issues List, including (i) the self-inspection conducted by the online lending information intermediary itself, (ii) the self-discipline inspection conducted by local internet finance associations or other local organizations, and (iii) the administrative inspection conducted by the local online lending rectification offices. All of these compliance inspections shall be completed before the end of 2018. However, the Circular 1 issued in January 2019 specified that by the end of 2018, all self-inspection has been completed, but the administrative inspection could be completed in only a few jurisdictions. Thus the administrative inspection shall be conducted in the first quarter of 2019. As of the date of this annual report, all three types of inspection of us have been completed; however, we have not been informed about the result of the administrative inspection conducted by SFO.

72

Table of Contents

*Disposal in a Classified Manner.* Circular 175 emphasizes again that the online lending information intermediaries shall be disposed of in a classified manner, based on current results of identification in accordance with Circular 63 and other applicable circulars. Circular 175 further provides that an online lending information intermediary shall be classified into two general categories: (i) Intermediary with Incurred Risk, which means any online lending information intermediary having been exposed to high risks such as delinquency and not able to run its business in a consistent manner; and (ii) Intermediary without Incurred Risk, which means any online lending information intermediary having not been exposed to any high risk. The Intermediary without Incurred Risk shall be further divided into certain categories, including but not limited to a zombie intermediary, an online lending intermediary with high risk, and a normally running online lending intermediary, among which only the normally running online lending intermediaries could be subject to further compliance inspection. As of the date of this annual report, we have not been informed by any regulatory authorities that we would be classified as an Intermediary with Incurred Risk, a zombie intermediary, or an online lending intermediary with high risk.

*Access to Data Reporting System.* Circular 73 and Circular 175 require that all online lending information intermediaries shall be accessed to the Specific Rectification of Online Lending Information Intermediaries Data Reporting System, and any online lending information intermediary not listed in such system shall be transferred to designated local authorities dealing with illegal fund-raising for further disposition. As of the date of this annual report, we have successfully registered for such data reporting system.

*Reduction of Business Volume.* According to the Circular 1, (x) with respect to administrative regions, the number of online lending intermediaries, the number of investors and the business volume therein shall be reduced, (y) with respect to an online lending intermediary, the number of investors, business volume and number of lenders thereon shall be reduced. The Note on Further Regulating Relevant Performance During the Special Rectification of Online Lending Intermediaries Industry issued by Shenzhen Internet Finance Association in December 2018, also requires the online lending intermediaries with registered address or place of actual business within the administrative region of Shenzhen, among other things: (i) not to increase the outstanding balance of loan; (ii) not to increase the number of lenders and reduce the number of lenders in an orderly manner; and (iii) not to establish new branches and reduce the number of offline stores.

Notwithstanding the forgoing, the local financial regulatory authority in Shenzhen are still in the process of drafting detailed implementation rules regarding the record-filing procedures, and to our knowledge, none of the online information intermediaries, including us, have been permitted to submit such application for record-filing in Shenzhen, and we cannot assure you that once submitted, our application will be accepted by the relevant government authorities.

*Regulations Relating to Funds Custodian of Online Lending*

The Interim Measures purport, among other things, to require an online lending intermediary to carry out isolated management of its proprietary funds and the funds of lenders and borrowers and choose an eligible banking financial institution as the custodian institution for the funds of lenders and borrowers. Pursuant to the Interim Measures, the depositary shall enter into fund custodian agreements with an online Information Intermediary, the borrowers, the lenders and/or other related parties, and conduct custodian, transfer, payment, accounting and supervision of the funds of lenders and borrowers pursuant to such agreements.

In February 2017, the CBRC released the Guidelines to Regulate Funds Custodian for online lending intermediaries, or the Custodian Guidelines. The Custodian Guidelines define depositories as commercial banks that provide online lending fund custodian services, and stipulate that the depositories shall not engage in offering any guarantee, including: (i) offering guarantees for lending transaction activities conducted by online lending intermediaries, or undertaking any liability for breach of contract related to such activities; (ii) offering guarantees to lenders, guaranteeing principal and dividend payments or bearing the risks associated with fund lending operations for lenders.

73

Table of Contents

Apart from the requirements set forth in the Interim Measures and the Guidelines, the Custodian Guidelines impose certain responsibilities on online lending intermediaries, including entering into fund custodian agreements with only one commercial bank to provide fund custodian services, and organizing independent audit on funds custodian accounts of borrowers and investors and various other services. The Custodian Guidelines also provide that online lending intermediaries are permitted to develop an online lending fund custodian business only after satisfying certain conditions, including: (i) completing registration, filing records and obtaining a business license from the competent industry and commerce administration authority; (ii) filing records with the local financial regulatory authority; and (iii) applying for a corresponding telecommunications service license pursuant with the relevant telecommunication authorities. The Custodian Guidelines also require online lending intermediaries to perform various obligations, and prohibits them from advertising their services except in accordance with certain exposure requirements, the interpretation and applicability of which is unclear, as well as certain oversight requirements. The Custodian Guidelines also sets forth other business standards and miscellaneous requirements for depositories and online lending intermediaries as well. Online lending intermediaries and commercial banks conducting the online custodian services prior to the effectiveness of the Custodian Guidelines have a six-month grace period to rectify any activities not in compliance with the Custodian Guidelines.

We have entered into an online lending fund custodian agreement with China Guangfa Bank, pursuant to which China Guangfa Bank shall set up separate custodian accounts for funds of lenders and users on *Juzi Licai*, and shall perform fund custody, payment and settlement services on *Juzi Licai*.

*Regulations Relating to Information Disclosure by Online Lending Intermediary*

The Interim Measures stipulate certain requirements on the information disclosure by an online lending intermediary, which include, among other things: (i) full disclosure of the basic information of borrowers and the financing projects, the risk assessment results and potential risk of the projects, the use of funds, and other related information on the official websites; and (ii) submission of the regular information disclosure announcements and other relevant documents to the local financial regulatory authorities for records, and preservation of such documents at the intermediary's domicile for inspection by the public. Pursuant to the Interim Measures, detailed rules on the information disclosure by an online lending intermediary shall be formulated separately.

In August 2017, the General Office of the CBRC released the Guidelines on Information Disclosure of Business Activities of Online Lending Information Intermediaries, or the Information Disclosure Guidelines. Consistent with the Interim Measures, the Information Disclosure Guidelines emphasize the requirement of information disclosure by an online lending intermediary and further, detail the frequency and scope of such information disclosure. Any violation of the Information Disclosure Guidelines by an online lending intermediary may subject the online lending intermediary to certain penalties under Interim Measures. In addition, the Information Disclosure Guidelines require online lending intermediaries that do not fully comply with the Information Disclosure Guidelines in conducting their business to rectify the relevant activities within six months after the release of the Information Disclosure Guidelines.

We have implemented and will continue to implement various policies and procedures to conduct our business and operations to comply such Interim Measures and the Information Disclosure Guidelines, including: maintaining a section on official website and APPs for disclosing the basic information of *Juzi Licai*, the borrowers and the financing projects on *Juzi Licai*.

*Regulations Relating to Campus Online Lending*

In April 2016, the General Office of the Ministry of Education, or the MOE, and the General Office of the CBRC jointly issued the Notice on Education and Guidance Work and Strengthening the Risks Prevention of Campus Delinquency Online Lending, or the Education and Guidance Work Notice. The Education and Guidance Work Notice provides that (i) the local financial regulatory authority shall closely monitor the online lending intermediaries' actions, such as false and misleading advertising and promotion, or other actions that may mislead the lenders or borrowers, and strengthen the supervision and the risk warnings of online lending intermediaries' advertising and promotional activities focusing on those college students, as well as those online lending intermediaries who neglect to conduct borrower qualification examination; and (ii) the corresponding response measures and plan for non-compliant campus online lending shall be established and improved; and any non-compliant online lending intermediary that has advertised and promoted its services within the campus and thus may infringe upon the

Exhibit 4
Page 10

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 20-F

**(Mark One)**

☐    **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

or

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2017.**

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from          to**

or

☐    **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of event requiring this shell company report

Commission file number: 001-38328

# LexinFintech Holdings Ltd.
(Exact name of Registrant as specified in its charter)

**N/A**
(Translation of Registrant's name into English)

**Cayman Islands**
(Jurisdiction of incorporation or organization)

**27/F CES Tower**
**No. 3099 Keyuan South Road**
**Nanshan District, Shenzhen 518052**
**The People's Republic of China**
(Address of principal executive offices)

**Craig Yan Zeng, Chief Financial Officer**
**Telephone: +86 755 3637 8888**
**Email: IR@lexinfintech.com**
**27/F CES Tower**
**No. 3099 Keyuan South Road**
**Nanshan District, Shenzhen 518052**
**The People's Republic of China**
(Name, Telephone, Email and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| American depositary shares (one American depositary share representing two Class A ordinary shares, par value US$0.0001 per share) | The Nasdaq Stock Market LLC (The Nasdaq Global Market) |
| Class A ordinary shares, par value US$0.0001 per share* | The Nasdaq Stock Market LLC (The Nasdaq Global Market) |

\*    Not for trading, but only in connection with the listing on The Nasdaq Global Market of American depositary shares.

Securities registered or to be registered pursuant to Section 12(g) of the Act:

**None**
(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:

**None**
(Title of Class)

Indicate the number of outstanding shares of each of the Issuer's classes of capital or common stock as of the close of the period covered by the annual report.

**As of December 31, 2017, there were 217,070,940 Class A ordinary shares and 110,647,199 Class B ordinary shares, par value US$0.0001 per share.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

☐ Yes  ☒ No

Exhibit 5
Page 1

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.

☐ Yes   ☒ No

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

☒ Yes   ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

☒ Yes   ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐          Accelerated filer ☐          Non-accelerated filer ☒          Emerging growth company ☒

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ☐

†The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☒          International Financial Reporting Standards as issued          Other ☐
                     by the International Accounting Standards Board ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.

☐ Item 17   ☐ Item 18

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

☐ Yes   ☒ No

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.

