RANSOM, GILBERTSON, MARTIN & RATLIFF, LLP
Jeffrey S. Ratliff
Bailey Building
5441 S. Macadam Avenue, Suite 301
Portland, OR 97239Telephone: (503) 226-3664
Facsimile: (503) 243-6716

*Liaison Counsel for the Putative Class*

POMERANTZ LLP
Jeremy A. Lieberman (*pro hac vice*)
Tamar A. Weinrib (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044

*Lead Counsel for the Putative Class*

- additional counsel on signature page -

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| IN RE LEXINFINTECH HOLDINGS LTD. SECURITIES LITIGATION | Case No. 3:20-cv-1562-SI<br><br>**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT LEXINFINTECH HOLDINGS LTD.'S MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT** |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 3

    A.    Related Party Transactions ................................................................... 4

    B.    Lexin's Predatory Lending Practices and Questionable Growth Rate........ 7

    C.    Lexin's P2P Business........................................................................... 7

    D.    Lexin Masked True Delinquency Rates During the COVID-19 Pandemic ......................................................................................... 9

    E.    Management Compensation.................................................................. 10

    F.    Materially False and Misleading Statements in the Offering Documents ......................................................................................... 10

    G.    Materially False and Misleading Statements During the Class Period ............................................................................................. 11

    H.    The Truth Emerges ............................................................................. 14

ARGUMENT ........................................................................................................................ 16

    I.    Applicable Standards ......................................................................... 16

    II.    The Complaint Adequately Pleads A Section 10(B) Claim.................. 17

        A.    The Complaint Adequately Pleads Actionable Misstatements................. 17

            1.    Defendants Misled the Market Regarding Lexin's Growth.......... 18

            2.    Defendants' Generic Risk Warnings Are Not Exculpatory .......... 22

            3.    Defendants Misled the Market Regarding Related Party Transactions ............................................................................. 24

            4.    Defendants Misled Investors Regarding Their P2P Business....... 25

            5.    Defendants Misled Investors Regarding Their Delinquency Rates......................................................................................... 26

        B.    The Complaint Adequately Alleges Scienter........................................... 26

            1.    The Complaint Adequately Alleges Defendants' Recklessness ... 27

            2.    Motive and Opportunity Support the Inference of Scienter.......... 30

            3.    The Complaint Adequately Pleads Corporate Scienter ................ 31

        C.    The Complaint Adequately Pleads Loss Causation ................................. 31

    III.    The Complaint Adequately Alleges a Section 11 Claim ...................... 33

        A.    The Complaint Alleges Actionable Misstatements and Omissions.......... 34

        B.    The Section 11 Claims Are Not Precluded By The Statute of Repose..... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3226701 Can. v. Qualcomm, Inc.*,
No. 15cv2678-MMA (WVG), 2017 U.S. Dist. LEXIS 174367 (S.D. Cal. Oct. 20, 2017) ................................................................................................................................19

*Banc of Cal. Sec. Litig.*,
2017 WL 3972456 (C.D. Cal. Sept. 6, 2017) ...................................................................22, 33

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................................................16, 24, 34

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ..........................................................................................17, 23

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
No. 19-cv-06361-RS, 2020 WL 4569846 (N.D. Cal. Aug. 7, 2020).......................................17

*China Agritech, Inc. v. Resh*,
138 S. Ct. 1800 (2018)...........................................................................................................35

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
701 F. Supp. 2d 506 (S.D.N.Y. 2010).....................................................................................33

*Constr. Workers Pension Tr. Fund v. Genoptix, Inc.*,
No. 10cv2502-CAB (DHB), 2013 WL 12123841 (S.D. Cal. Mar. 22, 2013) .........................31

*Curry v. Yelp Inc.*,
No. 14-cv-03547-JST, 2015 WL 7454137 (N.D. Cal. Nov. 24, 2015)....................................19

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)...............................................................................................................31

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) .................................................................................................17

*Flynn v. Sientra, Inc.*,
No. CV 15-07548 SJO, 2016 WL 3360676 (C.D. Cal. June 9, 2016)....................................24

*Gebhart v. SEC*,
595 F.3d 1034 (9th Cir. 2010) ...............................................................................................27

*Glazer Capital Mgt., LP v Magistri*,
549 F.3d 736 (9th Cir. 2008) .............................................................................................31, 32

ii

*Grigsby v. Bofi Holding, Inc.*,
   979 F.3d 1198 (9th Cir. 2020) ...................................................................................32

*Hatamian v. Advanced Micro Devices, Inc.*,
   87 F. Supp. 3d 1149 (N.D. Cal. 2015) ........................................................................29

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983) ....................................................................................................33

*In re Acadia Pharm. Inc. Sec. Litig.*,
   No. 18-CV-01647-AJB-BGS, 2020 WL 2838686 (S.D. Cal. June 1, 2020) .........................17

*In re Amgen Inc. Sec. Litig.*,
   No. CV 07-2536 PSG, 2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) .................................27

*In re Banc of Cal. Sec. Litig.*,
   No. SACV 17-00118 AG (DFMx), 2017 WL 3972456 (C.D. Cal. Sept. 6,
   2017) ......................................................................................................................22, 33

*In re BofI Holding, Inc. Securities Litigation*,
   977 F.3d 781 (9th Cir. 2020) ...............................................................................2, 3, 4, 31

*In re ChinaCast Educ. Corp. Sec. Litig.*,
   809 F.3d 471 (9th Cir. 2015) ......................................................................................31

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) .....................................................................................30

*In re Gilead Scis. Sec Litig.*,
   536 F.3d 1049 (9th Cir. 2008) .....................................................................................16

*In re Intuitive Surgical Sec. Litig.*,
   65 F. Supp. 3d 821 (N.D. Cal. 2014) ..........................................................................18

*In re Iso Ray Inc. Sec. Litig.*,
   189 F. Supp. 3d 1057 (E.D. Wash. 2016) ...................................................................27

*In re Marsh & McLennan Cos. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) ........................................................................24

*In re Netflix, Inc. Sec. Litig.*,
   No. C04-2978 FMS, 2005 WL 1562858 (N.D. Cal. June 28, 2005) ...........................19

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ....................................................................................18

*In re Qudian Sec. Litig.*,
   No. 17-CV-9741 (JMF), 2019 WL 4735376 (S.D.N.Y. Sep. 27, 2019) ................22, 23

iii

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)................................................................28

*In re SemGroup Energy Partners, L.P.*,
    729 F. Supp. 2d 1276 (N.D. Okla. 2010).........................................................30

*In re Zynga Inc. Sec. Litig.*,
    No. C 12-04407 JSW, 2015 WL 1382217 (N.D. Cal. Mar. 25, 2015) ..................29

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) .....................................................................16, 17

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)..........................................................................16, 25, 30

*Melcher v. Fried*,
    No. 16-cv-2440-BAS-BGS, 2018 WL 6326334 (S.D. Cal. Dec. 4, 2018)...............22

*N.M. State Inv. Council v. Ernst & Young LLP*,
    641 F.3d 1089 (9th Cir. 2011) .........................................................................27

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) .....................................................................16, 30, 31

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) .........................................................................20

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019).....................................................................23

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) .........................................................................25

*Ret. Sys. of Miss. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) .........................................................................32

*Robb v. Fitbit Inc.*,
    216 F. Supp. 3d 1017 (N.D. Cal. 2016) ............................................................19

*Schueneman v. Arena Pharms. Inc.*,
    840 F.3d 698 (9th Cir. 2016) .........................................................................24

*Scott v. ZST Dig. Networks, Inc.*,
    2012 WL 538279 (C.D. Cal. Feb. 14, 2012).......................................................32

*Scott v. ZST Dig. Networks, Inc.*,
    896 F. Supp. 2d 877 (C.D. Cal 2012) ...............................................................28

iv

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) .................................................................................28

*Snellink v. Gulf Resources, Inc.*,
   870 F. Supp. 2d 930 (C.D. Cal. 2012) ...............................................................................22, 32

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
   243 F. Supp. 3d 1109 (E.D. Cal. 2017).................................................................................33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..................................................................................................1, 16, 27

*Turocy v. El Pollo Loco Holdings, Inc.*,
   No. SACV 15-1343-DOC, 2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) ...............................29

*Utesch v. Lannett Co.*,
   385 F. Supp. 3d 408 (E.D. Pa. 2019) ...................................................................................28

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009)..............................................19, 28

**Statutes**

15 U.S.C. § 77k................................................................................................................ *passim*

15 U.S.C. § 77o...................................................................................................................13, 15

15 U.S.C. § 78j(b) ...................................................................................................1, 17, 19, 34

15 U.S.C. § 78u-4(b)(1) ...........................................................................................................17

Sarbanes-Oxley Act of 2002 ....................................................................................................13

**Rules**

Fed R. Civ. P. 8 (a) .............................................................................................................31, 33

Fed R. Civ. P. 12(b)(6)..............................................................................................................16

**Other Authorities**

17 C.F.R. § 210.4-01(a) ..............................................................................................................4

17 C.F.R. § 229.403(a)............................................................................................................5, 6

17 C.F.R. § 229.404(a)............................................................................................................4, 5

v

**PRELIMINARY STATEMENT[1]**

For years, Defendants misled Lexin's investors.  Beginning with the Registration Statement filed in connection with its initial public offering, and then in filings with the SEC throughout the Class Period, Defendants overstated Lexin's growth metrics, failed to reveal that they utilized usurious rates and aggressive collection tactics to spur growth, continued to facilitate peer to peer lending on Lexin's Juzi Licai platform despite a regulatory crackdown and representations of compliance, engaged in undisclosed related party transactions, and understated delinquency rates during the COVID-19 pandemic.  In an attempt to distract the Court from its multi-year multifaceted misconduct, Lexin asks the Court to ignore the Complaint's well-pleaded allegations simply because a Grizzly Research short seller report issued on August 25, 2020 (the "Report") revealed the truth.  To serve its own false narrative, Lexin argues that the Amended Class Action Complaint ("Complaint") "relies exclusively" on the Report, ignoring explicit representations that Plaintiff conducted its own comprehensive investigation to validate the claims asserted therein. *See, e.g.,* ¶¶ 35, 38, 40.  That investigation, along with the Report, establish that Defendants made material representations that ultimately harmed investors.

