# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re LEXINFINTECH HOLDINGS LTD. SECURITIES LITIGATION | Case No. 3:20-cv-1562-SI<br><br>**OPINION AND ORDER** |

Jeffrey S. Ratliff, RANSOM, GILBERTSON, MARTIN, & RATLIFF, 5441 South Macadam Avenue, Suite 301, Portland, OR 97239; Phillip Kim, THE ROSEN LAW FIRM PA, 275 Madison Avenue, 40th Floor, New York, NY 10016; Jeremy Alan Lieberman, Joseph Alexander Hood, II, and Tamar A. Weinrib, POMERANTZ LLP, 600 Third Avenue, 20th Floor, New York, NY, 10016. Of Attorneys for Plaintiffs.

Kasonni Marie Scales, Peter B. Morrison, and Virginia F. Milstead, SKADDEN, ARPS, SLATE, MEAGHER AND FLOM LLP, 300 South Grand Avenue, Suite 3400, Los Angeles, CA 90071; Milo Petranovich, LANE POWELL PC, 601 SW Second Avenue, Suite 2100, Portland, OR 97204; Peter D. Hawkes, ANGELI LAW GROUP LLC, 121 SW Morrison St., Suite 400, Portland, OR 97204. Of Attorneys for Defendant LexinFintech.

**Michael H. Simon, District Judge.**

This putative class action securities fraud case is brought by shareholders (Plaintiffs) of Defendant LexinFintech, Inc. (Lexin). Plaintiffs allege that Lexin and certain of its current and former directors and officers, Jay Wenjie Xiao (Xiao), Craig Yan Zeng (Zeng), Keyi Chen, Yibo Shao (Shao), and Jared Yi Wu (Wu) (Individual Defendants), made material misrepresentations

or omissions that artificially inflated Lexin's stock price in violation the Securities Act of 1933

(the Securities Act) and the Securities Exchange Act of 1934 (the Exchange Act).

Before the Court is Defendant Lexin's Motion to Dismiss, made pursuant to Rules 9(b)

and 12(b)(6) of the Federal Rules of Civil Procedure and Section 21D(b)(1) of the Private

Securities Litigation Reform Act (PSLRA) of 1995. Lexin alleges that Plaintiffs fail to state a

claim under both Section 10(b) of the Exchange Act and Section 11 of the Securities Act. Also

before the Court is Defendant Lexin's Request for Incorporation by Reference and Judicial

Notice. For the following reasons, the Court grants both Lexin's request for judicial notice and

motion to dismiss.

## STANDARDS

### A.  Motion to dismiss

A motion to dismiss for failure to state a claim may be granted only when there is no

cognizable legal theory to support the claim or when the complaint lacks sufficient factual

allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs*.,

*Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual

allegations, the court must accept as true all well-pleaded material facts alleged in the complaint

and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-

Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629

F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint

"may not simply recite the elements of a cause of action, but must contain sufficient allegations

of underlying facts to give fair notice and to enable the opposing party to defend itself

effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all

reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon

Office Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the

plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epstein Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

A plaintiff who "makes a claim" in a complaint "but fails to raise the issue in response to a defendant's motion to dismiss" that claim, "has effectively abandoned [that] claim." *Walsh v. Nevada Dep't of Hum. Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006); *see also Maldonado v. City of Ripon*, 2021 WL 2682163, at *8 (E.D. Cal. June 30, 2021) ("Plaintiff does not address Defendants' arguments regarding punitive damages in his opposition to the motion to dismiss and therefore concedes the arguments."); *Kerrigan v. Allstate Ins. Co.*, --- F. Supp. 3d ---, 2021 WL 2389644, at *1 (C.D. Cal. June 10, 2021) ("Plaintiff also did not oppose and, thus, concedes, Defendants' argument that because Allstate Insurance was not a party to the insurance policy at issue in this action it was improperly named and should be dismissed.").

**B.  Securities Fraud Heightened Pleading Standard**

Claims asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 must satisfy the requirements of the PSLRA, codified at 15 U.S.C. § 78u-4(b). The PSLRA requires a plaintiff plead with particularity each statement or omission that is alleged to be misleading and

PAGE 3 – OPINION AND ORDER

the reasons why it is misleading. *Id.* § 78u-4(b)(1). The PSLRA also requires that a plaintiff

"state with particularity facts giving rise to a strong inference" that the defendant acted with

scienter. *Id.* § 78u-4(b)(2). "The inference that the defendant acted with scienter need not be

irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing

inferences,' but it 'must be more than merely plausible or reasonable'—it must be cogent and at

least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314,

324.

       Additionally, a complaint alleging securities fraud in a private action for damages must

satisfy Rule 9(b) of the Federal Rules of Civil Procedure. *Or. Pub. Emps. Ret. Fund v. Apollo*

*Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) ("Rule 9(b) applies to all elements of a securities

fraud action[.]"). Rule 9(b) requires that "a party must state with particularity the circumstances

constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind

may be alleged generally." Fed. R. Civ. P. 9(b). "To satisfy Rule 9(b), a pleading must identify

'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or

misleading about [the purportedly fraudulent] statement, and why it is false.'" *Cafasso v. Gen.*

*Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (quoting *Ebeid ex rel. United States*

*v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)).

## BACKGROUND

       As alleged in the Amended Class Action Complaint (Amended Complaint), this is a

putative class action on behalf of persons or entities who purchased or otherwise acquired

publicly traded LexinFintech securities (a) pursuant or traceable to the Company's initial public

offering conducted on or about December 21, 2017 (the IPO); or (b) between December 21, 2017

and August 24, 2020, both dates inclusive (the Class Period). Am. Compl. ¶ 1 (ECF 33). A

putative class seeks to recover compensable damages caused by Defendants' alleged violations

of the Securities Act and the Exchange Act. The claims asserted in this action arise under

Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o) and Sections 10(b)

and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule l0b-5 promulgated

thereunder by the Securities and Exchange Commissioner (SEC) (17 C.F.R. § 240.l0b-5).

The Amended Complaint alleges that Lexin, through its subsidiaries, purports to operate

as an online consumer finance platform for young professionals in the People's Republic of

China (China). Lexin operates Fenqile.com, a retail and online consumer finance platform that

offers installment purchase loans, personal installment loans, and other loan products, as well as

provides online direct sales with installment payment terms. *Id.* ¶ 30. Lexin also matches

consumer loans with diversified funding sources, including individual investors on its Juzi Licai

online investment platform and licensed financial institutions. *Id.* Lexin's securities trade on the

NASDAQ exchange under the ticker symbol "LX." *Id.* The Individual Defendants are or were

officers or directors of Lexin during the Class Period. *Id.* ¶¶ 18-26.[1]

On November 13, 2017, Lexin filed with the SEC a registration statement on Form F-1

for the IPO, which, after an amendment, was declared effective on December 20, 2017. *Id.* ¶ 29.

On December 21, 2017, Lexin filed a prospectus for the IPO on Form 424B4, which

incorporated and formed part of the registration statement (the registration statement, together

with all amendments, and the prospectus are referred to herein as the Offering Materials). *Id.* The

---

[1] Plaintiffs use the phrase "Exchange Act Defendants" to refer to Defendants Lexin, Xiao
(the CEO and a Director), and Zeng (the CFO). Am. Compl. ¶ 22. Plaintiffs use the phrase
"Exchange Act Individual Defendants" to refer to Defendants Xiao and Zeng. *Id.* ¶ 20. Plaintiffs
use the phrase "Securities Act Individual Defendants" to refer to all Defendants except Lexin. *Id.*
¶ 26.

Offering Materials were used to sell to the investing public approximately 12 million Lexin American depository shares (ADSs),[2] at $9.00 per ADS. *Id.*

On August 25, 2020, Grizzly Research (Grizzly) published a report (the Grizzly report) describing a number of issues that it identified with Lexin's business practices. *Id.* ¶ 8. Specifically, the Grizzly report claimed that, among other things, Lexin: (i) reports artificially low delinquency rates; (ii) issued loans with usurious interests rates, (iii) used harassment to collect on outstanding loans, (iv) conducted undisclosed related party transactions, and (v) was still conducting direct peer-to-peer lending despite claiming otherwise. The day that the Grizzly report was released, Lexin's ADSs fell $0.47 per share, or 5.52 percent, to close at $8.04 per share on August 25, 2020. *Id.* ¶ 109.

Plaintiffs here are investors in Lexin, who allege that Lexin's Offering Materials were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing its preparation. *Id.* ¶ 57. Plaintiffs additionally allege that, throughout the Class Period, Defendants made materially false and misleading statements regarding Lexin's business, operational, and compliance policies. *Id.* ¶¶ 59-102.

## DISCUSSION

### A. Request for Incorporation by Reference and Judicial Notice

Generally, courts may not consider material outside of the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Khoja v.*

---

[2] An American Depositary Share is an equity share of a non-U.S. company that is held by a U.S. depositary bank and is available for purchase by U.S. investors.

*Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). The Court, however, may

consider documents outside of and not attached to the complaint when the document is either

(1) one "which a court may take judicial notice under Federal Rule of Evidence 201"; or (2) is

"incorporated into the complaint by reference." *Louisiana Mun. Police Emps.' Retirement Sys. v.*

*Wynn*, 829 F.3d 1048, 1063 (9th Cir. 2016) (quoting *Tellabs, Inc. v. Makor Issues & Rights,*

*Ltd.*, 551 U.S. 308, 322 (2007)). Rule 201 permits the Court to "judicially notice a fact that is not

subject to reasonable dispute" because it either "is generally known within the trial court's

territorial jurisdiction" or it "can be accurately and readily determined from sources whose

accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A document may be

incorporated by reference when "the plaintiff refers extensively to the document or the document

forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th

Cir. 2003) (describing that incorporation by reference may apply where, for example, "a

plaintiff's claim about stock fraud is based on the contents of SEC filings").

      Lexin requests that the Court take judicial notice of six exhibits: (1) the Grizzly report,

(2) a copy of Lexin's ADS stock price data from August 24, 2020, to March 19, 2021,

(3) excerpts of Lexin's 2019 Form 20-F Annual Report, (4) excerpts of Lexin's 2018 Form 20-F

Annual Report, (5) excerpts of Lexin's 2017 Form 20-F Annual Report, and (6) excerpts of

Lexin's Form F-1 Registration Statement (all attached at ECF 36). Lexin argues that each of

these exhibits may be considered by the Court because each either is incorporated by reference in

the Amended Complaint or is subject to judicial notice under Rule 201 of the Federal Rules of

Evidence.

Plaintiffs do not specifically oppose Lexin's request.[3] Additionally, Plaintiffs submit similar materials, including different excerpts of the same SEC filings, although Plaintiffs do not specifically request that the Court take judicial notice of those materials. Those materials include excerpts of Lexin's 2017, 2018, and 2019 Form 20-F Annual Reports, the same documents from which different excerpts were submitted by Lexin,[4] and the executed Sarbanes-Oxley Act (SOX) Certification by Principal Executive Officer for those same Forms 20-F.[5]

## 1. Grizzly Report

Lexin requests that the Court take judicial notice of the contents of the Grizzly report (Exhibit 1), including the disclaimers provided on that report. Lexin clarifies that it seeks judicial notice only for the existence of the Grizzly report and its contents, not for the truth of its contents. *See Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 913 (N.D. Cal. 2015) (taking judicial notice of certain documents "only for their existence and the existence of their contents, not for the truth of their contents"). Because virtually all of Lexin's factual allegations are based on information from the Grizzly report, the Court finds it appropriate to take judicial notice of the existence and contents of that report, but not the truth of its contents.

---

[3] Plaintiffs docketed their response to Lexin's Motion to Dismiss as a response to both the Motion to Dismiss (ECF 34) and the Request for Judicial Notice (ECF 35), and thus the docket entry in the Court's Electronic Filing System reflects that Plaintiffs' brief is an opposition to both of Defendants' filings. *See* Docket entry for ECF 37. The document filed by Plaintiffs, however, is titled "Memorandum of Law in Opposition to Defendant LexinFintech Holding's Motion to Dismiss." ECF 37. Nowhere in that document do Plaintiffs reference Lexin's request for judicial notice.

[4] Plaintiffs' submissions have out-of-order pages and pages with differing footers. The excerpts provided by Plaintiffs, however, do not appear to overlap with the excerpts of which Lexin requests the Court take judicial notice.

[5] These same exhibits were both attached to Plaintiffs' response brief (ECF 37-1 to 37-9) and were filed as exhibits to the Declaration of Tamar A. Weinrib (ECF 38-1 to 38-10, skipping 38-5).

### 2. Stock Price Data

Lexin also requests that the Court take judicial notice of a copy of Lexin's stock price data during a specific date range (Exhibit 2). The Ninth Circuit has granted judicial notice of historic stock prices because they are "'not subject to reasonable dispute' and 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 799 (9th Cir. 2017) (citing Fed. R. Evid. 201(b)). There does not appear to be any dispute as to the accuracy of the historic stock prices for which Lexin advocates judicial notice and, given the nature of Plaintiffs' claims, the Court finds it appropriate to take judicial notice of those prices.

### 3. Lexin's Forms 20-F

Finally, Lexin requests judicial notice of various excerpts of its Forms 20-F contained in Exhibits 3-6. The Court finds that these documents are incorporated by reference in the Amended Complaint. The Ninth Circuit has applied the doctrine of incorporation by reference "to consider documents in situations where the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010). Here, the parties not only do not appear to dispute the relevance of the Forms 20-F from 2017, 2018, and 2019, but both rely on them extensively. No party has raised questions as to the authenticity of these documents. Thus, the Court may consider the relevant SEC filings.

Further, even if these forms were not incorporated by reference in the Amended Complaint, courts regularly take judicial notice "of the existence and contents of SEC filings, not the truth of the information contained in them." *Spy Optic, Inc. v. Alibaba Com Inc.*, 163 F. Supp. 3d 755, 763 (C.D. Cal. 2015); *see also In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d

1148, 1158 (C.D. Cal. 2007) ("[O]n a motion to dismiss securities fraud claims, the court may consider the full text of the relevant documents to determine whether the plaintiffs have alleged material misrepresentations or omissions, without converting the motion to a motion for summary judgment." (simplified)); *see also Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) ("When deciding a motion to dismiss a claim for securities fraud on the pleadings, a court may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC. Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents.").

## B.  Section 10(b) Claims

Section 10(b) of the Exchange Act makes it "unlawful for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations the Commission may prescribe." 15 U.S.C. § 78j. Rule 10b-5, implementing Section 10(b), states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. In order to recover damages for violations of Section 10(b) of the

Exchange Act, a plaintiff must prove:

> (1) a material misrepresentation or omission by the defendant;
> (2) scienter; (3) a connection between the misrepresentation or
> omission and the purchase or sale of a security; (4) reliance upon
> the misrepresentation or omission; (5) economic loss; and (6) loss
> causation.

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (quotation marks

omitted). Defendants argue that Plaintiffs fail to allege a material misrepresentation or omission,

scienter, and loss causation.

### 1.  Alleged Misrepresentations and Omissions

As described above, to state a claim under either Section 10(b) or Rule 10b-5, a plaintiff

must plead with particularity that a defendant has made a material misrepresentation or omission,

and such allegations are subject to the heightened pleading standards of both Rule 9(b) and the

PSLRA. Plaintiffs allege generally that Defendants made material misstatements or omissions

regarding the following five topics: a) growth metrics, b) usury and harassment, c) related-party

transactions, d) delinquency rates, and e) peer-to-peer lending. For the reasons provided below,

the Court finds that Plaintiffs have not alleged any of the purported misstatements or omissions

with sufficient particularity to state a claim under Section 10(b).

### a.  Growth Metrics

Plaintiffs allege in the Amended Complaint that "Lexin has overstated its growth metrics

for registered users," on the grounds that "web traffic remained flat, or even declined at points,

which is entirely inconsistent with the amount of growth Defendants represented[.]" Am. Compl.

¶ 44. In support of this assertion, Plaintiffs attach a reproduction of a "Baidu Index" chart "for

Fenqile"—Lexin's online platform—from January 1, 2017, through May 5, 2020, which was

contained in the Grizzly report. Plaintiffs do not allege a description or definition of the Baidu

Index, explain what that Index generally measures, or explain what the alleged chart specifically measures.

Lexin argues in its Motion to Dismiss that Plaintiffs do "not allege what the actual number of registered users or growth rate supposedly were, or provide any facts to show the figures were incorrect," and also do not "explain what was wrong with Lexin's 'growth metrics' or allege what the proper 'growth metrics' were." Plaintiffs respond by arguing about data that *Baidu Analytics*—as distinct from the Baidu Index—can provide regarding the visitors to a specific website (*e.g.*, conversions, on-page activity, and visitor demographics), although Plaintiffs did not allege facts to that effect in the Amended Complaint. Plaintiffs assert that based on that data, the "web analytics demonstrate with near certainty that Lexin could not have expanded its user base" by the amounts it claimed, because "[w]eb traffic directly and logically correlates to growth." The allegations in the Amended Complaint, however, involve a chart of the *Baidu Index*, not information from *Baidu Analytics*, and Plaintiffs do not allege any information from *Baidu Analytics* regarding the number of website visits to Lexin's website or user data, but merely include a chart of the internet search trend data from the Baidu Index.

Plaintiffs' growth metrics argument is based entirely on speculation. Plaintiffs allege only one concrete fact in their Amended Complaint: that the provided chart shows that "web traffic" as measured by the Baidu Index remained relatively flat, and thus does not match Lexin's purported growth rate. Am. Compl. ¶ 44. This allegation is insufficient for several reasons. First, Plaintiffs do not define what metric the Baidu Index measures. Plaintiffs do not allege that it measures "web traffic" in the sense of the actual number of users logging into Lexin's website. Second, the term "web traffic" can mean traffic trends over the entire internet and does not necessarily mean only traffic only on Lexin's website. Thus, Plaintiffs' do not plausibly allege

that the Baidu Index's measurement of "web traffic" means Lexin's specific website visits.

Third, Plaintiffs do not allege how "web traffic"—whether it means search term trends or

specific Lexin website visits—is so closely correlated to Lexin's growth rate such that if "web

traffic" is flat the growth rate also must be flat. There are many scenarios in which "web traffic"

could be flat and yet growth rate could increase, including users learning about Lexin from other

users and not the internet and users accessing Lexin through its app and not its website. Plaintiffs

have not adequately alleged the purported "web traffic" or why a divergence between "web

traffic" and growth rates is so instructive as to meet the heightened pleading standards to sustain

a securities class action under the statutes at issue here.