☐ Yes   ☐ No

Table of Contents

## TABLE OF CONTENTS

| | | |
|---|---|---:|
| INTRODUCTION | | 1 |
| FORWARD-LOOKING INFORMATION | | 2 |
| PART I | | 2 |
| Item 1. | Identity of Directors, Senior Management and Advisers | 2 |
| Item 2. | Offer Statistics and Expected Timetable | 2 |
| Item 3. | Key Information | 3 |
| Item 4. | Information on the Company | 53 |
| Item 4A. | Unresolved Staff Comments | 88 |
| Item 5. | Operating and Financial Review and Prospects | 88 |
| Item 6. | Directors, Senior Management and Employees | 117 |
| Item 7. | Major Shareholders and Related Party Transactions | 127 |
| Item 8. | Financial Information | 129 |
| Item 9. | The Offer and Listing | 130 |
| Item 10. | Additional Information | 130 |
| Item 11. | Quantitative and Qualitative Disclosures about Market Risk | 141 |
| Item 12. | Description of Securities Other Than Equity Securities | 141 |
| PART II | | 143 |
| Item 13. | Defaults, Dividend Arrearages and Delinquencies | 143 |
| Item 14. | Material Modifications to the Rights of Security Holders and Use of Proceeds | 143 |
| Item 15. | Controls and Procedures | 143 |
| Item 16A. | Audit Committee Financial Expert | 144 |
| Item 16B. | Code of Ethics | 145 |
| Item 16C. | Principal Accountant Fees and Services | 145 |
| Item 16D. | Exemptions from the Listing Standards for Audit Committees | 145 |
| Item 16E. | Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 145 |
| Item 16F. | Change in Registrant's Certifying Accountant | 145 |
| Item 16G. | Corporate Governance | 145 |
| Item 16H. | Mine Safety Disclosure | 145 |
| PART III | | 146 |
| Item 17. | Financial Statements | 146 |
| Item 18. | Financial Statements | 146 |
| Item 19. | Exhibits | 146 |
| SIGNATURES | | 150 |

i

Table of Contents

## INTRODUCTION

Unless otherwise indicated or the context otherwise requires, all information in this annual report reflects the following:

- "ABS" refers to asset-backed securities;

Exhibit 5
Page 2

- improve our operational efficiency;

- continue to scale our technology infrastructure to support the growth of our platforms and higher transaction volume;

- broaden our product and service offerings;

- operate without being adversely affected by the negative publicity about the industry in general and our company in particular, if any;

- maintain the security of our platforms and the confidentiality of the information provided and utilized across our platforms;

- cultivate a vibrant consumer finance ecosystem;

- attract, retain and motivate talented employees;

- navigate microeconomic conditions and fluctuations; and

- defend ourselves in litigation, and against regulatory, intellectual property, privacy or other claims.

If our market does not develop as we expect, if we fail to educate potential customers and funding sources about the value of our platforms and services, or if we fail to address the needs of our target customers, our reputation, business and results of operations will be materially and adversely affected.

*If we are unable to retain existing customers or attract new customers, or if we fail to meet the financial needs of our customers as they evolve and are therefore unable to capture their long-term growth potential, our business and results of operations will be materially and adversely affected.*

The volume of loans we originate has grown rapidly over the past few years. From our inception in August 2013 through December 31, 2017, we cumulatively originated RMB76.5 billion (US$11.8 billion) in loans. In 2016 and 2017, we originated RMB22.2 billion and RMB47.7 billion (US$7.3billion) in loans, respectively, for approximately 3.0 million and 4.1 million active customers. We strategically focus on serving educated young adults and seek to capture their long-term growth potential. To maintain the high growth momentum of our platform, we must continuously increase loan originations by retaining current customers and attracting more customers. If there is insufficient demand for our loan products, investors and institutional funding partners may not be able to deploy their funds in a timely or efficient manner, and may seek alternative investment opportunities. If there are insufficient commitments from investors or institutional funding partners, customers may not be able to obtain capital through our platform and may turn to other sources for their borrowing needs. If we are unable to attract qualified customers and sufficient commitments from investors or institutional funding partners, we might not be able to increase our loan originations and operating revenue as we expect, and our business and results of operations may be adversely affected.

In addition, the success of our business depends on our ability to continue to serve our customers' growing credit needs as their consumption requirements change and their ability to repay loans increases with their increasing income. Moreover, we depend on repeat borrowing to cultivate customer loyalty, accumulate customer data and credit history, grow with our customers and offer them better products and services. Of all active customers on our platform in 2015, 2016 and 2017, approximately 63%, 74% and 80%, respectively, were repeat customers who had made at least one transaction on our platform before in the same year or in the previous year. If we fail to retain our existing customers as they enter the workforce, or if we fail to retain these customers by offering products and services that cater to their evolving consumption needs, or if we fail to maintain or increase repeat borrowing on our platform, we may not be able to capture their long-term growth potential, and our business and results of operations may be adversely affected.

6

Table of Contents

*The laws and regulations governing the online consumer finance industry and microcredit companies in China are developing and evolving rapidly. If we fail to obtain and maintain requisite approvals, licenses or permits applicable to our business, financial condition and results of operations would be materially and adversely affected.*

Before any industry-specific regulations were introduced in mid-2015, the PRC government relied on general and basic laws and regulations for governing the online consumer finance industry, including the General Principles of the Civil Law of the PRC, the PRC Contract Law and related judicial interpretations promulgated by the Supreme People's Court. Since mid-2015, the PRC government and relevant regulatory authorities have issued various laws and regulations governing the online consumer finance industry, including, among others, the Guidelines on Promoting the Healthy Development of the Online Finance Industry, or the Guidelines, the Interim Measures on Administration of Business Activities of Online Lending Information Intermediaries, or the Interim Measures, the Guidelines on Online Lending Funds Custodian Business, or the Custodian Guidelines, the Guidelines on Information Disclosure of Business Activities of Online Lending Information Intermediaries, or the Information Disclosure Guideline, the Notice on Regulating and Rectifying "Cash Loan" Business jointly issued by the Internet Finance Rectification Office and Online Lending Rectification Office in December 2017, or the Circular 141, and the Notice on the Rectification and Inspection Acceptance of Risk of Online Lending Intermediaries issued by the Online Lending Rectification Office on December 8, 2017, or the Circular 57. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Online Consumer Finance Services."

The Interim Measures introduced a record-filing and registration regime, which requires online lending information intermediaries to register with the local financial regulatory authority, and to obtain a telecommunication business license from the relevant telecommunication regulatory authority. Our online investment platform, *Juzi Licai*, operated by Shenzhen Qianhai Juzi Information Technology Co., Ltd., or Qianhai Juzi, a subsidiary of one of our variable interest entities, would be required to obtain certain telecommunications service licenses in accordance with the Interim Measures and the relevant provisions of telecommunications authorities after completing record-filing with a local financial regulator. Please see "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Record-filings of Online Lending Information Intermediary Service Agency" for the rectification and inspection acceptance requirements. As of the date of this annual report, we are in the process of preparing application materials for acceptance inspection of the rectification as required by local financial regulatory authorities (including the application report, legal opinions and special audit report). However, local financial regulatory authorities are still in the process of drafting detailed implementation rules regarding the filing procedures, and to our knowledge, none of the online information intermediaries, including us, have been permitted to submit such application for record-filing in Shenzhen. We are uncertain as to when we will be allowed to submit such application for record-filing and to obtain a license, and we cannot assure you that once submitted, our application will be accepted by the relevant government authorities. Failure to register as an online lending information intermediary, if deemed as a violation of the Interim Measures or any other relevant regulations or rules, may result in, among others, regulatory warning, correction order, condemnation, fines or criminal liability to us, or may cause us not to be able to conduct our current business on *Juzi Licai* in the future. If such situations were to occur, our business, financial condition, results of operations and prospects would be materially and adversely affected.

Our online consumer finance platform, *Fenqile*, does not itself engage in direct loan facilitation between peers. *Fenqile* merely facilitates transactions that are funded by our institutional funding partners and *Juzi Licai*. As such, we do not consider *Fenqile* as an "online information intermediary" regulated under the Interim Measures. However, we cannot assure you that the China Banking Regulatory Commission, or the CBRC, or other regulatory agencies would not expand the applicability of the Interim Measures or otherwise regard Shenzhen Fenqile as an online lending information intermediary. In the event that *Fenqile* is deemed as an online lending information intermediary by the PRC regulatory authorities in the future, we may be required to register with local financial regulatory authorities and our current business practices would need to be modified to adapt to the regulatory requirements as an online lending information intermediary. If such situations were to occur, our business, financial condition, results of operations could be materially and adversely affected.

The regulatory regime and practice with respect to network microcredit companies are also evolving and subject to uncertainty. In November 2017, the National Internet Finance Rectification Office, or the Internet Finance Rectification Office, issued the Notice on the Immediate Suspension of Approvals for the Establishment of Network Microcredit Companies, which suspends the approval of new network microcredit companies. On December 1, 2017, the Internet Finance Rectification Office and the Online Lending Rectification Office jointly issued the Circular 141, which states the same requirement and further imposes measures to strengthen the regulation of network microcredit companies. On December, 8, 2017, the Online Lending Rectification Office issued the Implementation Plan of Specific Rectification for Risks in Microcredit Companies and Network Microcredit Companies, or the Rectification Implementation Plans of Network Microcredit Companies, which further details the requirements on network microcredit companies. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Microcredit." Ji'an Fenqile Network Microcredit Co., Ltd., or Ji'an Microcredit, a subsidiary of Shenzhen Fenqile, has obtained a network microcredit license from the relevant competent local authorities to provide up to RMB900 million (US$135 million) in loans, which will remain valid until August 2018. However, as the laws and regulations continue to develop and evolve, we cannot assure you that we will be able to renew the license to continue our operation of network microcredit companies when the current license expires. In addition, the relevant governmental authorities will inspect, investigate and review the qualification and compliance of the network microcredit companies in accordance with the Rectification Implementation Plans of Network Microcredit Companies. We cannot assure you that we would not be subject to any rectification requirements or administrative penalties due to any non-compliance, nor can

Exhibit 5
Page 3

we assure you that we will be able to satisfy rectification requirements, if any, and maintain such license or renew the license upon its expiration to continue the operation of Ji'an Microcredit. Although we believe that Ji'an Microcredit is only a supplementary funding source and we do not intend to rely on it as a major source for funding, to the extent we need to obtain funding from Ji'an Microcredit, if we are unable to maintain or renew the microcredit license or obtain any other requisite approvals, licenses or permits applicable to our business, our business, financial condition and results of operations would be materially and adversely affected.