The Complaint also adequately alleges scienter as to the §10(b) claim.  The Complaint does not simply rely on Defendants Xiao and Zeng's positions with Lexin, as Defendants selectively argue, though their positions certainly contribute to the holistic analysis that *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) requires.  The misstatements concern Lexin's core operation, it's consumer finance business, the success of which hinges on its number of users,

---

[1] The action has been brought against LexinFintech Holdings, Ltd. ("Lexin"), Jay Wenjie Xiao ("Xiao"), Craig Yan Zeng ("Zeng"), Keyi Chen, Yibo Shao, and Jared Yi Wu. Doc. No. 33. Defense counsel has informed Lead Counsel that they only represent Lexin and do not have authorization to accept service on behalf of the Individual Defendants.  Lead Plaintiff is still attempting to serve the Individual Defendants all of whom are located in China.

delinquency rates, and regulatory compliance. Moreover, Defendants Xiao and Zeng not only had access to information contradicting their public statements by virtue of their positions and their roles as signatories on the Company's filings, but also admitted in every 20-F filed during the Class Period to regularly monitoring the number of active users, borrower delinquencies, and tracking regulatory compliance. These allegations of recklessness combined with allegations that Defendants Xiao and Zeng signed Sarbanes Oxley certifications representing that they designed disclosure controls to make sure they kept apprised of all material information and ensured compliance with generally accepted accounting principles ("GAAP") and allegations of GAAP violations (*i.e.,* the undisclosed related party transactions) establish an inference of scienter that is at least as compelling as any opposing inference.

Moreover, the Complaint adequately alleges loss causation given the precipitous decline in Lexin's ADS price following the issuance of the Report. Defendants again ask the Court to dismiss on loss causation grounds simply because the corrective disclosure is a short seller report. However, per *In re BofI Holding, Inc. Securities Litigation*, which Defendants cite, supports a finding of loss causation. 977 F.3d 781 (9th Cir. 2020), given that there is no evidence another market participant conducted the same investigation or analysis, the fact that many of the facts upon which the Report is based- though publicly available- are difficult to obtain, and the authors' representation that "all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable," loss causation is adequately pled.

Lexin fails to advance a single substantive argument that is not based on a mischaracterization of the Complaint, and thus also fails to negate its "virtually absolute" §11 liability. Instead it argues incorrectly that the statute of repose precludes Plaintiff's §11 claim, focusing solely on the date Lead Plaintiff filed the Complaint, and ignoring that a related complaint

2

filed against it on September 11, 2020 asserted the §11 claim, which Lead Plaintiff also referenced in its motion to serve as Lead Plaintiff in this action on November 9, 2020 (*see infra*).

Lexin's motion to dismiss the Complaint should therefore be denied.

### STATEMENT OF FACTS[2]

Through its subsidiaries, Lexin operates as an online consumer finance platform for young professionals in China. ¶ 30. Lexin targets students studying at tertiary institutions, recent graduates or those who recently entered the workplace. *Id.* The Company operates Fenqile.com, a retail and online consumer finance platform that offers installment purchase loans, personal installment loans, and other loan products, as well as provides online direct sales with installment payment terms. *Id.* In addition, the Company operates Le Card, a membership platform that offers savings, benefits, and membership privileges to food and beverage, apparel, hospitality, and leisure sectors. *Id.* The Company also matches customer loans with diversified funding sources, including individual investors on its Juzi Licai online investment platform, third-party commercial banks, consumer finance companies, institutional funding partners in its direct lending programs, investors of its asset-backed securities, and other licensed financial institutions. *Id.*

Lexin filed a registration statement on Form F-1 with the SEC in connection with its IPO, which the SEC declared effective on December 20, 2017 following several amendments. ¶ 29. On December 21, 2017, pursuant to the Registration Statement, Lexin's ADSs began trading on the NASDAQ under the symbol "LX." *Id.* That same day, Lexin filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement ("Offering Documents"). *Id.*

---

[2] "¶ __" references are to the Complaint filed on January 19, 2021 (Doc. No. 33).

### A.    Related Party Transactions

In the Offering Documents, and in annual 20-F filings thereafter, Defendants purported to disclose all of Lexin's related party transactions. ¶ 31. Indeed, SEC Regulations and GAAP required the Company, as a publicly traded company, to disclose all material related party transactions. *Id.* SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 117 CFR 210.4-01(a)7 C.F.R. § 210.4-01(a)(1). *Id.*

Under Accounting Standards Codification ("ASC") No. 850, a public company's "[f]inancial statements shall include disclosures of material related party transactions." ASC 850-10-50-1; ¶ 32. "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." ASC 850-10-05-3; *Id*. "Affiliate" includes any company that is under common control or management with the public company. ASC 850-10-20. Management is defined as "[p]ersons who are responsible for achieving the objectives of the enterprise and who have the authority to establish policies and make decisions by which those objectives are to be pursued. Management normally includes members of the board of directors, the chief executive officer, chief operating officer, vice presidents in charge of principal business functions (such as sales, administration, or finance), and other persons who perform similar policymaking functions. Persons without formal titles also may be members of management." ASC 850-10-20.

According to GAAP, disclosures of related party transactions must include: (a) the nature of the relationship involved; (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements; (c) the dollar amount of transactions for each of

4

the periods for which income statements are presented; and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. ASC 850-10-50-1; ¶ 33.

Item 404 of SEC Regulation S-K ("Reg. S-K") ("Item 404") also requires the disclosure of detailed information concerning related-party transactions in which the amount involved exceeds $120,000, including the names of the "related person" or entity participating in the transaction, the related person's interest in the transaction, including related person's position, relationship or ownership in the other entity that is a party to the transaction, and the amount involved in the transaction. *See* 17 C.F.R. § 229.404(a). A "related person" under Item 404 is defined to include any director or executive officer of the company, any nominee for director, any immediate family member of a director or executive officer of the registrant, or of any nominee for director, or any person who is known to the registrant to be the beneficial owner of more than five percent of any class of the registrant's voting securities (*i.e.*, a 5% or greater shareholder), or the immediate family member of such beneficial owner. *See* Instruction 1 to 17 C.F.R. § 229.404(a); 17 C.F.R. § 229.403(a).

Although Defendants purported to disclose all material related party transactions in the Offering Documents and in 20-F filings thereafter, Plaintiff's investigation and the Grizzly Report uncovered facts demonstrating that the Company engaged in additional related party transactions that Defendants did not disclose as SEC regulations and GAAP require. ¶ 35. Specifically, the facts show that several Lexin executives operate companies with which Lexin transacted to inflate the Company's financials and engage in improper lending activities. *Id.*

At least five companies that transact with Lexin are owned by individuals "related" to Lexin. ¶ 36. These include Beihai Caidan Electronic E-Commerce Co., Ltd. ("Beihai Caidan"),

5

and it's four subsidiaries, Beihai Tuling Information Technology Co., Ltd., Beihai Jiguang Information Technology Co., Ltd., Beihai Juzi Network Technology Co., Ltd., and Tianjin Lexin Insurance Agency Co., Ltd. *Id.*  A review of China's State Administration of Industry and Commerce ("SAIC") records for these companies reveals that only one, Beihai Jiguang, has meaningful financials, half of which is from loan collection services. *Id.*

Three individuals own Beihai Caidan: Yang Tao (50% owner), Yuan Kai (25% owner), and Ma Ming (25% owner). ¶ 37. Yang Tao is also the legal representative of Beihai Caidan.  On Lexin's website, Yang Tao was listed as the Vice President. Yuan Kai is the legal representative for numerous branch offices of Shenzhen Fenqile, one of Lexin's main subsidiaries. *Id.*  In other words, with a combined 75% ownership, Yang Tao and Yuan Kai had ultimate control over Beihai Caidan and its subsidiaries at the same time they held positions of control at Lexin. *Id.*

Moreover, Plaintiff's investigation uncovered that Beihai Caidan and Shenzehn Fenqile jointly own 8% and 92% of Tianjin Lexin Insurance, respectively. *See* https://aiqicha.baidu.com/company_detail_32672727738694; ¶ 38.  Additionally, Beihai Juzi Network Technology is a copyright owner for the website of Lexin Caifu, a Lexin subsidiary.