### b.  Usury and Harassment

Plaintiffs allege that "[u]nbeknownst to investors, predatory and usurious lending and

collection practices have driven Lexin's revenue growth." Am. Compl., ¶ 42. Plaintiffs also

allege that Lexin's Offering Documents, issued on December 21, 2017, pursuant to its IPO, *id.*

¶ 5, claimed that Lexin did not charge interest rates above the legal usury rate in China—36

percent, *id.* ¶ 55. Similarly, Plaintiffs allege that Defendant Zeng issued a press release with the

filing of a Form 6-K, touting the company's regulatory compliance. *Id.* ¶ 59. Plaintiffs further

allege that Lexin does, in fact, charge interest rates above the legal usury rate and that Lexin

illegally harasses "borrowers' contacts and family members as part of its collection strategy,

causing injuries both economic and physical." *Id.* ¶¶ 42-3. In support of these allegations,

Plaintiffs provide excerpts from a few online consumer complaints.[6] Two complaints are alleged

---

[6] The consumer complaints refer to loans taken out from "Fenqile" which, as described
previously, is the name of Lexin's online platform.

to support the claim that customers were charged usurious rates.[7] Two complaints are alleged to

support the claims that customers and their friends and family were harassed during the

collections process.[8] *Id.*

---

[7] The first customer complaint alleging usury reads, in relevant part, as follows:

> The borrowing amount reached RMB 30,000 plus between 2018 and 2020, and even if [I] borrowed RMB 35,000, and based on an annual interest rate of 24%, 1 year [I will have to pay] RMB 7,200, and it will be RMB 14,400 for two years. Adding the total annual interest payable of RMB 6,000 before 2018, the total interest [for me to pay] should only be about RMB 20,000. Now [Fenqile] is asking me to pay RMB 45,000, which means even if the principal of RMB 30,000 plus is paid off during these years, but the interest [on this principle] is RMB 45,000. This interest rate is much higher than the law-allowed red line, and it is usury of the usuries.

Am. Compl. ¶ 42 (brackets in original). The second reads, in part, as follows:

> In the middle of 2016, one relative used my name to borrow RMB 30,000, and the actual borrowing [from Fenqile] is RMB 30,000. During this period my relative promised to pay it back, but he/she only paid in installments or minimum payback, and until now the total payback reached RMB 15,000. During this period, the debt collection parties phoned many of the contacts on my phone, and then I realized that the current balance payable increased to RMB 50,000. I believe Fenqile belongs to usury, and it collects fees and uses the interest to grow interest under the name of installment fees.

*Id.* (brackets in original).

[8] The first customer complaint alleging harassment reads as follows:

> The outsourced loan collection company called many people in my contact list, even to my company. I have now been laid off due to this. I tried to negotiate an installment but they didn't agree and continued to aggressively call everyone on my contact list.…

Am. Compl. ¶ 43. The second reads, in relevant part, as follows:

> [T]hey contacted my family and told them about the loan issue. My mother is almost 60 years old and has always been in poor health. Upon hearing the news, she was shocked and suffered health

Lexin argues that Plaintiffs have not met their burden of proof with respect to these claims because their allegations depend on four anonymous complaints from nondescript sites on the internet that Plaintiffs copied from the Grizzly report, two complaining of usury and two complaining of harassment. Lexin contends that Plaintiffs improperly rely on anonymous sources and that the two sources for each contention are anecdotal and insufficient. Lexin also argues that it was under no duty to disclose unproven allegations of usury and harassment and that it adequately warned investors of the risks regarding collection efforts. Plaintiffs respond that these consumer complaints are cited as examples and are not the entire universe of instances where Lexin charged its borrowers usurious rates. Plaintiffs argue that Lexin's generic risk warnings are not exculpatory and that Lexin was required to disclose the use of usury and harassment in its collection efforts. Plaintiffs also contend that the customer complaints meet the standards for acceptable anonymous complaints because they are not subjective or based on inferences, but are concrete examples of objective facts.

Lexin argues that the Court should reject the anonymous customer complaints as unreliable, primarily relying on *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009), which in turn applied the reliability standard set forth in *In re Daou Systems, Inc. Securities Litigation*, 411 F.3d 1006 (9th Cir. 2005). Although those cases were addressing the reliability of confidential witnesses with respect to proving scienter, the Ninth Circuit noted in *In re BofI Holding, Inc. Securities Litigation* that the same standard applies when considering falsity. 977 F.3d 781, 787 (9th Cir. 2020) ("The shareholders

---

injuries. My father was injured as well. They also managed to call my father's new number. I don't know how they got that in the first place.

*Id.*

predicated their showing of falsity on allegations attributed to confidential witnesses who used to

work at BofI. The district court concluded that the witnesses' allegations were reliable and based

on personal knowledge, as our circuit's case law requires." (citing *Zucco Partners*, 552 F.3d

at 995)); *see also Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1036 (N.D. Cal. 2012),

*aff'd*, 561 F. App'x 598 (9th Cir. 2014) (applying *Zucco Partners* and *In re Daou* reliability

standard in evaluating falsity).

      The Ninth Circuit in *Zucco* applied the *In re Daou* standard for evaluating confidential

witness statements to the scienter element of Section 11 claims, explaining that

> a complaint relying on statements from confidential witnesses must
> pass two hurdles to satisfy the PSLRA pleading requirements.
> First, the confidential witnesses whose statements are introduced to
> establish scienter must be described with sufficient particularity to
> establish their reliability and personal knowledge. Second, those
> statements which are reported by confidential witnesses with
> sufficient reliability and personal knowledge must themselves be
> indicative of scienter.

*Zucco Partners*, 552 F.3d at 995 (citations omitted). To meet the standard of reliability, "the

complaint must provide an adequate basis for determining the witnesses in question have

personal knowledge of the events they report." *Id.* (quoting *In re Daou*, 411 F.3d at 1015). The

Court must also look at "the level of detail provided by the confidential sources, the

corroborative nature of the other facts alleged (including from other sources), the coherence and

plausibility of the allegations, the number of sources, the reliability of the sources, and similar

indicia." *Id.*

      The Ninth Circuit further warned that "vague hearsay . . . is not enough to satisfy *Daou's*

reliability standard." *Id.* at 997. The court in *Zucco Partners* also directed that "a hearsay

statement, while not automatically precluded from consideration to support allegations of

scienter, may indicate that a confidential witnesses' report is not sufficiently reliable, plausible,

or coherent to warrant further consideration." *Id.* at 997 n.4. In *Zucco Partners*, the Ninth Circuit

concluded that various hearsay statements, without sufficient details, were "vague and

unreliable," were "not detailed enough to pass muster under *Daou*," and failed to establish "the

witnesses' personal knowledge or reliability by recounting the particulars of the alleged

transgressions." *Id.* at 997-98.

The Court agrees with Lexin that the customer complaints in this case suffer from similar

defects. For the first complaint relating to usury, the borrower who asserts that he or she or is

being asked to pay 45,000 RMB interest on a 30,000 RMB loan does not explain how he or she

calculated that interest amount and thus the overall interest rate, and that it appears the customer

miscalculated the interest rate. Because the Amended Complaint does not allege any details

explaining the context of the loan or the alleged interest rate, this "unsubstantiated statement

without substance or context . . . hardly supports a claim" under the PSLRA. *Police Ret. Sys. of*

*St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014). The second customer

complaint merely uses the term "usury" without providing any details regarding the loan or the

interest rate. The complaints describing harassment are similarly too vague and conclusory to

support a claim. One asserts that an "outsourced loan company" called everyone on the

complainants contact list. The other asserts that an unidentified caller associated with Lexin

contacted the borrower's parents regarding a Lexin loan, causing harm.

Further, even if the Court were to credit the anonymous complaints, they are insufficient

because they are purely anecdotal and come from only four people out of millions of borrowers.

Because "every large company can expect to have some consumer complaints," *In re Netflix,*

*Inc. Securities Litigation*, 2005 WL 1562858, at *7(N.D. Cal. June 28, 2005), courts typically

reject the argument that "customer complaints alleging circumstances that are contrary to

defendant's representations independently suffice to establish the falsity of those representations," *Curry v. Yelp, Inc.*, 2015 WL 7454137, at *7 (N.D. Cal. Nov. 24, 2015).