7

Table of Contents

**If any of our business practices is deemed to violate any PRC laws or regulations, our business, financial condition and results of operations would be materially and adversely affected.**

Pursuant to the Guidelines and the Interim Measures, intermediaries that provide online lending information services may not engage in certain activities, including, among others, (i) fund-raising for the online lending information intermediaries themselves, (ii) holding lenders' funds or setting up capital pools with lenders' funds, (iii) providing security or guarantee to lenders as to the principals and returns of the investment, (iv) issuing or selling any wealth management products, (v) splitting the terms of any financing project, (vi) securitization, (vii) promoting its financial products on physical premises, and (viii) equity crowd-funding. The Interim Measures also require the intermediaries that provide online lending information services to strengthen their risk management, enhance screening and verifying efforts on the borrowers' and lenders' information, to set up custody accounts with qualified banks to hold borrowers' funds, and to disclose the basic information of the borrower and the financing projects. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Online Consumer Finance Services."

To comply with existing laws, regulations, rules and governmental policies relating to the online consumer finance industry, we have implemented and will continue to implement various policies and procedures to conduct our business and operations. However, due to the lack of detailed rules and the fact that the relevant laws, regulations and rules are expected to continue to evolve, we cannot be certain that our existing practices would not be deemed to violate any existing or future laws, regulations and rules. Below are a few examples.

- *Requirement to set custody account*. We have entered into an agreement with China Guangfa Bank, under which the bank provides custodian services for funds of customers and investors. Although we have established the custodian mechanism in this agreement to comply with the requirement of the Custodian Guidelines and the regulatory authorities, we may need to further amend the agreement in the event any detailed implementation rules of the Custodian Guidelines or other new laws and regulations regulating the custodian mechanism applicable to online lending information intermediaries are promulgated. Further, the Circular 57 requires that online lending intermediaries set up custody accounts with qualified banks that have passed certain testing and evaluation procedures run by the National Online Lending Rectification Office to hold funds of customers and investors. If China Guangfa Bank fails such testing and evaluation procedures, we may have to seek an alternative custodian bank other than China Guangfa Bank to satisfy the relevant regulatory requirement, which may materially affect our rectification progress and record-filing application, which in turn may materially and adversely our business.

8

Table of Contents

- *Requirement on the information disclosure*. We have implemented various policies and procedures to conduct our business and operations to comply with the requirement relating to the information disclosure set forth in the Interim Measures and the Information Disclosure Guidelines, including maintaining a section on an official website for disclosing the basic information of *Juzi Licai*, the borrowers and the financing projects on *Juzi Licai*. However, we cannot assure that we would not be subject to any further rectification requirements from the relevant authorities.

- *Limit on the loan amount*. The Interim Measures require that the balance of loans borrowed by the same individual must not exceed RMB200,000 (US$30,060) on a single online lending information intermediary and not exceed RMB1 million (US$150,301) in the aggregate on all online lending information intermediaries in the PRC. We currently do not offer loans to the same individual in an aggregate amount exceeding RMB200,000 (US$30,060). We determine whether customers have outstanding loans through consumer finance platforms using external databases at the time they obtain a loan from us. We also compare our customer's name with the list in the databases on a regular basis. However, due to the lack of an industry-wide information sharing arrangement, there can be no assurance that the aggregate amount borrowed by any customer through our platform and other online lending information intermediaries does not exceed the RMB1 million (US$150,301) borrowing limit set out by the Interim Measures.

- *Restriction on credit enhancement*. For investor protection purposes, our previous quality assurance program established in July 2017 and ceased in April 2018 covers loans funded by individual investors historically, and we have entered into deposit arrangements with certain institutional funding partners. These practices might be deemed as provision of credit enhancement services, security interest or guarantee that is prohibited by the Interim Measures and/or the Circular 141 (if applicable). See "—If our current investor protection measures are deemed to violate the relevant laws and regulations, our business, financial condition and results of operations would be materially and adversely affected."

- *Restriction on funding sources*. We fund loans through Ji'an Microcredit, which is a network microcredit company holding license issued by the relevant competent local authorities, and through trusts established in collaboration with trust companies. We cannot assure you that our existing practice of using Ji'an Microcredit or our collaboration with trust companies will be deemed to be in full compliance with applicable existing or future PRC laws, regulations or rules. The funding of loans by us without going through network microcredit companies or trusts may render us to be deemed as a lender or a provider of financial services by the PRC regulatory authorities, and we may be subject to supervision and restrictions on lending under applicable PRC laws and regulations. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Online Consumer Finance Services." There are uncertainties as to the interpretation of the relevant PRC laws and regulations and their applicability to our business. In the event that we are subject to or be deemed to violate such PRC laws and regulations, we may be subject to certain administrative penalties, including the confiscation of illegal revenue, fines up to five times the amount of the illegal revenue and suspension of business operations. Furthermore, our current service fees and various other fees charged to our customers might be fully or partially deemed as interest, which shall be subject to the restrictions on interest rate as specified in applicable rules on private lending. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Online Consumer Finance Services—Regulations Relating to Loans Between Individuals."

- *Regulations on network microcredit companies*. Pursuant to the Rectification Implementation Plans of Network Microcredit Companies issued by the Online Lending Rectification Office on December 8, 2017, the third-party institutions cooperating with microcredit companies are prohibited from collecting any interests or fees from borrowers. In light of the foregoing provision, we have modified our business model so that the loans are to be funded by Ji'an Microcredit and facilitated by Shenzhen Fenqile. Currently, all the fees are charged and collected by Ji'an Microcredit as the lender. However, we cannot assure you that such modification will be able to satisfy rectification requirements.

As of the date of this annual report, we have never been subject to any material fines or other penalties under any PRC laws or regulations, including those governing the online consumer finance industry and microcredit companies in China. However, the growth in the popularity of online consumer finance increases the likelihood that the PRC government will seek to further regulate this industry. We are unable to predict with certainty the impact, if any, that future legislation, judicial precedents or regulations relating to the online consumer finance industry will have on our business, financial condition and results of operations. To the extent that we are not able to fully comply with any existing or new regulations when they are promulgated, our business, financial condition and results of operations may be materially and adversely affected.

9

Table of Contents

**Our operations have been and may need to continue to be modified to ensure full compliance with the laws and regulations governing the online consumer finance industry, including those governing campus online lending, which may materially and adversely affect our business and results of operations.**

The laws, regulations, rules and governmental policies in the online consumer finance industry, including those governing campus online lending, are expected to continue to evolve. For a detailed discussion of relevant laws, regulations, rules and notices, see "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Campus Online Lending."

To ensure full compliance with evolving laws and regulations of the online consumer finance industry, we have modified certain aspects of our business operations and may need to do so again in the future. For example, in March 2017, we received two letters from the Shenzhen Finance Development Service Office, or the SFO, relating to regulatory compliance of our *Juzi Licai* and *Fenqile* businesses. The letters we received identified various regulatory requirements applicable to *Juzi Licai* and *Fenqile*. These requirements include, among other things, (i) limits on

Exhibit 5
Page 4

borrowers any interest or fees to borrowers. The Circular 141 specifies the features of "cash loans" as not relying on consumption scenarios, with no specified use of loan proceeds, no qualification requirement on the part of users and no security to the loans, etc. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Online Consumer Finance Services." It is unclear whether our personal installment loans would be viewed as the "cash loans" specified in the Circular 141 and thus be subject to the provisions thereunder. Nevertheless, to comply with this new requirement, we have proactively made an adjustment to our cooperation model with institutional funding partners. We have adjusted our cooperation model with institutional funding partners through Shenzhen Lexin Financing Guarantee Co., Ltd., a subsidiary of Shenzhen Fenqile, which is qualified to provide funding guarantee for the users on our platform and to charge fees for the relevant guarantee services. For personal installment loans funded by banking financial institutions and network microcredit companies, Shenzhen Fenqile has discontinued to charge any fees to users. Instead, Shenzhen Lexin Financing Guarantee Co., Ltd. has started to charge users fees for the guarantee services it provides to users in favor of our institutional funding partners. We have further adjusted our cooperation model with certain institutional funding partners by having them charge fees directly to borrowers and pay certain fees to us. However, we cannot assure you that our interpretation of the relevant regulations will be the same as the view of authorities, or our solutions, including the ways the fees are charged, will be viable. First, it is uncertain whether the adjusted cooperation model would be accepted by our institutional funding partners at reasonable commercial terms. As of the date of this annual report, certain institutional funding partners require us to provide them with a deposit to compensate them in the event of a user default, as they believe our personal installment loans would not be deemed as "cash loans" specified in Circular 141 and thus would be subject to the requirements thereunder. As required, we may also cooperate with other third-party financing guarantee companies or commercial insurance companies, which provide guarantee or insurance services for the borrowers on our platform. Second, due to the restriction on the outstanding guarantee liabilities and the assets ratio of a financing guarantee company set forth in the applicable PRC laws and regulations (see "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Financing Guarantee"), we may need to take necessary measures as our business grows, such as increasing the registered capital of Shenzhen Lexin Financing Guarantee Co., Ltd. from time to time, or cooperating with other financing guarantee companies or insurance companies, which may have an impact on our financial condition. Third, due to the lack of interpretation and implementation rules and the fact that the laws and regulations are rapidly evolving, even if we implement such measures, we cannot assure you that the adjusted business model will be in full compliance with existing and future laws and regulations, nor can we assure you that we would not be required to make further change to our business in the future. If any of the foregoing were to occur, our business, financial condition and results of operations would be materially and adversely affected. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Financing Guarantee."

12

Table of Contents

***We cooperate with institutional funding partners, whose compliance with PRC laws and regulations may affect our business.***

As we do not hold relevant permits or licenses for lending activities, we rely on our funding partners for our loan products. Our collaboration with institutional funding partners has exposed us to and may continue to expose us to additional regulatory uncertainties faced by such institutional funding partners. For example, the Circular 141 jointly issued by the Internet Finance Rectification Office and the Online Lending Rectification Office in December 2017 provides a series of guidance on the cash loans business of financial institutions. See "Item 4. Information on the Company—B. Business Overview—Regulations —Regulations Relating to Online Consumer Finance Services." To comply with such guidance, our institutional funding partners, such as banks and consumer finance companies, may need to adopt changes to the cooperation model with their business partners, including us, which changes may adversely affect our business. In addition, we cannot assure you that the business operations of our institutional funding partners currently are or will be in compliance with the relevant PRC laws and regulations, and in the event that our institutional funding partners do not operate their businesses in accordance with the relevant PRC laws and regulations, they will be exposed to various regulatory risks and therefore, our business, financial condition and prospects would be materially and adversely affected.