Defendants did not reveal any of the foregoing in its Offering Documents or in subsequent filings with the SEC. ¶ 39.

In addition to the undisclosed related party relationships with Beihai Caidan and its subsidiaries, Plaintiff's investigation confirmed that Defendants failed to disclose a transaction between related parties involving more than a third of one of Lexin's businesses, Ji'an Fenqile Network Microedit Co. Ltd.  ¶ 40.  According to SAIC records and the Chinese government-run database, The National Enterprise Credit Information Publicity System, Ji'an Microcredit was established on December 2, 2016, and was 100% owned by one of Lexin's subsidiaries until May

8, 2019, when a company called Jiangxi Leyu Rong Technology Co., Ltd. ("Jiangxi Leyu"), *another Lexin subsidiary*, became a 34% shareholder. ¶ 41. Another company called Ji'an Aojuxun Information Consulting Services Co., Ltd. ("Ji'an Aojuxun"), shares the same phone number (15079604902), email address (1913425305@qq.com) with Jiangxi Leyu and both companies are on the 7th floor of the same building. *Id.* Ji'an Aojuxun is 80% owned by Xiao Wenjuan, *an immediate family member of Defendant Xiao*. *Id.*

## B.    Lexin's Predatory Lending Practices and Questionable Growth Rate

Unbeknownst to investors, predatory and usurious lending and collection practices have driven Lexin's revenue growth. ¶ 42. The legal usury rate in China is 36% per annum. *Id.* However, Fenqile charges interest rates over the legal limit as demonstrated by numerous consumer complaints, examples of which are detailed in the Complaint. *Id.;* https://ts.21cn.com/; *https://ts.21cn.com/tousu/show/id/2305472;https://ts.21cn.com/tousu/show/id/2306531.*

Defendants' predatory tactics include harassing borrowers' contacts and family members as part of its collection strategy, causing injuries both economic and physical. ¶ 43; *https://ts.21cn.com/tousu/show/id/2339816; https://ts.21cn.com/tousu/show/id/2305293. Id.*

Moreover, Lexin overstated its registered users growth rate. ¶ 44. As of March 2020, Lexin reported that its registered user base had grown from approximately 20 million users at the time of the IPO to approximately 84 million. *Id.* Despite this claim of exponential growth, the Baidu index for Fenqile for that same time frame shows that its web traffic remained flat, or even declined at points, which is inconsistent with the level of growth Defendants represented.

## C.    Lexin's P2P Business

Defendants' shady business tactics did not end with their failure to fully report Lexin's related party transactions or misleading description of growth rates and strategies but extended to statements regarding its peer to peer lending business as well. ¶ 45. Peer to peer ("P2P") lending

enables individuals to obtain loans directly from other individuals, cutting out the financial institution as the middleman. *Id.* P2P lending websites, like Lexin's Juzi Licai platform, connect borrowers directly to investors. *Id.* Following the rapid and explosive growth of the P2P lending industry in China in a virtual regulatory vacuum, China began establishing a regulatory regime for P2P lending following a wave of scandals. *Id.*

Since July 2015, the Chinese government has been instituting regulations and enforcing more stringent oversight over P2P lending due to the high-risk nature of the business. ¶ 46. The heavily intensified focus on regulating the P2P industry and a general governmental crackdown on high-risk financing has caused the close down of hundreds of P2P platforms since 2015. On December 7, 2018, the Shenzhen Internet Finance Association (a self-regulating body backed by the local government) issued a notice that put additional strict rules on the P2P sector. *Id.* Specifically, the notice stated that P2P companies like Lexin should not increase the balance of loans outstanding, should not increase the number of individual investors on their platforms, and should decrease the number of individual investors. ***Defendants acknowledged awareness of this notice in a press release issued on December 12, 2018***. *Id.* Thereafter, Defendants represented that Lexin no longer facilitates new loans with funding from individual investors on its Juzi Licai platform. ¶ 47. For example, in Lexin's 20-F for 2019, Defendants stated that:

> Given the increasingly tightening trend of restrictions on online consumer financing, we have gradually shifted our business model away from individual funding and further diversified our funding sources in 2019 in line with regulatory guidance. ***We have ceased facilitating new loans with funding from individual investors on Juzi Licai platform since November 2019.***

However, Lexin did not in fact stop facilitating P2P loans from individual investors. Lexin continued to facilitate P2P loans, matching borrowers and individual lenders on the Juzi Licai platform, raising a risk of regulatory scrutiny. *Id.*

8

### D.    Lexin Masked True Delinquency Rates During the COVID-19 Pandemic

For a Company like Lexin that lends to borrowers that do not qualify for loans from traditional banks and that pose a higher credit risk, delinquency rates are a significant metric to which investors pay particular heed. ¶ 48. As the media heavily reported, the COVID-19 pandemic caused default rates at traditional banks to skyrocket as borrowers suffered severe economic downturns. *Id.* For example, a March 29, 2020 article in *The Economic Times,* titled "A global consumer default wave is just getting started in China," reported that:

> **Consumer default rates at some banks have already increased to as high as 4% from about 1% before the outbreak**, according to Zhao Jian, head of Atlantis Financial Research, who cited a survey of lenders. An executive at one major Chinese bank said his firm is taking steps to **tighten credit card loans or even drop some clients after seeing a rapid increase in overdue payments**.

Similarly, a March 22, 2020 article in the *Financial Times,* titled "China banks pump money into consumer loans," reported:

> Meanwhile, multiple local banks told the FT their **overdue personal loan ratio had surged by as much as 60 percent from January**, when the disease broke out….China Merchants Bank Co., paused on its credit-card business in March after a significant increase in past-due loans.
>
> ***
>
> The lending campaign, however, has raised concerns about credit risks because defaults have also taken off. Zhou Lifeng, chief risk officer at Hangzhou-based Sunyard Fintech, a consultancy that advises banks on risk management, said **his clients had seen an increase of between 20 percent and 50 percent in non-performing consumer loans since the disease emerged**.

However, Lexin lends to borrowers that are characteristically subprime and higher risk borrowers that did not qualify for a traditional bank loan. ¶ 50. Delinquency rates therefore logically surpass those of a traditional bank. *Id.* Indeed, from 2016 to 2019, Lexin's SEC filings reflect that the percentage of loans from higher risk levels D, E. F, N and others increased exponentially (Lexin rates its loans from "A" – "N and others," with the latter being the riskiest category and most likely to default). *Id.* However, to mask its rising delinquency rates during the

9

pandemic, Defendants engaged in practices such as artificially increasing the maturity of loans upon default through features called "installment on installment" and "minimum payment," which means the Company did not accurately book delinquencies. *Id.*

### E.    Management Compensation

Nevertheless, from 2016 to 2019, Lexin's executive officer compensation (including Defendants Xiao, Zeng, and Wu) grew from 4.6 RMB million to 28.1 RMB million. ¶ 51.

### F.    Materially False and Misleading Statements in the Offering Documents

The Offering Documents touted Lexin's "competitive strengths [that] are essential to [its] success and differentiate [it] from [its] competitors," including the Company's status as "a leading and fast-growing online consumer finance platform that is well positioned to capture the long-term growth potential of educated young adults in China," its "advanced and customized credit risk management," its "superior customer experience supported by an efficient and robust technology platform," its "targeted and cost-effective customer acquisition strategy," its "diversified and scalable funding," and its "self-reinforcing and demographically targeted ecosystem, creating powerful network effects." ¶ 52. Additionally, the Offering Documents touted Lexin's growth strategies, representing, in relevant part, that the Company's "target customer cohort, educated young adults aged between 18 and 36 in China, features young people with high income potential, high educational background, high consumption needs, a strong desire to build their credit profile, and an appreciation for efficient customer experience;" that Lexin has "scalable and stable funding to meet [its] customers' needs and grow [its] platform;" that Lexin "adopt[ed] a targeted and cost-effective customer acquisition strategy by leveraging [its] e-commerce channel, word-of-mouth referrals, as well as cooperation with reputable commercial banks;" that Lexin's "educated young adult customers are often geographically concentrated and socially connected, which enables [Lexin] to achieve effective customer acquisition through customer referrals;" and that Lexin

10

"cooperate[s] with commercial banks, for example, by promoting co-branded credit cards issued by the bank to reach potential customers." ¶ 53.