In *Curry*, the plaintiffs alleged that executives of Yelp made material misrepresentations as to, *inter alia*, whether Yelp manipulated reviews in favor of certain businesses. 2015 WL 7454137, at *1. The plaintiffs compared a statement on Yelp's website claiming that there was no manipulation, and 34 consumer complaints filed with the FTC that alleged manipulation of reviews, arguing that those consumer complaints were sufficient to meet the applicable pleading standard. The Northern District of California noted that the FTC had released more than 2,000 consumer complaints for the applicable time period and that many of the applicable complaints "hinged on the customers' inferences of misconduct, rather than concrete examples of Yelp's behavior." *Id.* at *6-7. Ultimately, the court concluded that "a dozen relevant but unsubstantiated and divergent consumer complaints over at least five years does not establish a pattern of conduct sufficient to indicate that Defendants' statements were false." *Id.*

Similarly, in *In re Netflix*, purchasers of publicly traded securities of Netflix alleged that executives of the company issued false and misleading statements, causing Netflix shares to trade at artificially inflated levels. 2005 WL 1562858, at *1. Specifically, the plaintiffs alleged that Netflix made misleading statements in "claiming that its improved service resulted in a profitable and faster growing company." *Id.* at *7. The plaintiffs relied on a number of consumer complaints for the proposition that Netflix's service was "much worse than represented and was leading to consumer defections." *Id.* The court concluded that "every large company can expect to have some customer complaints, and the existence of such complaints fails to render Netflix's statements about its service false," and likewise noted that "vague and amorphous statements do

not give rise to liability for securities fraud, since reasonable investors do not consider such puffery material when making an investment decision." *Id.*

In this case, as discussed, Plaintiffs provide only two complaints claiming usury and two complaints claiming harassment. Unlike in *Netflix*, the customer complaints, as re-alleged by Plaintiffs, are more particularized than alleging mere "bad service"—these complaints allege that Lexin engages in certain practices that it claims not to do. Like in *Yelp*, however, these unsubstantiated complaints on their own are insufficient to indicate that Defendants' statements that they do not charge usury and do not harass borrowers are false. Plaintiffs argue in their response that the Amended Complaint "cites these customer complaints as *examples*, not the entire universe of" conduct Defendants claim did not occur, but Plaintiffs do not allege with any degree of particularity that many other consumers had similar complaints. Rather, the Amended Complaint merely alleges in a conclusory manner that "numerous" consumer complaints allege usurious interest rates, and cites a URL (https://ts.21cn.com/) that appears not to work. *Id.* ¶ 42.

Plaintiffs cite two cases in support of their position that the alleged customer complaints are sufficient, *3226701 Canada, Inc. v. Qualcomm, Inc.*, 2017 WL 4759021 (S.D. Cal. Oct. 20, 2017) and *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017 (N.D. Cal. 2016). In *Qualcomm*, the plaintiffs brought claims against the manufacturer of a microprocessor used in Samsung smartphones, which plaintiffs alleged had debilitating problems with overheating. *Qualcomm*, 2017 WL 4759021, at *2. The court found that the plaintiffs adequately plead falsity, where the complaint alleged widely reported concerns with manufacturing the microprocessor in *Forbes* and the *Wall Street Journal* due to overheating issues and consumer complaints of various related operating problems. *Id.* at *21. In *Robb*, the plaintiffs challenged Fitbit's claims as to the accuracy of its heart rate tracking devices. 216 F. Supp. 3d at 1023. Fitbit argued that

"the customer complaints, studies, and confidential witness statements in the Amended

Complaint do not suffice to prove that Fitbit's devices could not do what they claimed to do." *Id.*

at 1029. The court disagreed, and specifically distinguished *Curry* and *In re Netflix*, noting that

the plaintiffs did not rely exclusively on consumer complaints to establish the veracity of their

allegations, but rather on "multiple and varying sources," including consumer complaints. *Id.*

The plaintiffs in both those cases, however, relied on various other sources in addition to

consumer complaints to support their allegations. Here, Plaintiffs allege no facts—like studies

and confidential witnesses as in *Robb* or widespread publication of the issues such as in

*Qualcomm*—other than the consumer complaints to support their contention that Lexin charges

usurious rates or engages in harassment. Although Plaintiffs are correct that the alleged wrongs

described in the consumer complaints appear to be more concrete than the customer service

complaints alleged in *In re Netflix* and the inferences of misconduct in *Curry*, four anonymous

Internet complaints, standing on their own, without any additional corroborating facts, are not

sufficient to meet the heightened pleading standard required of a securities class action. Plaintiffs

have not cited any cases in which a court found that the mere existence of consumer complaints

is sufficient to demonstrate falsity. *See, e.g.*, *Mahapatra v. True Car, Inc.*, 2015 WL 12552062,

at *1 (C.D. Cal. Dec. 9, 2015) ("[T]he mere existence of consumer complaints does not establish

that TrueCar misrepresented that it guaranteed prices to customers."). Based on the foregoing,

the Court finds that Plaintiffs have not plead sufficient facts to maintain their Section 10(b) claim

based on usury and harassment.

### c. Related-Party Transactions

Under applicable SEC regulations, a company is required to disclose any transaction that

exceeds $120,000 in which the company took part in that fiscal year in which a "related person"

had a direct or indirect material interest. 17 C.F.R. § 229.404(a). A "related person" includes

company officers, directors, and any security holder with a five percent or greater interest, and their immediate family members. *Id.*, Instruction 1.

Plaintiffs allege that Lexin improperly failed to report various related-party transactions, described below, contending that this failure violated both applicable SEC regulations and Generally Accepted Accounting Principles (GAAP), which includes similar disclosure requirements.[9] Plaintiffs use the word "transactions" in this context, but the word "relationships" seems more appropriate, as none of the facts Plaintiffs allege are, in fact, transactions, but rather relationships from which Plaintiffs seem to infer that transactions took place. These alleged relationships, or transactions, concern various directors and subsidiaries of two seemingly separate companies: Beihai Caidan and Defendant Lexin. Plaintiffs allege that an individual named Yang Tao owns 50 percent of and is the legal representative of Beihai Caidan, while also serving as the Vice President of Lexin. Am. Compl. ¶ 37. Plaintiffs also allege that an individual named Yuan Kai is a 25 percent owner of Beihai Caidan and serves as the legal representative of multiple branch offices of a subsidiary of Lexin. *Id.* Plaintiffs allege that Lexin subsidiary

---

[9] Under Accounting Standards Codification (ASC) 850-10-50-1, a company's "[f]inancial statements shall include disclosures of material related party transactions." Examples of related party transactions include those between a parent company and its subsidiaries, subsidiaries of a common parent, an entity and its principal owners, management, or members of their immediate families, and affiliates. ASC 850-10-05-3. An "affiliate" is defined as "[a] party that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an entity." ASC 850-10-20. Applicable SEC regulations provide that "[f]inancial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate[.]" 17 C.F.R. § 210.4-01(a)(1). Plaintiffs do not appear to argue that the SEC regulations and the GAAP requirements governing related-party transactions impose different requirements, except that GAAP does not include a minimum transaction amount to trigger disclosure. As this Opinion and Order makes clear, the Court's disposition of Plaintiffs' related-party transaction allegations does not depend on the threshold amount required by the applicable SEC regulations, but rather whether Plaintiffs have adequately alleged that any "transaction" took place. Because both require that an underlying transaction took place, the Court does not discuss the potential differences in duties imposed by the SEC regulations and GAAP.

Shenzen Fenqile owns a 92 percent interest in one of Beihai Caidan's subsidiaries, Tianjin Lexin Insurance. *Id.* ¶ 38. Based on these relationships, Plaintiffs allege the following "transactions" that Plaintiffs contend are improper related-party transactions:

### i. Copyright Ownership

Plaintiffs allege that a subsidiary of Beihai Caidan called Beihai Juzi owns the copyright of the website for a Lexin subsidiary called Lexin Caifu. Am. Compl. ¶ 38. Lexin in its Motion to Dismiss notes that this allegation does not concern any "transaction," but rather merely alleges that a relationship between two subsidiaries exists. Plaintiffs do not address this argument in their Response, and their allegations fail to demonstrate a related-party transaction.

### ii. Beihai Jiguang

The next allegation concerns a subsidiary of Beihai Caidan called Beihai Jiguang. Plaintiffs allege that, in 2018, Beihai Jiguang had around 20 million RMB from loan collection services—services that Plaintiffs allege Beihai Jiguang provided to Lexin. Am. Compl. ¶ 107. Lexin notes that Plaintiffs give no tangible reason to conclude that Lexin was a participant or in any way involved in any of Beihai Jiguang's transactions. In their Response, Plaintiffs argue that, even if Lexin accounted for only 4 percent of Beihai Jiguang's loan collection services, that that would still meet the $120,000 requirement of the applicable SEC regulations. Plaintiffs claim that it is a "reasonable inference" that at least some of Beihai Jiguang's services were provided to Lexin, because Yang Tao and Yuan Kai both hold executive positions in Lexin (as described above) and because Beihai Caidan and Shenzen Fenqile jointly own Tianjin Lexin Insurance. In its Reply, Lexin again notes that Plaintiffs have not alleged any purchases, sales, or other transactions between these entities, but rather assumes that those transactions took place because the entities are related as described. Lexin appears to be correct that Plaintiffs do not allege adequately that any qualifying related-party transaction took place here, but rather merely

infer that, due to the relationship between the entities, *some* transactions *must* have occurred. These allegations are not sufficient to meet the applicable pleading standards.

### iii. Ji'an Microcredit

Ji'an Microcredit (Microcredit) is jointly owned by two subsidiaries of Lexin. Plaintiffs allege Ji'an Microcredit is the same company as one called Ji'an Aojuxun (Aojuxun), and that Aojuxun is 80 percent owned by Xiao Wenjuan, an immediate family member of Defendant Xiao. Am. Compl. ¶ 41. Plaintiffs allege that Aojuxun and Microcredit share the same phone number, email address, and physical address, and that those facts give rise to the inference that the two companies are, in fact, the same. *Id.* Lexin argues that Plaintiffs do not demonstrate why two companies sharing contact information somehow suggests that a transaction took place such that would trigger the reporting requirements. As Lexin notes, the fact that two companies share a business address and certain contact information does not necessarily establish that they are the same company, or have common ownership or control. *In re Sandridge Energy, Inc.*, 2013 WL 12094274, at *10 (W.D. Okla. Sept. 11, 2013) (the allegation that defendant shared an address with a participant in a transaction failed to establish that the defendant "itself was a party to any undisclosed transaction or financial relationship"). As above, Plaintiffs rely on inferences of transactions that are not sufficiently particularized to meet the pleading standards. Even assuming that these two companies are related, Plaintiffs do not allege even an inference that a qualifying transaction occurred between them.