For example, the Circular 141 requires network microcredit companies, such as Ji'an Microcredit, to suspend the funding of microloans with no specific consumption scenario or designated use of loan proceeds, gradually reduce the volume of the existing business relating to such loans and take rectification measures in the period to be separately specified by authorities. The Notification also prohibits online lending information intermediaries, such as *Juzi Licai*, from facilitating loans with no designated use of loan proceeds. The banking financial institutions are also prohibited from providing loans with no designated use of loan proceeds under the relevant PRC laws and regulations. For personal installment loans, we require users to select one of the specified permissible uses of loan proceeds in their loan applications, such as education, cost of living or driving school expenses, and we track actual use of the loans with reasonable measures. It is unclear whether such personal installment loans would be deemed as loans with no designated use of loan proceeds and thus be subject to the foregoing requirements under the Circular 141. If such personal installment loans were deemed as loans with no designated use of loan proceeds, Ji'an Microcredit and *Juzi Licai* would need to take necessary measures to track the actual use of loans, and the financial institutions would also need to take necessary measures to track the actual use of loans and may require us to cooperate with them and upgrade our system, both of which could cause us to incur substantial additional expenses. If we were unable to effectively implement the foregoing or other rectification measures, we might need to reduce or even cease the funding and facilitation of such personal installment loans. If the foregoing were to occur, our business, financial condition and results of operations would be materially and adversely affected.

13

Table of Contents

***If we are unable to effectively maintain the quality of our loan portfolio, our business, financial conditions and results of operations may be materially and adversely affected.***

Our financial condition and results of operations are affected by our ability to effectively maintain the quality of our loan portfolio. There is no assurance that the quality of our loan portfolio will remain at the current level or improve. In 2016, 2017 and 2018, we originated RMB22.2 billion, RMB47.7 billion and RMB66.1 billion (US$9.6 billion) in loans, respectively. As of December 31, 2014, 2015, 2016, 2017 and 2018, our outstanding principal balance of loans was approximately RMB374 million, RMB3.4 billion, RMB9.9 billion, RMB19.3 billion and RMB32.4 billion (US$4.7 billion), respectively. Our financing receivables, net amounted to RMB7,537 million, RMB11,642 million and RMB6,424 million (US$934 million) as of December 31, 2016, 2017 and 2018, respectively. Our vintage charge-off rates as of December 31, 2018 were approximately 2% for each vintage of a three-month period from January 1, 2015 through December 31, 2018. The quality of our loan portfolio may be negatively affected by a variety of factors, many of which are beyond our control. These factors include, among others, the slowdown and structural reform of the PRC economy, adverse development in general economic conditions, an increase in unemployment rates among our target users, and natural disasters. The quality of our loan portfolio may also deteriorate if we are not able to manage credit risks. In addition, we may experience an adverse change in user credit risk as we expand our user base and offer new product features and higher credit lines to users. For example, while we have set certain requirements for the use of flexible repayment options, such as requiring minimum monthly repayments and keeping the user's credit line at the approved amount, the flexible repayment options may affect our loan delinquencies and charge-offs as the outstanding principal balance of the new loan borrowed by a user using the flexible repayment options will be considered as current, as long as the user meets the payment schedule of the new loan agreed to by the user and us. We may also experience an adverse change in user credit risk if our credit assessment and control process fails to effectively contain the credit exposures of higher-risk users in using our existing or new credit products. Moreover, our risk management system and policies are subject to change from time to time. We cannot assure you that our risk management system and policies have been, or will be, effective in managing our credit risks and hence the asset quality of our loan portfolio.

Furthermore, we use our proprietary *Hawkeye* engine to assess credit risks of our users. While we continually improve our risk management capabilities as we accumulate user data, the *Hawkeye* engine may inaccurately predict future credit losses under certain circumstances. For instance, after initial credit lines are granted, a user's risk profile may change due to a variety of factors, such as deteriorating financial situations, and there is no assurance that such changes will be captured by the *Hawkeye* engine in a timely manner. The models and algorithms used by the *Hawkeye* engine may contain errors, flaws or other deficiencies that may lead to inaccurate credit assessment, and the data provided by users and external data sources may be incorrect or obsolete. If any of the foregoing were to occur in the future, our loan pricing and approval process could be negatively affected, resulting in misclassified loans or incorrect approvals or denials of credit applications.

If we are unable to effectively maintain and manage the quality of our loan portfolio due to any reason, the delinquency rates and the charge-offs of our loan portfolio may increase. Moreover, if the quality of our loan portfolio were to deteriorate, investors may try to rescind their affected investments, institutional funding partners may decide not to continue to cooperate with us, and users may seek to revise the terms of their loans or reduce the use of our platform for borrowing. If any of the foregoing were to occur, our business, competitive position, financial condition and results of operations may be materially and adversely affected.

***We need adequate funding at reasonable cost to successfully operate our business, and access to adequate funding at a reasonable cost cannot be assured.***

The growth and success of our operations depend on the availability of adequate funding to meet user demand for loans on our platform. We derive our funding for our platform from a variety of sources and types of investors, including individual investors on *Juzi Licai*, our institutional funding partners in our direct lending programs and investors of asset-backed securities. We obtained the majority of our funding from *Juzi Licai* in 2016 and 2017, and from institutional funding partners in 2018. Our ability to diversify funding sources is subject to the development of regulatory requirements. For example, the Circular 141 prohibits banking financial institutions from providing loans to persons without source of income or investing in asset-backed securities with underlying assets consisting of "cash loans" or "campus loans." If college students are deemed as persons without source of income, the funding of loans to college students provided by financial institutions may need to be terminated. Although investors of asset-backed securities were not our major source of funding in historical periods, to the extent we intend to

Exhibit 5
Page 5

Furthermore, as we plan to continue expanding our product offerings, we expect to include more products in our inventory, which will make it more challenging for us to manage our inventory and logistics effectively. If we fail to manage our inventory effectively, we may be subject to a heightened risk of inventory obsolescence, a decline in inventory value, and significant inventory write-downs or write-offs. In addition, we may be required to lower sale prices in order to reduce inventory level, which may lead to lower gross margins. High inventory levels may also require us to commit substantial capital resources, preventing us from using that capital for other purposes. Any of the above may materially and adversely affect our results of operations and financial condition. On the other hand, if we underestimate demand for our products, or if our suppliers fail to supply quality products in a timely manner, we may experience inventory shortages, which might result in missed sales, diminished brand loyalty and lost revenues, any of which could harm our business and reputation.

***Limited liquidity exists for investments made on Juzi Licai, which may make these investments less attractive to investors.***

There currently exists no trading market for the loans invested by individual investors on *Juzi Licai*. Individual investors are not permitted to directly transfer their investments to other individual investors prior to maturity. For fixed maturities investment programs, investors are only allowed to withdraw their funds upon maturity. For step-up returns investment programs, individual investors are allowed to withdraw their funds on the condition that withdrawals be made on specified dates during each weekly or monthly period. In the event that investors request to withdraw a substantial amount of their investments at the same time or within a short time period, it may cause a run on our investment programs and we may be unable to meet the investors' withdrawal demands on a timely basis, or at all. To the extent that individual investors are not able to transfer loans at all or withdraw their funds when needs for liquidity arise, individual investors may be discouraged from investing on *Juzi Licai* in the future, which may have a material and adverse effect on our business and competitive position.

***Misconduct, errors and failure to perform by our employees could harm our business and reputation.***

We are exposed to many types of operational risks, including the risk of misconduct and errors by our employees. Our business depends on our employees to interact with customers and investors, process large numbers of transactions and support the loan collection process, all of which involve the use and disclosure of personal information. We could be materially and adversely affected if transactions were redirected, misappropriated or otherwise improperly executed, if personal information was disclosed to unintended recipients, or if an operational breakdown or failure in the processing of transactions occurred, whether as a result of human error, purposeful sabotage or fraudulent manipulation of our operations or systems. In addition, the manner in which we store and use certain personal information and interact with customers and investors is governed by various PRC laws. It is not always possible to identify and deter misconduct or errors by employees, and the precautions we take to detect and prevent this activity may not be effective in controlling unknown or unmanaged risks or losses. If any of our employees take, convert or misuse funds, documents or data or fail to follow protocol when interacting with customers and investors, we could be liable for damages and subject to regulatory actions and penalties. We could also be perceived to have facilitated or participated in the illegal misappropriation of funds, documents or data, or have failed to follow protocol, and therefore be subject to civil or criminal liability.

***If our ability to collect delinquent loans is impaired, or if the collection efforts of our in-house team or third-party service providers are impaired, our business and results of operations might be materially and adversely affected.***

Our in-house collection team handles the collection of delinquent loans. We also engage certain third-party collection service providers from time to time. If either our or our third-party service providers' collection methods, such as phone calls, text messages, in-person visits and legal letters, are not effective and we fail to respond quickly and improve our collection methods, our delinquent loan collection rate may decrease. While we have implemented and enforced policies and procedures relating to collection activities by us and third-party service providers, if those collection methods were to be viewed by the customers or regulatory authorities as harassments, threats or other illegal conducts, we may be subject to lawsuits initiated by the customers or prohibited by the regulatory authorities from using certain collection methods. If this were to happen and we fail to adopt alternative collection methods in a timely manner or the alternative collection methods are proven to be ineffective, we might not be able to maintain our delinquent loan collection rate and the funding sources' confidence in our platform may be negatively impacted. If any of the foregoing takes place and impairs our ability to collect delinquent loans, the loan originations on our platform will decrease, and our business and the results of operations could be materially and adversely affected.

21

Table of Contents

***Uncertainties relating to the growth and profitability of the online retail industry in China in general, and the e-commerce industry in particular, could adversely affect our operating revenue and business prospects.***

Online direct sales on our e-commerce channel account for a significant portion of our total operating revenue and loan originations. Our future results of operations will depend on numerous factors affecting the development of the e-commerce industry in China, which may be beyond our control. These factors include:

- the growth of internet, broadband, personal computer and mobile penetration and usage in China, and the rate of any such growth;

- the level of trust and confidence of Chinese consumers in online shopping, as well as changes in customer demographics and consumer tastes and preferences;

- the selection, price and popularity of products that we and our competitors offer online;

- whether alternative retail channels or business models that better address the needs of consumers emerge in China; and

- the development of fulfillment, payment and other ancillary services associated with online purchases.