Attesting to Lexin's successful implementation and execution of its growth strategy, the Offering Documents touted the Company's user growth metrics, stating, in relevant part, that Lexin "had approximately 3.0 million active customers in 2016 and 3.3 million active customers in the nine months ended September 30, 2017, representing a 103% increase and a 34% increase from 2015 and the nine months ended September 30, 2016, respectively;" that, "[a]s of September 30, 2017, [Lexin] had over 6.5 million customers with an approved credit line and over 20 million registered users;" that, "[a]s of September 30, 2017, [Lexin's] target customer group represented over 90% of [its] customer base"; and that, "[i]n 2016 and the nine months ended September 30, 2017, approximately 36% and 45%, respectively, of [Lexin's] new customers registered on [its] platform using a referral code obtained from an existing customer." ¶ 54.

The Offering Documents represented that, "[c]urrently, none of our loans has annual interest rate exceeding 36%," which constitutes usury in China. ¶ 55. The Offering Documents also purported to disclose all of Lexin's related party transactions. ¶ 56.

The statements in the Offering Documents were negligently prepared and, as a result, made false and/or misleading statements and/or failed to disclose that: (i) Lexin misrepresented its growth strategy and the causes of its competitive edge, which included usurious lending and harassment of borrowers' friends and family for collection purposes, thus raising a risk of regulatory scrutiny and/or reputational damage- including negative publicity and customer complaints; and (ii) Lexin engaged in undisclosed related party transactions.

### G.　　Materially False and Misleading Statements During the Class Period

The Class Period begins on December 21, 2017, when Lexin's securities began publicly trading on the NASDAQ pursuant to the materially false or misleading statements or omissions in

11

the Offering Documents. ¶ 58.  Throughout the Class Period, in press releases, Forms 20-F and earnings calls with analysts, Defendants made statements representing exponential annual growth in Lexin's number of "registered users" (99.2%, ¶ 59; 94.8%, ¶ 68, 82.9%, ¶ 72, 61%, ¶ 74, 55.8%, ¶ 76, 59.6%, ¶ 80, 92.2%, ¶ 88, 96.5%, ¶ 90, 99.7%, ¶ 97, 90, ¶ 100) and "users with credit line," (68.9% in 2017, ¶ 59; 64%, ¶ 68, 58.8% ¶ 72, 46.4%, ¶ 74, 38.8%, ¶ 76, 41.6% ¶ 80, 74.7%, ¶ 88, 84%, ¶ 90, 78.9%, ¶ 97, 68.4%, ¶ 100), attributing the Company's massive growth rate *solely* to its "continued investment in financial technology [that] has allowed us to establish strong competitive advantages…" ¶ 59; *see also* ¶¶ 68, 70 ("Nearly a third of Lexin's operating expenses went into financial technology research and development in the past year, which resulted in higher operating efficiency and greater profitability as we scale up our business.")  Later in the Class Period, Defendants attributed Lexin's growth and low delinquency rate during the COVID-19 pandemic to Lexin's, "New Consumption Platform Strategy and a continuing recovery of China's consumer market," rather than to the Company's machinations to mask delinquency rates, its usurious rates, or harassment tactics. ¶ 100.

Defendants further represented that they provided their customers with "more competitive terms…while ensuring compliance with all applicable laws and regulations," ¶ 59; and that their "consistent regulatory compliance and our investment in financial technology have enabled us to strengthen our competitive advantages and fuel our growth; ¶ 68

The Companies' SEC filings always included a section purported to list all amounts due from and to related parties.  *See, e.g.,* ¶¶ 60, 65, 69, 72, 74, 76, 80, 85, 88, 90, 94, 97, 100. Moreover, beginning with an earnings call on March 14, 2019, Defendants represented that the Company had stopped P2P lending, stating, "since the end of last year, in accordance with the regulators' wishes, we stopped the growth of the balances on our P2P." ¶ 78.  Indeed, on May 17,

12

2019, Defendant Xiao went so far as to claim, "But, safe to say that whatever needs to be done, *we've done it already*, and we're very well-prepared to do whatever else the government will require us to be done. On this, *we've definitely been a clear leader in being more compliant* and being forward thinking and *being aware of what the government will want*." ¶ 81. (emphasis added). *See also* ¶¶ 93, 101.

On June 4, 2020, Defendants represented that the, "90 day+ delinquency ratio was 2.57% as of March 31, 2020," and further stated that, "[o]ur first quarter seven-day delinquency rate was 3.7%, recovering with the domestic Chinese economy. As of today, our seven-day delinquency rate has declined to 2.77%, recovering to pre-pandemic levels." ¶¶ 97-98. Then, on August 18, 2020, Defendants represented that the "90 day+ delinquency ratio was 2.99% as of June 30, 2020," and, "[a]s of today, our day-7 delinquency has declined to 2.32%, which is even lower than our numbers from the third quarter of last year." ¶ 101. Delinquency rates proved of such significance to the market that despite an earnings miss announced on August 18, 2020, analysts Nomura and DBS Group issued buy ratings citing the improving delinquency rate in 2Q20. ¶ 103.

The 20-F filings also attached signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Exchange Act Defendants certified that each 20-F "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company." *See, e.g.,* ¶¶ 66, 86, 95.

As described above, however, these statements misled investors because: (i) Lexin failed to disclose that usurious lending and harassment of borrowers' friends and family for collection purposes, contributed to its growth, and raised a risk of regulatory scrutiny and/or reputational damage- including negative publicity and customer complaints; (ii) it misrepresented its growth

13

metrics; (iii) the reported related party numbers do not account for Lexin's undisclosed related party transactions involving Beihai Caidan and its subsidiaries as well as the related party transaction involving Ji'an Fenqile Microedit Co., Ltd.; (iv) Lexin in fact continued facilitating P2P loans, despite a regulatory crackdown on peer to peer lending; and (v) though admitting to an increase in delinquencies, the Company masked the extent of that increase during the COVID-19 pandemic by utilizing tactics such as "installment on installment and "minimum payment."

## H.    The Truth Emerges

On August 25, 2020, Grizzly issued a research report on Lexin (the "Report") alleging that the Company reported "unfathomably low" delinquency rates by providing borrowers in default new funds to make payments, that Lexin engaged in undisclosed related party transactions, and that a review of Lexin's web traffic called into question the Company's purported growth. ¶ 105. Specifically, with respect to Lexin's low delinquency rates, the Report stated, "[Lexin] has artificially deflated its default and delinquency ratio to give the appearance of a more healthy financial position;" that Grizzly "believe[s] . . . [Lexin] has been artificially increasing the maturity of the loans upon default through a feature called . . . installment on installment and . . . minimum payment;" that "this is equivalent to when your minimum credit card payment comes due . . . the company gives another extension to your minimum payment and treat[s] it as a new credit loan;" that, "[a]ccording to [Lexin] users, [Lexin] has recently been extending the maturity of their loans on the second day after they become delinquent;" and that "[t]his feature has been implemented by [Lexin] since 2016," but "was only used on loans that weren't delinquent," whereas, "[n]ow, most likely due to effects of COVID-19, the company has deployed this tactic on delinquent loans to generate a seemingly healthy loan portfolio," whereby "[t]he users don't have to pay back the amount immediately and the company no longer has to book delinquencies." ¶ 106. The Report concluded that "***the black box is so elaborately set up that even institutional investors and***

14

*insurance companies are not fully aware*," and that, "[a]s long as the company can solicit more funding from investors the Ponzi scheme keeps rolling." (emphasis added). *Id.*

With respect to Lexin's undisclosed related party transactions, the Report stated, in relevant part, that Grizzly "identified at least five companies that are owned by individuals who [Grizzly] believe[s] are related to [Lexin];" that Lexin "obtained SAIC filing [*sic*] on th[ose] companies and discovered that only Beihai Jiguang had meaningful financials," including "52m RMB in revenue in 2018, of which close to 20M RMB were from loan collection services provided most likely to [Lexin];" that "there were no costs associated with the additional 20M revenue," so "[i]t's as if the company gave this money to Beihai Jiguang for free;" that "[t]hree individuals own Beihai Caidan E-Commerce Co., Ltd ('Beihai Caidan'), which has another 4 subsidiaries;" that "[t]hose individuals are YANG Tao (50%), YUAN Kai (25%), and Ma Ming (25%);" that "YANG Tao is also the legal representative of Beihai Caidan;" that "[o]n [Lexin]'s official website, YANG Tao was listed as the company's Vice President;" that "Yuan is the legal representative for numerous branch offices of Shenzhen Fenqile, which is one of [Lexin]'s main subsidiaries;" and that, given "the employee being legal representative [*sic*] and combined 75% equity interest of Beihai Caidan (along with its 4 subsidiaries) owned by its employees, [Grizzly] believe[s] it is reasonable to say that [Lexin] has the ultimate control over Beihai Caidan." ¶ 107.

Finally, with respect to Lexin's website traffic calling into question its purported growth, the Report stated, in relevant part, that, based on the "Baidu index for [Lexin]'s key consumer lending product Fenqile . . . from the beginning of 2017 to May 21, 2020," and a chart provided by Grizzly sourced from the Baidu index, "[o]ne can easily see that in the past couple of years the index has [been] rather flat;" that "[t]his does not make sense given that . . . [Lexin]'s registered users increased from 20.2M at IPO to 84.2M as of March 2020, or approximately 300% in total;"

15

and that all the foregoing caused Grizzly to question "[h]ow does a company manage to grow by 3x when the website traffic on its main platform appears to be at or even declining?" ¶ 108.