### iv. Conclusion

Based on the descriptions of Plaintiffs' alleged "transactions," none constitute related-party transactions within the meaning of the applicable SEC regulations or GAAP, such that Defendants would have been required to make any disclosures regarding these transactions, or

relationships. Thus, Plaintiffs fail to allege actionable omissions or misstatements regarding related-party transactions.

### d. Delinquency Rates

Plaintiffs assert in their Amended Complaint that the COVID-19 pandemic has "caused default rates at traditional banks to skyrocket as borrowers suffered severe economic downturns." Am. Compl., ¶ 48. Because "Lexin lends to borrowers that are characteristically subprime and higher risk borrowers that did not qualify for a traditional bank loan," Plaintiffs allege that "[d]elinquency rates would therefore logically surpass those of a traditional bank loan," but Lexin's reported delinquency rates do not. *Id.* ¶ 50. Plaintiffs further allege that, during the pandemic, Lexin "engaged in practices such as artificially increasing the maturity of loans upon default through features called 'installment on installment' and 'minimum payment,' which means [Lexin] is not accurately booking delinquencies." *Id.* ¶ 50. Lexin argues that Plaintiffs plead no facts to support this allegation, but rather merely claim that it is a logical inference based on Lexin's "subprime and higher risk borrowers." Lexin also notes that installment on installment and minimum payment options had been available to borrowers long before the pandemic began, and the availability of those options had been fully disclosed.

As with their assertions regarding growth metrics, Plaintiffs' allegations regarding delinquency rates are entirely based on speculation. Plaintiffs provide no evidence to support their position other than asserting that, because of the pandemic, Lexin's delinquency rate could not possibly have been as low as was reported.[10] The fact that Lexin's delinquency rates were not

---

[10] The Amended Complaint alleges that consumer default rates at some banks increased during the pandemic from 1 percent to 4 percent, ¶ 48, and that Lexin's delinquency rates should "logically surpass those of a traditional bank," because Lexin "lends to borrowers that are characteristically subprime and higher risk," ¶ 50. Specifically, the Amended Complaint describes that certain Defendants represented that the 90-day delinquency rate as of March 31, 2020, was 2.57 percent, ¶¶ 97-98, and that the seven-day delinquency rate was 3.7 percent, ¶ 98.

quite in lockstep with the market is not sufficient to meet the heightened pleading standards for a securities class action.

### e. Peer-to-Peer Lending

Plaintiffs explain in their Amended Complaint that beginning in July 2015 the Chinese government has cracked down on peer-to-peer lending. Plaintiffs allege that Defendants represented in November 2019 that Lexin no longer facilitated new loans with funding from individual investors on one of its platforms. Am. Compl. ¶¶ 46-7. Plaintiffs claim that Defendants continued facilitating such loans despite this representation, and provide an undated[11] screenshot of what Plaintiffs purport represents a facilitated peer-to-peer loan. *Id.* ¶ 47. Plaintiffs do not provide any factual allegations beyond the one unexplained screenshot, taken directly from the Grizzly report. Plaintiffs do not allege that they have additional information—whether by way of screenshots, consumer complaints, or any other corroborating information—to support their claim that Lexin has continued to facilitate peer-to-peer lending. Lexin argues that the single screenshot is insufficient to meet the pleading standards, because Plaintiffs fail to allege sufficient facts to support that the screenshot even shows a peer-to-peer loan or that the purported transaction took place after November 2019.

Neither party cites any authority for their position on the question of whether a single, out of context screenshot suffices to meet the heightened pleading standard of Rule 9(b). In the context of considering a witness, however, the Ninth Circuit has held that a "single statement by

---

Later that summer, Defendants announced that the 90-day delinquency rate was 2.99 percent as of June 30, 2020, and that the seven-day delinquency rate was 2.32 percent. ¶¶ 100-101.

[11] Although the Amended Complaint does not allege a date with respect to this screenshot, the Grizzly report identifies the date the pictured transaction occurred as "July 8." ECF 36-1 at 14. It does not, however, identify a year.

a lone witness . . . . without substance or context. . . . hardly supports a claim[.]" *Police Ret. Sys. of St. Louis*, 759 F.3d at 1063. Additionally, like with their pleading regarding usury and harassment, Plaintiffs do not allege with the requisite particularity the details of this transaction. Rather, the Amended Complaint merely states that Lexin continues—contrary to its assertions—to facilitate peer-to-peer loans, and inserts one screenshot with the vague introduction, "*See, e.g.*" as the factual basis for that allegation. Further, the screen shot is undated and Plaintiffs do not allege the date of this purported peer-to-peer transaction or otherwise allege that it occurred after Lexin's November 2019 statement that it no longer facilitated such transactions. This one out-of-context screenshot is not sufficient to meet the requisite pleading standards for a Section 10(b) claim.

### 2. Scienter

The PSLRA requires that a plaintiff "state with particularity facts giving rise to a strong inference" that the defendant acted with scienter. 15 U.S.C. § 78u-4(b)(2). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,'" but it "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 324 (2007).

"Scienter may be established . . . by showing that the defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements." *Gebhart v. S.E.C.*, 595 F.3d 1034, 1041 (9th Cir. 2010). Recklessness in this context is "'deliberate recklessness' or 'conscious recklessness,' and . . . it includes 'a subjective inquiry' turning on 'the defendant's actual state of mind.'" *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1093 (9th Cir. 2010) (quoting *Gebhart*, 595 F.3d at 1042)). The Ninth Circuit has

defined the required deliberate or conscious recklessness in the context of a securities fraud case as:

> a highly unreasonable omission, involving . . . an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. [Additionally,] the danger of misleading buyers must be actually known or so obvious that any reasonable man would be legally bound as knowing.

*In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014) (quotation marks and citation omitted) (first alteration in original).

In evaluating scienter, courts must look at the complaint in its totality and not just the individual allegations of scienter. *See Zucco Partners*, 552 F.3d at 991 ("Thus, a court now reviewing a complaint's scienter allegations under the PSLRA must 'consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.' The court must determine whether '*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" (emphasis in original) (quoting *Tellabs*, 551 U.S. at 322-23) (citation omitted)); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("[A] court should look to the complaint as a whole, not to each individual scienter allegation as *Silicon Graphics* suggests. Thus, *Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation.").

It is well-settled law in the Ninth Circuit that "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and

related to the fraud." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008). The Ninth Circuit has recognized two narrow exceptions to this general rule and, in some circumstances, has found that a defendant's role in a company may give rise to an inference of scienter where a plaintiff's allegations are "particular and suggest that defendants had *actual* access to the disputed information" or "in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Police Ret. Sys. of St. Louis*, 759 F.3d at 1062 (quoting *S. Ferry*, 542 F.3d at 785-86) (emphasis added). In both exceptions, the nature of the alleged misrepresentations must be so clear, that it is essentially obvious that management must have known of the falsity of the information. Additionally, "corporate scienter relies heavily on the awareness of the directors and officers." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008) (quotation marks).

With respect to SEC filings, the Ninth Circuit has held that the fact that a corporate official signed a SOX certification is insufficient to raise a strong inference of scienter. *Zucco*, 552 F.3d at 1003-04 ("[A]llowing Sarbanes-Oxley certifications to create an inference of scienter in 'every case where there was an accounting error or auditing mistake made by a publicly traded company' would 'eviscerat[e] the pleading requirements for scienter set forth in the PSLRA.'" (citing *Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1266 (11th Cir. 2006))). The Ninth Circuit has reached a similar conclusion regarding GAAP violations, holding that "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *DSAM Glob. Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 390 (9th Cir. 2002) (quoting *In re Software Toolworks Inc.,* 50 F.3d 615, 627 (9th Cir. 1994)). For GAAP violations to give rise to a strong inference of scienter, a plaintiff "must allege facts

demonstrating that defendants 'knowingly and recklessly engaged in an improper accounting practice,' for example, that a company's external auditors counseled against a practice or that a company's CFO was aware that the practice was improper." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) (quoting *Metzler,* 540 F.3d at 1068-69).

Plaintiffs have not, for the most part, made specific scienter allegations with respect to each individual alleged misstatement. Rather, Plaintiffs allege generally that "[b]y virtue of their positions at Lexin, [Defendants] had actual knowledge of the materially false and misleading statements and material omissions alleged herein" or, alternatively, that Defendants "acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to" them. Am. Compl. ¶¶ 144-145. Those general, non-specific allegations do not give rise to a strong inference of scienter that is "as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 324.

In addition to those general allegations, Plaintiffs make two tangible scienter arguments in their Response—(1) that the statements contained in the SOX certifications "contribute to a compelling inference of scienter" because of the representations made by Defendants in those disclosures and (2) that Defendants' GAAP violations give rise to an inference of scienter. The Amended Complaint, however, does not include particularized allegations that representations made in SOX certifications or GAAP violations give rise to inferences of scienter—Plaintiffs make those assertions for the first time in their Response to the Motion to Dismiss. This is insufficient to state a claim for relief.