A decline in the popularity of online shopping in general, or any failure by us to adapt our website and improve the online shopping experience of our customers in response to trends and consumer requirements, may adversely affect our operating revenue and business prospects.

Furthermore, the e-commerce industry is subject to macroeconomic changes, and retail purchases tend to decline during recessionary periods. Many factors outside of our control, including inflation and deflation, currency exchange rate fluctuation, volatility of stock and property markets, interest rates, tax rates, other government policies, and unemployment rates, can adversely affect consumer confidence and spending, which could in turn materially and adversely affect our growth and profitability. Unfavorable developments in domestic and international politics, including military conflicts, political turmoil and social instability, may also adversely affect consumer confidence and reduce spending, which could in turn materially and adversely affect our growth and profitability.

***Our delivery, return and exchange policies may materially and adversely affect our results of operations.***

We have adopted customer-friendly return and exchange policies. We may also be required by law to adopt new or amend existing return and exchange policies from time to time. For example, pursuant to the PRC Consumer Rights and Interests Protection Law and the Measures on the Administration of Online Transactions promulgated by the State Administration for Industry and Commerce, or the SAIC, in January 2014, which became effective in March 2014, or the Online Transactions Measures, consumers are entitled to return goods purchased online within seven days upon receipt of such goods for no reason, subject to certain exceptions. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Product Quality and Consumer Rights Protection." These policies improve customers' shopping experience and promote customer loyalty, which in turn help us acquire and retain customers. However, these policies also subject us to additional costs and expenses which we may not be able to recoup with increased revenue. Our ability to handle a large volume of returns is unproven. If our return and exchange policy is misused by a significant number of customers, our costs may increase significantly and our results of operations may be materially and adversely affected. If we revise these policies to reduce our costs and expenses, our customers may be dissatisfied, which may result in a loss of existing customers or failure to acquire new customers at a desirable pace, and may materially and adversely affect our results of operations as a result.

***If we fail to compete effectively, our results of operations and market share could be harmed.***

The online consumer finance industry in China is highly competitive and evolving. As a leading online consumer finance platform in China, we face competition from other online platforms, major internet players, traditional financial institutions as well as other installment loan service providers. Our competitors include, among others, Ant Financial Services Group, JD Finance and WeBank. We also compete with traditional financial institutions, including credit card issuers, consumer finance business units in commercial banks and other consumer finance companies.

22

Exhibit 5
Page 6

Table of Contents

Our competitors operate with different business models, have different cost structures or participate selectively in different market segments. They may ultimately prove more successful or more adaptable to new regulatory, technological and other developments. Some of our current and potential competitors have significantly more financial, technical, marketing and other resources than we do, and may be able to devote greater resources to the development, promotion, sale and support of their platforms. Our competitors may also have longer operating histories, more extensive customer or investor bases, larger amounts of data, greater brand recognition and loyalty, and broader partner relationships than we do. Additionally, a current or potential competitor may acquire one or more of our existing competitors or form a strategic alliance with one or more of our competitors. Any of the foregoing could adversely affect our business, results of operations, financial condition and future growth.

In addition, our competitors may be better at developing new products, responding to new technologies, charging lower fees on loans and undertaking more extensive marketing campaigns. When new competitors seek to enter our target market, or when existing market participants seek to increase their market share, they sometimes undercut the pricing and/or terms prevalent in that market, which could adversely affect our market share or ability to exploit new market opportunities. Also, since the online consumer finance industry in China is relatively new and fast evolving, potential investors and customers may not fully understand how our platform works. Our pricing and terms could deteriorate if we fail to act to meet these competitive challenges. In addition, in response to more stringent PRC laws and regulations regarding cash loans, more online lending platforms may expand their services and products to scenario-based lending, including partnering with e-commerce platforms, which may drive up the competition among online lending platforms. Such intensified competition may increase our operation costs and adversely affect our results of operations and profitability. Furthermore, to the extent that our competitors are able to offer more attractive terms to our business partners, such business partners may choose to terminate their relationships with us. In addition, as our competitors may implement certain procedures to reduce their fees in response to the current or potential PRC regulations on interest rates and fees charged by online lending platforms, we may need to reduce our fees as well to comply with such regulations and to remain competitive in the online lending industry. If we are unable to compete with our competitors, or if we are forced to charge lower fees due to competitive pressures, we could experience reduced revenues or our platforms could fail to achieve market acceptance, any of which could materially and adversely affect our business and results of operations.

*If the total addressable market for our target customer cohort is smaller than what we believe it is, our results of operations may be adversely affected and our business may suffer.*

It is very difficult to estimate the total addressable market for our target customer cohort due to factors such as market demand, PRC regulations of the credit industry, competition, general economic conditions and the relatively short history of the online consumer finance industry in China. We believe that our total addressable market of customers consists of educated young adults. However, if there is less demand than we anticipate for loan products offered on our platform, it may materially and adversely impact our business, financial condition and results of operations.

*Our quarterly results may fluctuate significantly due to the seasonality of our business and may not fully reflect the underlying performance of our business.*

We experience some seasonality in our business, reflecting a combination of seasonal demand for consumer loans and seasonality patterns associated with the online retail industry. For example, we generally experience less user traffic and purchase orders during national holidays in China, particularly during the Chinese New Year holiday season in the first quarter of each year. Furthermore, e-commerce companies in China hold special promotional campaigns on November 11 each year, which improve our results for that quarter. The demand for our products and services is higher in March, April, September, October and November, which generally corresponds to the start of school and our promotional activities around November 11. While our rapid growth has somewhat masked this seasonality, our quarterly operating results could be affected by such seasonality in the future.

Therefore, our quarterly results of operations, including our operating revenue, expenses, net loss or income and other key metrics, may vary significantly in the future, and period-to-period comparisons of our operating results may not be meaningful. Accordingly, the results for any single quarter are not necessarily an indication of future performance.

23

Table of Contents

*We may not be able to obtain additional operating capital on favorable terms or at all.*

Our consolidated financial statements have been prepared on a going concern basis. While we incurred net losses in the past, we anticipate that the net proceeds we received from the initial public offering of the ADSs, together with our current cash, cash provided by operating activities and funds available through our bank loans and credit facilities, will be sufficient to meet our current and anticipated needs for general corporate purposes for at least the next 12 months. However, we need to make continued investments in facilities, hardware, software, technological systems and to retain talents to remain competitive. Due to the unpredictable nature of the capital markets and our industry, we cannot assure you that we will be able to raise additional capital on terms favorable to us, or at all, if and when required, especially if we experience disappointing operating results. If adequate capital is not available to us as required, our ability to fund our operations, take advantage of unanticipated opportunities, develop or enhance our infrastructure or respond to competitive pressures could be significantly limited, which would adversely affect our business, financial condition and results of operations. In such event, there may also be significant doubt as to our ability to continue as a going concern. If we do raise additional funds through the issuance of equity or convertible debt securities, the ownership interests of our shareholders could be significantly diluted. These newly issued securities may have rights, preferences or privileges senior to those of existing shareholders.

*We have obligations to verify information relating to customers and to detect fraud. If we fail to perform such obligations to meet the requirements of relevant laws and regulations, we may be subject to liabilities.*

Our business of connecting individual investors and customers on *Juzi Licai* constitutes an intermediary service, and Qianhai Juzi's contracts with individual investors and/or customers on *Juzi Licai* are intermediation contracts under the PRC Contract Law. Under the PRC Contract Law, an intermediary that intentionally conceals any material information or provides false information in connection with the conclusion of the proposed contract, which results in harm to the client's interests, may not claim any service fee for its intermediary services and is liable for any damage incurred by the client. In addition, the Interim Measures have imposed on us additional obligations to verify the truthfulness of the information provided by or in relation to customers, and to actively detect fraud. Therefore, if we intentionally conceal any material information or provide false information to funding sources, or fail to verify the truthfulness of the information provided by or in relation to our customers or to actively detect fraud, we could be subject to liabilities as an intermediary under the PRC Contract Law and liabilities under the Interim Measures, and our results of operations and financial condition could be materially and adversely affected.

*Changes in PRC regulations relating to interest rates and fees for online consumer finance platforms and microcredit lending, including campus online lending, could have a material adverse effect on our business.*

The interest rate permitted to be charged on loans originated on our platform is subject to limitations set forth in the Provisions on Several Issues Concerning Laws Applicable to Trials of Private Lending Cases issued by the Supreme People's Court in August 2015 and effective in September 2015, or the Private Lending Judicial Interpretations, which provide that (i) when the interest rate agreed between the borrower and lender does not exceed an annual interest rate of 24%, the People's Court will uphold the interest rate charged by the lender, and (ii) when the interest rate agreed between the borrower and lender exceeds an annual interest rate of 36%, the portion in excess of 36% is void and the People's Court will uphold the borrower's claim for return of the excess portion to the borrower. For loans with interest rates per annum between 24% and 36%, if the interest on the loans has already been paid to the lenders, and so long as such payment has not damaged the interest of the state, the community or any third parties, the courts will likely not enforce the borrower's demand for the return of such interest payment.

Ji'an Microcredit, is subject to regulations applicable to micro-credit companies. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Microcredit." These regulations provide that "integrated actual interest" (namely the aggregated borrowing costs charged to borrowers in the forms of interest and various fees) shall be subject to the limit on interest rate of private lending set forth in the Private Lending Judicial Interpretations issued by the Supreme People's Court. The loans originated on our platform and by Ji'an Microcredit will be subject to the aforementioned interest rate restrictions, which could affect our ability to originate loans to certain customers and may have a material adverse effect on our business.

24

Table of Contents

In addition, the Notice on Further Strengthening the Rectification of Campus Online Lending issued by six PRC regulatory agencies in October 2016 prohibits, among other things, providing usurious loans by charging various fees such as procedure fee, overdue fine, service fee and recovery fee.