Following the release of the Report, Lexin's ADS price fell $0.47 per share, or 5.52%, to close at $8.04 per share on August 25, 2020. ¶ 109. As of the time the Complaint was filed, the price of Lexin ADSs continued to trade below the Offering price, damaging investors. ¶ 110.

## ARGUMENT

### I.    Applicable Standards

Courts must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).[3] Dismissal pursuant to Rule 12(b)(6) "is appropriate only where the complaint lacks a cognizable theory or sufficient facts to support a cognizable theory." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). A complaint "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011). "[A] district court ruling on a motion to dismiss is not sitting as a trier of fact … so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Courts must accept as true all well-pleaded factual allegations, draw all reasonable inferences in plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). While Exchange Act claims are subject to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), courts should not "raise the bar of the PSLRA any higher than that which is required." *No. 84 Emp'r-Teamster Joint Council Pension*

---

[3] Internal citations and quotations are omitted herein, unless stated otherwise.

16

*Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 946 (9th Cir. 2003).

## II.    The Complaint Adequately Pleads A Section 10(B) Claim

To state a claim under Section 10(b) of the Exchange Act, a plaintiff must plead: "(1) a material misstatement or omission by the defendant [falsity]; (2) scienter; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Khoja*, 899 F.3d at 1008.

### A.    The Complaint Adequately Pleads Actionable Misstatements[4]

At the pleading stage, a plaintiff need not prove falsity, but instead only "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).  Falsity is a mixed question of law and fact for the trier of fact; the Court should only dismiss the case if "'reasonable minds' could not disagree that the challenged statements were not misleading." *Fecht v. Price Co*., 70 F.3d 1078, 1080-82 (9th Cir. 1995).  A statement is misleading "if it would give a reasonable 'investor the impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc*., 527 F.3d 982, 985 (9th Cir. 2008). Even if the statement is not literally false, it may still be misleading if it omits material information. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014). The allegations need only "raise a plausible inference" that a statement was

---

[4] Defendants' "puzzle" pleading argument is off base. Def. Br. at 10. The Complaint is carefully organized, alleges each misleading statement and related omission, including date and the speaker or author thereof; and after each group of misstatements, provides the reasons why those statements were misleading when made.  Courts have repeatedly found this style of pleading permissible. *Bos. Ret. Sys. v. Uber Techs., Inc.,* No. 19-cv-06361-RS, 2020 WL 4569846 , at *4-5 (N.D. Cal. Aug. 7, 2020) (rejecting defendants' puzzle pleading argument even though the complaint is "long, confusing, and meandering," such that "it is difficult to locate the main points within it," because defendants were still capable of "figuring out what statements are alleged to be false."); *In re Acadia Pharm. Inc. Sec. Litig.*, No. 18-CV-01647-AJB-BGS, 2020 WL 2838686, at *4 (S.D. Cal. June 1, 2020) (rejecting puzzle pleading argument though the complaint "does contain large block quotes.")

misleading. *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 (N.D. Cal. 2014). The Complaint meets this standard, alleging that Defendants made false and misleading statements regarding Lexin's growth tactics, growth rate, related party transactions, P2P business, and delinquency rate during the COVID-19 pandemic.

### 1.    Defendants Misled the Market Regarding Lexin's Growth

Throughout the Class Period, Defendants repeatedly touted Lexin's growth in terms of numbers of registered users, users with credit lines, and compound annual growth rate ("CAGR"). Defendants attributed Lexin's seemingly unstoppable growth to their investment in financial technology, provision of competitive terms, and consistent regulatory compliance.   These statements misled investors in two material ways—the causes and the true rate of Lexin's growth.

***First***, by discussing the *causes* of its growth and referring to competitive terms and regulatory compliance[5] in particular, Defendants undertook a duty to reveal that its usurious lending at terms far above government imposed caps as well as the Company's *modus operandi* of harassing borrowers' friends and family to collect on loans, contributed to its success and also raised a risk of regulatory scrutiny and/or reputational damage from negative publicity and customer complaints.  Lexin argues that reliance on four customer complaints cannot establish a practice of usurious lending.  The Complaint cites these customer complaints as *examples*, not the entire universe of instances where Lexin charged its borrowers rates above the regulatory limit. Plaintiff is not obligated to allege *every instance* in which Lexin charged usurious rates in direct contradiction to their public statements.   Moreover, Lexin's reliance on *Netflix* and *Yelp* is

---

[5] Seemingly conceding the fraudulence of their Class Period statements, Defendants characterize their assurances of regulatory compliance as "generic," Def. Br. at 18, implying that the market should not have believed their repeated public assertions that they had "consistent regulatory compliance," "ensur[ed] compliance with all applicable laws and regulations," and were "more compliant" than competitors. ¶¶ 59, 68, 81.

misplaced. In *Netflix*, the court held that complaints about customer service – subjective opinions— could not demonstrate the falsity of statements that improved service resulted in a profitable and faster growing company, which the court also deemed puffery. *In re Netflix, Inc. Sec. Litig.*, No. C04-2978 FMS, 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005). Similarly, in *Yelp,* the court found that customer complaints could not establish falsity because they, "hinged on the customers' inferences of misconduct, rather than concrete examples of Yelp's behavior." *Curry v. Yelp Inc.*, No. 14-cv-03547-JST, 2015 WL 7454137, at *6 (N.D. Cal. Nov. 24, 2015). The customer complaints here are not subjective or based on inferences but rather are concrete examples of objective facts. They demonstrate that Lexin charged usurious rates far above the regulatory cap, contrary to Defendants' statements that Lexin *always* provided competitive terms in compliance with applicable regulations, as well as demonstrate that Lexin harassed borrowers' contacts to collect on loans, and thus demonstrate falsity. *See 3226701 Can. v. Qualcomm, Inc.*, No. 15cv2678-MMA (WVG), 2017 U.S. Dist. LEXIS 174367, at *21 (S.D. Cal. Oct. 20, 2017) (finding falsity based on allegations of customer complaints); *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1029 (N.D. Cal. 2016) (same).[6]

Lexin also incorrectly relies on *Zucco*, which addresses the use of confidential witness statements to establish scienter-- not citation to customer complaints to establish falsity-- to make a conclusory argument that the Complaint didn't describe the sources of the complaints with "sufficient particularity." Def. Br. at 15. Courts require that plaintiffs describe sources with enough detail to establish that they credibly held the knowledge attributed to them. *See Nursing Home*

---

[6] Lexin is wrong that Plaintiff must show that regulatory scrutiny actually materialized. All that a §10(b) claim requires is an allegation, which the Complaint contains, that Defendants hid **the risk** of regulatory scrutiny, and that when the risk became known via the Report, the price of Lexin ADS's declined, damaging investors. Moreover, the Complaint alleges that the risk of reputational damage and negative publicity in fact materialized.

*Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004). Here, the Complaint alleges that the complaints that Lexin charged usurious rates came ***directly from customers charged those usurious rates***. As the victims of these rates, these sources clearly stood in a position to hold the knowledge attributed to them. Lexin's baseless attacks on the customer complaints are unavailing. Def. Br. at 16-17. Arguing that one "borrower does not explain the basis for his or her claim that Fenqile" charged usurious rates, Lexin disregards the numerous details, context and calculations via which the borrower explains *precisely* how Lexin charged it a usurious rate and then failed to communicate with the customer regarding the issue despite promises to do so. ¶ 42. That the second complainant describes a loan taken out by a relative is a red herring, given that the relative took the loan out in the ***complainant's name***. *Id.* Moreover, Lexin focuses on the loan's mid-2016 commencement, disregarding that collection efforts would have taken place later and that as of the date of the complaint, the borrower still had a current balance payable and suffered harassing phone calls. Lexin wrongly argues that the final two complaints don't identify Lexin as the loan company at issue (Def. Br. at 17), disregarding the introductory sentence explaining that the customers described "***Defendants'*** predatory tactics." ¶ 43. Moreover, while Lexin attempts to make light of its harassment as mere "telephone calls," it ignores the allegations that these calls went to "many people in my contact list" and "family," not just the actual borrowers, and describe these calls as "aggressive[]," harmful, and without cause in one instance given that the loan had already been repaid. *Id.*[7]

---

[7] Defendants bizarrely argue that Plaintiff, as a shareholder, should be happy they undertook nefarious tactics to collect on loans given that collecting on loans ultimately benefits shareholders, and baselessly argue that Plaintiff would have complained if it had not harassed borrowers and their relatives in order to collect on loans "with zeal." Def. Br. at 6. Absurd assertions aside, it does not benefit shareholders if the company they invest in commits undisclosed fraud that ultimately harms its business and reputation.