Even if Plaintiffs had adequately alleged in the Amended Complaint that the SOX certifications contained misrepresentations and that representations in SOX certifications gave

rise to an inference of scienter, the Ninth Circuit, as described above, has previously rejected that argument. *See Zucco*, 552 F.3d at 1003-04. Similarly, even if Plaintiffs had adequately alleged in the Amended Complaint that Defendants violated GAAP with respect to alleged related-party "transactions" and that such violations give rise to an inference of scienter, the Ninth Circuit has also rejected that argument. *See Lloyd*, 811 F.3d at 1207. Plaintiffs do not make any distinguishing arguments on either point. Neither alleged misrepresentations in SOX certifications nor GAAP violations are sufficient, standing alone, to give rise to an inference of scienter and so Plaintiffs' newly-raised contentions, even if contained in the Amended Complaint, would be insufficient to show scienter.

With respect to the remaining alleged misrepresentations, Plaintiffs have not pleaded sufficient facts to avail themselves of either exception to the general rule that a management position alone is insufficient to establish scienter. Notwithstanding the Court's conclusion that Plaintiffs have not met the required pleading standard with regard to any of the alleged misstatements, none of those misstatements are so clearly false or so integral to the company's functioning that an inference of scienter is appropriate.

### 3. Loss Causation

The Ninth Circuit has discussed the pleading requirements for loss causation as follows:

> Broadly speaking, loss causation refers to the causal relationship between a material misrepresentation and the economic loss suffered by an investor. [*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)]. Ultimately, a securities fraud plaintiff must prove that the defendant's misrepresentation was a "substantial cause" of his or her financial loss. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005). At the pleading stage, however, the plaintiff need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors. *Metzler Inv. GMBH v.*

> *Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008). In
> other words, the plaintiff must plausibly allege that the defendant's
> fraud was "*revealed* to the market and *caused* the resulting losses."
> *Id.* at 1063 (emphasis added).

*Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (emphases in original); *see also*

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119 (9th

Cir. 2013) ("Typically, to satisfy the loss causation requirement, the plaintiff must show that the

revelation of that misrepresentation or omission was a substantial factor in causing a decline in

the security's price, thus creating an actual economic loss for the plaintiff." (quotation marks

omitted)).

Plaintiffs allege that the Grizzly report constitutes a "corrective disclosure" which

"reveal[ed] new information to the market that has not yet been incorporated into the price," *In

re BofI*, 977 F.3d at 794, causing a decline in Lexin's stock price. The Ninth Circuit has adopted

a "flexible approach to evaluating corrective disclosures," where the disclosure is based on

publicly available information. *Id.* at 794-95. Some information, the Ninth Circuit recognized,

"although nominally available to the public, can still be 'new' if the market has not previously

understood its significance." *Id.* at 794. The Ninth Circuit also held, however, that "[t]o rely on a

corrective disclosure that is based on publicly available information, a plaintiff must plead with

particularity facts plausibly explaining why the information was not yet reflected in the

company's stock price." *Id.* The court assumes without deciding that Plaintiffs sufficiently allege

that the information combined in the Grizzly report was sufficiently disparate and complex that it

is only "nominally public" information and thus provided new information to the market.

Under *In re BofI*, however, even assuming the Grizzly report was new information, it is

not plausible that the market would view it as a corrective disclosure. The Ninth Circuit

discussed several specific blog posts in *Seeking Alpha* and noted that even though the posts

included only "nominally public" information, some of them "required extensive and tedious

research involving the analysis of far-flung bits and pieces of data." *Id.* The court determined

that "[t]he time and effort it took to compile this information make it plausible that the posts

provided new information to the market, even though all of the underlying data was publicly

available." *Id.* The Ninth Circuit, however, held:

> We nonetheless conclude that the shareholders have not plausibly
> alleged that these posts constituted corrective disclosures. Even if
> the posts disclosed information that the market was not previously
> aware of, it is not plausible that the market reasonably perceived
> these posts as revealing the falsity of BofI's prior misstatements,
> thereby causing the drops in BofI's stock price on the days the
> posts appeared. The posts were authored by anonymous short-
> sellers who had a financial incentive to convince others to sell, and
> the posts included disclaimers from the authors stating that they
> made "no representation as to the accuracy or completeness of the
> information set forth in this article." A reasonable investor reading
> these posts would likely have taken their contents with a healthy
> grain of salt.
>
> Therefore, the shareholders have not plausibly alleged that any of
> the *Seeking Alpha* blog posts constituted a corrective disclosure.

*Id.*

The Ninth Circuit held in *In re BofI* that, even where a plaintiff adequately alleges that an

anonymous short-seller has compiled new information not reasonably available to average

market participants, the fact that that information comes from a short-seller with financial

incentive to create a market adjustment and that the disclosure included disclaimers, means that a

reasonable market would likely not rely on that information such that it would constitute a

corrective disclosure. *Id.* Similar to posts at issue in *In re BofI*, the Grizzly report was issued by

anonymous, self-interested short sellers[12] and the report contained a broad disclaimer on every

page:

> The report and all statements contained herein are the opinions of
> Grizzly Research, and are not statements of fact . . . Grizzly
> research . . . has a direct or indirect short position in the stock . . .
> of the company covered herein, and therefore stands to realize
> significant gains in the event that the price of LX's stock declines.
> Therefore, use Grizzly Research's research at your own risk. You
> should do your own research and due diligence before making any
> investment decision with respect to the securities covered herein.
> The opinions expressed in this report are not investment advice nor
> should they be construed as investment advice or any
> recommendation of any kind.

ECF 36-1.

The Ninth Circuit in *In re BofI* concluded that a reasonable investor, reviewing short-

seller accounts containing similar disclaimers, would "likely have taken their contents with a

healthy grain of salt," and that, as such, those reports did not constitute corrective disclosures. *In

re BofI*, 977 F.3d at 794; *see also Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1208-09 (9th

Cir. 2020) (concluding that an article written by an anonymous short-seller based on publicly

available information, which required no specialized skills and included disclaimers about the

accuracy and completeness of the information did not constitute a corrective disclosure);

---

[12] Plaintiffs asserted at oral argument that Grizzly is not "anonymous" because the
Grizzly website identifies its owner and operator, Siegfried G. Eggert. The site also, however,
states that the "analyst team consists of trained account[ant]s, economists, and engineers," and
thus it does not appear that Mr. Eggert is necessarily the author of the Grizzly report. Plaintiffs
also argued that, although Grizzly itself is a short-seller, the Grizzly report is not a "short-seller
report" within the meaning of *In re BofI*, because the information contained in the report came
from people without short positions in Lexin. Plaintiffs did not, however, *allege* any facts with
respect to the authorship or sources of the report. Further, Plaintiffs raised these arguments for
the first time at oral argument, and thus they are untimely and waived. For all these reasons, the
Court rejects these arguments by Plaintiffs. In deciding the pending motion, the Court considers
the Grizzly report as authored by an "anonymous short-seller," as the *Seeking Alpha* posters were
considered in *In re BofI*.

*Mulquin v. Nektar Therapeutics*, 510 F. Supp. 3d 854, 873 (N.D. Cal. 2020) ("But even if the

Report disclosed new information, the [report] . . . was published by an anonymous short seller

who had a financial interest in driving [the company's] stock price down and who disclaimed

any representation, express or implied, as to the accuracy, timeliness, or completeness of any

such information or with regard to the results obtained from its use. The Court thus concludes

that it is not plausible that the market reasonably perceived the Plainview Report as revealing the

falsity of the challenged statements." (simplified)). Thus, as described in *In re BofI* and its

progeny,[13] even if the Grizzly report revealed new information that the market had not

previously taken into account, it is not plausible that investors would perceive the Grizzly report

as revealing the falsity of statements by Lexin and its officers and directors. Plaintiffs have not

alleged sufficient facts that would allow the Court to conclude otherwise.

## C.  Section 11 Claims

Section 11 of the Securities Act, 15 U.S.C. § 77k, "gives purchasers of securities a right

of action against an issuer or designated individuals, including securities underwriters, for any

material misstatements or omissions in a registration statement." *Cal. Pub. Employees' Ret. Sys.

v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2044 (2017) (hereinafter *CalPERS*) (quotation marks

omitted); *see also In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013)

(Section 11 "provides a cause of action to any person who buys a security issued under a

materially false or misleading registration statement."). To prevail in a Section 11 action, "a

plaintiff must prove '(1) that the registration statement contained an omission or

misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would

---

[13] Plaintiffs conceded at oral argument that they had not cited any cases since the Ninth Circuit's decision in *In re BofI* that have found a short-seller's report sufficient on its own to establish loss causation on a Section 10(b) claim.

have misled a reasonable investor about the nature of his or her investment.'" *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (quoting *In re Daou*, 411 F.3d at 1027). "A claim under section 11 based on the omission of information must demonstrate that the omitted information existed at the time the registration statement became effective." *Id.* at 1164. "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Like with Section 10(b) claims, claims made pursuant to Section 11 require a plaintiff adequately to allege a material misrepresentation, but, unlike Section 10(b) claims, a plaintiff need not demonstrate scienter or loss causation to maintain a Section 11 claim. *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996).