Exhibit 5
Page 7

Certain Opinions Regarding Further Strengthening the Financial Judgment Work issued by the Supreme People's Court in August 2017, or the Opinions for Financial Judgment Work, provide more detailed rules on the legal limits of interest and fees charged in connection with a loan and specify that the intermediary service fees charged by an online lending intermediary to circumvent the legal limit of interest of private lending shall be invalid. The Circular 141 jointly issued by the Internet Finance Rectification Office and the Online Lending Rectification Office in December 2017 further clarifies that the total amount of interest and fees charged to borrowers must be within the limit set forth in the Private Lending Judicial Interpretations. See "Item 4. Information on the Company—B. Business Overview—Regulations—Regulations Relating to Online Consumer Finance Services—Regulations Relating to Loans Between Individuals."

Currently, none of our loans facilitated by us has an overall annualized interest rate exceeding 36%. We believe our current service fees and various other fees charged to our customers are reasonable and in compliance with relevant requirements under the Provisions on Several Issues Concerning Laws Applicable to Trials of Private Lending Cases, the Notice on Further Strengthening the Rectification of Campus Online Lending, the CBRC Circular 26 and the Opinions for Financial Judgment Work. However, if our current fee level is deemed to be excessive or constitutes usurious loans under any existing or future relevant PRC laws, regulations and rules, we may face, among others, regulatory warning, correction order, condemnation, fines and criminal liability and may be required to reduce the fees and annual interest rate we charge to our customers. If such situations were to occur, our business, financial condition, results of operations and prospects would be materially and adversely affected.

***The origination of loans on our platform could give rise to liabilities under PRC laws and regulations that prohibit illegal fundraising and unauthorized public offerings.***

PRC laws and regulations prohibit persons and companies from raising funds by advertising to the public a promise to repay premium or interest payments over time through payments in cash or in kind except with the prior approval of the applicable government authorities. Failure to comply with these laws and regulations may result in penalties imposed by the PBOC, the SAIC, and other governmental authorities, and can lead to civil or criminal lawsuits.

We have taken measures to avoid conducting any activities that are prohibited under the illegal-funding related laws and regulations. We act as online lending information intermediaries for customers and individual investors. In addition, we do not directly receive any funds from individual investors in our own accounts as funds from individual investors are deposited into and settled by a third-party custody account managed by China Guangfa Bank. To date, our platform has not been subject to any fines or other penalties under any PRC laws and regulations that prohibit illegal fundraising. Nevertheless, considerable uncertainties exist with respect to the PBOC, the SAIC and other governmental authorities' interpretations of the fundraising-related laws and regulations. Therefore, we cannot guarantee you that our current services provided to investors will not be deemed to violate illegal fundraising laws and regulations in the future.

The PRC Securities Law prohibits the issuance of securities for public offering without obtaining prior approval in accordance with the provisions of the law. The following offerings are deemed to be public offerings under the PRC Securities Law: (i) offering of securities to non-specific targets; (ii) offering of securities to more than 200 specific targets; and (iii) other offerings provided by the laws and administrative regulations. Additionally, private offerings of securities may not be carried out through advertising, open solicitation and disguised publicity campaigns. If any transaction between a customer and multiple individual investors is identified as a public offering by PRC government authorities, we may be subject to sanctions under PRC laws and our business may be adversely affected.

25

Table of Contents

***Credit and other information that we receive from prospective customers and third parties about a customer may be inaccurate and thus may not accurately reflect the customer's creditworthiness, which may compromise the accuracy of our credit assessment.***

For our credit assessment, we obtain from prospective customers and third parties certain information of the prospective customers, which may not be complete, accurate or reliable. Our credit assessment of a customer may not reflect that particular customer's actual creditworthiness due to outdated, incomplete or inaccurate customer information. Additionally, once we have obtained a customer's information, the customer may subsequently (i) become delinquent in the payment of an outstanding obligation; (ii) default on a pre-existing debt obligation; (iii) take on additional debt; or (iv) experience other adverse financial events, making the information we previously obtained inaccurate. We currently determine whether customers have outstanding loans through consumer finance platforms using external databases at the time they obtain a loan from us. We also compare a customer's name against our database on a regular basis. Once we detect that a customer has multiple outstanding loans with substantial aggregate balances and poses a high credit risk, we will place such customer on a high risk customer list and closely monitor the customer going forward. However, there is no assurance that we have complete and accurate information relating to all of our customers' outstanding loans. For example, a customer may borrow money through our platform in order to pay off loans on other consumer finance platforms, and vice versa. If a customer incurs additional debt before fully repaying any loan that customer takes out on our platform, the additional debt may impair the ability of that customer to make payments on his or her loan with us and our funding sources, ability to receive investment returns associated with such loan. In addition, the additional debt may adversely affect the customer's creditworthiness generally and could result in the financial distress or insolvency of the customer. To the extent that a customer has other indebtedness and cannot repay all of his or her indebtedness, the customer may choose to make payments to other platforms instead of us.

Such inaccurate or incomplete customer information could affect the accuracy of our credit assessment and the effectiveness of our risk management, which could in turn harm our reputation, and as a result, our business and results of operations could be materially and adversely affected.

***Our ability to protect the confidential information of our customers and funding sources and our ability to conduct our business may be adversely affected by cyber-attacks, computer viruses, physical or electronic break-ins or similar disruptions and we may be subject to liabilities imposed by the relevant government regulations.***

Our platform collects, stores and processes certain personal and other sensitive data from our customers and funding sources. There are numerous laws governing privacy and the storage, sharing, use, disclosure and protection of personally identifiable information and user data. Specifically, personally identifiable and other confidential information is increasingly subject to legislation and regulations in numerous domestic and international jurisdictions. The regulatory framework for privacy protection in China and worldwide is currently evolving and is likely to remain uncertain for the foreseeable future. We could be adversely affected if legislation or regulations in China are expanded to require changes in business practices or privacy policies, or if the PRC governmental authorities interpret or implement their legislation or regulations in ways that negatively affect our business, financial condition and results of operations. In November 2016, the Standing Committee of the NPC released the Internet Security Law, which took effect in June 2017. The Internet Security Law requires network operators to perform certain functions related to internet security protection and the strengthening of network information management. For instance, under the Internet Security Law, network operators of key information infrastructure generally shall, during their operations in the PRC, store the personal information and important data collected and produced within the territory of the PRC. We are in the process of evaluating the potential impacts of the Internet Security Law on our current business practices. We plan to further strengthen our information management and privacy protection of the user data stored in our system. However, we cannot assure you that the measures we have taken or will take are adequate under the Internet Security Law. If further changes in our business practices are required under China's evolving regulatory framework for privacy protection, our business, financial condition and results of operations may be adversely affected. Further, we use certain data collected from external data sources to make credit assessment. In the event that the data collection and provision by any of our external data sources is considered in violation of the Internet Security Law, we may not be able to use relevant data for our credit assessment and our business may be materially and adversely affected.

In addition to laws, regulations and other applicable rules regarding privacy and privacy advocacy, industry associations or other private parties may propose new and different privacy standards. Because the interpretation and application of privacy and data protection laws and privacy standards are still uncertain, it is possible that these laws or privacy standards may be interpreted and applied in a manner that is inconsistent with our practices. Any inability to adequately address privacy concerns, even if unfounded, or to comply with applicable privacy or data protection laws, regulations and privacy standards, could result in additional cost and liability to us, damage our reputation, inhibit the use of our platform and harm our business.

26

Table of Contents

The massive data that we have processed and stored makes us or third-party service providers who host our servers a target and potentially vulnerable to cyber-attacks, computer viruses, physical or electronic break-ins, or similar disruptions. While we have taken steps to protect the confidential information that we have access to, our security measures could be breached. Because techniques used to sabotage or obtain unauthorized access to systems change frequently and generally are not recognized until they are launched against a target, we may be unable to anticipate these techniques or to implement adequate preventative measures. Any accidental or willful security breaches or other unauthorized access to our platform could cause confidential customer and investor information to be stolen and used for criminal purposes. Security breaches or unauthorized access to confidential information could also expose us to liability related to the loss of the information, time-consuming and expensive litigation and negative publicity. If security measures are breached because of any third-party action, employee error, malfeasance or otherwise, or if design flaws in our technology infrastructure are exposed and exploited, our relationships with customers and investors could be severely damaged, we could incur significant liability and our business and operations could be adversely affected.

Exhibit 5
Page 8

Use these links to rapidly review the document
TABLE OF CONTENTS
INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

Table of Contents

**As filed with the Securities and Exchange Commission on November 13, 2017**

**Registration No. 333-**

# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, DC 20549**

## FORM F-1
**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

# LexinFintech Holdings Ltd.
(Exact name of Registrant as specified in its charter)

**Not Applicable**
(Translation of Registrant's name into English)

| | | |
|---|---|---|
| **Cayman Islands** | **6199** | **Not Applicable** |
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**27/F CES Tower**
**No. 3099 Keyuan South Road**
**Nanshan District, Shenzhen 518052**
**The People's Republic of China**
**+86 755 3637 8888**
(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)

**Law Debenture Corporate Services Inc.**
**801 2nd Avenue, Suite 403**
**New York, NY 10017**
**(212) 750-6474**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

**Copies to:**

| | |
|---|---|
| **Z. Julie Gao, Esq.**<br>**Will H. Cai, Esq.**<br>**Skadden, Arps, Slate, Meagher & Flom LLP**<br>**c/o 42/F, Edinburgh Tower**<br>**The Landmark**<br>**15 Queen's Road Central**<br>**Hong Kong**<br>**+852 3740-4700** | **Matthew D. Bersani, Esq.**<br>**Shearman & Sterling LLP**<br>**c/o 12th Floor, Gloucester Tower**<br>**The Landmark**<br>**15 Queen's Road Central**<br>**Hong Kong**<br>**+852 2978-8000** |

Exhibit 6
Page 1

**Approximate date of commencement of proposed sale to the public:** as soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box.  ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933. Emerging growth company  ☒

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 7(a)(2)(B) of the Securities Act.  ☐

**CALCULATION OF REGISTRATION FEE**

| Title of each class of securities to be registered | Proposed maximum aggregate offering price[2][3] | Amount of registration fee |
|---|---|---|
| Class A Ordinary Shares, par value US$0.0001 per share[1] | $500,000,000 | $62,250.00 |

(1)    American depositary shares issuable upon deposit of Class A ordinary shares registered hereby will be registered under a separate registration statement on Form F-6 (Registration No. 333-            ). Each American depositary share represents            Class A ordinary shares.