*Second*, Defendants misled the market regarding the actual rate of Lexin's growth. Web analytics tracked on the Baidu index show that the massive annual increases of Lexin's user base and loan originations Defendants claimed during the Class Period are simply untenable. The Baidu index shows that from early 2017 through May 21, 2020, web traffic to Lexin's key consumer lending product Fenqile remained relatively flat, which is inconsistent with claims that its registered user base skyrocketed approximately 300% during that time. Indeed, Baidu Analytics (aka Baidu Tongi) provides statistics about a website's traffic, conversions, on-page activity and visitor demographics. Improperly seeking to hold Plaintiff to a standard beyond what the securities laws require at the pleading stage, Lexin argues that Plaintiff cannot allege falsity without alleging, "what the actual number of registered users or growth rate supposedly were," Def. Br. at 11, metrics that are uniquely and solely within Defendants possession pre-discovery. They next argue, wrongly, that Plaintiff does not "provide any facts to show the figures were incorrect," ignoring the allegation that web analytics demonstrate with near certainty that Lexin could not have expanded its user base by approximately 300% from early 2017 to May 2020 given the stagnation of web traffic growth to its website *during that same timeframe,* in other words, "contemporaneous facts contradicting Lexin's statements" (*Id.*).

Faced with analytics they cannot dispute, Defendants resort to challenging the quality of the chart showing the web traffic metrics and misrepresent the data demonstrated therein. Def. Br. at 11. Whether or not Defendants deem the <u>text</u> on the chart "legible," there is no ambiguity as to the directionality or lack of movement in the <u>graph</u> line. ¶ 44. Moreover, the Complaint alleges that this chart "shows that its *web traffic* remained flat, or even declined at points," not the "number of times people collectively searched the internet for the name of one of Lexin's platforms" as Lexin wrongly asserts relying on an unsubstantiated Wikipedia entry. *Id*. Web traffic directly and

21

logically correlates to growth.  It simply does not compute that Lexin's user base grew astronomically at a time when web traffic was stagnant or declining.

That Defendants misled investors regarding the level and causes of their growth is precisely the type of information "a reasonable investor would consider ... important in deciding whether to buy or sell securities." *Melcher v. Fried*, No. 16-cv-2440-BAS-BGS, 2018 WL 6326334, at *12 (S.D. Cal. Dec. 4, 2018).  The Complaint's citation to the Grizzly Report, particularly given allegations that Plaintiff conducted its own investigation (¶¶ 35, 38, 40), does not detract from the strength of the claim.  Courts have held that short-seller reports can suffice to establish falsity, when the facts are publicly available and verifiable as they are here.  *See In re Banc of Cal. Sec. Litig.*, No. SACV 17-00118 AG (DFMx), 2017 WL 3972456, at *10 (C.D. Cal. Sept. 6, 2017); *Snellink v. Gulf Resources, Inc.*, 870 F. Supp. 2d 930, 938 (C.D. Cal. 2012).  The Report makes clear that, "*[t]o the best of our ability and belief, **all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable.***"  Moreover, as the *Banc of California* court noted, "the Court isn't willing to close the courthouse to any investor who was defrauded simply because the fraud was revealed by a short-seller." *Banc of Cal. Sec. Litig.*, 2017 WL 3972456, at *10.

## 2.     Defendants' Generic Risk Warnings Are Not Exculpatory

Relying on *Qudian,* decided outside this jurisdiction, Lexin claims it adequately warned investors of the risks regarding collection efforts. Def. Br. at 19-20.  However, while describing innocuous collection efforts as "phone calls, text messages, in-person visits, legal letters," Defendants never revealed that they used these methods aggressively not just to contact the borrower but to harass the borrowers' contacts and family members, even in instances where the loan had already been repaid.  Moreover, Defendants assured investors that they had "implemented and enforced policies and procedures relating to collection activities," *see, e.g.* Def. Ex. 3, at 7,

22

unlike the warnings in *Qudian* which the court held "explicitly warned investors that the company could *not* assure investors that 'personnel will not engage in any misconduct as part of their collection efforts." *In re Qudian Sec. Litig.*, No. 17-CV-9741 (JMF), 2019 WL 4735376, at *7 (S.D.N.Y. Sep. 27, 2019). Indeed, Qudian even cautioned that one of its businesses was already under investigation for use of "violence on loan collection processes." *Id.*

The warnings in *Qudian* regarding usurious rates also differed from those here. In *Qudian*, the defendant explicitly stated that a "financing service fee" it charged could be seen as interest and thus raise the interest rate above the "36% upper limit." *Id.* Here, Defendants represented that the rates they charged, including "service fees and various other fees" were "reasonable" and "in compliance with relevant requirements under the above PRC laws, regulations or rules." *See, e.g.,* Def. Ex. 3, at 8.    Regarding both the collection tactics and usurious rates, Defendants simply included boilerplate warnings in their filings that did not reveal that the risks of which they warned had already come to fruition. *Berson*, 527 F.3d at 986 (holding that risk warnings are actionable as material omissions when the warnings speak to "entirely… as-yet-unrealized risks and contingencies" and fail to alert "the reader that some of these risks may already have come to fruition"). They thus did not adequately "counterbalance [the] misleading impression created by [the initial misrepresentations]." *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484-85 (9th Cir. 2019). Because the material risk that Defendants purportedly warned *might* occur in the future *had already* materialized, Defendants' argument is meritless.  *Flynn v. Sientra, Inc.*, No. CV 15-07548 SJO (RAOx), 2016 WL 3360676, at *10-11 (C.D. Cal. June 9, 2016).[8]

---

[8] Lexin argues that they had no duty to accuse themselves of wrongdoing, Def. Br. at 20-21, though that is not what the Complaint alleges. The Complaint alleges that having opted to speak about Lexin's staggering growth rate, sources of its growth, "competitive terms," and consistent regulatory compliance, Defendants undertook an obligation to speak fully and reveal that it engaged in usury and harassment—which not only contributed to growth—but also contradicted

### 3. Defendants Misled the Market Regarding Related Party Transactions

Defendants also misled the market in purporting to divulge all related party transactions but omitting any mention of the several Lexin executives that operate companies with which Lexin transacted to inflate the Company's financials and engage in improper lending activities. The Complaint alleges that two Lexin executives in positions of control collectively held 75% of Beihai Caidan and its four subsidiaries, which operate in the consumer financial lending business and describe themselves similarly to Lexin. Indeed, the Complaint further alleges that only one of Beihai Caidan's subsidiaries, Beihai Jiguang, had meaningful financials that included 20M RMB in revenue in 2018, *during the Class Period*, from loan collection services likely provided to Lexin (a reasonable inference given that 75% ownership in Beihai Caidan and its subsidiaries by two Lexin executives[9]). Under ASC No. 850, GAAP, and Item 404 of Regulation S-K, Defendants had an obligation to disclose these related party transactions. Indeed, 20M RMB equates to over $3 million, well above Item 404's $120,000 threshold. ***Even if Lexin only accounted for 4% of Beihai Jiguang's revenue from collection services, that still meets Item 404's $120,000 threshold***. The Complaint further alleges another related party transaction that met the regulatory thresholds for disclosure, but which Defendants failed to include in their related party disclosures throughout the Class Period. Specifically, in May 2019 Jiangxi Leyu Rong Technology Co., Ltd. ("Jiangxi Leyu"), *a Lexin subsidiary*, became a 34% shareholder in Ji'an Microcredit, which until

---

their public statements and raised a risk of regulatory scrutiny and reputational damage. *See Schueneman v. Arena Pharms. Inc.*, 840 F.3d 698, 707-08 (9th Cir. 2016); *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006).

[9] The Court must draw all reasonable inferences in the plaintiff's favor. *Twombly*, 550 U.S. at 555. The inference is further supported by the additional ways in which Lexin is intertwined with Behai Caidan and its subsidiaries. Beihai Caidan and Fenqile jointly own 8% and 92% of Tianjin Lexin Insurance, another Beihai Caidan subsidiary. Moreover, Beihai Juzi Network Technology, another Beihai Caidan subsidiary, is listed as the copyright owner for the website of Lexin Caifu, a Lexin subsidiary.

24

then had been 100% owned by *another Lexin subsidiary*.  Adding another layer to the related party aspect of this transaction is that Jiangxi Leyu appears to be the same company as Ji'an Aojuxun Information Consulting Services Co., Ltd.,[10] which is 80% owned by Xiao Wenjuan, *an immediate family member of Defendant Xiao*.  Defendants do not deign to dispute that these relationships existed or that these transactions transpired.

Proffering a materiality argument that is not appropriately considered on a 12(b)(6) motion[11], or supported by any substantive argument, Lexin argues that the Complaint does not allege a GAAP violation.  As explained, the Complaint adequately alleges that Defendants failed to disclose related party transactions as required by ASC 850, GAAP, and Item 404 and that the transactions met Item 404's monetary threshold.  That Lexin had an intricate web of related parties engaging in transactions, including improper lending activities, that inflated its financials "would have been viewed by the reasonable investor as having significantly altered 'the total mix' of information made available." *Matrixx*, 563 U.S. at 38, (2011).