## 1.  Statute of Repose

Lexin argues that this Court should dismiss Plaintiffs' Section 11 claims because those claims are barred by the applicable statute of repose. Section 11 claims are subject to the time limitations found in Section 13, which provide that claims under Section 11 must be brought within three years of the security's public offering. 15 U.S.C. § 77m ("In no event shall any such action be brought to enforce a liability created under section 77k . . . of this title more than three years after the security was bona fide offered to the public. . ."). The Supreme Court has held that Section 13 "admits of no exception and on its face creates a fixed bar against future liability." *CalPERS*, 137 S. Ct. at 2049. "[T]he object of a statute of repose, to grant complete peace to defendants, supersedes the application of a tolling rule based in equity." *Id.* at 2052.

Lexin's IPO occurred on December 21, 2017, and thus the three-year statute of repose expired on December 21, 2020. The original putative class action plaintiff in this case, Robert Solis, filed the First Complaint (ECF 1) in this action on September 9, 2020, and did not assert a

Section 11 claim. On September 18, 2020, Solis filed an amended putative class action complaint, which did allege claims under Section 11. ECF 4 at 31, ¶¶ 67-74 ("Count I: Violations of Section 11 of the Securities Act Against All Defendants"). On October 12, 2020, the parties filed a stipulated scheduling request, asking that the Court not require Defendants to answer the September 18th First Amended Complaint and instead extend Defendants' time to respond until after naming a lead plaintiff and lead counsel, and after the forthcoming lead plaintiff files a further amended complaint. ECF 6. The Court entered a scheduling order in line with the parties' stipulation. ECF 12. On November 9, 2020, Lead Counsel filed the motion to appoint Matthew Castner as Lead Plaintiff (ECF 17), which the Court granted in its Order Appointing Lead Plaintiff and Approving Counsel (ECF 30) on November 19, 2020. In that same order, the Court directed Lead Plaintiff to file a Second Amended Complaint within 60 days. ECF 30. Defendants were not required to answer or respond to the September 9th original complaint (ECF 1) or the September 18th amended complaint (ECF 4), but instead were permitted to wait until after lead plaintiff and lead counsel filed the third complaint. Pursuant to the Court's Order, Lead Plaintiff filed the Amended Complaint on January 19, 2021 (ECF 33), which is the third complaint filed in this case.

Lexin originally argued that the first complaint in this action filed on September 9, 2020, did not assert a Section 11 claim and that the Section 11 claim was not added to this case until January 19, 2021. Plaintiffs responded with a convoluted argument about how Lead Counsel filed a putative class action on September 11, 2020, in New Jersey on behalf of a different plaintiff (Ernesto Vela) that alleged a Section 11 claim, and that the day after Lead Counsel filed the motion to appoint the current Lead Plaintiff, Matthew Castner (ECF 17, filed November 9, 2020), Lead Counsel dismissed the New Jersey case. Plaintiffs also argued that the motion to

appoint Castner discussed the Section 11 claim (albeit tangentially by referencing the Securities

Act, not Section 11 specifically), and thus the January 19, 2021, Complaint in this case can relate

back to the September 11, 2020, complaint in the New Jersey case. In its reply, Lexin

acknowledged in a footnote that the Section 11 claims were included in the September 18th

amended complaint (ECF 4), but argued that "the relation-back doctrine does not apply to the

statute of repose" and that that amended complaint "was filed by a different plaintiff, upon

whose filing Plaintiff cannot rely." The Court issued a minute order directing the parties to be

prepared to more specifically address the September 18, 2020, amended complaint and its effect

on Lexin's motion under the statute of repose at oral argument. ECF 43.

As Lexin notes, an action is "brought" "when a particular complaint is filed in a

particular court," and a party may not rely on a filing "in a separate forum, on a separate date, by

a separate named party" as "the same 'action,' 'proceeding,' or 'suit'" for purposes of the statute

of repose. *CalPERS*, 137 S. Ct. at 2054. The September 18, 2020, amended complaint, however,

was filed in this action, in this court. In *CalPERS*, the plaintiff had been a member of a putative

class action, but elected to withdraw and proceed in a separate suit filed more than three years

after the relevant securities offering, seeking recovery on the same bases as the original class

action. *Id.* at 2047. The plaintiff argued that its individual suit was timely "because the filing of

the class-action complaint 'brought' petitioner's individual 'action' within the statutory time

period." *Id.* at 2054. The Supreme Court disagreed, noting that, in the plaintiff's view, "the

bringing of the class action would make any subsequent action raising the same claims timely,"

and that plaintiff's argument was limitless and implausible. *Id. CalPERS* is inapposite to the

pending case, in which a putative class action plaintiff files an amended complaint asserting a

PAGE 37 – OPINION AND ORDER

claim and then a court appoints a different lead plaintiff in the same case, who files a further amended complaint asserting the same claim.

Lexin also cites *In re Petrobas Securities Litigation*, 116 F. Supp. 3d 368 (S.D.N.Y. 2015), for the same proposition. In *Petrobas*, in the case on appeal, the plaintiff had not asserted the Section 11 claim until after the statute of repose. *Id.* at 385. The court stated: "Nor does the 'relation back' doctrine apply, so plaintiffs may not rely on the complaint filed by a different plaintiff, the City of Providence, in one of the related cases." *Id.* Here, however, the claim was raised in a timely manner by Plaintiff Solis on September 18, 2020. Lead Plaintiff Castner's January 19, 2021, Amended Complaint simply restates an existing claim in this case.[14]

Lexin is correct that neither the filing of Plaintiffs' Lead Plaintiff motion nor the now-dismissed New Jersey case constitute Lead Plaintiff "bringing" his Section 11 claim. Here, however, the original putative class action plaintiff, Solis, filed the First Amended Class Action Complaint in September 2020, before the applicable statute of repose expired. Lexin does not cite any authority for the proposition that the appointment of a lead plaintiff in a putative class action turns the case into one so separate from the original that the lead plaintiff may not rely on the originally brought claims to satisfy the statute of repose, and nothing in either *CalPERS* or *Petrobas* supports that argument.[15] The Court, therefore, finds that Plaintiffs' Section 11 claims are not barred by the statute of repose and turns now to the merits of those claims.

---

[14] The parties acknowledged at oral argument that, had the Court appointed Solis as Lead Plaintiff, there would be no argument that the statute of repose would bar the Section 11 claims.

[15] During oral argument on this Motion, Lexin brought several other cases to the Court's attention, most notably *De Vito v. Liquid Holdings Group, Inc.*, 2018 WL 6891832 (D.N.J. Dec. 31, 2018), and *Peifa Xu v. Gridsum Holdings, Inc.*, 2021 WL 773002 (S.D.N.Y. Feb. 23, 2021), both of which were cited briefly in Lexin's Motion. Neither of these cases, however, are on point. In *De Vito*, the co-lead plaintiffs timely asserted a Section 11 claim, which the court held they lacked standing to assert. 2018 WL 6891832, at *18. Another plaintiff—the "trust plaintiff"—did possess standing, but had been added to the action after the statute of repose had

## 2. Alleged Misstatements or Omissions

The dispositive question in a Section 11 analysis is whether Plaintiffs have alleged that, at the time that the Offering Materials were issued, statements included therein were materially false or misleading or there was a material omission. As described above, the Court found that Plaintiffs had not adequately alleged material misstatements or omissions to maintain their Section 10(b) claims. Plaintiffs' Section 11 claims are based on those same alleged misstatements and omissions. Even assuming, however, that Plaintiffs did allege actionable misstatements, for the reasons set out below, the Court additionally finds that Plaintiffs have not adequately alleged that the Offering Materials issued pursuant to Lexin's IPO were materially false or misleading.

---

run. *Id.* at 22. The court held that, because "no party asserted a *viable* claim within the statute of repose period" and "the Trust Plaintiff's addition to the suit was untimely[, u]nder the statute of repose, the Trust Plaintiff had no cause of action to assert." *Id.* (emphasis added). Lexin does not contend that the original Lead Plaintiff in this case—Solis—lacked standing to bring the Section 11 claims. Additionally, unlike the trust plaintiff in *De Vito*, the current Lead Plaintiff in this case was appointed before the statute of repose ran. In *Peifa Xu*, the court held that the timely filing of a Section 11 claim based on certain alleged misstatements did not render timely a later Section 11 claim based on different alleged misstatements. 2021 WL 773002, at *8. Although it is not abundantly clear which of the numerous factual claims Plaintiffs allege specifically relate to their Section 11 claims, both the September 18th complaint (ECF 4) and the Amended Complaint (ECF 33) allege that the Offering Documents made false or misleading statements regarding Lexin's growth and failed to disclose alleged related-party transactions. ECF 4, ¶ 25; ECF 33, ¶ 57. At oral argument, Lexin argued that the two complaints are not sufficiently similar, citing *Peifa Xu*. Specifically, Lexin stated generally that the Amended Complaint alleged GAAP violations and usury and harassment in debt collection practices, but the September 18th Complaint did not. Upon the Court's review, however, the September 18th Complaint did allege that Lexin failed to disclose related party transactions and, although it did not allege GAAP violations specifically, the GAAP violation alleged in the Amended Complaint appear to involve the same related party transactions as described in the September 18th Complaint. ECF 4, ¶¶ 52-53; ECF 33, ¶¶ 36-41. Likewise, the September 18th Complaint excerpts extensively from the Grizzly report, including the statement that "[t]here are countless complaints about usurious interest rates . . . and predatory collection practices." ECF 4, ¶ 50. That the Amended Complaint explains these factual allegations in more depth does not mean that the two complaints are so dissimilar that Plaintiffs may not rely on the September 18th Complaint.