(2)    Includes Class A ordinary shares that are issuable upon the exercise of the underwriters' over-allotment option. Also includes Class A ordinary shares initially offered and sold outside the United States that may be resold from time to time in the United States either as part of their distribution or within 40 days after the later of the effective date of this registration statement and the date the shares are first bona fide offered to the public. These Class A ordinary shares are not being registered for the purpose of sales outside the United States.

(3)    Estimated solely for the purpose of determining the amount of registration fee in accordance with Rule 457(o) under the Securities Act of 1933.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

†    The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Exhibit 6
Page 2

Table of Contents

***The laws and regulations governing the online consumer finance industry and microcredit companies in China are developing and evolving rapidly. If any of our business practices is deemed to violate any PRC laws or regulations, our business, financial condition and results of operations would be materially and adversely affected.***

Due to the relatively short history of the online consumer finance industry in China, the PRC government has yet to establish a comprehensive regulatory framework governing our industry. Before any industry-specific regulations were introduced in mid-2015, the PRC government relied on general and basic laws and regulations for governing the online consumer finance industry, including the PRC Contract Law and related judicial interpretations promulgated by the Supreme People's Court. Since mid-2015, the PRC government and relevant regulatory authorities have issued various laws and regulations governing the online consumer finance industry, including, among others, the Guidelines on Promoting the Healthy Development of the Online Finance Industry, or the Guidelines, the Interim Measures on Administration of Business Activities of Online Lending Information Intermediaries, or the Interim Measures, and Guidelines on Online Lending Funds Custodian Business, or the Custodian Guidelines. See "Regulation—Regulations Relating to Online Consumer Finance Services."

According to the Guidelines and the Interim Measures, intermediaries that provide online lending information services may not engage in certain activities, including, among others, (i) fund-raising for the online lending information intermediaries themselves, (ii) holding investors' fund or setting up capital pools with investors' fund, (iii) providing security or guarantee to investors as to the principals and returns of the investment, (iv) issuing or selling any wealth management products, (v) splitting the terms of any financing project, (vi) securitization, (vii) promoting its financial products on physical premises, and (viii) equity crowd-funding. The Interim Measures also require the intermediaries that provide online lending information services to strengthen their risk management, enhance screening and verifying efforts on the customers' and investors' information, and to set up custody accounts with qualified banks to hold customer funds. The Interim Measures also introduced a record-filing and licensing regime, which requires online lending information intermediaries to register with the local financial regulatory authority, and to obtain a telecommunication business license from the relevant telecommunication regulatory authority. Our online investment platform, *Juzi Licai*, operated by Shenzhen Qianhai Juzi Information Technology Co., Ltd., a subsidiary of one of our variable interest entities, would be required to obtain certain telecommunications service license in accordance with the Interim Measures and the relevant provisions of telecommunications authorities after completing record-filing with a local financial regulator. However, the specific requirements and detailed implementation rules regarding such registration and licensing regime are still pending further clarification by the relevant governmental authorities. The Interim Measures also provide a twelve-month rectification period for intermediaries to make necessary adjustments. However, as of the date of this prospectus, local financial regulatory authorities are still in the process of drafting detailed implementation rules regarding the filing procedures, and to our knowledge, none of the online information intermediaries, including us, have been permitted to submit such application for record-filing. We are uncertain as to when we will be allowed to submit such application for record-filing and to obtain a license, and we cannot assure you that once submitted, our application will be accepted by the relevant government authorities.

To comply with existing laws, regulations, rules and governmental policies relating to the online consumer finance industry, including but not limited to the Guidelines on Information Disclosure of Business Activities of Online Lending Information Intermediaries, which were issued by the General Office of the CBRC in August 2017, we have implemented and will continue to implement various policies and procedures to conduct our business and operations. However, due to the lack of detailed rules and the fact that the relevant laws, regulations and rules are expected to continue to evolve, we cannot be certain that our existing practices would not be deemed to violate any existing or future rules, laws and regulations. For instance, we have entered into an agreement with China Guangfa Bank,

14

Exhibit 6
Page 3

Table of Contents

under which the bank provides custodian services for funds of customers and investors. Although we have established the custodian mechanism in this agreement to be in compliance with the requirement of the Custodian Guidelines or the regulatory authorities, we may need to amend the agreement to comply with the Custodian Guidelines in the event of any newly promulgated detailed implementation rules pursuant to the Custodian Guidelines, or other new laws and regulations regulating the custodian mechanism applicable to online lending information intermediaries.

In addition, the Interim Measures require that the balance of loans borrowed by the same individual must not exceed RMB200,000 (US$30,060) on a single online lending information intermediary and not exceed RMB1 million (US$150,301) in the aggregate on all online lending information intermediaries in the PRC. We currently do not offer loans to the same individual in an aggregate amount exceeding RMB200,000 (US$30,060). We determine whether customers have outstanding loans through consumer finance platforms using external databases at the time they obtain a loan from us. We also compare our customer's name with the list in the databases on a regular basis. However, due to the lack of an industry-wide information sharing arrangement, there can be no assurance that the aggregate amount borrowed by any customer through our platform and other online lending information intermediaries does not exceed the RMB1 million (US$150,301) borrowing limit set out by the Interim Measures.

Furthermore, the Interim Measures prohibit online lending information intermediaries from providing any security interest or guarantee to investors on the principal or return of their investments. There are also certain legal requirements governing guarantee companies under PRC laws and regulations. We believe that our current quality assurance program, which was established in July 2017, does not constitute providing any security interest or guarantee to investors on the principal or return of their investments under the Interim Measures. As set forth in the agreement relating to the quality assurance program between *Juzi Licai* and the individual investors, the purpose of the quality assurance program operated by *Juzi Licai* is to provide make-up payments to individual investors on *Juzi Licai* when a customer fails to satisfy their principal or interest repayment obligations, and not to provide individual investors with guarantees on repayment of the loan principal and interest. In addition, the amount to be transferred from each customer's monthly repayment to our quality assurance funds is limited to a certain percentage, currently equal to 4.5%, of the outstanding principal balance at the beginning of the relevant monthly period, divided by 12, and the investors have acknowledged that *Juzi Licai* reserves the final right of interpretation on the rules for establishing and using the quality assurance funds. For the above reasons, we do not believe that the quality assurance program provides a security or guarantee to investors under the Interim Measures. In addition, we provide a deposit to our funding partners in our direct lending programs with our own funds equal to a percentage of the total loans funded by the institutional funding partners and are required to replenish such deposit from time to time, in order to compensate them for the principal and interest repayment of loans in the event of a customer default. As of the date of this prospectus, the deposit we provide to our funding partners has not been deemed to be a financing guarantee under applicable PRC laws and regulations. However, it is uncertain how the Interim Measures and the PRC laws and regulations governing guarantee companies will be interpreted due to the lack of detailed implementation rules. As a result, we cannot rule out the possibility that we might be viewed by the PRC regulatory authorities as providing a security interest or guarantee to our individual investors or a financing guarantee to institutional funding partners under the relevant PRC laws and regulations as their interpretation and implementation evolve. In such event, we may be required to change our business operations relating to the protection of individual investors and institutional funding partners, which may make us less attractive to our funding sources, and may materially and adversely affect our business, financial condition and results of operations. Our online consumer finance platform, *Fenqile*, does not itself engage in direct loan facilitation between peers. *Fenqile* merely facilitates transactions that are funded by our institutional funding partners and *Juzi Licai*. As such, we do not consider *Fenqile* as an "online information intermediary" regulated under the Interim Measures. However, we cannot assure you that

15

Exhibit 6
Page 4

Table of Contents

the CBRC or other regulatory agencies would not expand the applicability of the Interim Measures and/or otherwise regard Shenzhen Fenqile, as an online lending information intermediary. In the event that *Fenqile* is deemed as an online lending information intermediary by the PRC regulatory authorities in the future, we may be required to register with local financial regulatory authorities and our current business practices would be modified to adapt to the regulatory requirements as an online lending information intermediary. Therefore, our business, financial conditions and results of operations could be materially and adversely affected.

The regulatory regime and practice with respect to online microcredit companies are also evolving and subject to uncertainty. Our consolidated variable interest entity, Ji'an Fenqile Network Microcredit Co., Ltd., has obtained approval from the relevant competent local authorities to provide up to RMB900 million (US$135 million) in loans. We also fund loans through trusts established in collaboration with trust companies. We cannot assure you that our existing practice of using Ji'an Fenqile Network Microcredit Co., Ltd. or our collaboration with trust companies will be deemed to be in full compliance with applicable existing or future PRC laws, regulations or rules. The funding of loans by us without going through online microcredit companies or trusts may render us to be deemed as a lender or a provider of financial services by the PRC regulatory authorities, and we may be subject to supervision and restrictions on lending under applicable PRC laws and regulations. See "Regulation—Regulations Relating to Online Consumer Finance Services." There are uncertainties as to the interpretation of the relevant PRC laws and regulations and their applicability to our business. In the event that we were subject to or be deemed to violate such PRC laws and regulations, we may be subject to certain administrative penalties, including the confiscation of illegal revenue, fines up to five times the amount of the illegal revenue and suspension of business operations. Furthermore, our current service fees and various other fees charged to our customers might be fully or partially deemed as interest, which shall be subject to the restrictions on interest rate as specified in applicable rules on private lending. See "Regulation—Regulations Relating to Online Consumer Finance Services—Regulations Relating to Loans Between Individuals."

In April 2017, the Office of Leading Group on Special Rectification of Risks in the Online Lending, or the National Rectification Office, issued the Notice on the Performance of Check and Rectification of Cash Loan Business Activities and a supplementary notice, or the Notice on Cash Loan. The Notice on Cash Loan requires the local branches of the National Rectification Office to conduct a comprehensive review and inspection of the cash loan business of online lending platforms and require such platforms to implement necessary improvements and remediation within a specific period to comply with the relevant requirements under the applicable laws and regulations. The Notice on Cash Loan focuses on preventing malicious fraudulent activities, loans that are offered at excessive interest rates and violence in the loan collection processes in the cash loan business operation of online lending platforms. The National Rectification Office also issued a list of cash loan business activities that are to be examined. As of the date of this prospectus, we have not been subject to any inspection as may be required under the Notice on Cash Loan. Due to the uncertainties with respect to the interpretation and application of the laws and regulations relating to cash loan business, we cannot assure you our business practice will be deemed to be in full compliance with all such existing or future laws and regulations, and we may be required to modify our current business practices or be subject other penalties, which could be costly, and as a result, our business, financial condition and results of operations might be materially and adversely affected.

We have cooperated with our institutional funding partners, whose compliance with PRC laws and regulations may affect our business. Our collaboration with institutional funding partners has exposed us to and may continue to expose us to additional regulatory uncertainties faced by such institutional funding partners. We cannot assure you that the business operations of our institutional funding partners currently are or will be in compliance with the relevant PRC laws and regulations, and in the event that our institutional funding partners do not operate their businesses in accordance with the

16

Exhibit 6
Page 5

Table of Contents

relevant PRC laws and regulations, they will be exposed to various regulatory risks and therefore, our business, financial condition and prospects would be materially and adversely affected.

As of the date of this prospectus, we have never been subject to any material fines or other penalties under any PRC laws or regulations, including those governing the online consumer finance industry and microcredit companies in China. However, to the extent that we are not able to fully comply with any existing or new regulations when they are promulgated, our business, financial condition and results of operations may be materially and adversely affected. We are unable to predict with certainty the impact, if any, that future legislation, judicial precedents or regulations relating to the online consumer finance industry will have on our business, financial condition and results of operations. Furthermore, the growth in the popularity of online consumer finance increases the likelihood that the PRC government will seek to further regulate this industry.

***Our operations have been and may need to continue to be modified to ensure full compliance with the laws and regulations governing the online consumer finance industry, including those governing campus online lending, which may materially and adversely affect our business and results of operations.***

The laws, regulations, rules and governmental policies in the online consumer finance industry, including those governing campus online lending, are expected to continue to evolve. For a detailed discussion of relevant laws, regulations, rules and notices, see "Regulation—Regulations Relating to Campus Online Lending."

To ensure full compliance with evolving laws and regulations of the online consumer finance industry, we have modified certain aspects of our business operations and may need to do so again in the future. For example, in March 2017, we received two letters from Shenzhen Finance Development Service Office, or the SFO, relating to regulatory compliance of our *Juzi Licai* and *Fenqile* businesses. The letters we received identified various regulatory requirements applicable to *Juzi Licai* and *Fenqile*. These requirements include, among other things, (i) limits on the use of loans, (ii) termination of agency relationships with sales agents who are students, (iii) limits on penalties we can charge delinquent customers, (iv) prohibition on splitting of any loan, (v) settlement of investors' funds and customers' loans through third-party custody accounts, and (vi) prohibition on promotion activities claiming full guarantee on the principal and return of investment programs. The letters identified certain non-compliance issues in our businesses relating to the foregoing regulatory requirements and requested us to submit rectification plans. We submitted such plans and have been providing reports on our progress of implementation of these plans to the SFO on an ongoing basis.

We are implementing certain measures to ensure timely and full compliance with the relevant regulatory requirements addressed in the letters and the applicable laws and regulations. With respect to the non-compliance issues mentioned above, we have implemented the following measures, which were included in the rectification plans we submitted to the SFO: (i) we require our customers to select in their loan applications one of the specified permissible uses of loan proceeds and require college student customers to use loans only for completing education, starting business or other uses that help promote work-related skills; (ii) in 2016, we terminated our contracts with college students who were sales agents promoting our products and services; (iii) the APR charged to customers for late repayments (including penalty interest charged by the funding source and service fees and collection service fees charged by us) will not exceed 36%; (iv) we have also modified our service terms and conditions on *Juzi Licai* to ensure that the transfer of investors' rights for outstanding loan obligation at the time of investor exits are fully authorized by such investors; (v) we have entered into an agreement with China Guangfa Bank to set up separate custody accounts for the funds of customers and investors; and (vi) we ceased promotion activities claiming full guarantee on the principal and return of investment programs. While we have implemented the above measures, it is uncertain that these measures will be sufficient to ensure our compliance with the regulatory requirements under the relevant laws and regulations as their implementation and interpretation evolve and due to the lack of

17

Exhibit 6
Page 6

Table of Contents

RMB 22.2 billion (US$3.3 billion) and RMB31.3 billion (US$4.7 billion) in loans, respectively. As of December 31, 2016 and September 30, 2017, our outstanding principal balance of loans was approximately RMB9.9 billion (US$1.5 billion) and RMB15.9 billion (US$2.4 billion), respectively. Our financing receivables, net amounted to RMB3,219 million, RMB7,537 million (US$1,133 million) and RMB10,760 million (US$1,617 million) as of December 31, 2015 and 2016 and September 30, 2017, respectively. Our M6+ charge-off rates as of September 30, 2017 were generally below 2% for each vintage of a three-month period from January 1, 2015 through March 31, 2017. The quality of our loan portfolio may be negatively affected by a variety of factors, many of which are beyond our control. These factors include, among others, the slowdown and structural reform of the PRC economy, adverse development in general economic conditions, an increase in unemployment rates among our target customers, and natural disasters. The quality of our loan portfolio may also deteriorate if we are not able to manage credit risks. In addition, we may experience an adverse change in customer credit risk as we expand our customer base and offer new product features and higher credit lines to customers. For example, while we have set certain requirements for the use of flexible repayment options, such as requiring minimum monthly repayments and keeping the customer's credit line at the approved amount, the flexible repayment options may affect our loan delinquencies and charge-offs as the outstanding principal balance of the new loan borrowed by a customer using the flexible repayment options will be considered as current, as long as the customer meets the payment schedule of the new loan agreed to by the customer and us. We may also experience an adverse change in customer credit risk if our credit assessment and control process fails to effectively contain the credit exposures of higher-risk customers in using our existing or new credit products. Moreover, our risk management system and policies are subject to change from time to time. We cannot assure you that our risk management system and policies have been, or will be, effective in managing our credit risks and hence the asset quality of our loan portfolio.

Furthermore, we use our proprietary *Hawkeye* engine to assess credit risks of our customers. While we continually improve our risk management capabilities as we accumulate customer data, the *Hawkeye* engine may inaccurately predict future credit losses under certain circumstances. For instance, after initial credit lines are granted, a customer's risk profile may change due to a variety of factors, such as deteriorating financial situations, and there is no assurance that such changes will be captured by the *Hawkeye* engine in a timely manner. The models and algorithms used by the *Hawkeye* engine may contain errors, flaws or other deficiencies that may lead to inaccurate credit assessment, and the data provided by customers and externa data sources may be incorrect or obsolete. If any of the foregoing were to occur in the future, our loan pricing and approval process could be negatively affected, resulting in misclassified loans or incorrect approvals or denials of credit applications.

If we are unable to effectively maintain and manage the quality of our loan portfolio due to any reason, the delinquency rates and the charge-offs of our loan portfolio may increase. Moreover, if the quality of our loan portfolio were to deteriorate, investors may try to rescind their affected investments, institutional funding partners may decide not to continue to cooperate with us, and customers may seek to revise the terms of their loans or reduce the use of our platform for borrowing. If any of the foregoing were to occur, our business, competitive position, financial condition and results of operations may be materially and adversely affected.

***We need adequate funding at reasonable cost to successfully operate our business, and access to adequate funding at a reasonable cost cannot be assured.***

The growth and success of our operations depend on the availability of adequate funding to meet customer demand for loans on our platform. We derive our funding for our platform from a variety of sources and types of investors, including individual investors on *Juzi Licai*, our institutional funding partners in our direct lending programs and investors of asset-backed securities. While we strive to maintain the diversity of our funding sources, we obtained the majority of our funding from *Juzi Licai* in each of 2015, 2016 and the nine months ended September 30, 2017. To the extent there is insufficient funding from investors or funding partners willing to accept the risk of default posed by

19

Exhibit 6
Page 7

Table of Contents

was disclosed to unintended recipients, or if an operational breakdown or failure in the processing of transactions occurred, whether as a result of human error, purposeful sabotage or fraudulent manipulation of our operations or systems. In addition, the manner in which we store and use certain personal information and interact with customers and investors is governed by various PRC laws. It is not always possible to identify and deter misconduct or errors by employees, and the precautions we take to detect and prevent this activity may not be effective in controlling unknown or unmanaged risks or losses. If any of our employees take, convert or misuse funds, documents or data or fail to follow protocol when interacting with customers and investors, we could be liable for damages and subject to regulatory actions and penalties. We could also be perceived to have facilitated or participated in the illegal misappropriation of funds, documents or data, or have failed to follow protocol, and therefore be subject to civil or criminal liability.

***If our ability to collect delinquent loans is impaired, or if the collection efforts of our in-house team or third-party service providers are impaired, our business and results of operations might be materially and adversely affected.***

Our in-house collection team handles the collection of delinquent loans. We also engage certain third-party collection service providers from time to time. If either our or our third-party service providers' collection methods, such as phone calls, text messages, in-person visits and legal letters, are not effective and we fail to respond quickly and improve our collection methods, our delinquent loan collection rate may decrease. While we have implemented and enforced policies and procedures relating to collection activities by us and third-party service providers, if those collection methods were to be viewed by the customers or regulatory authorities as harassments, threats or other illegal conducts, we may be subject to lawsuits initiated by the customers or prohibited by the regulatory authorities from using certain collection methods. If this were to happen and we fail to adopt alternative collection methods in a timely manner or the alternative collection methods are proven to be ineffective, we might not be able to maintain our delinquent loan collection rate and the funding sources' confidence in our platform may be negatively impacted. If any of the foregoing takes place and impairs our ability to collect delinquent loans, the loan originations on our platform will decrease, and our business and the results of operations could be materially and adversely affected.

***Uncertainties relating to the growth and profitability of the online retail industry in China in general, and the e-commerce industry in particular, could adversely affect our operating revenue and business prospects.***

Online direct sales on our e-commerce channel account for a significant portion of our total operating revenue and loan originations. Our future results of operations will depend on numerous factors affecting the development of the e-commerce industry in China, which may be beyond our control. These factors include:

- the growth of internet, broadband, personal computer and mobile penetration and usage in China, and the rate of any such growth;

- the level of trust and confidence of Chinese consumers in online shopping, as well as changes in customer demographics and consumer tastes and preferences;

- the selection, price and popularity of products that we and our competitors offer online;

- whether alternative retail channels or business models that better address the needs of consumers emerge in China; and

- the development of fulfillment, payment and other ancillary services associated with online purchases.

28

Exhibit 6
Page 8