### 4.    Defendants Misled Investors Regarding Their P2P Business

Defendants repeatedly assured investors that Lexin had ceased facilitating new loans with funding from individual investors on Juzi Licai platform, *i.e.*, P2P loans, (even calling themselves "more compliant" than competitors) though in reality they continued to do so, contravening applicable regulations to which Defendants claimed adherence. ¶¶ 47, 93, 101. Once again unable to dispute the actual allegations, Defendants instead take issue with the quality of a screenshot demonstrating that Defendants continued to match borrowers with individual investors via its Juzi Licai platform during the Class Period even after representing they had ceased such practices.  The

---

[10] Plaintiff's investigation confirmed that both companies share a phone number (15079604902), email address (1913425305@qq.com), and are located on the 7th floor of the same building.

[11] *Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996) (materiality should not be considered on motion to dismiss as assessments of materiality are "peculiarly ones for the trier of fact.")

screenshot shows (as the Report explains) that on July 8, 2020, an individual with the last name Rong borrowed RMB 90,000 via the Juzi Licai platform. ¶ 47; Def. Ex. 1, at 14. As of the date of the Report, the Juzi Licai platform still showed P2P loan transactions with peer loans being matched with peer lenders, in direct contradiction to Defendants' public statements. *Id.*

     5.     **Defendants Misled Investors Regarding Their Delinquency Rates**

During the COVID-19 pandemic, Lexin reported remarkably low delinquencies rates that did not accurately depict its true defaults. ¶¶ 97, 98, 100-01. Indeed, the media heavily reported that the pandemic caused default rates at *traditional banks* to skyrocket. ¶ 48. Lexin lent to riskier younger subprime borrowers that did not qualify for traditional bank loans and therefore defaulted at significantly higher rates. The Complaint alleges that to mask Lexin's true delinquency rate, Defendants artificially increased the maturity of loans upon default through features called "installment on installment" and "minimum payment," *Id.* Defendants again fault Plaintiff for not divulging Lexin's actual delinquency rate though that level of detail is peculiarly in Defendants' possession pre-discovery. All the Complaint needs to allege at this stage is that Defendants reported an inaccurate delinquency rate. Drawing all inferences in Plaintiff's favor as the Supreme Court requires, the Complaint alleges that Lexin's default rate had to have been substantially higher than reported given the pandemic, the quality of Lexin's borrowers, combined with examples of Defendants' machinations to artificially depress the true rate. Defendants' argument that Lexin long disclosed their use of "installment on installment" and "minimum payment" options is a red herring. The Complaint concedes as much but makes clear that those features had never been used for loans in default until the pandemic, a fact which Defendants concealed. ¶ 106.

     B.     **The Complaint Adequately Alleges Scienter**

The relevant inquiry in assessing scienter is whether all of the facts alleged, "taken collectively, give rise to a strong inference of scienter, not whether any individual allegation,

scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 323. The inference "need not be irrefutable … or even the most plausible." *Id.* at 324. An inference of scienter is "strong," and a motion to dismiss must be denied, where "a reasonable person would deem [it]… cogent and at least as compelling as any opposing inference." *Id.* "[A] tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, No. CV 07-2536 PSG (PLAx), 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014).

### 1.    The Complaint Adequately Alleges Defendants' Recklessness

The Ninth Circuit has held that "[s]cienter can be established by direct or circumstantial evidence." *Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010). "[A]llegations of recklessness have been sufficient where defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *N.M. State Inv. Council v. Ernst & Young LLP,* 641 F.3d 1089,1098 (9th Cir. 2011).

***Core operations***: Lexin's business is consumer finance; its success thus rises and falls on its number of users/borrowers, its delinquency rates (relatedly its collection efforts), and regulatory compliance. The most logical inference is that Defendants focused on these matters and would have known (or recklessly disregarded) that they did not accurately report their user growth rate, delinquency rate during the pandemic, the status of their P2P business, and their regulatory compliance. *See In re Iso Ray Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1079 (E.D. Wash. 2016).

***Defendants' Positions and Access to Information***: As the leaders of the Company, Defendants Xiao and Zeng had access to information and, as authors of Lexin's filings and press releases, had a duty to inquire, investigate, familiarize and reassure themselves as to the truth of their statements. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007). Their failure to do so is recklessness. Indeed, an allegation of "falsity may itself be indicative of scienter where it is combined with allegations regarding a management's role in the company that are particular and suggest that the defendant had actual access to the disputed information, and where

27

the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009), *as amended* (Feb. 10, 2009); *see also Scott v. ZST Dig. Networks, Inc.*, 896 F. Supp. 2d 877, 892 (C.D. Cal 2012).  Though Defendants attack this allegation in isolation, it is part of the holistic analysis and ***contributes*** to the overall inference of scienter.

*Defendants' Own Statements and Access to Information Support an Inference of Scienter:* Defendants spoke about Lexin's growth, collection practices, regulatory compliance, its P2P business, delinquency rates, and related party issues repeatedly and comprehensively, thus putting themselves forth as knowledgeable on these topics.  Speaking with detail and "certitude" contributes to the inference of scienter. *Utesch v. Lannett Co.*, 385 F. Supp. 3d 408, 422 (E.D. Pa. 2019).  If they did not possess that knowledge (which is highly unlikely), then they were reckless in speaking on those issues at all.  If they did possess that knowledge, as they represented, then they had access to information regarding those topics and would have known the material information that contradicted their public statements.  *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1146 (N.D. Cal. 2017) ("absurd for [defendants] not to have been aware" of adverse DAU and MAU trends that were "integral" to growth and monitored closely).

Indeed, Defendants admitted to "regularly monitor[ing]" certain metrics including "number of active users who used our loan products" and number of new active users who used our loan products." Weinrib Decl., Exs. A-C[12].  They also maintain a credit blacklist by monitoring their borrowers' delinquency rates and placing those with "significant delinquencies" on the blacklist. *Id.*[13]  Moreover, Defendants have stated that they "determine the priorities of our collection efforts based on the level of delinquency" and "develop our credit assessment

---

[12] Exhibit A, at p. 89; Exhibit B, at p. 90; Exhibit C, at p. 99.
[13] Exhibit A, at p. 61, Exhibit B, at p. 60, Exhibit C, at p. 68.

model based on the historical delinquency performance of our users…" *Id.*[14]  Defendants thus concede in their SEC filings that they had access to, and had to monitor, delinquency rates at all relevant times.  Defendants have also admitted to tracking regulatory compliance. *Id.* ("we have closely tracked the development and implementation of new rules and regulations that are likely to affect us…We will continue to ensure timely compliance with existing and new laws and regulations applicable to our business."). [15]  Such access to information supports an inference of scienter as compelling as any opposing inference. *Turocy v. El Pollo Loco Holdings, Inc.*, No. SACV 15-1343-DOC (KESx), 2017 WL 3328543, at *16-17 (C.D. Cal. Aug. 4, 2017) (finding "access to" reports, including real-time reports, supports scienter, especially where (as here) company itself cited its monitoring of metrics); *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1162 (N.D. Cal. 2015) (finding scienter where information to apprise defendants of key metrics could have been obtained and disclosed without extraordinary effort); *In re Zynga Inc. Sec. Litig.*, No. C 12-04407 JSW, 2015 WL 1382217, at *7 (N.D. Cal. Mar. 25, 2015) (strong inference of scienter where defendants tracked numbers).

Additionally, the statements contained in Defendants' SOX certifications contribute to the compelling inference of scienter because Defendants here represented that they personally designed the disclosure controls and procedures to "ensure that material information…***is made known to us***" and "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." Weinrib Decl., Exs. D-I.  *See In re SemGroup Energy Partners, L.P.,* 729 F. Supp. 2d 1276, 1298 (N.D. Okla. 2010), <u>on reconsideration in part</u> (July 30, 2010).

***Defendants' GAAP Violations Support an Inference of Scienter***: Defendants' GAAP

---

[14] Exhibit A, at p. 62; Exhibit B, at p. 61; Exhibit C, at p. 69.
[15] Exhibit A, at p. 90; Exhibit B, at p. 92; Exhibit C, at p. 100.

violations (*i.e.,* their failure to disclose related party transactions) also contribute to an inference of scienter—and Defendants offer no valid argument to the contrary. "Violations of GAAP standards can also provide evidence of scienter." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005) (citing *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) for the proposition that "after all, books do not cook themselves"). This is particularly so here where Defendants certified, pursuant to SOX, their oversight in ensuring the financial statements had been prepared in accordance with GAAP. Weinrib Decl., Exs. D-I.

### 2.    Motive and Opportunity Support the Inference of Scienter

Although not required, motive can support a strong inference of scienter. *Matrixx*, 563 U.S. at 48. As detailed above, the Complaint pleads facts evidencing Defendants' recklessness with regard to each alleged misstatement. Defendants' argument that lack of insider trading negates scienter is yet another red herring. "Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003). This is particularly so where, as here, Defendants Xiao and Zeng directly benefitted from the fraud with exorbitant compensation that skyrocketed during the Class Period. *Id.* Specifically, between 2016 and 2019 Lexin's executive officer compensation (including Defendants Xiao, Zeng, and Wu) grew from 4.6 RMB million to 28.1 RMB million. ¶ 51.[16]

---

[16] Focusing solely on the related party misstatements, and missing the mark, Lexin claims no motive existed because they disclosed other related party transactions. Def. Br. at 30. Their disclosure of other related party transactions simply confirms they understood their disclosure obligations though choosing to ignore them as to the related party transactions set forth above which they actively hid from investors. Moreover, the Complaint pleads Defendants' recklessness which suffices to plead an inference of scienter. *No. 84 Emp.-Teamster,* 320 F.3d at 944.

### 3.    The Complaint Adequately Pleads Corporate Scienter

The Court should impute scienter to the Company due to the strong inference of scienter against the Individual Defendants. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 479 (9th Cir. 2015) (imputing, to the company, the scienter of its "founder and CEO, the one person on whom the board undoubtedly should have kept close tabs"); *Glazer Capital Mgt., LP v Magistri,* 549 F.3d 736, 744 (9th Cir. 2008)("there could be circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication").

### C.    The Complaint Adequately Pleads Loss Causation

Loss causation is subject to the less rigorous pleading requirement of Rule 8(a)(2) and is "not meant to impose a great burden upon a plaintiff." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The Complaint alleges that Lexin ADSs fell in response to new information in the Grizzly Report revealing the fraud. ¶¶ 105-11. Such allegations suffice to create a connection between the misstatements and the decline of Lexin's ADS price following the corrective disclosure. *Constr. Workers Pension Tr. Fund v. Genoptix, Inc*., No. 10cv2502-CAB (DHB), 2013 WL 12123841, at *7-8 (S.D. Cal. Mar. 22, 2013).

*In re BofI Holding, Inc. Securities Litigation*, which Defendants cite, supports a finding of loss causation. 977 F.3d 781 (9th Cir. 2020).  In *Bofi,* the Ninth Circuit rejected the bright line rule that Defendants advocate here, instead adopting a "flexible approach to evaluating corrective disclosures" that are based on public information. *Id.* at 794-95. The Court found that a plaintiff can plead loss causation by plausibly explaining why the company's stock price did not yet reflect the publicly available information. *See id.* For example, a plaintiff may plead facts suggesting that other market participants *had not* done the same analysis. *See id.* The Court explained that, "[t]he fact that the underlying data was publicly available is certainly one factor to consider. *But other*

31

*factors include the complexity of the data and its relationship to the alleged misstatements, ... and the great effort needed to locate and analyze it, as the shareholders allege here.*" *Id*.

Here, there is no evidence that other market participants had done the same investigation or analysis that Grizzly conducted. Indeed, many of its conclusions are based on facts that, while public, are not obtainable by investors without "great effort." These include, *inter alia*, Chinese regulations, China's Supreme People's Court documents, Chinese National Development and Reform Commission documents, State Administration for Industry Commerce ("SAIC") filings, Baidu Tongi web analytics, and interviews -- all of which require fluency in Chinese and sophisticated understanding of intricate Chinese laws, guidelines, and financial filings . *See Snellink*, 870 F. Supp. 2d at 942 ("A short seller report may be used to establish loss causation," even when based on public information); *Scott v. ZST Dig. Networks, Inc.*, 2012 WL 538279, at *11 (C.D. Cal. Feb. 14, 2012) (finding loss causation based on a short seller report, despite defendants' truth on the market defense); *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) ("The underlying information, although publicly available, 'had little to no probative value in its native state'; someone needed to put the pieces together before the market could appreciate its import."). Unlike the *BofI* blog posts that were "published by anonymous authors on Seeking Alpha, a crowd-sourced [] resource"[17] (*id.* at 788), the Report here was issued in Grizzly's name, posted on its website, and noted that, **"*all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable*,** *and who are not insiders or connected persons of the stock covered herein*

---

[17] The Ninth Circuit in *Grigsby v. Bofi Holding, Inc.* similarly limited its holding to a Seeking Alpha article and reaffirmed that there are "circumstances in which already-public information may qualify as a corrective disclosure for purposes of alleging loss causation." 979 F.3d 1198, 1208-09 (9th Cir. 2020).

32

*or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer.* [18] Def. Ex. 1, at 2 (emphasis added).  Moreover, the magnitude of the decline demonstrates that investors had no awareness of the supposedly public facts on which the Report is based. *See Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 515 (S.D.N.Y. 2010).

## III.    The Complaint Adequately Alleges a Section 11 Claim

The Securities Act imposes a "stringent standard of liability" against any individual who signs a registration statement with an untrue statement of material fact or omitting to state material facts required to make the statements therein not misleading. Under § 11, "[i]f a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Securities Act claims are thus governed by Fed. R. Civ. P. 8(a)'s notice pleading standard. *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1112 (E.D. Cal. 2017).  Rule 8(a)(2) requires nothing more than "a short and plain statement of the claim showing that the pleader is entitled to relief," and "do[es] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545, 570 (2007).

---

[18] Defendants' notably fail to acknowledge this statement on Grizzly's website, instead selectively quoting boilerplate disclaimers that Grizzly puts on every report, advising readers to "do your own research." Plaintiff did so, verifying the accuracy of the facts addressed therein. ¶¶ 35, 38, 40. Courts have held that short-seller reports can suffice to establish falsity, when the facts are publicly available and verifiable. *See In re Banc of Cal. Sec. Litig.*, No. SACV 17-00118 AG (DFMx), 2017 WL 3972456, at *10 (C.D. Cal. Sept. 6, 2017).  While Defendants make much of Grizzly's statement that its Report contains *opinions*, those opinions are based on the verifiable *facts* analyzed therein.  *Id.*, 2017 WL 3972456, at *10 (upholding a complaint based on a short seller report because it relied on the facts that led to the author's opinion, not just on the opinion itself, noting that, "the Court isn't willing to close the courthouse to any investor who was defrauded simply because the fraud was revealed by a short-seller.")

### A.    The Complaint Alleges Actionable Misstatements and Omissions

None of Defendants' arguments negate their "virtually absolute" liability. To argue, wrongly, that the Offering Documents contained no actionable misstatements or omissions Defendants rehash the same arguments they proffered against the falsity element of the Section 10(b) claim—all of which are unavailing for the same reasons stated above.   Moreover, Lexin argues that the Complaint does not indicate the omitted related party transactions existed at the time of the Offering Documents. Def. Br. at 35. Not so.  With the exception of the Ji'an Microcredit transaction, which the Complaint specifies took place later in the Class Period (and is relevant for the Exchange Act claim), the Complaint alleges that the other undisclosed relationships existed at the time of the Offering Documents. ¶¶ 35-39, 56-57. Section 11 liability is thus sufficiently pled.

### B.    The Section 11 Claims Are Not Precluded By The Statute of Repose

On September 11, 2020, Lead Counsel filed a complaint on behalf of Plaintiff Ernesto Vela, individually and on behalf of all others similarly situated, against Defendants in the District of New Jersey, which alleged the same §10(b) Exchange Act *and §11 Securities Act* claims based on the same set of facts as the Complaint. *Vela, et. al., v. Lexinfintech Holdings Ltd., et al.,* Case 1:20-cv-12606 (D.N.J. Sept. 11, 2020) (Doc. No. 1) ("NJ Action").  The original complaint in the instant action ("Oregon Action") was filed on September 9, 2020. (Doc. No. 1).  Lead Counsel then filed a "Notice of Motion of Matthew P. Castner for Appointment as Lead Plaintiff and Approval of Counsel" in the *Oregon Action* on November 9, 2020. (Doc. No. 17) ("Lead Plaintiff Motion"), which also addressed both *the §11 claim* and the §10(b) claim.  A notice of voluntary dismissal was then filed in the NJ Action the same day, which was "so ordered" on November 10, 2020. (NJ Action, Doc. No. 12).  Lead Plaintiff did not wait until the statute of repose had run to file the Lead Plaintiff Motion based *on both the Securities Act and Exchange Act* claims and then seek to piggyback on an earlier timely filed class action. *China Agritech, Inc. v. Resh*, 138 S. Ct.

34

1800, 1809 (2018).  As such, the §11 claim against Defendants, originally filed on September 11, 2020 (and addressed in the Lead Plaintiff Motion filed on November 9, 2020) was brought well within the relevant statute of repose and is properly preserved.

Dated: May 18, 2021

Respectfully submitted,

RANSOM, GILBERTSON, MARTIN & RATLIFF, LLP

By: s/ Jeffrey S. Ratliff
Jeffrey S. Ratliff
Bailey Building
5441 S. Macadam Avenue, Suite 301
Portland, OR 97239
Telephone: (503) 226-3664
Facsimile: (503) 243-6716
Rgmr1500@gmail.com


POMERANTZ LLP
Jeremy A. Lieberman
(admitted pro hac vice)
Tamar A. Weinrib
(admitted pro hac vice)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
taweinrib@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
(admitted pro hac vice)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

Attorneys for Plaintiff

35