### a. Growth Metrics

With respect to Lexin's growth metrics, Plaintiffs allege that, since Lexin's IPO, it reported growth metrics inconsistent with web traffic. Am. Compl. ¶ 44. Plaintiffs lay out in detail the history of Lexin's reported growth rates from the company's Forms 6-K and 20-F, as well as public statements made by the Individual Defendants. Despite this degree of detail provided with respect to Lexin's reported growth, however, Plaintiffs do not provide the same degree of detail to their allegation that those reports were false or misleading. Instead, as discussed with respect to their Section 10(b) claim, Plaintiffs offer one screenshot purporting to show flat "web traffic" (a term Plaintiffs do not define, much less with particularity), and summarily allege, at various points, that Defendants misrepresented Lexin's "growth strategy," Am. Compl. ¶ 57, and "growth metrics," *id.* ¶¶ 7, 62, 67, 71, 73, 75, 77, 82, 87, 89, 91, 96, 99, 102. Essentially, paragraphs 54 through 102 of the Amended Complaint are merely a laundry list of Defendants' various representations of its growth rate, peppered with the occasional paragraph stating in a conclusory manner that various of those representations, including those regarding growth metrics, were false.

Although Plaintiffs' allegations regarding Lexin's growth metrics do appear to encompass Lexin's growth before and after the IPO in December 2017, it is not clear to the Court what, precisely, Plaintiffs allege Lexin misrepresented in its offering statements regarding its growth rate. The heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure requires that a plaintiff do more than quote a defendant's statement and declare it to be false. *See Rubke*, 551 F.3d at 1161 (explaining that, under Rule 9(b), "the complaint must 'set forth what is false or misleading about a statement, and why it is false.'" (quoting *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999))). Plaintiffs have not plead with the requisite particularity that Defendants made any material misrepresentations regarding Lexin's growth

rate, and additionally have not adequately plead that any of those alleged misrepresentations were made in the Offering Documents issued pursuant to Lexin's IPO.

### b.  Usury and Harassment

With respect to usury and harassment, as explained at length with respect their Section 10(b) claim, Plaintiffs rely on four anonymous consumer complaints to allege that Lexin charged usurious interest rates and harassed borrowers in collecting on outstanding loans. As pertains to their Section 11 claims, Plaintiffs allege that "the Offering Documents represented that, '[c]urrently, none of our loans has an annual interest rate exceeding 36%,' which constitutes usury in China." Am. Compl. ¶ 55 (alterations in Amended Complaint). Plaintiffs go on to allege that the Offering Documents were materially false or misleading insofar as "Lexin misrepresented its growth strategy and the causes of its competitive edge, which included usurious lending and harassment of borrowers' friends and family for collection purposes, thus raising a risk of regulatory scrutiny and/or reputational damage[,] including negative publicity and customer complaints[.]" *Id.* ¶ 57.

None of the consumer complaints provided, however, are sufficiently particular to support this allegation. One of the complaints claiming harassment is undated, and references collection efforts by an "outsourced loan company," without explaining its connection to Lexin. *Id.* ¶ 43. The second complaint claiming harassment references only "April 24th," with no year identified. *Id.* Two anonymous, undated complaints are not sufficiently particular to support Plaintiffs' allegation that Lexin did, in fact, harass its borrowers, much less that Defendants omitted material information regarding that alleged harassment from the 2017 Offering Materials.

Although the two complaints claiming usury provide a bit more detail, they are likewise not sufficient to demonstrate, under the heightened pleading standard, that statements in Lexin's

Offering Documents were materially false or misleading. The first seems to describe that the

consumer took out a loan of around RMB 30,000 in about 2018, but that the total interest on that

loan as of the writing of the complaint—a date which Plaintiffs do not allege—was RMB 45,000.

*Id.* ¶ 42. Plaintiffs do not allege any facts that would permit the Court to consider that single

loan, taken out in 2018 and whose terms are not clearly explained, as sufficient to maintain a

Section 11 claim based on Offering Materials issued in 2017. The second claim similarly

describes that, in 2016, a relative of the complainant used the complainant's name to borrow

RMB 30,000, but that, as of the writing of the complaint, the payable balance was RMB 50,000.

*Id.* This complaint is undated, and Plaintiffs have not alleged whether this loan was outstanding

at the time the Offering Materials were issued, or any other facts that would permit the Court to

find that the Offering Materials made material misstatements regarding their interest rates based

on this vague complaint on its own. The Court concludes, based on the foregoing, that the four

vague, undated complaints Plaintiffs provide are not sufficient plausibly to allege that the

Offering Materials contained material misstatements or omissions regarding usury and

harassment.

### c. Related-Party Transactions

As described above, Plaintiffs allege that various related-party transactions took place

that Lexin failed to disclose as required. First, Plaintiffs allege that a subsidiary of Beihai

Jiguang owns the copyright for the website of one of Lexin's subsidiaries. Am. Compl. ¶ 28.

Second, Plaintiffs allege that Beihai Jiguang provided 20 million RMB worth of loan collection

services to Lexin in 2018.*Id.* ¶ 107. Third, Plaintiffs allege that in May 2019 Lexin subsidiary

Jiangxi Leyu acquired a 34 percent stake in Ji'an Microcredit, a company formerly 100 percent

owned by a different Lexin subsidiary, and that Ji'an Microcredit is the same company as Ji'an

Aojuxun, which is 80 percent owned by an immediate family member of Defendant Xiao. *Id.* ¶ 41.

Although Plaintiffs allege that the Offering Materials contained false statements or omissions because "Lexin engaged in undisclosed related party transactions, contravening GAAP, and also raising a risk of audit or challenge by the [Chinese] tax authorities," *id.* ¶ 57, none of the transactions that Plaintiffs claim Lexin was required to disclose took place before the issuance of the Offering Materials. Even assuming both the truth of these allegations and that these scenarios constitute related-party transactions requiring disclosure, Plaintiffs cannot rely on transactions that took place in 2018 and 2019 to argue that Lexin's Offering Materials, issued in December 2017, contained a material misstatement or omission under Section 11.

### d.  Delinquency Rates

Plaintiffs do not allege that Lexin underreported its delinquency rates in its Offering Materials. Rather, Plaintiffs allege only that Lexin has underreported its default rates since the beginning of the COVID-19 pandemic, based on the characteristics of Lexin's borrowers as compared to traditional lending institutions. Am. Compl. ¶ 50. Even assuming the truth of those allegations, manipulation of default rates beginning in 2020 cannot serve as the basis for a Section 11 claim pursuant to a December 2017 IPO.

### e.  Peer-to-Peer Lending

Plaintiffs allege that Lexin continued to facilitate peer-to-peer loans after it represented that it would no longer do so in November 2019. Am. Compl. ¶ 46-7. Even assuming that Lexin did continue to offer such loans after representing that it would not, misrepresentations that occurred in 2019 cannot form the basis of a Section 11 claim based on Offering Materials issued in 2017. Plaintiffs do not allege that any statements in the Offering Materials were false or misleading with respect to peer-to-peer lending.

PAGE 43 – OPINION AND ORDER

**D.  Sections 15 and 20(a) Claims**

Section 15 of the Securities Act and Section 20(a) of the Exchange Act permit causes of action against certain individuals based on violations of Section 11 of the Securities Act and Section 10(b) of the Exchange Act, respectively. In its Motion to Dismiss, Defendant Lexin notes that, to the best of its knowledge, the remaining defendants—individuals Xiao, Zeng, Chen, Shao, and Wu—all live in China, have not been served with the Amended Complaint, and are not represented by counsel. Lexin clarifies that it brought the Motion to Dismiss on behalf of itself only but that because, in its view, the Amended Complaint fails to state a claim under either Section 11 of the Securities Act or Section 10(b) of the Exchange Act, Plaintiffs' Section 15 and Section 20(a) claims must fail as well. *See Curry*, 2015 WL 7454137, at *14 ("A claim under section 20(a) can only survive if the underlying predicate Securities Exchange Act violation also survives."). In their response to the Motion to Dismiss, Plaintiffs state that they are still attempting to serve the Individual Defendants, but do not respond to Defendants' contention that, if their Section 11 and Section 10(b) claims fail, then their Section 15 and Section 20(a) claims necessarily do as well.

Lexin is correct that claims under both Section 15 and Section 20(a) require an underlying primary violation of the securities laws. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012); *see also Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Plaintiffs offer no other response than that they are attempting to serve the individual defendants. Thus, Plaintiffs concede any argument that their Section 15 and Section 20 claims would not fail were their Section 11 and Section 10(b) claims dismissed. *See Walsh v. Nevada Dep't of Hum. Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006). Based on the foregoing conclusions that Plaintiffs' Section 10(b) and Section 11 claims must be dismissed, the Court also concludes that Plaintiffs' Section 15 and Section 20(a) claims will be dismissed as well.

**CONCLUSION**

The Court GRANTS Defendant Lexin's Request for Incorporation by Reference and Judicial Notice (ECF 35). The Court also GRANTS without prejudice Defendant Lexin's Motion to Dismiss (ECF 34). Plaintiffs may file an amended complaint within 30 days from the date of this Opinion and Order if Plaintiffs believe they can cure the deficiencies identified herein.

**IT IS SO ORDERED**.

DATED this 24th day of November, 2021.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge